UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,　　*　　　　Docket Number:
　　　　　　　　　　　　　　　　22-CR-00109-LJV-HKS-1
　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　*　　　　Buffalo, New York
　　　　　　　　v.　　　　　　*　　　March 10, 2023
　　　　　　　　　　　　　　*　　　10:32 a.m.
　　　　　　　　　　　　　　*
PAYTON GENDRON,　　　　　　　*　　　STATUS CONFERENCE
　　　　　　　　　　　　　　*
　　　　　Defendant.　　　　　*
　　　　　　　　　　　　　　*
* * * * * * * * * * * * * * *

CORRECTED TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:　　　　　TRINI E. ROSS,
　　　　　　　　　　　　　　UNITED STATES ATTORNEY,
　　　　　　　　　　　　　　By JOSEPH M. TRIPI, ESQ.,
　　　　　　　　　　　　　　　BRETT A. HARVEY, ESQ.
　　　　　　　　　　　　　　　LAURA BLAKEMORE GILSON, ESQ.,
　　　　　　　　　　　　　　Assistant United States Attorneys,
　　　　　　　　　　　　　　Federal Centre,
　　　　　　　　　　　　　　138 Delaware Avenue,
　　　　　　　　　　　　　　Buffalo, New York  14202,
　　　　　　　　　　　　　　Appearing for the United States.


For the Defendant:　　　　　FEDERAL PUBLIC DEFENDER'S OFFICE
　　　　　　　　　　　　　　By ANNE M. BURGER, ESQ.,
　　　　　　　　　　　　　　　SONYA A. ZOGHLIN, ESQ.,
　　　　　　　　　　　　　　Assistant Federal Public Defender,
　　　　　　　　　　　　　　28 East Main Street,
　　　　　　　　　　　　　　Suite 400,
　　　　　　　　　　　　　　Rochester, New York  14614.
　　　　　　　　　　　　　　And
　　　　　　　　　　　　　　By MARYBETH COVERT, ESQ.,
　　　　　　　　　　　　　　Assistant Federal Public Defender,
　　　　　　　　　　　　　　300 Pearl Street,
　　　　　　　　　　　　　　Suite 200,
　　　　　　　　　　　　　　Buffalo, New York  14202.

The Courtroom Deputy:          LLANE M. GUIDOTTI

The Court Reporter:            BONNIE S. WEBER, RPR,
                               Notary Public,
                               Robert H. Jackson Courthouse,
                               2 Niagara Square,
                               Buffalo, New York  14202,
                               Bonnie_Weber@nywd.uscourts.gov.


              Proceedings recorded by mechanical stenography,
                   transcript produced by computer.


                   (Proceedings commenced at 10:32 a.m.)


          THE CLERK:  All rise.

          The United States District Court for the Western

District of New York is now in session.  The Honorable H.

Kenneth Schroeder, Jr. Presiding.

          THE COURT:  Be seated, please.

          THE CLERK:  This is United States versus Peyton

Gendron, Docket Number 22-CR-109.  This is a status conference.

          Assistant United States Attorneys Joseph Tripi, Brett

Harvey and Laura Blakemore Gilson appearing on behalf of the

Government.

          Assistant Federal Public Defenders Anne Burger, Sonya

Zoghlin and MaryBeth Covert appearing on behalf of defendant.

          Defendant's appearance is waived.

          THE COURT:  Good morning.

          MR. TRIPI:  Good morning, Your Honor.

MS. ZOGHLIN:  Good morning, Your Honor.

THE COURT:  We're here for a status conference.  I know there was a conference held before Judge Vilardo, who is the trial judge to whom this case has been assigned.

And I'm aware of the proceedings that occurred in that appearance and I know I had indicated that the parties should be prepared to start talking about a scheduling order today, when I set this date for the status conference.

Since then, a motion has been filed on behalf of the defendant, which I understand he waives his appearance, correct?

MS. ZOGHLIN:  That's correct.

THE COURT:  Seeking to have this case declared to be a complex litigation, which necessitates more than the amount of time that is usually attributed for the prosecution and completion of the prosecution.

And the most substantial basis for that labeling is the multiple terabytes of digital discovery material that has been turned over to the defense and that the defense is trying to get through.

In analyzing the situation up to this date, having a great deal of familiarity with it, since I had it even before the formal charges were made by reason of the numerous search warrants that were returned, I have concluded that this is a case that should be labeled complex litigation.

And in doing that, I am also of the opinion that it's

reasonable for defense counsel to continue functioning in their representation of the defendant, so as to provide the defendant with effective assistance of counsel.

That this, in fact, is a death penalty case, I think they have that obligation as attorneys, until such time as the Government indicates otherwise.

And because it's reasonable for them to proceed on the basis that it's a death penalty case, they have a further obligation in meeting their responsibilities professionally to the defendant to provide effective assistance of counsel by going through all of that discovery material, not only for purposes of the issue of guilt or innocence, if there is to be a trial on that, but more importantly on the issue of mitigating circumstances as to why the death penalty should not be imposed at a trial by a jury.

And in order to develop the mitigation evidence or basis, they have to go through that material for that purpose as well.

And that's basically been designated by the American Bar Association and by judicial opinions in other types of death penalty cases.

In that context, the Government is involved in the decision-making process.

As I understand it from the last meeting, the first step, that is the local meeting between defense counsel and the

U.S. Attorneys Office, has been conducted, wherein and whereby the defense tries to convince the U.S. Attorney that the death penalty should not be sought.

And the Government takes into account whatever is presented on behalf of the defendant in that regard and uses that in evaluating what report and recommendation the U.S. Attorneys decides to make to the Attorney General or the Attorney General's designee as to the decision on a death penalty application.

