UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

     v.

                                   22-CR-109 (LJV-HKS)

PAYTON GENDRON,

          Defendant.

———————————————————————

## MOTION TO STRIKE THE DEATH PENALTY
## AS A POSSIBLE PUNISHMENT IN THIS CASE

## I.      INTRODUCTION AND BACKGROUND

Defendant, Payton Gendron, through undersigned counsel hereby moves this Court to enter an order finding the federal death penalty constitutes a cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments and striking the government's Notice of Intent to Seek Death (ECF No. 125).

In 1972, in *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court of the United States found the Georgia death penalty statute to be unconstitutional. This was short-lived. Four years later, with decisions in three cases on three new statutory schemes—*Gregg v. Georgia*, 428 U.S. 153 (1976), *Proffitt v. Florida*, 428 U.S. 242 (1976), and *Jurek v. Texas*, 428 U.S. 262 (1976)—the death penalty was revived. The Court reasoned that state governments could execute people as punishment without running afoul of the Constitution by ensuring that their statutes were structured to narrow eligibility for the death penalty, and to give adequate information and guidance to juries to avoid the arbitrary and capricious imposition of death sentences. The expectation, and requirement for purposes of the Constitution, was that, thereafter, only the worst of the worst would be sentenced to death.

The federal government modified its death penalty statutes in 1988 to meet the new requirements. That year, Congress passed the Drug Kingpin Act[1] as part of the Anti-Drug Abuse Act of 1988.[2] The Drug Kingpin Act authorized the federal death penalty for certain drug-related murders.[3] Specifically, it codified the death penalty as punishment for any defendant, while working as part of a criminal enterprise, that intentionally kills, counsels, commands, procures, induces or causes the intentional killing of an individual[4] or law enforcement officer.[5] The legislative history behind the 1988 bill shows that Congress aimed the death penalty provisions specifically at triggermen and drug lords from whom the triggermen received their orders.[6]

Six years later, that changed. In 1994, the federal government again revised its death penalty code. The new Federal Death Penalty Act (FDPA) greatly expanded the number of federal crimes potentially carrying a sentence of death, with members of Congress placing the number at sixty.[7] Prior to 1994, federal death penalty statutes could be placed in one of three

---

[1] 21 U.S.C. § 848 (1988).

[2] Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181.

[3] *See* 21 U.S.C. § 848(e) (1988).

[4] *See id.* § 848(e)(1)(A).

[5] *See id.* § 848(e)(1)(B). A law enforcement officer is defined as "a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions." *Id.* § 848(e)(2).

[6] *See* Brian Serr, *Of Crime and Punishment, Kingpins, and Foot Soldiers, Life and Death: The Drug War and the Federal Death Penalty Provision--Problems of Interpretation and Constitutionality*, 25 Ariz. St. L.J. 895, 914 (1993) (explaining that there is an abundance of legislative history showing Congress intended the Drug Kingpin Act for use against triggermen and their bosses).

[7] *See, e.g.*, 140 Cong. Rec. S12421-01, S12433 (daily ed. Aug. 24, 1994) (statement of Sen. Kerry) (stating that there were "about 60" new death penalties); Charles Kenneth Eldred, *The New Federal Death Penalties*, 22 Am. J. Crim. L. 293, 293 n.2 (1994). ("It is indisputable that

categories: (1) crimes in which a person was intentionally killed; (2) crimes in which a dangerous activity resulted in death; and (3) non-homicide crimes including treason and espionage.[8]  The FDPA expanded the number of crimes for which the death penalty can be imposed in all three categories.[9] First, in the intentional killing category, the FDPA permits capital punishment for the following crimes: (1) murder during a drug related drive-by shooting; (2) murder by a federal prisoner serving a life sentence; (3) murder of a United States national; (4) murder by an escaped federal prisoner already sentenced to life imprisonment; and (5) murder of a state correctional officer.[10] Second, the FDPA added five new crimes in the category of dangerous activity resulting in death: (1) violent acts at airports; (2) rape or child molestation; (3) violence in the course of maritime navigation; (4) violence at maritime fixed platform; and (5) use of a weapon of mass destruction.[11] In this category, the FDPA also amended other crime statutes to allow for the imposition of a death sentence when the following acts result in a death: kidnapping, hostage-taking, alien smuggling, genocide, conspiracy against civil rights, and deprivation of civil rights under color of law.[12] Third, the non-homicide category was amended and the following crimes became eligible for the death penalty: (1) carjacking resulting in death;

---

the quantity of crimes for which the death penalty has been made available has substantially increased.").

[8] John P. Cunningham, *Death in the Federal Courts: Expectations and Realities of the Federal Death Penalty Act of 1994*, 32 U. Rich. L. Rev. 939, 953–54 (1998).

[9] *Id.* at 954-55.

[10] *Id.*

[11] *Id.* at 955.

[12] *Id.* at 955-56.

(2) murder in a federal facility; (3) first degree murder committed by firing a weapon into a crowd; (4) murder of a witness, victim, or informant in response to law enforcement; and (5) murder of a court officer or juror.[13]

Much has changed in the three decades since *Furman* and *Gregg,* and since the FDPA was signed into law. At first, juvenile offenders could be prosecuted and sentenced to death for capital crimes,[14] but then they were excluded.[15] Similarly, intellectually disabled people were included for almost the first 30 years, but then were removed from the pool of eligible subjects.[16] At the end of 1994, when the FDPA went into effect, 34 States and the federal government held 2,890 prisoners under sentence of death.[17] At the end of 2023, 27 states plus the federal government and the U.S. military had 2,266 prisoners on death row.[18] And for the first time, a majority of Americans are opposed to executing people as punishment and believe capital punishment is applied unfairly.[19]

---

[13] *Id.* at 955.

[14] *Stanford v. Kentucky*, 492 U.S. 361 (1989).

[15] *Roper v. Simmons*, 543 U.S. 551 (2005).

[16] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[17] *See* Bureau of Justice Statistics Bulletin, *Capital Punishment 1994*, available at https://bjs.ojp.gov/content/pub/pdf/cp94.pdf (last visited May 28, 2024).

[18] *See* Death Penalty Information Center, *Prisoners on Death Row as of October 1, 2023 (per Death Row USA)*, available at https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-in-the-united-states-from-1977-by-state-and-by-year and https://deathpenaltyinfo.org/executions/execution-database (last visited May 28, 2024).
[19] Juan A. Lozano, PBS Newshour, available at https://www.pbs.org/newshour/nation/for-the-first-time-more-americans-believe-death-penalty-is-applied-unfairly-report-finds (last visited May 28, 2024).

Many of these changes have come about because, as Justice Breyer concluded, "the death penalty, in and of itself, now likely constitutes a legally prohibited 'cruel and unusual punishmen[t].'" *Glossip v. Gross*, 576 U.S. 863, 908-946 (2015) (Breyer, J., dissenting). Justice Breyer based his decision on "[a]lmost 40 years of studies, surveys, and experience" that "strongly indicate" that entrusting to the states the significant responsibility to develop procedures to protect against the constitutional problems identified in *Furman* "has failed." *Id.* He discerned that the administration of the modern, post-*Furman* death penalty involves serious unreliability, arbitrariness with various underlying causes, and unconscionably long delays, which, for federal death row inmates, result in decades-long solitary confinement. *See, generally*, *Id.* at 908-09.