We are now awaiting the second step, as I understand it, which would be the scheduling of the meeting in Washington between the defendant's counsel and the Department of Justice personnel, who do the review and evaluation process as to whether the death penalty should be sought or not.

Has a date been set for such a second meeting?

**MR. TRIPI:**  No, Your Honor.  The deliberative process between the assistant Attorney General and the U.S. Attorney is still underway.

There has not been a recommendation made at this point, therefore, there is no date for that next meeting yet.

**THE COURT:**  All right.  Knowing that, I'm not trying to tell anybody how to defend or how to prosecute.  That's not my job.

But I do have to try and keep this thing moving, not only for the benefit of the defendant as well as the Government,

but for the benefit of the public.

And in that context -- and I know you recognize this Mr. Tripi, but I want to make sure the record is clear and the public understands, the Government does have a -- an obligation to exercise due diligence in the evaluation process of whether a death penalty should be carried out or whether the Government is going to decide not to.

Now, as we all know, due diligence is a nice legal term, but it has a lot of degrees to it, and so I have to leave it to the Executive Branch, Department of Justice, U.S. Attorney's Office to guide its actions in keeping with that principal --

**MR. TRIPI:**  I can --

**THE COURT:**  -- but I'm not setting any kind of deadlines.

**MR. TRIPI:**  I understand, Your Honor.  We can assure the Court that we're exercising that diligence that the Court would expect of us.

We just received supplemental mitigation information last week from the defense.  We're not going to cut them off when they choose to provide us with additional information.

It's just the nature of the review.  They can submit supplemental information at any point in time, so we're taking that all in and treating it with the seriousness that this case deserves.

THE COURT: Now, the motion that was filed on behalf of the defendant, was a copy of that served on the Government?

MS. ZOGHLIN: Yes.

THE COURT: Okay. So you will know what I'm talking about, then, as to what the defense is claiming with respect to the volume of discovery material that they are now trying to process through?

MR. TRIPI: Yes. And when the Court provides us, I would like to respond today and make a record for the Court, whenever you give us that opportunity.

THE COURT: Okay. The motion was filed under seal and so in making your response, I assume it's going to be addressed solely to the issue of time needed and the discovery information that's the subject of the request for time?

MR. TRIPI: Yes. I -- the motion contains some numbers and data. I have some numbers and data that I can provide the Court.

And just -- I will note, though, from -- initially from my review of the motion, I don't think it's a motion that needs to be under seal, frankly.

It doesn't discuss anything that's the substance of any of the discovery, so we do think this is something that can be filed publicly.

But that being said, I can keep my comments at a high enough level right now to -- to not get into anything that

was -- delve into your protective order that we crafted and the Court has entered.

But as you indicated, Judge, the motion deals with whether the case is a complex case.  And we do agree that the nature of the death penalty and the prospective of capital punishment merits a complex case designation, so we don't object to that.

That being said, though, this case has been treated by this Court and Your Honor as a complex case from the inception.

When these atrocities occurred on May 14, 2022, that was 300 days ago, this Court had the foresight to assign these defense counsel that very day.

That occurred before Mr. Harvey and I were even beginning to work on the case, these counsel were assigned.

So they had a head start and we're aware that it's been 299 days since they started their mitigation investigation by meeting with witnesses to get a history of their client.

And they conducted interviews the Sunday after these shootings happened -- these murders, so that was 299 days ago.

The complaint was filed June 15, 2022.  It's been 268 days since the complaint was filed.

We provided them with discovery -- very focused, searchable, organized discovery, the very next day, June 16, 2022.

That discovery included the defendant's manifesto, as

both recovered from his laptop and online, and that included the body camera footage of three of the arresting officers.

Now, later, the discovery and the terabytes they talked about, we gave them everyone's body camera footage.

But at the complaint, they had the three who actually handled him. And then there was a fourth that was relevant and we isolated that for them.

So out of the over a hundred body cameras, the terabytes they tell you about, four are relevant.

**THE COURT:** Well, I've been assuming that included in the terabyte description were all of the materials seized pursuant to the numerous search warrants that were issued, including social media accounts, e-mail accounts.

**MR. TRIPI:** Yes. And I'll get to that, Your Honor, and, again, I'll keep it high level, but the discovery was very focused.

I would contend at the complaint stage, the defense had his whole discord diary, but they had already had it because it was published in multiple media outlets because he released it online.

So before the complaint was even filed, I'm sure the defense knew what was in that discord diary, that we then again provided them in discovery at the complaint stage and then reprovided it post-indictments.

You signed the search warrant that we did for that,

but it was already publicly disseminated, because he posted it online.

THE COURT:  Let me ask you --

MR. TRIPI:  I do have more record to make.

THE COURT:  Yes, but let me ask you this:  At the moment, then, up to this point, had the Government gone through all of that material for the purposes of looking for Brady material?

MR. TRIPI:  I'll get to that.  We will answer.  We have gone through and I'll explain the Brady process in a moment.

THE COURT:  All right.

MR. TRIPI:  The indictment was June -- July 14, 2022. It's been 239 days since indictment.

Getting back to how this Court has treated this as a complex case from inception, normally -- first, let me backup to the complaint -- normally, this Court doesn't give any time on the complaint.

You gave the parties time on the complaint for discovery to be produced and reviewed.  There was time built in.

Normally, the Court doesn't do that.  This Court was treating it as a complex case.

Then at the indictment stage, the indictment's returned July 14, 2022, this Court and every judge in this courthouse normally sets a scheduling order at arraignment.

Your Honor didn't do that.  Your Honor treated this as a complex case.  It's been 239 days since indictment, with no scheduling order set.

Again, this Court treated it as a complex case, even without the designation.

In fact there has been no case that I'm aware of in this district since I've been practicing in it -- and if someone can come up with one, then I stand corrected -- but I'm not aware of any case that has gone 239 days without a scheduling order being entered.