This Court will not be the first to consider the constitutionality of the Federal Death Penalty Act. *See e.g.*, *United States v. Bowers*, No. CR 18-292, 2020 WL 1675916 (W.D. Pa. Apr. 6, 2020); *United States v. Sampson*, Cr. No. 01-10384-MLW, 2015 WL 6511247 *21 (D. Mass., Oct. 28, 2015). In *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016),  after receiving extensive statistical and expert testimony at an evidentiary hearing, the district court found that "the FDPA—like the very similar state death penalty statutes enacted after *Furman*— remains inherently unreliable as it seeks to identify those cases in which death is the just outcome;" "that the death penalty continues to be imposed in an arbitrary manner;" and that "delay continues to be a primary feature of the FDPA [such that] the statistical evidence that executions, many years after the offense conduct, affect the murder rate has not been accepted by the National Resource Council and continues to be unprovable." *Id.* at 340, 345, 349. Nonetheless, the court declined to strike the death notice, regarding itself precluded from doing so by Supreme Court precedent, though it urged the high court to revisit the issue. *Id.* at 358-59.

This Court should follow the example set in *Fell*. Though the Court is bound by Supreme Court precedent, it "can hold a hearing and permit witnesses to testify." *Id.* at 329. Further, after developing a factual record, the Court can fully address the legal issues. While it may simply acknowledge that current Supreme Court precedent forecloses reconsideration of these issues, it may also decide that "the new factual record may require a fresh look at the manner in which existing principles are applied to a factual record which continues to develop," *id.*, and that contemporary examination will aid a higher Court that considers these issues at a later date. *See United States v. Fell*, 217 F.Supp.2d 469, 477 (2002) (The Supreme Court has "acknowledged an ongoing 'obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society'") (quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977)); *State v. Santiago*, 318 Conn. 1, 47 (2015) ("Because the legal standard is an evolving one, it is both necessary and appropriate for us to consider the issue anew, in light of relevant recent developments, when it is raised.").

## II.     ARGUMENT

### A.  The General Fifth and Eighth Amendment Principles that the Supreme Court has Recognized Govern Payton Gendron's Challenge to the Federal Death Penalty.

The Due Process Clause of the Fifth Amendment prohibits the imposition of punishment on the basis of "arbitrary distinction[s]." *Chapman v. United States*, 500 U.S. 453, 465 (1991). The Eighth Amendment imposes additional restrictions, and establishes the minimum standards for what constitutes impermissibly cruel and unusual punishment.

Specifically, the United States Supreme Court has indicated that at least three types of punishment may be deemed unconstitutionally cruel. First, the Eighth Amendment categorically prohibits the imposition of inherently barbaric punishments. *See Graham v. Florida*, 560 U.S.

48, 59 (2010); *Gregg v. Georgia*, 428 U.S. 153, 170–72 (1976) (opinion announcing judgment); *In re Kemmler*, 136 U.S. 436, 447 (1890). Second, the Eighth Amendment prohibits excessive and disproportionate punishments. *See Graham*, 560 U.S. at 59. Because life in prison without the possibility of parole by itself is so harsh and promotes the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation, *see, e.g.*, *id.* at 71, the imposition of the death penalty is excessive and nothing more than the "gratuitous infliction of suffering." *Gregg*, 428 U.S. at 183.

Finally, the Eighth Amendment prohibits punishments that are arbitrary. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court required "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." "To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988). It is with these principles in mind that Payton Gendron challenges the constitutionality of the FDPA.

**B. Almost Half a Century's Worth of Studies, Surveys, and Experience Demonstrate That the Procedural Protections Included in the Federal Death Penalty Act Have Failed to Achieve Their Intended Goal of a Fair, Consistent, and Reliable Application of the Death Penalty.**

Most of the challenges to the FDPA have been met with the response that the Act is constitutional because it contains the safeguards articulated in *Gregg*. *See, e.g., United States v. Sampson*, 2015 WL 7962394 * 18 (D. Mass. 2015); *United States v. Jacques*, 2011 WL 1675417 * 3 (D. Vt. May 4, 2011). The problem with this response is that it ignores the actual experience of utilizing these particular safeguards. As articulated in *Glossip*, "the Court in effect delegated significant responsibility to the States [and Congress] to develop procedures that would protect

against those constitutional problems. Almost 40 years of studies, surveys, and experience

strongly indicate, however, that this effort has failed." *Id.* at 909 (Breyer, J., dissenting).

### 1. The Exercise of Prosecutorial Discretion Remains a Root Cause of Arbitrariness in the Application of the Federal Death Penalty.

The most determinative event in the process of sentencing a person to death occurs when

a prosecutor decides what to charge and, if capital charges are brought, whether to seek a death

sentence or accept a plea in exchange for a lesser sentence. *See* Elisabeth Semel, *Reflections on*

*Justice John Paul Stevens's Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice*

*Renounces Capital Punishment*, 43 U.C. Davis L. Rev. 783, 788 (2009). But this discretion is

susceptible to abuse.

Although our legal system vests broad discretion in prosecutors to select whom to

prosecute and what crimes to charge, "there are undoubtedly constitutional limits upon its

exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978)(noting broad prosecutorial

discretion "carries with it the potential for both individual and institutional abuse"). This problem

has not gone unnoticed in the courts in the years since *Gregg*. In *DeGarmo v. Texas*, 474 U.S.

973 (1985) Justice Brennan, joined by Justice Marshall in a dissent from a denial of certiorari

acknowledged that "capital sentencing schemes have failed to eliminate arbitrariness in the

choice of who is put to death . . . This gross disparity in treatment is solely a product of the

prosecutor's unfettered discretion to choose who will be put in jeopardy of life and who will

not." *DeGarmo*, 474 U.S. 973, 974. *See also id.* at 475 ("The selection process for the imposition

of the death penalty does not begin at trial; it begins in the prosecutor's office.").

Application of the federal death penalty is not immune to the arbitrariness that results

from the prosecutor's discretion. Under the FDPA, the Attorney General is the ultimate

decisionmaker on whether to seek the death penalty in every case where a defendant is charged

with a federal crime for which death is a possible punishment. *See* Department of Justice

Manual, § 9-10.030. The manual requires that the decision whether to seek the death penalty

"must be based upon the facts and law applicable to the case and be ***set within a framework of***

***consistent and even-handed national application Federal capital sentencing laws.***" *Id.*

(emphasis added); *see also id.* ("National consistency requires treating similar cases similarly

when the only material difference is the location of the crime.")

But at least one court has found that this principle is inconsistently applied. In *United*

*States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), the court precluded the government

from seeking the death penalty against Gary Joe Littrell considering its decision not to seek death

against equally culpable co-defendants. In light of these circumstances the district court wrote:

"it is clear that no rational decision-maker would continue to seek to execute Gary Joe Littrell.