Last week -- so let me step back again, for the discovery.  Once it got to the indictment stage, Your Honor, we produced every Grand Jury transcript; all of them.  There is over 30.  You can read those in a day.

We produced the search warrant affidavits unredacted for every search warrant you signed.  You can read all those in another day.  You know it, because you signed them.

The returns on those were distilled and isolated.  I worked line-by-line on the discovery.  So although it sounds complex, the way it was portrayed, and it is voluminous, there is no doubt about that, it is organized.

It came to them much better than we received it.  We then sat with them and went through it again, after they had it.

In terms of Brady, the reason they can cite to you all the subpoenas that were returned was because we produced every

subpoena return the Grand Jury had, whether it was relevant or not.

And that's because our discovery -- essentially opened file discovery in this case, was to demonstrate a negative to the defense.

Instead of dealing with what we would later contend would be frivolous Brady motions, we gave them everything. They can see it for themselves, to prove a negative, essentially, to the defense, right from the outset.

Consistent with the indictment, there are no accomplices. There are no co-conspirators. They have everything, essentially, that we have and I said that last week to Judge Vilardo.

They should be ready to try it, at least to the guilt phase. So, yes. They have a lot of other social media and a lot of other accounts that don't mean a whole hell of a lot, but they have it because we had it, because we acquired it to make sure in a case like this that no one else was involved.

And guess what, we have an indictment with one defendant. And this defense team has been working with the State defense team under the same ethical obligations that resulted in a guilty plea and a sentencing already.

They have to -- they had to comply with those ethical obligations before he entered a plea in State court.

You know from the orders you signed authorizing us to

share information, as well as the Grand Jury judge in this courthouse, 90 percent or more of the information that formed the State prosecution was Federal search warrants returned information, Federal investigation and whoever else they put in their Grand Jury.

It's almost all of the same stuff.  And that case is done and sentenced.  So are we really to say we're not in a position to set a scheduling order in this case?

It's been 169 days since we produced indictment discovery.  And a lot of that volume are volumes of Tops cameras for days and days that don't capture the two minutes.

The relevant two minutes is captured on video and it was streamed to the Internet.  And probably everyone in this courtroom saw it before there was a Federal charge.

Under the Crime Victims' Rights Act, there are 13 victims and family members of victims who deserve dignity and respect, and that includes moving this case along, as your -- this Court and Judge Vilardo have indicated.

We're not asking for much.  We're asking for a scheduling order to be set, because we've been reasonable.

Just last week, we sent the defense a proposed schedule, and I'll lay out the time frames we proposed, but instead of getting a response and working with us on something that was reasonable, we got a sealed motion at 4:06 p.m. yesterday.

We got an e-mail back saying we're going to file a motion and that motion, rather than working with us on dates, that would be reasonable.

I'm going to let you know the dates we proposed for this Court's consideration.

We proposed -- although voluntary discovery is already complete and has already been done, we proposed April 3, 2023, to complete that process, subject to the parties continuing discovery obligations under Rule 16C.

We proposed May 3, 2023 for defense motions with respect to discovery.

We proposed Government responses to those defense discovery motions, if applicable, by May 31, 2023.

We proposed that the defense have an opportunity to file Constitutional motions regarding capital punishment, motions to dismiss or strike.  And for the defense to provide reciprocal discovery by July 14, 2023.

And those are standard-type motions that are filed in many of these mass-shooting-type cases.  It's a review of the indictment and the allegations and the sufficiency and capital punishment.

It doesn't need to be tethered to review of discovery, those types of motions.

We proposed Government response to defense Constitutional motions regarding capital motion and motions to

dismiss or strike by August 11, 2023.

We proposed defense replies by August 25, 2023.

We proposed defense pretrial motions --

**THE COURT:**  Wait a minute, wait a minute.  You said August 5th for --

**MR. TRIPI:**  August 25th for the defense replies.

**THE COURT:**  August 25th.

**MR. TRIPI:**  We proposed defense pretrial motions to suppress and other pretrial motions not specified above -- so anything else they want to file, by October 6, 2023.

And Government responses by November 6, 2023.

We think those are reasonable.  The bulk of their motions are set out six months, which would be well over a year from the time they had complaint discovery, and almost a year since they had indictment discovery.

And so we think that schedule or something similar to that, laid out in that manner, is appropriate.

We think this case has been treated as a complex case since its inception and we think that this Court should set some type of scheduling order.

Thank you.

**THE COURT:**  Defense?

**MS. ZOGHLIN:**  Thank you, Judge.  Let me start with the most basic:  The disagreement that I think we have with the Government, and that is their assertion that they gave us more

than they needed to.

And I'm not saying that's not true. What I'm saying is they have given us -- it's true, they agree they have given us 4.1 terabytes, but a lot of that is not relevant, so we don't need -- I guess then the implication is we don't need to review it.

So, for example, they gave -- Mr. Tripi said we gave them over a hundred body worn cameras, but only four are relevant.

Well, it's our job to decide that, so it's our job to review them, so that we can decide what's relevant, so that we can give our client the representation that he deserves, that he's legally entitled to, that the ABA guidelines require us to give him.

In that respect, the Government also mentioned the plea in State court. And I believe what Mr. Tripi said is that the State team had the same ethical obligations as we do.

Totally incorrect. They did not. This is a potentially capital case. That was not.

The guidelines are specific to potentially capital cases. It is entirely different. The approach that one would need to take to a potentially capital case, to one that is not a capital case.

Mr. Tripi also said that they essentially have the same stuff, as we -- that we have the same stuff as the State

did in terms of discovery.

Also, not true.  We have much more than the State was given.

So getting back to the amount that we were given, 4.1 terabytes -- I think it's hard to even envision that what amount is.  It's certainly hard for me to envision it.