Accordingly, the Government's continued intention to seek the death penalty is arbitrary and

capricious, and must be stricken." *Id.* at 1192. *See also id.* at 1179 ("It is vital to the

constitutional protections of due process and to the moral authority of the Government . . . that

the decision to seek death is neither arbitrary and capricious nor wholly divorced from reason").

The court found its authority to intervene in the government's decision to seek death in

*Furman's* prohibition on arbitrary and capricious jury decision-making:

> *Furman* and its progeny are concerned solely with the imposition of the
> death penalty by the judge or jury. The cases make no comment on the
> breadth of the discretion afforded to the Government to seek the death
> penalty against a particular defendant. However, it would be
> fundamentally inconsistent with the constitutional prohibition on the
> arbitrary ***imposition*** of the death penalty to say that an arbitrary decision
> ***to seek*** the death penalty is constitutionally permissible. The Fifth
> Amendment requires that every aspect of the process by which the
> Government seeks to put a defendant to death is consistent with due
> process of law.  At a bare minimum, the protections of the Fifth
> Amendment must guarantee that the Government's decision to seek the
> death penalty is rational. When the Government's decision to seek death is

> wholly divorced from reason and arbitrarily disregards the totality of the
> relevant evidence, a capital prosecution based on that decision would be
> repugnant to the Constitution.

*Id.* at 1186-1187 (emphasis in original).

Though Payton Gendron has no co-defendants in this case, the principles discussed apply with equal force. The government has chosen to seek the death penalty against him because it can. But this same government has either refused to seek the death penalty, or withdrawn previously filed notices of intent to seek the death penalty, against several other individuals who were charged with equally violent homicides. *See, e.g., United States v. Patrick Crusius*, No. EP-20-CR-389, ECF Nos. 82, 254 (W.D. Tx) (In January 2023, the government filed notice of its intent not to seek the death penalty against Patrick Crusius, who shot to death 23 shoppers in an El Paso Walmart for the purpose of "defending my country" from "the Hispanic invasion of Texas"); *United States v. Anthony Jordan*, No. 4:15-cr-404, ECF Nos. 1988, 1990, 3725 (E.D. Mo.) (In November 2022, the government withdrew a death-penalty authorization for a gang enforcer responsible for more than a dozen murders committed over six years on behalf of a drug gang, tied to a Mexican cartel, that supplied cocaine throughout the Midwest); *United States v. Alexi and Jairo Saenz*, No. 2:16-cr-00403, ECF Nos. 1429, 1529, 2433 (E.D.N.Y) (In November 2023, the government withdrew death-penalty authorization for two brothers and members of the MS-13 gang; Alexi Saenz is charged in eight murders and Jairo Saenz is charged in seven murder).

A side-by-side comparison of Payton Gendron's case to these others shows that the government is failing to "treat[] similar cases similarly when the only material difference is the location of the crime." DOJ Manual § 9-10.130. In other words, it is arbitrary for the government

to spare some defendants but single out Payton Gendron, even though their culpability is arguably the same.[20]

### 2. "Death Qualification" Produces Juries that Are More Prone to Convict, Resulting in Unreliable Death Sentences.

The finality of death creates a "qualitative difference" between the death penalty and other punishments, including life in prison. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). That "qualitative difference" creates "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.*

"There is increasing evidence, however, that the death penalty as now applied lacks that requisite reliability." *Glossip*, 576 U.S. at 910 (Breyer and Ginsburg, JJ., dissenting). Research shows that there is significant pressure on—and zeal from—prosecutors to obtain a capital conviction and death sentence, which is compounded by a built-in component of capital prosecutions, the practice of "death-qualifying" juries. Justice Breyer observed that this process "'skews juries toward…death.'" *Id.* at 2758.

It is true that, under current law applicable to capital cases, courts must excuse prospective jurors whose views on the death penalty would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985). *See also Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (a

---

[20] In a similar vein, military prosecutors recently informed victims' family members in the 9/11 cases at Guantanamo that under plea agreements now under consideration to bring an end to their more than decade long prosecution, Khalid Sheikh Mohammed—the alleged architect of the September 11 attacks—and four other defendants will not face the death penalty. *See* Charlie Savage and Carol Rosenberg, *Biden Rejects Proposed Conditions for Plea Deals in Sept. 11 Case*, N.Y. Times, Sep. 6, 2023, available at https://www.nytimes.com/2023/09/06/us/sept-11-trial-plea-biden-guantanamo.html (last accessed June 7, 2024).

juror who "in no case would vote for capital punishment, regardless of his or her instructions, is

not an impartial juror and must be removed for cause"). A jury that is selected according to such

procedures is said to be "death qualified." *Buchanan v. Kentucky*, 483 U.S. 402, 407 n.6 (1987).

But the evidence has changed in the nearly three decades since the United States Supreme Court

last rebuffed a challenge to death qualification. As one researcher has observed, social-science

research was just emerging when the Court declined to reject death qualification in *Lockhart v.*

*McCree*, 476 U.S. 162 (1986):

> The Supreme Court reviewed this research along with fourteen
> other empirical studies in order to examine the allegation of death-
> qualified jury bias in Lockhart v. McCree. The study authored by
> Cowan, Thompson, and Ellsworth was the only study that the
> Court did not discard, but the Court was nonetheless unwilling to
> base its constitutional decision on a "lone study."

Emily Hughes, *The Empathic Divide in Capital Trials: Possibilities for Social Neuroscientific*

*Research*, 2011 Mich. St. L. Rev. 541, 571 (2011)(citing Claudia L. Cowan, William C.

Thompson & Phoebe C. Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition*

*to Convict and on the Quality of Deliberation*, 8 Law and Human Behavior 53 (1984)). Hughes

notes that since *Lockhart*, however, there has been a "rich body of social science evidence

augmenting and complicating the intersection of bias and capital juror decision making." *Id.* at

559.  Death qualification systematically eliminates the views of racial minorities and certain

religious groups and otherwise results in jurors that tend to be whiter, more conservative, more

sexist and homophobic, more conviction-prone and more biased against defendants than the

typical jury-eligible citizen. *See* Mona Lynch & Craig Haney, *Mapping the Racial Bias of the*

*White Male Capital Juror: Jury Composition and the "Empathic Divide,"* 45 Law & Soc'y Rev.

69, 70 (2011) ("because the death qualification process systematically excludes persons on the

basis of their strong death penalty views from the jury, the demographic makeup of the capital

jury is distinctive and problematic. That is, compared to juries seated in nondeath cases, death-qualified jury pools are disproportionately white, male, older, and more religiously and politically conservative").