**THE COURT:**  Let me interrupt you at this point.

**MS. ZOGHLIN:**  Certainly.

**THE COURT:**  On the police officer body cameras, I'm assuming those are videos that were taken on the day of the event, when the defendant was arrested.

**MR. TRIPI:**  Yes.  There are -- if I can just jump in. There is one from another day when he got a speeding ticket, March 8th, when he traveled from Conklin to Buffalo.

That was publicly reported, so I'm not revealing anything there.

There is a couple minutes of State trooper body camera footage from when he was pulled over and he received a ticket March 8th.

That was one of the days prior to May 14th, when he traveled here, but the remainder are from the day of the event.

**THE COURT:**  Am I not correct that he was arrested on the day of the shooting?

**MR. TRIPI:**  Yes.  He walked out of the store and was arrested.

**THE COURT:**  Obviously, I have not seen any of this and I will not be seeing any of this, but it would seem to me that there is a defined period of time on the day in question, as far as those body cameras are concerned, from the time the police arrived and they arrested the defendant, I would assume was a matter of --

**MR. TRIPI:**  It was minutes.

**THE COURT:**  I was going to say an hour or less.  And assuming that to be the case, I would think that there was a large amount of volume to be reviewed as to those body camera videos.

So when we're talking about terabytes, I'm trying to breakdown the terabytes as to the core pieces of discovery and it would seem to me that the body camera videos would be core pieces of discovery for the purposes of the defense.

I understand that the rest of it starts to go over to the question of mitigation, but I'm just trying to keep these compartmentalized so-to-speak.

There are body cameras --

**MS. ZOGHLIN:**  Right.

**THE COURT:**  -- discovery.  There are search warrant discovery; there are social media discovery.

**MS. ZOGHLIN:**  Right.  And all --

**THE COURT:**  I think the volume -- correct me if I'm wrong, the volume is really going to be -- the digital volume is

going to be in the social media, which would include all of the social media platforms, Internet, e-mail chats, all of that is where I suspect the major volume is.

**MS. ZOGHLIN:** I think that's accurate, Judge. And that is a massive volume.

**THE COURT:** I'm not saying it isn't. I'm once again compartmentalizing.

**MS. ZOGHLIN:** Right. And I think the Court is absolutely correct about that.

And just to put it in perspective, that is the bulk of the discovery; all of which we need to review.

So a very small portion of the discovery, for example, is the 55,164 pages of reports, so that's the small amount and then the larger amount are all the digital discovery.

I think that the most significant point here, Judge, is we don't have the luxury of saying, well, that's probably not relevant; we don't need to look at it.

We do not need to look at it. We do need to look at it. We are legally, Constitutionally, ethically obligated to look at all of it.

**THE COURT:** Let me ask you this: Has any kind of search protocol been created?

**MR. TRIPI:** In terms of what, Judge?

**THE COURT:** Like a word search protocol or artificial intelligence app that can screen -- that kind of thing, to speed

up the process?

MR. TRIPI:  No.  I mean, they were provided everything that came back on the warrant.

THE COURT:  All right.  So then my question is to the defense:  Has there been any kind of protocol developed by the experts in conducting a search of all this digital material?

MR. TRIPI:  I should correct my statement for just a moment.

With respect to the social media search warrants, for example, the agents reviewed it, carved and scoped what you're attachment B authorized, and what was produced in discovery to be -- for example, they would receive a folder that says: Scoped, relevant.  That's the attachment B stuff.

And then they also received another folder that says: Here is the whole return, in case there is other stuff that they think is Brady.

You know, so they received the scoped -- that's the attachment B relevant to --

THE COURT:  So it would be like a search warrant for the defendant's Google account?

MR. TRIPI:  Right.

THE COURT:  We want everything in the Google account to be turned over.

And the analogy I always use is, it's a file cabinet of four drawers of file information.  You turn over the four

drawers; somebody who is not connected with the prosecution will go through those four drawers to review what's there, so they can then glean from that only that which the search warrant covers as far as turning over to the Government for prosecution for the crimes charged.

MR. TRIPI:  Well, I think -- sort of.  I think that conflates two things.

That would be the situation if there was a filter review; if there was privileged information.

You are not getting that with social media, so what happened was the agents review it -- so in your analogy, four drawers, one drawer is relevant, that becomes attachment B.

Here's the scoped folder of the stuff that's authorized under the warrant.

Here's the other three drawers, defense.  You go through it if you want.  The first drawer was the drawer we were authorized to seize and this is what we are using as relevant evidence in the prosecution.

THE COURT:  Right.

MR. TRIPI:  We delineated with each account, with each search warrant those in that way.  And that's why -- that's another reason why they have so much.

As opposed to just giving them attachment B, the scoped relevant information, what if they think we're wrong?

Going back to your Brady question, and what's relevant

to them; we gave them scoped, as well as the complete for them to review.

**THE COURT:**  I understand the Government's position and I also understand what the defense is saying.

The defense is saying, Judge, we can't take the word -- not that they are questioning the word, but we can't just accept what the Government says, this is all that's relevant.

We have an obligation to make that determination ourselves.

**MR. TRIPI:**  Which is why we provided everything.

**THE COURT:**  I understand, but that's what I understand defense counsel to be saying.

Yeah.  The Government might say this is all that's relevant, but we would be derelict in just accepting that, because the Government has got an objective to prosecute.

They have an obligation to defend.  And in order to provide effective assistance of counsel for the defendant, they have to review all of it.

That's what I understand the defense to be saying.

**MS. ZOGHLIN:**  That's exactly right, Judge.  That is what I'm saying.

I would just add in terms of the amount of discovery, in addition to the social media, that there are also multiple devices that were imaged and need to be processed and reviewed.