As researchers have noted, the federal death penalty system has not avoided the pitfalls caused by death qualification. *See* Mona Lynch, *Institutionalizing Bias: The Death Penalty, Federal Drug Prosecutions, and Mechanisms of Disparate Punishment*, 41 Am. J. Crim. L. 91 (2013) (discussing the bias that results from death qualified juries). In *Fell*, the district court concluded—based on testimony from Dr. Craig Haney, a social psychologist who had studied jury selection in capital cases—"[w]ith respect to the compositional bias of the death-qualified jury, it can no longer be seriously questioned that panel who have announced their openness to a death penalty verdict and have been selected on that basis are more likely to convict than jurors who more closely mirror the full range of values in our society." *Fell*, 224 F.Supp.3d at 333. Dr. Haney testified that among the reasons that death qualification results in capital juries that are biased in favor of the prosecution are that it excludes minorities; selects jurors who are more likely to impose the death penalty than other jurors; and promotes death sentences because of the psychological effect of the questions asked and answers given. *Id.* at 332.  The judge found as matter of fact that "death qualified juries have a disposition towards conviction which is significantly greater than the attitude of juries who have not passed through the filter of death qualification." *Id.* at 335. Based on all the evidence presented in that case, the *Fell* court found that the social science had "converged on a common conclusion that the process by which jurors are selected does not measure up to the standards of detached objectivity required by *Gregg*" and it "supported the position [] that jury selection since *Gregg* is not the solution to inherent jury bias, but rather part of the problem." *Id.* at 338. The court continued:

[T]he procedures for conducting trials mandated by the Gregg decision have not cured systemic shortcomings in jury selection and deliberations.  The death qualification process continues to weight jury panels in favor of conviction and in favor of the death penalty through the exclusion of a large portion of the community which holds views opposed to the death penalty.  When surveyed, jurors who actually served in capital cases had great difficulty in following courts' instructions.  It is an inadequate response to presume that juries follow our instructions when the evidence is to the contrary.  The evidence introduced at the hearing demonstrates that despite efforts to create a more just death penalty regime, the FDPA – like the very similar state death penalty statutes enacted after Furman – remains inherently unreliable as it seeks to identify those cases in which death is the just outcome.

*Id.* at 339-40.

Whatever the validity of the Supreme Court's views on death qualification at the time of *McCray*, social science research now indicates that death qualification exacerbates rather than reduces the risk of wrongful execution. By removing citizens who oppose the death penalty, the process results in juries that are more homogenous, less empathetic, with higher unconscious levels of racism and sexism, and who appear to receive victim-impact evidence in different, even racialized ways.

A secondary jury-related issue that affects jurors' decision-making is the concept of "information overload"—a marketing and business doctrine which shows that "too much information presented to a decision maker can result in sub-optimal decision making." Katie Morgan & Michael J. Zydney Mannheimer, *The Impact of Information Overload on the Capital Jury's Ability to Assess Aggravating and Mitigating Factors*, 17 Wm. & Mary Bill of Rts. J. 1089, 1089 (2009). Research shows the difficulty jurors have in comparing aggravating and

mitigating factors.[21] Because death penalty trials involve "conditions of uncertainty and complexity, jurors, like all other rationally bounded decision makers are unable to devise either a fully specified solution to the problem at hand or to assess fully the probable outcomes of their action." *Id.* at 1126. As Morgan and Mannheimer explain, capital juries make their decisions in stressful and unfamiliar settings. Layered on top of that is the sheer magnitude of the aggravating and mitigation information presented for their consideration. And further layered on top of that the complex struggle to "understand the abstruse legal framework that the courts have constructed around the death penalty." *Id.* at 1126-27.

Ultimately, the impact of this information overload is that jurors will, "whether consciously or subconsciously, choose[] to simply pick an option to end the decision-making process instead of choosing the best option," a phenomenon known as satisficing, *id.* at 1116, 1126, or simply opt out or check out of the decision-making process altogether, *id.* at 1117, 1126. In so doing, jurors "ignore or disregard other relevant information" and "select which information he or she desires to process and become blind to all additional information." *Id.* at 1127. When capital jurors do this, "they are ultimately sentencing defendants to death, not based upon the belief that defendants are unworthy to live, as determined by a comparison of aggravating and mitigating evidence, but because the capital jury is unable to adequately make this crucial decision," a process that results in an unreliable and arbitrary death sentence. *Id.* at 1128.

---

[21] Richard L. Wiener, *Death Penalty Research in Nebraska: How Do Judges and Juries Reach Penalty Decisions?,* 81 Neb. L. Rev. 757, 768-69 (2002) (reviewing several studies concerning juror comprehension of mitigating circumstances).

### 3.   Trial Errors Also Undermine the Reliability of Death Sentences

Like state capital systems, trial errors also occur under the FDPA. In *United States v. Sampson*, the court identified 17 out of 73 defendants whose cases had been reversed.  *Sampson*, 2015 WL 7962394, at *19 (D. Mass., Dec. 2, 2015).  The vast majority of these reversals came after 2003: *David Paul Hammer*, Cr. No. 4:96-239 (M.D. Pa.) (*Brady* violation); *David Lee Jackson*, No. 05-CR-51 (E.D. Tex.) (*Brady* violation); *John Johnson*, Cr. No. 2:04-17 (E.D. La.) (trial error, including improper argument by the government); *Ronell Wilson*, Cr. No. 1:04-1016 (E.D.N.Y.) (trial error, including improper argument by the government); *Angela Johnson*, Cr. No. 01-3046 (N.D. Iowa) (ineffective assistance of counsel); *Darryl Johnson*, Cr. No. 96-379 (N.D. Ill.) (trial error); *Richard Stitt*, Cr. No. 98-47 (E.D. Va.) (ineffective assistance of counsel); *George Lecco and Valerie Friend*, Cr. No. 2:05-107 (S.D.W.V.) (as to both, juror misconduct); *Gary Sampson*, Cr. No. 01-cr-10384 (D. Mass.) (juror misconduct).[22]

Significantly, two of these cases were overturned upon the revelation of federal investigatory and prosecutorial misconduct. First, in 2013 it came to light that the death sentence of David Lee Jackson in 2007 in the Eastern District of Texas was tainted by a *Brady* violation. At the § 2255 stage, Jackson raised an *Atkins* claim. In connection with the discovery for that claim, it was revealed that the government failed to disclose at the first trial evidence from the Bureau of Prisons that Mr. Jackson had been diagnosed by a BOP psychiatrist with paranoid schizophrenia and underwent a change in psychotropic medication.  In a court filing, the

---

[22] For summaries of these cases, *see* DPIC, Federal Death Row Prisoners. Additionally, Paul Hardy had been sentenced to death in 1996, and his sentence was overturned by the Fifth Circuit in 1999. Prior to his resentencing, on November 24, 2010, the district court held that Hardy suffered from an intellectual disability, and thus *Atkins* prohibited his execution, and ordered he be sentenced to life in prison. *See United States v. Hardy*, 762 F. Supp. 2d 849, 905 (E.D. La. 2010).

government confessed to the *Brady* violation, admitting both that the information had been withheld and that it "was relevant to multiple issues in the sentencing phase," including "allowing counsel to more effectively cross-examine certain of the government's penalty-phase witnesses" as well as constituting "relevant mitigating evidence." *Jackson v. United States*, No. 1:09-cv-1039-RC, Govt's Resp. Pet'r Supplement to Pet. For Collateral Relief, ECF No. 171 at 4 (E.D. Tx. Mar. 22, 2013).  On March 25, 2013, the district court accepted the agreement of the parties to settle the case and vacated the judgment of death.  *See id.* ECF No. 172.