So for example, the most significant of which are our client's laptop, desktop, cell phone, but there are also multiple other devices that are relevant to the investigation.

**THE COURT:**  I kind of put that under the search warrant heading, because the search warrant covered the seizure of devices.

And as I say, there were a number of search warrants that I signed.  And I know that there were search warrants signed by other judges in different locations in the Northern District and perhaps elsewhere.

**MS. ZOGHLIN:**  The other thing I just wanted to mention, Judge, you asked the question about -- sort of a system of review.

And I just wanted to refer the Court to the ex parte filing that we made that sets forth what it is we've done and what it is we need to do and generally what's needed to be done to this sort of digital forensic evidence before it can be reviewed.

So I would refer the Court to the specific information in that affidavit or declaration in response to the Court's question.

I would also just say, Judge, one of the things -- one of the additional things that the Government stated in Mr. Tripi's record for the Court was that the family members deserve dignity and respect.

And we absolutely agree with that.  And we would also say that all parties and the public and, certainly, the family members deserve to have this process done properly and done once.

And that is also in our motivation in making these applications to the Court.

**MR. TRIPI:**  Judge --

**THE COURT:**  Now --

**MR. TRIPI:**  -- the last thing that I would like to say, is that we are -- just to put a finer point on it --

**THE COURT:**  First of all, let me say, it won't be the last thing you say, but go ahead.

**MR. TRIPI:**  We are not disputing that the defense needs time to review the material.

The only difference here, Judge, is that we think we are far enough down the road to set a reasonable and realistic scheduling order.

And that they can continue to work towards the schedule that the Court sets that's realistic and reasonable.

Even if you disagree with the time frames that we've proposed, enough time has passed and enough review and diligence has been implemented to set some type of scheduling order.  I think that's the only disagreement we have.

**THE COURT:**  I understand.  And I'm going to ask the defense counsel about the proposed scheduling order the

Government has indicated.

What I am trying to balance -- and I emphasize the word balance -- is if I put a scheduling order in place, that's one thing.

But that, as I view it, does not necessarily hold the Government's feet to the fire in making the decision as to whether there is going to death penalty or not.

Because once the scheduling order is in place, playing devil's advocate for the moment, the Attorney General can say, well, let's see what they file and what that plays out to be, and so forth and so on, so I don't have to make a decision right away.

Once again, I'm not trying to tell anybody how to do their job, but I -- I emphasize due diligence on the part of the Government's obligation in this decision-making process.

I'm not trying to rush the making of that decision by any means, but I'm trying to keep it on track, as well.

I don't want it to get put to the side because we're now focusing on a scheduling order, because I think everybody will agree if the decision is made not to seek the death penalty, there is going to be a plea and this case is over and done with, and there won't be any need for further review of discovery material or anything else.

So let me ask you this, Counsel, about the proposed dates that have been suggested by the Government for a

scheduling order.

As I have it, the Government is suggesting that we use the date of April 3, 2023, for the Government to complete all discovery.

Although they -- well, pardon me, they indicated they turned over just about everything.

And that then any motions with respect to or relating to discovery -- for example, but not limited to, we haven't gotten whatever we're looking for in the way of we know a device that was seized and reviewed and we don't see any information that was obtained from that.

Or the basic garden variety demand for a Bill of Particulars or 401 -- 404(b) material, whatever -- those kinds of motions relating to discovery to be filed by May 3, 2023.

**MS. ZOGHLIN:** Could I just comment on that, Judge?

**THE COURT:** Sure.

**MS. ZOGHLIN:** I think that that's a good place to start, which is sort of at the same time that I think the Government concedes that we couldn't possibly have had time to review all the discovery we received, we should make motions in a month and after half regarding what discovery we didn't receive.

It just is not -- it would be humanly impossible to have reviewed the discovery before then, such that we could then make a discovery motion.

I think that's sort of the beginning of why we think that this schedule is entirely unrealistic.

**THE COURT:**  Well, I was kind of narrowing the discovery motion concept down not to; we didn't get everything in the package that was turned over to us, but more in the along the lines of we want a Bill of Particulars.

The Government has already represented they turned over all the Grand Jury transcripts, so that eliminates that standard motion.

Brady, Giglio, Jencks materials, they have an obligation to turn over, they claim they turned it over by turning everything they had over.

There is no co-conspirators.  There is no informant. I mean, the standard -- the standard discovery motions are pretty much narrowed down.

**MS. ZOGHLIN:**  Well, I -- first, I would say, Judge, that we don't anticipate filing a standard discovery motion.

**THE COURT:**  Okay.  But that's what I was treating the May 3rd date as being.

Am I incorrect, Mr. Tripi?

**MR. TRIPI:**  Yes.

**THE COURT:**  I am incorrect?

**MR. TRIPI:**  No.  You are correct.  That's what the date would be.

And I suppose if they don't want to file those motions

on the schedule, then they don't have to file the motions.

**THE COURT:**  No.  What we're trying to clarify is what is covered by that date, that motion.

What is -- what is to be addressed?

As I understood it, it would be the standard-type discovery motions.

**MR. TRIPI:**  Yeah.  Rule 16, Bill of Particulars and anything else that they wanted to raise.

**THE COURT:**  That's what I'm saying.

**MS. ZOGHLIN:**  But just --

**THE COURT:**  Let's all be patient.

**MS. ZOGHLIN:**  There is nothing simple or standard about that.

Part of that would be a motion -- motions regarding what we think they should have turned over that they didn't turn over.

We wouldn't say, specifically -- you know, the Government has an obligation to turn over Brady material. Please make sure you've done that.