Second, in *United States v. Hammer*, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2005), the district court granted a § 2255 petition to vacate a death sentence in an FDPA case on the ground that the United States Attorney's Office violated its *Brady* obligations in failing to turn over 33 FBI 302 statements that summarized interviews with prison inmates.  *See also United States v. Hammer*, 564 F.3d 628, 631 (3d Cir. 2009) (summarizing procedural history).  Mr. Hammer had been sentenced to death for the strangulation killing of another inmate. In particular, the government had argued that the fact that Mr. Hammer braided his sheets into ropes supported the "substantial planning and premeditation" aggravating factor.  The jury agreed, recommending a sentence of death in 1998.  *See Hammer*, 404 F. Supp. 2d at 690, 799.

On the 29th day of an evidentiary hearing on Mr. Hammer's Third Amended § 2255 Petition, the government for the first time revealed the 33 FBI 302's that it had had in its possession since the beginning of the case, which among other things contained statements that Mr. Hammer was known to braid sheets into ropes for consensual sexual bondage.  *Id.*  The district court found that the suppressed 302s were both exculpatory and material, because a juror reasonably could have found that the braiding sheets into ropes was evidence of his preparation for sexual activity, not the murder of the decedent. *Id.* at 798-99.   On July 17, 2014, after a

resentencing trial before Judge Slomsky, Mr. Hammer received a sentence of life imprisonment without possibility of parole. *See* Cr. No. 4:96-0239, ECF No. 1770 (M.D. Pa. July 17, 2014).

Appellate courts reviewing federal death penalty cases have also found a variety of errors at the trial level. *See, e.g., United States v. Aquart*, 913 F.3d 1 (2018) (error by prosecutor in summation for criticizing defense theory, saying lawyers did not believe it); *United States v. Troya*, 733 F.3d 1125, 1136-38 (11th Cir. 2013) (error in excluding defense expert's testimony on future non-dangerousness, which should have been admitted as both mitigation and rebuttal); *United States v. Hager*, 731 F.3d 167, 206 (4th Cir. 2013) (district court's and prosecutor's use of present tense to describe defendant's supposed lack of remorse, in jury instructions and summation, was error); *United States v. Runyon*, 707 F.3d 475, 492-99 (4th Cir. 2013) (finding error in introduction at sentencing of videotape of an interrogation of the defendant in which police confronted him with the evidence and facts of the crime and urged him to confess and show remorse by making references to his religion and ethnicity, and defendant, for the most part, kept silent.); *United States v. Ebron*, 683 F.3d 105, 153 (5th Cir. 2012) (erroneous finding of substantial-planning aggravating factor); *United States v. Bernard*, 299 F.3d 467, 484-487 (5th Cir. 2002) (jury's invalid finding of pecuniary-gain aggravating factor (based on insufficient evidence) was error); *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011) (summation remarks criticizing the decision to have defendant's children testify in mitigation were improper); *United States v. Lighty*, 616 F.3d 321, 363 (4th Cir. 2010) (finding or assuming district court erred in excluding mitigating evidence); *United States v. Purkey*, 428 F.3d 738, 757759 (8th Cir. 2005) (error in preventing defense psychologist from opining that defendant suffered from fetal alcohol syndrome and in refusing to allow cross examination of government expert); *United States v. Stitt*, 250 F.3d 878, 898-899 (4th Cir. 2001) (erroneous admission of

victim-impact evidence in rebuttal); *United States v. Chanthadara*, 230 F.3d 1237, 1264-1268 (10th Cir. 2000) (two errors — faulty instruction on pecuniary gain and six jurors' exposure to newspaper headline conveying that district judge had referred to defense theory as a "smokescreen" — were prejudicial enough to require new sentencing hearing.); *United States v. Barnette*, 211 F.3d 803, 825 (4th Cir. 2000) (erroneous exclusion of surrebuttal testimony by defense mental-health expert was not harmless); *United States v. Webster*, 162 F.3d 308, 326 (5th Cir. 1998) (erroneous instruction on "substantial planning" aggravator); *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999) (reversing two codefendants' convictions on one of three capital counts because of lack of evidence on an essential element); *United States v. McCullah*, 76 F.3d 1087, 1102 (10th Cir. 1996) (erroneous admission at trial of defendant's coerced statements to government informant was not harmless as to sentence).

The fact that constitutional error is discovered in so many federal capital cases, sometimes only after assiduous investigation, sometimes through little more than happenstance, compels the conclusion that the federal capital sentencing system is incapable of identifying and remedying every instance of serious constitutional error. *See Sampson*, 275 F. Supp. 2d at 79 n.12 (collecting cases in which one or more Supreme Court Justice perceived there was harmful error in a capital case, but execution occurred anyway). Given the many sources of inaccuracy and error, whether from investigators, prosecutors, jurors, witnesses, or the defendant's own counsel, it is simply unrealistic to believe that the federal death penalty system is capable of identifying and remedying them with the constitutionally requisite accuracy and reliability.

**4. The Inherent and Necessary Delays in Federal Capital Prosecutions Result in Decades-Long Solitary Confinement and in Executions So Far in Time from the Offense to be Punished that the Consequence Is a Sentence that is Cruel and Unusual Which Diminishes the Goals of Sentencing.**

The Supreme Court has recognized that death as a punishment is quintessentially different from any other by virtue of its finality. *Woodson*, 428 U.S. at 303.  In view of this, the Court has required, and states and the federal government have purported to establish, protective mechanisms intended to assure a conviction and sentence are constitutionally sound before a person is executed. While these protections are appropriate and should not be diminished, they have an unintended and unavoidable effect that compounds the arbitrariness discussed above. Not only does the punishment, if it does happen, have no deterrent value because of the time that has passed since the offense, the constitutionally required proceedings result in a torturous decades-long solitary confinement for those sentenced to death, and serve to inflict further emotional anguish on surviving victims.

      a.  Persons sentenced to death endure additional punishment before their execution by living in solitary confinement for years awaiting an execution that may never come.

The Eighth Amendment's prohibition on cruel and unusual punishment reaches beyond the concerns of arbitrariness and capriciousness of *Furman* and *Gregg*. Constitutionally required review of capital sentences, and the growing disfavor for capital punishment generally, have resulted in years of delay between conviction to execution that was surely not foreseen or intended by the majority in *Gregg*. This delay imposes years of dehumanizing incarceration on federal death row inmates that compound the Eighth Amendment issues created. *See Glossip*, 576 U.S. at 923 (Breyer and Ginsburg, JJ., dissenting) ("The problems of reliability and unfairness almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death.

That is to say, delay is in part a problem that the Constitution's own demands create . . . [U]nless

we abandon the procedural requirements that assure fairness and reliability, we are forced to

confront the problem of increasingly lengthy delays in capital cases"). It is not unusual for a

death sentence to be carried out, if ever, 25 or more years after the conviction. *Id.* at 924-25

(Breyer and Ginsburg, JJ., dissenting) (citing sources).