These will be very much tailored to this case.  That's what a good lawyer does.  That's certainly what we would have an obligation to do in this case, so --

**THE COURT:**  Okay.  So just so the record is clear, you will recall when he was arraigned on the initial appearance on the complaint and when he was arraigned on the indictment, I

gave the standard admonishment to the Government pursuant to the Due Process Protections Act, Public Law 116-182, 134 statute 894 and Federal Rule of Criminal Procedure 5(f)(1), as to the Government's obligations with respect to Brady materials.

**MS. ZOGHLIN:** Absolutely. The Court advised them of their obligations. The Constitution advises them of their obligations.

**THE COURT:** I'm just saying that I already addressed that.

**MS. ZOGHLIN:** Absolutely. But part of our job is to make specific Brady demands.

And I think that is often legally required, that way we would make specific Brady demands -- demands that are specific to the facts of our case.

For example, this is what we would consider Brady material for both the guilt and the penalty phase, because Brady applies to both.

**THE COURT:** Well, as I understand the Brady demands -- and I'm not sure I understand what you mean when you say specific Brady material.

The Brady demand normally is: Government, I hereby demand that you turn over any and all evidence that you have or know of that could be exculpatory to the defendant.

Period. That's the specificity.

**MS. ZOGHLIN:** Right. That is not the type of Brady

demand we would file, Judge.  And I think the law requires more than that.

It, to me, would be --

**THE COURT:**  Well, that's the definition of Brady; isn't it?

Anything that would be deemed exculpatory.

**MS. ZOGHLIN:**  Yes.  But part of our job would be to delineate what areas of information we believe to be exculpatory and why.

And that would be as to, as I have said, both phases.  Both the guilt and the penalty phases, so it's not a one sentence demand.

**THE COURT:**  I'm still having a hard time understanding or comprehending.

I mean, for example, we don't have any statements allegedly by a co-conspirator or co-defendant or anybody, as I understand it, that would be a witness to say it wasn't Gendron that did the shooting.

It was somebody else.  I mean, that guilt has already been established.

So in trying to determine conceptually what would be Brady material that would be exculpatory, in a more specific way, I'm just not able to conceptualize.

**MS. ZOGHLIN:**  Well, exculpatory in only in the most basic way is it somebody else committed this crime.  Clearly,

that's not our position.

**THE COURT:**  No.  As I always understood the definition of Brady, it is any evidence that would be exculpatory in that it could cause a jury to find in favor of the defendant.

**MS. ZOGHLIN:**  And it's -- Brady, specifically, is any potentially exculpatory material as to both guilt and punishment.

So there is a whole world of exculpatory material potentially -- potential Brady material as to the sentence.

**THE COURT:**  Well, when you're talking about punishment, we're now getting over to mitigation, which is a separate topic.

**MS. ZOGHLIN:**  Respectfully, Judge, I don't think it's a separate topic.  I think Brady --

**THE COURT:**  No, no.  I'm not saying Brady is not applicable to the mitigation --

**MS. ZOGHLIN:**  Right.

**THE COURT:**  -- I'm just saying mitigation is a separate topic in the context of discovery.

You've got all of the material that the Government says they have that you will need to examine to find out what can be utilized for mitigation purposes.

**MS. ZOGHLIN:**  Well, certainly --

**THE COURT:**  Mitigation, as I understand it, is evidence that the defendant would present as to why the death

penalty should not be imposed.

**MS. ZOGHLIN:**  And the Government has a Brady obligation --

**THE COURT:**  But it's not limited to Brady.  It could be anything.

It could be what he suffered when he was two years old to mitigate why he shouldn't be put to death now, because that event when he was two years old formed or shaped this distorted view he had.

That's not Brady material, but that's certainly mitigation material.

**MS. ZOGHLIN:**  Certainly, yes.  That might be mitigating information to the extent that they have information that might be mitigating, that is Brady material that they are legally obligated to disclose to us.

**THE COURT:**  See, I'm having a hard time putting Brady material, meaning exculpatory with mitigation.

Mitigation already has established guilt.

**MS. ZOGHLIN:**  Right.  And --

**THE COURT:**  Now the question is what should the punishment be for that guilt.  It's no longer exculpatory.  He's guilty, so it's not Brady.

**MS. ZOGHLIN:**  That -- that's where, respectfully, Judge, I would disagree with the Court on that.

**THE COURT:**  And that's why we have the word

mitigation.

MS. ZOGHLIN:  But Brady applies to mitigation.  Brady applies to the penalty phase, as well as the guilt phase.

So it's -- it is much broader than something that would be traditionally considered exculpatory, as in he didn't commit this crime.

So that's what I -- I mean, I'd be happy to also put this in writing, Judge.

THE COURT:  No, no.  I think we're trying to be on the same page.

All I'm saying is when you get into mitigation, the defense will try and harvest up as much background information about a defendant that can be conceivably be harvested; all kinds of psychological history, data, documentation.

It may be psychiatric.  It may be physical medical things; things that have had a -- an environmental and personal subjective part or role in the development of the defendant, which the -- the defendant -- which the defense would argue is what put him in this state of mind, which really is responsible for what he did and he should not be put to death for that.

It's a matter of all of these terrible historical things that happened to him that brought about this situation and, therefore, this constitutes mitigation or mitigating evidence as to why he shouldn't be put to death.

That's the way I understand mitigation to be and to

work.  And then it's a matter of convincing a jury as to that kind of history and analysis and weight to be given.

When we talk about exculpatory, it is evidence is that this person should not be found guilty.

**MS. ZOGHLIN:**  And that's where we disagree, Judge.  I agree with everything you have said up to that point about what mitigation is.

And what I'm saying is that exculpatory Brady -- Brady material -- in fact, in the Brady case itself, it says specifically that information -- Brady information encompasses information that is relevant to sentencing.

It encompasses mitigation.  So Brady applies to both. And that's just some idea of why -- how a Brady demand in a case like this will be different than, please give us all of your exculpatory information.