These delays are unavoidable, "given the special need for reliability and fairness in

capital cases." *Id.* at 2770-72. *Accord Santiago*, 318 Conn. at 93 n.96 ("Delays, then, are

indispensable if the ultimate punishment is to be reliably applied, and, if the constitution did not

mandate such close scrutiny, the execution of innocent persons would inevitably result."). Yet

such prolonged delays create an Eighth Amendment whiplash effect.  Defendants sentenced to

death are normally housed under severe, punitively isolating conditions on death rows. *See

Johnson v. Bredesen*, 558 U.S. 1067, 1069 (2009) (statement of Stevens, J., respecting denial of

certiorari) (after recounting petitioner's confinement in a solitary cell awaiting his execution for

nearly 29 years: "the delay itself subjects death row inmates to decades of especially severe,

dehumanizing conditions of confinement"); *accord Glossip*, 576 U.S. at 924-25 (Breyer and

Ginsburg, JJ., dissenting). The result is that a person is effectively in solitary confinement for

years and sometimes decades.

In *Fell*, the district court heard expert testimony and made detailed findings about the

conditions on federal death row and their effects on condemned prisoners. 224 F. Supp. 3d at

345-47. As it recognized, individuals on death row "are confined to their cells for 23 out of every

24 hours." *Id.*  In a six-by-ten-foot box, the size of a parking spot, they eat, sleep, shower, use the

toilet, and seek distraction from a small television. They "have very limited contact with other

people," including other prisoners and guards. This is "by design," as even "the physical

arrangement of . . . death row . . . is set up to minimize contact by prisoners with others." *Id.*
Thus, the cells have solid steel doors and "no view to the outside," and "unusual measures [are]
taken to achieve isolation through the use of slots for food trays" and "separation of cells," with
inmates often surrounded by empty cells. *Id.* Even the exercise cages, to which prisoners are
taken fully shackled for an hour five times a week, are surrounded by solid walls on all sides and
permits only a view of the sky. *Id.* And because death row is physically remote from most
prisoners' homes and families, they rarely receive visitors. Such conditions make it far more
restrictive overall than even most solitary-confinement units across the country. *Id.* at 345-47.

The *Fell* court considered "most troubling" the psychological effects of such extreme
"long term-isolation." These, it found, included significant "trauma and distress," "high rates of
depression and social withdrawal," and a "widespread phenomenon" described by a nationally
recognized expert, Dr. Craig Haney, whom it credited, and who had inspected federal death row
and interviewed prisoners there. Dr. Haney spoke of "a melancholia, a deep joylessness, a kind
of a grief that's deeper than depression, where people just feel like they've lost who they are,
who they were. And they've lost the capacity to regain." *Id. See also United States v. Aquart*,
No. 3:06- cr-160, Tr.83 (D. Conn. Oct. 21, 2021) (recognizing "the terrifying and arbitrary
nature of life on [federal] death row and the toll that it takes nearly driving Mr. Aquart to
madness" in his nine years there).

These individuals are held under these conditions not because of any distinctive feature
of their crime or their character, but simply because the Bureau of Prisons, an arm of the DOJ,
chooses to do it in this manner. If a person on death row presents a behavior problem or danger,
he is subjected to additional restrictions. Consequently, people sentenced to death will serve a

preliminary sentence of 15 years or more of the psychological duress of this confinement in addition and as a condition precedent to their actual sentence.

For prisoners, the "dehumanizing effects" of being entombed on federal death row are aggravated by the looming threat of being put to death, which most recently occurred with the execution of 13 prisoners between July 2020 and January 2021. This is a prospect whose inexorable approach they are reminded of with every execution of a fellow prisoner, the preparation and carrying out of which unfolds around them.[23]

As several Supreme Court justices have recognized, the passage of decades between a death sentence and its execution can constitute "cruel and unusual punishment prohibited by the Eighth Amendment," *Gomez v. Fierro*, 519 U.S. 918 (1996) (Stevens & Breyer, JJ., dissenting), because it "subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement," *Glossip*, 576 U.S. at 924-35 (Breyer & Ginsburg, JJ., dissenting). The cruelty of such delays appears even clearer today, given the growing understanding of the serious psychological damage caused by prolonged solitary confinement. Thus, the federal death penalty gives rise to a secondary Eighth Amendment violation by the conditions in which those sentenced to die are held for years while their sentence is litigated.

---

[23] Elizabeth Breunig, *The Man I Saw Them Kill*, N.Y. Times (Dec. 17, 2020), available at https://www.nytimes.com/2020/12/17/opinion/federal-executions-trump-alfred-bourgeois.html (accessed June 7, 2024); Liliana Segura, *Trump Prepares to Execute Christopher Vialva for a Crime He Committed as a Teenager*, The Intercept (Sept. 20, 2020), https://theintercept.com/2020/09/20/federal-executions-christopher-vialva/ (accessed June 7, 2024); Billie J. Allen, *A Dispatch From Federal Death Row*, The Marshall Project (July 16, 2020), https://www.themarshallproject.org/2020/07/16/a-dispatch-from-federal-death-row (accessed June 7, 2024).

b. The prolonged time that is necessary for review removes any execution that does occur so far in time from the offense, that there is no deterrent effect to killing the defendant, thus making it gratuitous.

The other consequence of the protracted time periods that are necessary for capital cases to be processed and through appeal and §2255 post-conviction proceedings is that, by the time a defendant is executed, so much time has passed since the commission of the offense that the execution has no deterrent value at all. This means that deterrence cannot be a justification for the federal death penalty.

For example, David Hammer pled guilty in June 1998 to killing his cellmate in April 1996. Arguably, his case may have proceeded at an accelerated pace because he moved to dismiss his appeal.[24] *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000). Hammer then initiated post-conviction proceedings where the district court determined that the government had committed a *Brady* violation. *See United States v. Hammer*, 404 F. Supp. 2d 676, 800–01 (M.D. Pa. 2005). After further litigation, Hammer was ultimately re-sentenced to life in prison without parole in August 2014, 18 years after the offense (during which time he was held in the solitary confinement of federal death row). Had the district court imposed a death sentence again, further litigation would have been required, extending the delay to any execution even more.

As the chart below illustrates, of the 12 men and one woman who were executed by the government between July 2020 and January 2021, five of them had spent at least two decades on death row, in solitary confinement, before their execution. There are currently 40 men on death row, one of whom has been on death row for 28 years (Len Davis), two others for 26 years (Billie Jerome Allen and Norris Holder), and another for 22 years (Julius Robinson).