**THE COURT:**  So the Government says, we've given you all the Brady material that we're aware of.

**MS. ZOGHLIN:**  Right.  They can -- but, again, as the Court pointed out earlier, we don't need to take their word for it.

They did an exhaustive investigation in this case, as well they should have, with every resource the Federal Government has.

They have interviewed well beyond -- well beyond anything that relates to the specific acts that occurred on

May 14th, as understandably.

So we are going to make specific requests, demands, that we be provided with information about anything that they may have uncovered relative to mitigation.

And we will be specific about that, because I think it's our obligation to be specific about that.

I don't think the Government has said --

**THE COURT:**  Can you give me an example of a specific request?

**MS. ZOGHLIN:**  Well, I can -- mitigating the information that the Government may have -- for example, they have interviewed -- they have done all sorts of interviews of family members, friends, teachers, that kind of thing.

**THE COURT:**  Okay.  And then the Government says, yes. We turned over all that interview information to you.

Correct?

**MR. TRIPI:**  Correct.

**MS. ZOGHLIN:**  But I have not heard the Government say that they have given us everything that they have, right?

**THE COURT:**  No.  Because they haven't received it -- I guess, a demand from you yet.

**MR. TRIPI:**  I'd be hard pressed to identify something off the top of my head, sitting here right now, that we have that they don't.

If there is one piece of paper that exists -- maybe

I'm wrong.  I'll go back and look, but they have everything.

Everything they could conceivably think might be Brady, that normally we would disagree with, they have.

They have the people who were in those Internet chats who were interviewed.  They have those.

They have people of color who interacted with Mr. Gendron in his life and saw no racial animus from him.  They have those.

So you're right.  Your question is identify something that we haven't turned over, they are not going to be able to do it.

Our response is going to be very short.  You have it already.  That's why you have it already, to avoid these motions which will be frivolous.

How --

**MS. ZOGHLIN:**  How does --

**MR. TRIPI:**  Because they have it.

**THE COURT:**  Time out.  You brought us around full circle with your last statement, because defense has already said, well, how do we know that we have everything until we review it?

**MS. ZOGHLIN:**  Exactly.

**THE COURT:**  I know what you're doing to say:  Because we gave it to you.

Well, this is where we are -- the standoff you're at.

**MR. TRIPI:** Right.

**MS. ZOGHLIN:** Right. And Mr. Tripi is essentially arguing; take my word for it. We gave you everything. A lot of it isn't relevant.

You don't really have to look at it. And anyway, we have already decided that anything you might file will be frivolous.

**MR. TRIPI:** No. I'm saying it's been 300 days and we can set a schedule.

**THE COURT:** I understand both sides now. All right. So we're back to a post scheduling order.

Does the defense have a different schedule?

**MS. ZOGHLIN:** We need to know what's in the discovery. We need to be able to have reviewed the discovery before we can propose a scheduling order.

**THE COURT:** So we're back to what kind of a deadline needs to be set for completion of the review of materials that have been turned over.

**MS. ZOGHLIN:** What we proposed, Judge, was an adjournment so that we can update the Court -- as we did yesterday, about our review of the material, what we've done and what we expect that we need to do.

**THE COURT:** And what you've indicated to me was 90 days.

**MS. ZOGHLIN:** That is our request.

THE COURT:  My concern is, I don't want to be coming back every 90 days for the next six months.

MS. ZOGHLIN:  I understand.  I understand that, Judge, and that's -- that's not --

THE COURT:  When's the next conference before Judge Vilardo?  I know he set one.

MR. TRIPI:  May -- I don't know the date.  It's in late May, early June, Judge.

THE COURT:  June?  Okay.

MS. ZOGHLIN:  Judge, another issue that Mr. Tripi said, I can't think of anything we haven't given them.

Does that mean their investigation is complete?  My guess is that they have an ongoing investigation, so --

THE COURT:  Well, I've been operating from the premise that the Government says it's ready to go to trial, but for awaiting the decision of the Attorney General as to whether they are going to proceed with the death penalty.

MR. TRIPI:  Correct.  We have a single defendant indictment.  That's our case.  We're ready for trial on the guilt phase.

THE COURT:  But you're not, because you don't know whether you are supposed to ask for --

MR. TRIPI:  On the guilt phase, we would be ready for trial, Judge.

THE COURT:  Yeah.  But there has been no motion to

bifurcate.

**MR. TRIPI:**  Right.

**THE COURT:**  As I say, everything is going to hinge on what the Attorney General decides.

**MS. ZOGHLIN:**  I agree with that, Judge.

**MR. TRIPI:**  I think our positions are framed up for you, Your Honor.  I think that's why you're up there, though.

**THE COURT:**  Well, you can see from the colloquy that's taken place here this morning, we have different viewpoints and we have different interpretations of things, and it is just not a matter of a simple mathematical formula.

The defendant has certain rights under the Constitution.  The most basic one being effective assistance of counsel.

Counsel, as officers of the Court, have made certain representations as to what they need to be doing and how much time they need to do that.

The Government has its obligations to prosecute the case diligently in accordance with the Sixth Amendment of the United States Constitution.

And I have obligations to see that the Fifth Amendment due process rights are carried out, along with the Speedy Trial Act requirements.

I guess I have to come back to a point I touched upon briefly, if I were to say, okay, we'll have a status conference

in 90 days, I am hoping that that 90 days doesn't then cause a decision to be made -- this is not addressed to you, Mr. Tripi, or the U.S. Attorney, I'm just putting it out there -- that somebody in the Department of Justice can say, okay, we don't have to do anything for the next 90 days.  Let's wait and see what happens, as far as the second step process is concerned.

MR. TRIPI:  I can answer that, Judge, hypothetical. That will not happen.  We're going to continue the process and move the internal process along.