---

[24] The Third Circuit heard his case to determine whether Hammer could waive his right to appeal.

| Name | Date Sentence Imposed | Date of Execution | Time Elapsed at Date of Execution |
|---|---|---|---|
| **Daniel Lee** | May 13, 2002 | July 14, 2020 | 18 years, 2 months, 2 days |
| **Wesley Purkey** | January 23, 2004 | July 16, 2020 | 16 years, 5 months, 24 days |
| **Dustin Honken** | October 11, 2005 | July 17, 2020 | 14 years, 9 months, 7 days |
| **Lezmond Mitchell** | September 15, 2003 | August 26, 2020 | 16 years, 11 months, 12 days |
| **Keith Nelson** | March 11, 2002 | August 28, 2020 | 18 years, 5 months, 16 days |
| **William LeCroy** | March 10, 2004 | September 22, 2020 | 16 years, 6 months, 13 |
| **Christopher Vialva** | June 13, 2000 | September 24, 2020 | 20 years, 3 months, 12 days |
| **Orlando Hall** | February 12, 1996 | November 19, 2020 | 24 years, 9 months, 8 days |
| **Brandon Bernard** | June 13, 2000 | December 10, 2020 | 20 years, 5 months, 28 days |
| **Alfred Bourgeois** | June 27, 2002 | December 11, 2020 | 18 years, 10 months, 15 days |
| **Lisa Montgomery** | April 4, 2008 | January 13, 2021 | 12 years, 9 months, 10 days |
| **Corey Johnson** | June 1, 1993 | January 14, 2021 | 27 years, 7 months, 14 days |
| **Dustin Higgs** | January 3, 2001 | January 16, 2021 | 28 years, 14 days |

"The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted." *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of certiorari); *see also Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J., dissenting) ("[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment"); *Furman*, 408 U.S. at 302 (Brennan, J., concurring) ("[a] rational person contemplating a murder or rape is confronted, not with the certainty of a speedy death, but with the slightest possibility that he will be executed in the distant future"); *Jones v. Chappell*, 31 F. Supp.3d 1050, 1064 (C.D. Cal. 2014) (law and common sense dictate that "long delays

preceding execution frustrate whatever deterrent effect the death penalty may have"); *Santiago*, 218 Conn. at 93 ("[T]he fact that one who commits the most heinous of crimes can expect to spend decades in prison prior to any execution suggests that capital punishment promises little if any deterrence over and above life imprisonment"). But given the extremely long delays—necessarily so—between a death sentence and an execution, if it happens, the likelihood that an offender engages in this kind of "cost-benefit analysis . . . is so remote as to be virtually nonexistent." *Thompson v. Oklahoma*, 487 U.S. 815, 837 (1988); *see also Jones v. Chappell*, 31 F. Supp.3d 1050, 1053 (C.D. Cal. 2014) ("[S]ystemic delay has made [most] execution[s] so unlikely that the death sentence carefully and deliberately imposed by the jury has been quietly transformed into one no rational jury or legislature could ever impose: life in prison, ***with the remote possibility of death***. As for the random few for whom execution does become a reality, they will have languished for so long on death row that their execution will serve no retributive or deterrent purpose and will be arbitrary") (emphasis in original).

Moreover, to carry out an execution after decades have elapsed since the offense also saps the retributive purpose from the punishment and re-traumatizes the surviving victims. In *Santiago*, the Connecticut Supreme Court discussed this duality:

> What then remains of retribution when one who commits a heinous crime is not executed until after he has spent half a lifetime or more on death row, if ever? Unlike with deterrence, the retributive value of an execution defies easy definition and quantification, shrouded as retribution is in metaphysical notions of moral restoration and just deserts. What is clear, however, is that the most tangible retributive fruit of capital punishment—providing victims and their families with a sense of respite, empowerment, and closure—is grievously undermined by the interminable delays in carrying out the sentence imposed.
>
> "[I]n reality, rather than affording them a quick and final disposition of the case against the murderer, so that they may finalize the tragedy and begin rebuilding their lives, the capital

> punishment process often creates a second victimization of
> survivors. They must contend with repeated reminders about the
> murder during the protracted proceedings in which the death
> penalty's implementation is—usually unsuccessfully—sought." R.
> Tabak & J. Lane, "*The Execution of Injustice: A Cost and Lack–
> of–Benefit Analysis of the Death Penalty*," 23 Loy. L.A. L. Rev.
> 59, 129 (1989); *see also Nichols v. Heidle*, 725 F.3d 516, 559 (6th
> Cir. 2013) (Martin, J., concurring) (noting, inter alia, protracted
> nature of death penalty cases, which, in turn, provides "no closure
> for the families of the victims"), *cert. denied*, 574 U.S. 1025
> (2014). Psychologically, the capital punishment system actually
> may impede the healing process. R. Tabak & J. Lane, supra, at
> 131.

*Santiago*, 318 Conn. at 102.

The issue of retraumatizing families is also present in the federal death penalty system.

For example, in 2020, the family of Nancy Mueller and her eight-year-old daughter, Sarah

Powell—the victims in Daniel Lee's case—opposed Lee's execution and had done so for years.

*See*, Campbell Robertson, *"She doesn't want her daughter's killer to be put to death.  Should the

government listen?",* N.Y. Times, Oct. 29, 2019.[25] More recently, at the December 2021

resentencing hearing for Azibo Aquart,[26] a federal capital case in the District of Connecticut, one

family member lamented the seemingly never-ending proceedings:

> So I just want to leave this court just knowing that today will be it. I hope
> you guys take everything that the families have said to consideration and
> just know that we're tired. We thought we put this behind us 11 years ago
> when he was sentenced. And it's just starting to seem like it's never going
> to end. But I do have hopes and trust in the court system that today it will
> end. And that's all I have to say.

---

[25] Available at https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html
(accessed June 3, 2024).

[26] Mr. Aquart's death sentence was vacated by the Second Circuit because of prosecutorial
misconduct at the sentencing phase. *See United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018).

Transcript of Resentencing Hearing, *United States v. Azibo Aquart*, No. 3:06-cr-160-JBA, (D. Ct. Oct. 21, 2021), ECF No. 1368 at 76. When it came time to impose sentence, the judge acknowledged that "[r]esentencing like sentencing in a case about murders as horrific as these is retraumatizing to all involved. The family's pain 16 years later is still palpable." *Id.* at 81.[27]

And Sharon Risher, a minister and the daughter of Ethel Lance and the cousin of Tywanza Sanders and Susie Jackson, victims in the 2015 massacre at Mother Emanuel A.M.E. Church in Charleston, S.C., has spoken at length about how Dylann Roof's death sentence in that case "did not bring my family closure. It only prolonged our agony"[28]:

> Because he was sentenced to death, we are still suffering in ways that could have been avoided. Five years ago, Mr. Roof's first appeal was rejected. It was two years after his crime, but just the experience of that appeal being a headline brought back all of the horror of his violence, renewing our wounds. Every time our case is in the news, I am returned to that terrible day and the searing pain of the weeks, months and years that followed. It almost feels as if he gets to continue the terror he intended to create, because

---

[27] There has been one empirical study investigating how the impact of a death sentence affects the healing and psychological well-being of homicide survivors:

> [T]his Study found that the critical dynamic was the control survivors felt they had over the process of getting to the end. In Minnesota, survivors had greater control, likely because the appeals process was successful, predictable, and completed within two years after conviction; whereas, the finality of the appeals process in Texas was drawn out, elusive, delayed, and unpredictable. It generated layers of injustice, powerlessness, and in some instances, despair. Although the grief and depth of sorrow remained high for Minnesotans, no longer having to deal with the murderer, his outcome, or the criminal justice system allowed survivors' control and energy to be put into the present to be used for personal healing.