I can say that the death penalty determination will be determined by the established protocols.

If anything, Judge, a scheduling order and progressing the case, at least in some form or fashion towards a trial date, can't do anything, but aid the process of facilitating an answer.

THE COURT:  Well, the trial date will be set by Judge Vilardo, not me.  That was erroneously reported.

MR. TRIPI:  But getting on a schedule and progressing the case, deadlines create action.

And I am not asking this Court to impose a deadline for that internal process --

THE COURT:  No, no.

MR. TRIPI:  -- but the fact that we're on some type of schedule now would -- would potentially help move the process along.

**THE COURT:** As far as I'm concerned, the main motivating legal factor that the Government has to abide by is the concept of exercising due diligence and carrying out its obligation to make decisions.

**MR. TRIPI:** Yes.

**THE COURT:** That's all I'm saying.

**MR. TRIPI:** And we believe we are and we will.

**THE COURT:** I'm not -- I'm not questioning what has been done or not been done, I'm just saying that's the guiding principal.

90 days would bring us into early June.  What does June 16th look like on my calendar?

**MR. TRIPI:** Your Honor, the date for the status before the District Court is June 8th.

**THE COURT:** June 8th.

**MR. TRIPI:** Yes.  Just for your information.

**THE COURT:** I'm just trying to blend the appearance before Judge Vilardo on June 8th.

I would suspect what he's going to hear is, well, we have a status conference before judge magistrate on June 15th to talk about a scheduling order, so I don't know how much will be done in front of Judge Vilardo.

**MR. TRIPI:** Right.

**THE COURT:** But at the same time, I don't want to create any kind of obstacles for Judge Vilardo.  He wanted to

set a trial date, I know.

Before I forget, let me just do this, whatever time we're going to be talking about, does the defense agree on behalf of the defendant, and the Government agree, that the time periods set forth in the Interstate Detainer Agreement are to be extended or excluded, depending on what word you want to use --

**MS. ZOGHLIN:**  Absolutely.

**THE COURT:**  -- for the purposes of the time requirements set forth in that agreement, which say trial is to occur 120 days from the time the defendant went into Federal custody, unless for good cause shown, there is an extension?

**MR. TRIPI:**  We agree.

**THE COURT:**  I find there is good cause to extend based on the fact that this is a complex case with voluminous substantial discovery material that has to be reviewed by defense counsel, as indicated.

And so for the purposes of the extension of time, I will hold a status conference on June 15th, with the understanding that the time between now, March the 10th, 2023 and June 15th, 2023, will be excluded for the purposes of the Speedy Trial Act and any other statutory time requirements that might be required.

And as extending that time period for the purposes of when a trial must commence under the terms and conditions of the Interstate Detainer Agreement.

Does the defense agree?

**MS. ZOGHLIN:**  Absolutely.

**THE COURT:**  Does the Government agree?

**MR. TRIPI:**  Yes, Judge.

**THE COURT:**  And is it the position of the defense that the time between now and June 15th, 2023, will, in fact, be utilized in such a way so as to operate and enure to the benefit of the defendant and, therefore, that time should be excluded for the purposes of the Speedy Trial Act requirements, as well as extended for purposes of the time requirements in the Interstate Detainer Agreement?

**MS. ZOGHLIN:**  Absolutely.

**THE COURT:**  Does the Government agree that the time between now and June 15th will act and operate in the interest of justice in this case and, therefore, such time should be excluded for the purposes of the Speedy Trial Act and any other statutory time requirements that might be applicable, as well as extending the time for bringing the defendant to trial in accordance with the Interstate Detainer Agreement?

**MR. TRIPI:**  For all the reasons discussed on the record today, yes, Your Honor, we do.

**THE COURT:**  All right.  Based on the representations made by counsel with respect to the parties herein, I find there is a meritorious basis for adjourning this matter until June 15th, 2023.

And further, based on those representations, I find that the time between now and the date of June 15th, 2023, will, in fact, be utilized in such a way, so as to operate and enure to the benefit of the defendant, as well as operate in the interest of justice in this case, in that such time is going to be utilized to allow the defense to continue reviewing the voluminous discovery material that has been provided by the Government to the defendant as part of the defense's obligation to provide effective assistance of counsel to the defendant, both in the question of guilt or innocence in the prosecution of this case, as well as in the preparation for mitigation defense, in the event the Government seeks a death penalty.

The time will also be utilized by the Government in meeting its obligation to conduct due diligence in the decision-making process as to whether the Government or the prosecution will seek a death penalty prosecution in this case.

And for all of those reasons, then, the time is justifiably excludable for the purposes of the Speedy Trial Act, the Sixth Amendment of the United States Constitution and any other statutory time requirements that might be applicable, as well as extending the time under the Interstate Detainer Agreement for the purposes of when the defendant has to be brought to trial.

All being done pursuant to and in accordance with the provisions contained in Title 18, United States Code Sections

3161(h)(7)(A) and Section 3161(h)(7)(B)(iv).

And, Mr. Tripi, will you provide an order of exclusion to that effect, please?

**MR. TRIPI:**  Yes, Your Honor, I will.

**THE COURT:**  The time on June 15th, 10:30.

**MR. TRIPI:**  That's fine.

**MS. ZOGHLIN:**  That's fine, Judge.  Thank you.

**THE COURT:**  Anything else at this time?

**MR. TRIPI:**  No, Your Honor.

**MS. ZOGHLIN:**  No, thank you.

**THE COURT:**  Thank you.

(Proceedings concluded at 11:35 a.m.)

\*     \*     \*

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York before the Honorable H. Kenneth Schroeder, Jr.

_*s/ Bonnie S. Weber*___          __June 9, 2023_____
Signature                                    Date

BONNIE S. WEBER, RPR

Official Court Reporter
United States District Court
Western District of New York