Marilyn Peterson Armour and Mark S. Umbreit, *Assessing the Impact of the Ultimate Penal Sanction on Homicide Survivors: A Two State Comparison*, 96 Marq. L. Rev. 1, 98 (2012).

[28] Sharon Risher, *I Wish the Jury Had Not Sentenced My Family's Killer to Death*, N.Y. Times (Nov. 1, 2022), available at https://www.nytimes.com/2022/11/01/opinion/parkland-death-penalty.html (accessed June 7, 2024).

> the focus is on him, while his victims' families wait for the
> supposed finality of an execution that may never come.
>
> This is the unintended but very real consequence of the death
> penalty. Rather than helping my family heal, Dylann Roof's death
> sentence has done the opposite. [29]

Similarly, in this case, there is the prospect of additional delay beyond the current September 2025 trial start date. As the Court acknowledged when it set that tentative date, this case is complex. It is therefore not unreasonable for trial to be delayed as the parties and the Court must address myriad legal issues before jury selection even begins. And while some victims' family members have, understandably, expressed frustration and "annoy[ance] to keep hearing them push for more time for just one more time,"[30] the reality is that these delays are a necessary part of the process. And while family members are also correct that "[t]his is about the 10 families who lost a loved one. This is about Zaire and the survivors,"[31] the delays are a function of the government's decision to seek the death penalty.

In sum, the lengthy delays that are inherent and even necessary to the death penalty process pose two special constitutional conflicts. A lengthy delay "in and of itself is especially cruel because it subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement." *Glossip*, 576 U.S. at 925 (Breyer and Ginsburg, JJ., dissenting) (internal quotation omitted). And yet, those constitutionally warranted delays "undermine the

---

[29] *Id.*

[30] Victoria Hallikar, *Federal trial date set for September 2025 in Buffalo mass shooter case*, Spectrum News 1 (Feb. 2, 2024), https://spectrumlocalnews.com/nys/central-ny/tops_buffalo_mass_shooting/2024/02/02/federal-trial-date-set-for-sept--2025-in-buffalo-mass-shooter-case.

[31] *Id.*

death penalty's penological rationale, perhaps irreparably so." *Id.* at 929. "[L]engthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale." *Id.* at 933. A death penalty does not fulfill the goals of deterrence or retribution, "is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Atkins*, 536 U.S. at 319. In addition, these constitutional delays serve as constant reminders to victims' loved ones about their loss, and the seemingly never-ending trauma that occurs while the case winds itself, slowly, through the legal system.

> **5.  Public Opinion Polls, Legislative Trends and Other Evidence Support the Conclusion That Death Sentences are Increasingly Disfavored**.

With each passing year, public opinion polls show a steady decrease in support for the death penalty. Results from the October 2023 Gallup Crime Survey showed that more Americans believe the death penalty is applied unfairly (50%) than fairly (47%). Between 2000 and 2015, 51%-61% of Americans said they thought capital punishment was applied fairly in the U.S., but this number has been dropping since 2016. This latest number of 47% represents a historic low in the history of Gallup's polling.[32]

Further, notwithstanding the spate of federal executions that took place in a 6-month period between July 2020 and January 2021, legislative trends show that nationally, the death penalty has fallen out of favor, even in states where capital punishment was previously widely used. For example, in March 2021, Virginia Governor Ralph Northam signed a bill abolishing the death penalty in that state, which as one publication noted, "signifies the state's shifting politics; at the national level, it illustrates how unpopular capital punishment is becoming with

---

[32] Megan Brenan, *New 47% Low Say Death Penalty Is Fairly Applied in U.S.*, Gallup (Nov. 6, 2023), https://news.gallup.com/poll/513806/new-low-say-death-penalty-fairly-applied.aspx (accessed June 7, 2024).

the American public—despite the Trump administration's spree of executions."[33] And earlier this year, Missouri, Kentucky, and Ohio legislators introduced new bills to abolish the death penalty in their respective states and resentence those on death row to life in prison without the opportunity for parole.[34]

This court's consideration of the national and state legislative trends is not without precedent. To the contrary, the Supreme Court's consideration of legislative trends in its decisions that have restricted the imposition of the death penalty or other punishments under the Eighth Amendment support this approach. *See e.g., Roper*, 543 U.S. at 565 (characterizing as "telling" that five states had amended laws to prohibit execution of offenders younger than 18 since decision in *Stanford v. Kentucky*, 492 U.S. 361 (1989) in ruling that executing juvenile offenders violates the Eighth Amendment); *Kennedy*, 554 U.S. at 432 (considering state legislation in finding Eighth Amendment prohibits execution for rape of a child);  *Atkins*, 536 U.S. at 313-20 (noting that 16 states had changed their position on executing intellectually disabled persons since the decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989) had found no bar).

The promises of *Gregg* require constant and continuous reassessment of the administration of capital punishment to ensure adherence with the underlying values of the Eighth Amendment. Some jurists recognized the inherent human flaws in the death penalty process from the beginning. *See Gregg*, 428 U.S. at 427 (Brennan, J. dissenting); *id.* at 231 (Marshall, J., dissenting). Others came to recognize those flaws over time. *See Baze*, 553 U.S. 35

---

[33] Madeleine Carlisle, *Why It's So Significant Virginia Just Abolished the Death Penalty*, Time (Mar. 24, 2021), https://time.com/5937804/virginia-death-penalty-abolished/

[34] Death Penalty Information Center, *State Legislative Roundup: New Legislation on the Death Penalty* (Jan. 12, 2024), https://deathpenaltyinfo.org/news/state-legislative-roundup-new-legislation-on-the-death-penalty (accessed  June 7, 2024).

at 86 (Stevens, J., concurring in judgment) (concluding that the death penalty is "patently excessive and cruel and unusual punishment violative of the Eighth Amendment") (citation omitted). More importantly, the empirical data, newly ascertained facts, and argument presented here constitute a "special justification" to find that the FDPA, where it has failed to fulfill the unfounded predictions and requirements set out in *Gregg* is unconstitutional, and for that reason, the federal death penalty must be struck as a sentencing option in this case.

## III.    CONCLUSION

For the foregoing reasons, Payton Gendron moves this Court to enter an order finding the federal death penalty constitutes a cruel and unusual punishment prohibited by both the Fifth and Eighth Amendments and striking the government's Notice of Intent to Seek Death.

Dated:          June 10, 2024
                Buffalo, New York

_s/Sonya A. Zoghlin_
Sonya A. Zoghlin
Assistant Federal Public Defender

_s/Anne M. Burger_
Anne M. Burger
Supervisory Assistant Federal Public Defender

_s/MaryBeth Covert_
MaryBeth Covert
Senior Litigator

_s/Julie Brain_
Julie Brain
Attorney at Law