UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    v.                                                                22-CR-109 (LJV)

PAYTON GENDRON,

                Defendant.

_____

**MOTION TO ESTABLISH PROCEDURES FOR ADMISSION
OF VICTIM IMPACT EVIDENCE AND TO EXCLUDE
<u>CATEGORICALLY INADMISSIBLE TESTIMONY</u>**

      Payton Gendron respectfully submits this Motion to Establish Procedures for Admission

of Victim Impact Evidence and to Exclude Categorically Inadmissible Testimony, pursuant to

the Fifth, Sixth and Eighth Amendments to the United States Constitution and the Federal Death

Penalty Act ("FDPA"). In its Informational Outline, (Sealed ECF No. 210 at 13-20), the

government sets forth the evidence that it seeks to introduce in support of its non-statutory

aggravating factors of Victim Impact and Injury to Surviving Victims. (ECF No. 125 at 4.)  The

Injury to Surviving Victims aggravator is invalid under the FDPA and the Eighth Amendment

and should be stricken, and the government should be precluded from introducing evidence of

non-physical injury to the three surviving victims who are the subjects of non-capital counts in

the Indictment. With respect to the Victim Impact aggravator, the Court should adopt the

procedures requested herein in order to strike the delicate balance between the government's

interest in presenting such evidence and Payton Gendron's fundamental right to a fair trial.

      Victim impact testimony is the most emotionally charged and potentially overwhelming

evidence that a death penalty jury can be asked to hear and consider. As Chief District Court

Judge Mark Bennett put it:

> I can say, without hesitation, that the "victim impact" testimony presented in [the codefendant's] trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee,* which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the *Honken* trial and the juror's sobbing during the victim impact testimony still rings in my ears . . . [S]uch potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias—sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families.

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005) (internal citation omitted).

As Judge Bennett recognized, such evidence inevitably raises the specter of a capital sentencing determination that is based upon improper considerations that the Eighth Amendment cannot tolerate. "It is a hallmark of a fair and civilized justice system that verdicts be based on reason, not emotion, revenge, or even sympathy." *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002). In capital cases specifically, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

Some limited victim impact evidence is, nevertheless, admissible pursuant to the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808, 836 (1991). It is largely left to the trial courts to determine how to walk the difficult line between allowing the presentation of relevant evidence while preventing the penalty phase from becoming the equivalent of a memorial service for the victims that overwhelms jurors' emotions and prevents them from

dispassionately considering the mitigating evidence and reaching a moral decision regarding the appropriate sentence. As one Supreme Court justice has acknowledged, "[i]n the years since *Payne* was decided, [the Court] has left state and federal courts unguided in their efforts to police the hazy boundaries between permissible victim impact evidence and its impermissible, 'unduly prejudicial' forms." *Kelly v. California*, 555 U.S. 1020 (2008) (statement of Justice Stevens regarding the denial of certiorari in two capital cases raising questions concerning the admissibility of victim impact evidence).

There are at least three guideposts for the Court to follow when drawing the distinction between victim impact evidence that is appropriately limited and admissible and that which threatens the fundamental fairness of the proceeding. The first is the Court's statutory gatekeeping responsibility under 18 U.S.C. § 3593(c) to decide if the probative value of a particular piece of evidence is outweighed by the danger of unfair prejudice. The second is the responsibility of the Court to secure the defendant's right to due process by viewing the totality of the proffered evidence, deciding if it is so unduly prejudicial that it would render the trial fundamentally unfair and, if so, enforcing appropriate limitations on what the government may elicit. And third, there are particular categories of victim impact evidence, such as a witness's opinions and characterizations of the crime, the defendant or the appropriate punishment, that are per se inadmissible and must be excluded under all circumstances.

To best perform these functions, the Court should direct the government to prepare written statements for its victim impact witnesses that the Court can review in advance of trial. The Court can then comprehensively and efficiently adjudicate the admissibility of the contents of each one individually, as well as make the critically important assessment of whether, considered *in toto*, the proposed presentation is unduly prejudicial and needs to be further

limited. The Court should then permit the witnesses to testify before the jury by reading their written statements. Additionally, the Court should take appropriate measures to limit the likelihood of overly emotional breakdowns or outbursts in front of the jury.

It should go without saying that the pain and anguish suffered by both the families of the deceased victims and by the surviving victims in this case is unimaginable and is due the deepest and most profound respect. However, the penalty phase of a death penalty trial cannot be the forum for victims or their families to fully express their devastating losses or to have those losses acknowledged. The goal of a capital sentencing proceeding is to reach a just result after scrupulously observing the constitutional requirements placed on the weighty determination of whether the defendant should live or die. The procedures and relief requested herein are designed to further that goal.

## I.    Legal Background and Framework

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court reversed course and held that the Eighth Amendment erects no *per se* bar to the admission of victim impact evidence in the sentencing phase of a capital trial, overruling its contrary decision in *Booth v. Maryland*, 482 U.S. 496 (1987), four years earlier. The Court nevertheless recognized that victim impact evidence that "is so unduly prejudicial that it renders the trial fundamentally unfair" violates the Due Process Clause, *Payne*, 501 U.S. at 825, and maintained the restrictions upon certain specific categories of evidence that had been put in place in Booth. Thus, while the government may introduce evidence of the "injury and loss suffered by the victim and the victim's family" at a capital sentencing, 18 U.S.C. § 3953(a); *Payne v. Tennessee*, 501 U.S. 808, 825-26 (1991), the Fifth and Eighth Amendments and the FDPA circumscribe such evidence.

The evidence that is permitted under *Payne* is that which gives the jury "a glimpse of the

life which the defendant chose to extinguish," in order to "remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society," or that demonstrates the loss to the victim's family resulting from the homicide. *Id.* at 822, 825 (internal quotations omitted). In *Payne*, the defendant was convicted of attacking a woman and her two young children. *Id.* at 812. The woman and her daughter were killed, while her son, though seriously injured, survived. *Id.* The victim impact evidence admitted consisted of the testimony of one witness, the woman's mother and the children's grandmother. *Id.* at 814. She was asked a single question about how her grandson had been affected by the crime, and briefly described how he cried for his mother and sister and didn't understand why they did not come home. *Id.* at 814-15.

The FDPA expressly provides for the admission of victim impact evidence at the penalty phase of a federal capital trial. By its terms, it places more stringent limits upon the evidence that may be presented than the constitutional minimum. "The [aggravating] factors . . . may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information." 18 U.S.C. § 3593(a)(2). The statute provides, however, that "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice." 18 U.S.C. § 3593(c). This standard is more exacting than the standard for excluding evidence at an ordinary criminal trial, which requires that its probative value be "substantially outweighed" by the danger of unfair prejudice. Fed. R. Evid. 403 (emphasis added). It is the duty of the trial court to assess the victim impact evidence using this standard and to exclude it when necessary.

### A.  The Government May Present Evidence that Affords the Jurors a Glimpse of the Individual Lives That Were Lost.

Victim impact testimony regarding the victims' personal characteristics should be strictly limited in quantity and should be focused on the victim's life around the time of his or her death, not on a complete description of him or her from early childhood onwards. As noted, *Payne* permits the admission of evidence of a victim's personal characteristics to provide the jury with "a glimpse of the life" of the victim in order to "remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society." *Id.* at 822. *See also United States v. Fields*, 516 F.3d 923, 946 (10th Cir. 2008) (noting that "case law permit[s] evidence 'giving the jury a glimpse of the victim's personality and the life he led'") (quoting *United States v. Barrett*, 496 F.3d 1079, 1098-99 (10th Cir. 2007); *United States v. Smith*, No. 3:16-cr-00086-SLG, 2020 WL 6536208 at *2 (D. Alaska Nov. 5, 2020) ("The Supreme Court has allowed the government to offer 'a quick glimpse of the life' which a defendant 'chose to extinguish'") (quoting *Payne*); *United States v. Sampson*, 335 F. Supp. 2d 166, 186 (D. Mass. 2004) ("Under *Payne*, the prosecution may offer at capital sentencing 'a quick glimpse of the life which a defendant chose to extinguish.'") (quoting *Payne*); *United States v. Glover*, 43 F. Supp. 2d 1217, 1236 (D. Kan. 1999) (holding that government may present testimony that "provides 'a quick glimpse of the life the defendant chose to extinguish'") (quoting *Payne*); *Cargle v. State*, 909 P.2d 806, 828 (Okla. Crim. App. 1995) (noting that evidence of victim's "personal characteristics should constitute a 'quick glimpse' of their life" and "be restricted to those unique characteristics which define the individual who has died"); *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) ("Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed");

*State v. Koskovich*, 776 A.2d 144, 175 (N.J. 2001) (reiterating previous holding that "victim-impact evidence should provide only a glimpse of the murder victim's life and background").[1]

Thus, in *Sampson*, the court barred the government from putting into evidence a video about the victim that had been produced for a memorial service. *Id.* at 191. The video was 27 minutes long and included over 200 still photographs of the victim, documenting his life chronologically from birth to right before his death as an adult, set to evocative music. *Id.* In many of the photos the victim was depicted posing with family, friends and religious figures. *Id.* at 192. The court found that the video "would have constituted an extended emotional appeal to the jury and would have provided much more than a quick glimpse of the victim's life." *Id.* It therefore held that "its probative value was outweighed by the danger of unfair prejudice, and created a danger of provoking undue sympathy and a verdict based on passion as opposed to reason," and excluded the evidence.

The court in *Sampson* relied heavily on the decision of the Texas Court of Appeals in the factually similar *Salazar v. State*, 118 S.W. 3d 880 (Tex. App. 2003). *Sampson*, 335 F. Supp. 2d at 191-92. In *Salazar*, the prosecution was permitted to introduce a video chronicling the entire life of the victim, who was 20 years old at the time of his death. *Salazar*, 118 S.W.3d at 882. The video was 17 minutes long, contained 140 still photos arranged in a chronological montage, and was set to evocative music. *Id.* The appellate court noted that "the implicit suggestion [of the video was] that appellant murdered this angelic infant; he killed this laughing, light-hearted child; he snuffed out the life of a first-grade soccer player and of the young boy hugging his blond

---

[1] Payton Gendron cites to relevant state court decisions throughout this pleading. Although the Court is obviously not bound by them, we submit that they are instructive and persuasive. The state courts cited are applying the same constitutional principles that the Court must apply in this case, and the states have extensive experience with the admission of victim impact evidence in death penalty cases.

puppy dog," and thus "[t]he danger of unconsciously misleading the jury [was] high." *Id.* at 884. While "the prejudicial effect [of the video was] enormous," it was "barely probative of the victim's life at the time of his death," *id.*, and the appellate court vacated the defendant's sentence.

In *Cargle*, the Oklahoma Court of Criminal Appeals found error in the admission of victim impact testimony that, while "emotionally powerful," was largely "irrelevant." 909 P.2d at 829-830. As in *Sampson* and *Salazar*, the evidence, in the form of a lengthy statement read by a victim's sister, documented almost the entirety of the 33-year-old victim's life, beginning with an anecdote about him when he was age four. *Id.* 824 n.12. It continued with a story of him getting sunburned at the age of eight, included how he used to collect worms for local fishermen as a child and supported the Special Olympics in high school, described his talents as an artist and recounted his efforts raising money for local causes and dressing up as Santa to entertain children at Christmas. *Id.* The court noted that "portraying [the victim] as a cute child at age four in no way provides insight into the contemporaneous and prospective circumstances surrounding his death; nor does it show how circumstances surrounding his death have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family." *Id.* at 829. It therefore found that the probative value of the statement as a whole was substantially outweighed by its prejudicial effect. *Id.* at 830.

Limiting the amount of evidence of the victim's exemplary character and benefit to the community is also necessary to reduce the risk of inviting impermissible comparative worth judgments. *See, e.g., United States v. Fell*, No. 5:01-cr-00012-GWC ECF 1100 at 20 (D. Vt. Jan 20, 2017) (victim impact evidence "is not admissible to prove that one victim matters more than another"); *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998) (limiting victim impact

evidence "[w]hen the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society, then the State exceeds the bounds of permissible testimony . . . Trial judges should exercise their sound discretion in permitting some evidence about the victim's character and impact on others' lives while limiting the amount and scope of such testimony"); *Livingston v. State*, 444 S.E. 2d 748, 751 (Ga. 1994) (noting that it would be constitutionally impermissible for a jury to base its death penalty recommendation on the victim's social status); *Koskovich*, 776 A.2d at 182 ("comparing convicted murderers with their victims is inherently prejudicial because defendants in that setting invariably will appear more reprehensible in the eyes of jurors"). *See also* Amy K. Phillips, Note, *Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing*, 35 Am. Crim. L. Rev. 93, 105 (12997 ("victim impact evidence invites the jury to evaluate the victim's characteristics, such as wealth, class, and family characteristics, and to value the victim's worth accordingly"); Wayne A. Logan, *Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials*, 41 Ariz. L. Rev. 143, 157-58 (1999) ("victim 'characteristics' evidence carries the even greater threat that capital jurors, privy to a stream of witnesses extolling the virtues of the victim, will be tempted to weigh the relative worth of the victim against the defendant they have just found guilty of murder").

Especially pertinent in a case like this is that, even if individual pieces of evidence may not unduly inflame jurors' emotions, if many witnesses are permitted to testify at length and in great detail the total volume of information may overwhelm the jury and cause undue prejudice to the defendant. "Victim impact and character evidence may become unfairly prejudicial through sheer volume. Even if not technically cumulative, an undue amount of this type of

evidence can result in unfair prejudice under Rule 403. Hence, we encourage trial courts to place appropriate limits upon the amount, kind, and source of victim impact and character evidence." *Mosley*, 983 S.W.2d at 263. *See also Livingston*, 444 S.E.2d at 751 ("even some legitimate victim impact evidence could inflame or unduly prejudice a jury if admitted to excess").

### B.  The Government May Also Present a Brief Factual Statement of the Scope of the Loss Suffered by the Victim's Family Members.

Victim impact evidence should be limited to a brief general factual description of the effect that the decedent's death has had on his or her family members, free from inflammatory statements and from purely emotional pleas. *See Glover*, 43 F. Supp. 2d at 1236 (directing that victim impact testimony regarding the loss to the victim's family "should be factual, not emotional, and free of inflammatory comments or references"). *See also Sampson*, 335 F. Supp. 2d at 187 (testimony may not include "a 'mere emotional plea' unrelated to the impact of the crime on the victims or their families") (quoting *Hain v. Gibson*, 287 F.3d 1224, 1237-38 (10th Cir. 2002)); *Muhammad*, 678 A.2d at 181 (permitting only testimony that "describe[s] generally the impact of the victim's death on his or her immediately family" that is "factual, not emotional, and should be free of inflammatory comments or references"); *Turner v. State*, 486 S.E.2d 839, 842 (Ga. 1997) (approving victim impact statements that did not "provide[] a detailed narration of . . . emotional and economic sufferings of the victim's family") (internal quotation omitted) (alteration in original).

In *State v. Bernard*, 608 So.2d 966, 971 (La. 1992), the court held that prosecutors may introduce "a limited amount of general evidence demonstrating harm to the victim's survivors." The more detailed the evidence that is presented on this issue, the court warned, the less relevant it is to the circumstances of the crime or the character and propensities of the defendant, and "the more marginal the relevance of the victim impact evidence, the greater is the risk that an

arbitrary factor will be injected into the jury's sentencing deliberations." *Id.* "The introduction of "particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors, which go beyond the purpose of . . . verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal." *Id.* at 972.

Similarly, the Oklahoma Court of Criminal Appeals held that, while some evidence of the emotional impact of the victim's death on family members may be admitted, "a trial court runs a much greater risk of having its decision questioned on appeal," by admitting it, especially where the evidence is solely of emotional impact to the exclusion of other effects of the loss. *Cargle*, 909 P.2d at 830. "The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a reasoned moral response to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process." *Id.* The court also excluded a photograph of the two victims together in life as clearly irrelevant because it offered no information about how their deaths were affecting their survivors. *Id.*

### C. The Government's Proposed Evidence Must be Examined Piece by Piece and as a Whole to Determine Whether its Probative Value is Outweighed by the Danger of Unfair Prejudice to Payton Gendron and, if so, it Must be Excluded.

As noted, the admission of victim impact evidence violates the Constitution if it "'is so unduly prejudicial that it renders the trial fundamentally unfair' in violation of a defendant's right to due process." *United States v. Sampson*, 335 F. Supp. 2d 166, 186 (D. Mass. 2004) (quoting *Payne*). "'[I]n each case there is a traditional guard against the inflammatory risk, in the trial judge's authority and responsibility to control the proceedings consistently with due process." *Id.* (quoting *Payne*, 501 U.S. at 836 (Souter, J., concurring)). "Exercising this authority is essential in a capital case for, as the Supreme Court has cautioned, '[i]t is of vital

importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.'" *Id.* (quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977)); *see also Smith*, 2020 WL 6536208 at *4 (quoting *Sampson*); *Solomon*, 513 F. Supp. 2d at 540 (noting that, [u]nder the FDPA, the Court has the gatekeeping role to exclude any evidence from the consideration of the jury that is more unfairly prejudicial than probative"); *United States v. Northington*, No. 07-55005, 2013 WL 2147947 (E.D. Pa. May 16, 2013) (noting that "scope and limit of victim impact evidence 'is a matter for the court's discretion and must be determined with consideration for the constitutional limitation that the jury must not be influenced by passion or prejudice'") (quoting *United States v. McVeigh*, 944 F. Supp. 2d 1478, 1488 (D. Colo. 1996)).

There are "two checks on potentially unfairly prejudicial victim impact evidence . . . The first check is the trial court's statutory responsibility, *see* 18 U.S.C. § 3593(c), to decide if the probative value of a particular piece of evidence is outweighed by the danger of unfair prejudice . . . The second check is the responsibility of the court to secure the defendant's right to due process by viewing the proffered evidence in the case and deciding if its admission would contribute to or detract from a trial that is fundamentally fair and allows jurors to base their decisions on reason and reliable evidence rather than passion." *Id.* at 187. *See also United States v. Con-Ui*, No. 3:13-CR-123, 2017 WL783437 (M.D. Pa. Mar. 1, 2017) (noting that a due process violation may 'arise out of a single action or piece of evidence. It could also arise from the cumulative effect of a number of pieces of evidence in combination . . . [these] concerns demand that I consider the case as a whole and assess the overall effect of all evidence which may involve the danger of unfair prejudice") (quoting *Sampson*).

### 1. The Probative Value of Victim Impact Evidence.

At the conclusion of the sentencing phase jurors are called upon to render an individualized, reasoned moral judgment as to whether a sentence of death is appropriate for the defendant based upon the character of the defendant and the circumstances of the crime. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (holding that "full consideration of evidence that mitigates the death penalty is essential if the jury is to give a reasoned moral response to the defendant's background, character, and crime") (internal quotations omitted).  To assess the probative value of aggravating evidence sought to be admitted, including victim impact evidence, the Court must therefore first determine its relevance to that judgment – i.e. whether it tends to increase the moral blameworthiness of the defendant and, if so, the extent to which it does so.

The moral blameworthiness of a capital defendant is determined in part based upon circumstances of the crime about which he had foreknowledge or that were reasonably foreseeable. Obviously, if a defendant was aware that the victim was the mother of two children, for example, and decided to take her life anyway, the fact that she was a mother and he knew he would be depriving her children of their parent is directly relevant to his moral culpability. *See Nesbit*, 978 S.W.2d at 892-93 (approving testimony of impact of decedent's death on her children where defendant knew she was a single mother of five and holding that "probative value is particularly great, where the proof shows . . . that a defendant had specific knowledge about the victim's family when the crime was committed"); *Muhammad*, 678 A.2d at 172 (same); *see generally Payne*, 501 U.S. at 812-13 (decedent was a mother whose children were with her in apartment when crime occurred).

Additionally, the fact that the decedent was a unique individual and that they are likely to leave behind family members who will be negatively impacted by their loved one's death are consequences that are eminently foreseeable in any case of intentional murder. *See Bernard,* 608 So.2d at 971-72; *Muhammad,* 678 A.2d at 172.

> [A]ny person of basic understanding knows that every murder victim is a unique individual and that the murder will cause some emotional, physical or economic harm to some group of survivors. Since a specific intent murderer either knew or reasonably should have foreseen some of the consequences of his victim's death, this general knowledge at the time of the crime is a fact bearing on the murderer's moral culpability and to that extent is relevant both to the circumstances of the crime and to the murderer's character and propensities. Thus, the prosecutor, within the bounds of relevance under the statute, may introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors.

*Bernard*, 608 So.2d at 971.

However, the further that victim impact evidence goes beyond "[i]nforming the jury that the victim had some identity or left some survivors," and the more extensive the descriptions of the victim's characteristics or the emotional impact on his or her family members that the defendant could not have predicted, the lower its probative value. *Id. See also* Susan Bandes, *Empathy, Narrative, and Victim Impact Statements*, 63 Univ. of Chi. L. Rev. 361, 398 (1996) (noting that capital sentencing decision for particular defendant should be based "on the harm they have caused and their moral culpability for that harm, not on irrelevant fortuities such as the social position, articulateness, and race of their victims and their victim's families"); Janice Nadler & Mary R. Rose, *Victim Impact Testimony and the Psychology of Punishment*, 88 Cornell L. Rev. 419, 422 (2003) (noting that "the emotional fallout of a crime to a victim or a victim's family is a paradigmatic example of adventitious harm" that "reflects neither the murderer's mental state nor the morality of the act itself"). Victim impact evidence must therefore be limited

to general evidence of the victim's individuality and the loss to his or her family that is foreseeable and thus most relevant to the issue that the jurors will be called upon to decide.

### 2. The Prejudice That Victim Impact Evidence May Cause.

In contrast to its limited probative value, victim impact evidence has the potential to cause overwhelming prejudice to a defendant because of its emotional and heart-wrenching nature. "Victim impact evidence, by its very nature, is emotionally charged material which involves the risk of injecting arbitrary factors into a capital sentencing hearing." *Bernard*, 608 So.2d at 968. *See also Smith*, 2020 WL 6536208 at * 8 ("'Victim impact testimony cannot be totally divorced from emotion,' and thus, the 'presentation of victim impact evidence can be problematic because of the potential for emotional outbursts during the testimony of family members.'") (quoting *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 340 (M.D. Pa. 2002)).

The victim impact testimony presented during the trial of Timothy McVeigh in 1997 has been described as evidence of harm "in riveting, emotional, poignant, heart-wrenching detail: that was allowed to "flood the courtroom." Richard Burr, *Litigating with Victim Impact Testimony: The Serendipity That Has Come from* Payne v. Tennessee, 88 Cornell L. Rev. 517, 521, 526 (2003). "The 'grieving process, the mourning process' . . . and the compelling emotional need for witnesses to pay homage to their loved ones and to find some way of sharing their intense pain [] rolled over everyone . . . The truth is that the emotion was so powerful that it overwhelmed all those involved in this case – jurors, counsel, and judge." *Id.*

Social science research tells us that victim impact testimony can block jurors' ability to hear and process a defendant's mitigation story and feel empathy for him.

> [Victim impact statements] evoke unreasoned, unreflective emotion that cannot be placed in any usable perspective. In evidentiary terms, victim impact statements are prejudicial and inflammatory. They overwhelm the jury with feelings of outrage toward the defendant and identification with the victim. Finally, victim

> impact statements diminish the jury's ability to process other relevant evidence, such as evidence in mitigation.

Bandes, *supra* at 401 (internal citations omitted). *See also* Bryan Myers & Edith Greene, *The Prejudicial Nature of Victim Impact Statements: Implications for Capital Sentencing Policy*, 10 Psychology, Public Policy, and Law 492, 493-94 (2004) (victim impact evidence "may be so emotion-laden in its content that jurors may be persuaded more by how they feel about the testimony than by the facts of the case"); Logan, *supra*, at 177:

> [Victim impact evidence] is perhaps the most compelling evidence available to the State – highly emotional, frequently tearful testimony coming directly from the hearts and mouths of survivors left behind by killings. And it arrives at the precise time when the balance is at its most delicate and the states are highest – when jurors are poised to make the visceral decision of whether the offender lives or dies – after the defendant has been convicted of the most horrendous crime possible.

Jurors, like everybody else, feel empathy most easily with people who are like them. "We all have limited perspectives and a limited ability to empathize with those who do not share our life experiences and values." *Id.* at 399. Most jurors have a "natural, instinctive connection" with the victim of a crime. *Id.* at 400. It is often extremely difficult, however, for jurors to empathize with the defendant. "Not only has the defendant been convicted of a heinous crime – a fact that by itself sets him very much apart from the jury's experience – but he may be from a radically different socioeconomic milieu as well." *Id.* Victim impact statements, and the emotions that they evoke in jurors, further interfere with the challenging task of empathizing with the defendant and comprehending his humanity by playing upon their natural empathy for the victim. *Id.* at 401-03.

Empirical evidence also shows that jurors are, in fact, improperly influenced by the perceived social value of victims, counseling extreme caution in admitting victim impact evidence that highlights and underscores that value. Mock juror studies have shown that jurors

"evaluate the perpetrator's intentions less negatively when the victim is disliked." Myers &

Greene, *supra*, at 499-500 (collecting studies). One study also showed that jurors' perceptions of

harm to the victim's family are affected by the victim's social standing. "Mock jurors rated the

family's suffering as greater when the victim was portrayed as more respectable, (e.g.,

successful, civic minded, a loyal husband and devoted father, a professional photographer) than

when the victim was portrayed as less respectable (e.g., a loner and divorced biker)." *Id* at 500

(citing E. Greene, *The Many Guises of Victim Impact Evidence and Effects on Jurors'*

*Judgments*, 5 Psychol., Crime, and Law 331 (1999)).

Psychological research has uncovered several ways in which emotions affect decision

making. *See Nadler & Rose, supra,* at 443-48 (collecting studies). "Anger is a punitive emotion;

people who are angry in reaction to hearing about a crime are motivated to call for greater

punishment for that crime." *Id.* at 443. Anger also alters people's perceptions of why an event

happened. *Id.* at 444. People induced to feel anger in one study were more likely to blame

individuals for negative outcomes than they were to blame impersonal forces. *Id.* Anger also

activates a form of confirmation bias. "Exposure to intense emotional suffering heightens

decision makers' negative affect and consequently activates 'blame-validation processing.' In

this state, jurors or other decision makers look for ways to hold an offender responsible, even for

unforeseeable outcomes . . . In short, the anger aroused by hearing victim impact statements

often induces decision makers to engage in a search for evidence to support more blame and

punishment." *Id*. at 444-45.

Similarly, feelings of sympathy for the victim's family members motivate jurors to

punish more harshly. *Id.* at 446-47. "A particularly intriguing aspect of the role of sympathy in

punishment judgements is that the emotional intensity of witnesses giving victim impact

testimony is perceived by observers as a cry for help or relief . . . In this way, the emotion

expressed by the victim becomes a covert communication about the victim's, or the victim's

family's, desire for retribution." *Id.* at 447. Research since *Payne* was decided thus counsels

extreme caution in deciding how much emotional victim impact evidence can be admitted

without rendering the trial fundamentally unfair.

> **II. The Court should adopt procedures to effectively and efficiently exercise its gatekeeping function to ensure that Payton Gendron receives a fair trial.**
>
>> **A. The government should be required to produce written victim impact statements in order to permit a careful review of the government's proposed evidence in advance and make the required findings regarding its admissibility.**

In order to most effectively and efficiently fulfill its vitally important gatekeeping

function and ensure that Payton Gendron is afforded a fair trial, the Court should order the

government to produce written victim impact statements to enable the Court and the parties to

carefully assess the proposed evidence and determine its admissibility before it is placed before

the jury. The Court should thereafter direct the government to instruct its witnesses to read from

those statements before the jury. Once heard, inherently powerful and emotional evidence cannot

be ignored and, if undue prejudice has resulted, it cannot be remedied. Furthermore, especially in

a case of this magnitude with a large number of victims, it is crucial that the Court assess the

victim impact evidence as a whole before admitting any of it. To begin presenting the evidence

without first making the determination that it is properly admissible *in toto* risks the Court being

placed in the position of having to terminate the presentation midstream if it becomes apparent

that the risk of unfair prejudice has become too great.

To accomplish this task in the most accurate and efficient manner, the Court should

follow the procedure first implemented in *Glover*, 43 F. Supp. 2d at 1235-36, and subsequently

followed by a number of federal district courts. In *Glover*, "mindful of its authority and responsibility to control the proceedings consistently with due process," the court directed the government to "submit a written statement describing the proposed testimony as to each 'victim impact witness'" in advance of the penalty phase. *Id.* at 1235 (internal quotations omitted). The court granted the defendant's request that it "weigh each specific point of the proffered testimony to ensure that its probative value is not substantially outweighed by the risk of undue prejudice and misleading the jury, and to determine the relevance of the proffered testimony." *Id.*

The procedures implemented in *Glover* and requested by Payton Gendron have been adopted by several additional federal district courts including the Middle District of Pennsylvania, *see O'Driscoll*, 203 F.Supp.2d at 340-41 (following *Glover* and requiring advance submission of written statements describing testimony of each witness); the Eastern District of Pennsylvania, *see Northington*, 2013 WL 2147947 (requiring advance production of victim impact statements or outline of specific testimony of each witness to allow defendant to make specific objections); the Eastern District of New York, *see United States v. Wilson*, 493 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2007) (same); the District of Massachusetts, *see United States v. Sampson*, No. 01-cr-10384 ECF No. 2430 at 4 n.3 (D. Mass. Aug. 26, 2016) (*"Sampson II"*) (requiring pretrial proffer of entirety of anticipated testimony of victim impact witness); and the Southern District of Ohio, *see United States v. Henderson*, 485 F. Supp. 2d 831, 849-850 (S.D. Ohio 2007) (requiring advance production of written victim impact statements for court to review and redact as needed and requiring witnesses to read those statements verbatim at trial).

A number of state courts have prescribed similar procedures in order to protect a defendant's right to a fair trial. *See, e.g., State v. Muhammad*, 678 A.2d 164, 179-181 (N.J. 1996) (requiring victim impact testimony to be reduced to writing, a pretrial hearing to conduct

preliminary determination of admissibility and a limit of one witness who must read written statement); *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998) (requiring notice to court of intent to introduce victim impact evidence and hearing outside presence of jury to determine admissibility); *State v. Bernard*, 608 So.2d 966, 972-73 (La. 1992) (same); *Cargle*, 909 P.2d at 828 (state must file notice detailing victim impact evidence sought to be introduced and court must conduct in-camera hearing to determine admissibility); *Turner v. State*, 486 S.E.2d 839, 841-42 (Ga. 1997) (approving procedure requiring victim impact witnesses to prepare written statements, pretrial hearing to determine admissibility then requiring witness to read the written statement before jury).

Even if the Court is disinclined to restrict victim impact witnesses to reading their written statements verbatim when called to testify, requiring the government to prepare them for advance review by the Court is nevertheless the most efficient and effective way of reliably conducting the assessment and making the rulings that the Court is required to make. The procedure will serve to focus the parties' arguments and enable the Court to make the required judgments with the benefit of a thorough understanding of the potential scope and content of what the government proposes to present. The government can then craft its direct examinations to ensure that the testimony as presented stays within the bounds that the Court has imposed.

## B. The Court should take all available measures to limit the possibility of prejudicial emotional outbursts during victim impact testimony.

The Court should further require the government to inform the Court and the defense in advance of the hearing if it anticipates that any of its witnesses may have difficulty controlling their emotions on the witness stand. This will allow the Court to decide whether additional measures are necessary to protect the integrity of the trial such as video recording the witness' testimony to play for the jury or having the victim's statement read by a third party. *See, e.g.,*

*United States v. Christensen*, No. 2:17-cr-20037 ECF No. 529 at 24-39 (C.D. Il. July 9, 2019)

(victim impact testimony from decedent's mother videotaped and unduly prejudicial portions

edited out before recording played for jury); *O'Driscoll*, 203 F.Supp.2d at 341 n.6 (noting that

court "will give serious consideration" to any request that victim impact witnesses be videotaped

and presented to jury in that manner to "eliminate the possibility of emotional and potentially

prejudicial outbursts" before the jury).

Finally, the Court should admonish all victim impact witnesses prior to taking the stand

that they must "witnesses to refrain from reflecting excessive emotion and that the witnesses'

failure to do so might result in the Court's decision to terminate their testimony." *Henderson*, 485

F. Supp. 2d at 850. *See also Glover*, 43 F. Supp. 2d at 1221-22 (noting court will inform victim

impact witnesses that they may not testify if unable to contain emotions).

If the Court does not establish parameters for the government's victim impact evidence

*before* the penalty phase begins, there is virtually nothing that can be done once proceedings are

underway to reduce the risk of extreme and undue prejudice to Payton Gendron. Expecting

defense counsel to lodge objections during the government's victim impact case when testimony

overruns the constitutional and statutory parameters or is overly emotional puts defense counsel

in the position of choosing between failing to protect their client's rights or risking the assured

reprobation of the jury for having interrupted and objected to a rightfully emotionally distraught

victim witness.  *Shockley v. State*, 579 S.W.3d 881 (Mo. 2019) ("objecting would have made it

appear as if defendant were trying to hide someone's grief, which would not have been in his

best interest"); *Williams v. State*, 251 S.W.3d 290, 295 (Ark. 2007).

Moreover, even were the Court to address such an objection at sidebar, out of the jury's

hearing, the witness would be left alone on the witness stand under the weight of the memories

and sense of loss for the jury to observe. *United States v. Johnson*, 713 F. Supp. 2d 595, 625 (E.D. La. 2010) (during sidebar objection, victim-impact witness remained on stand and "continue[d] to cry within feet" of jurors, leaving them "totally vested in her plight" and "feel[ing] her misery unattended by counsel and the Court"); *see also Johnson*, 362 F. Supp.2d at 1107 ("[t]o pretend that such evidence is not potentially unfairly prejudicial . . . is simply not realistic, even if the court were to give a careful limiting instruction"). Once the government's presentation has begun, it is not easily interrupted without grave prejudice to Payton Gendron.

### III. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ELICITING TESTIMONY THAT IS CATEGORICALLY INADMISSIBLE

In addition to the Court's responsibility to limit the amount of victim impact evidence that is presented to a brief glimpse of the decedent's life and a description of the loss to his or her family to avoid overwhelming and unduly prejudicing the jury, there are certain kinds of information that are categorically inadmissible. Examples of testimony that falls within those categories are included in the government's Informational Outline as set forth below, and the Court should exclude them at the outset.

#### A. Victims' characterizations or opinions about the crime, Payton Gendron, or the appropriate punishment are improper.

While victims' family members may offer "evidence about the victim and about the impact of the murder on the victim's family," *Payne*, 501 U.S. at 827, the Supreme Court has also held that admission of survivors' "'characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment.'" *Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016) (per curiam) (quoting *Booth v. Maryland*, 482 U.S. 496, 502-03 (1987)); *see also Whitten v. United States*, 610 F.3d 168, 192 (2d Cir. 2010). Such statements, the Court has explained, "can serve no other purpose than to inflame the jury and divert it from deciding the

case on the relevant evidence concerning the crime and the defendant." *Booth*, 482 U.S. at 508. In this cross-racial case, where Payton Gendron, a white male, is charged with hate crimes resulting in the deaths of 10 Black victims, this necessarily includes victim witnesses' opinions about the racial nature of the case. Admission such racial victim impact evidence, which can be acutely prejudicial, raises the real risk, of an unreliable death sentence.

Additionally, victim impact testimony may not include descriptions of harm that has resulted from the trial process. *See McVeigh*, 944 F. Supp. at 1491 ("because victim impact evidence is relevant only to demonstrate the specific harm caused by a particular crime, it seems clear that the victims' testimony must reflect the harm caused by the criminal conduct, rather than the impact of the trial proceedings") (internal citations omitted); *Smith*, 2020 WL 6536208 at *7 (noting disinclination to find such testimony relevant). Indeed, admitting testimony on this subject would impermissibly burden a defendant's Sixth Amendment right to a trial. *Cf. Griffin v. California*, 380 U.S. 609, 614 (1965) (noting that commenting on a defendant's refusal to testify at trial "is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly").

Accordingly, based on the Supreme Court precedent, the government should be precluded from eliciting the following:







**B. The Court must categorically exclude evidence that improperly invites a comparative worth assessment, including evidence and/or testimony describing a victim's value to the community or society.**

The Supreme Court's decision in *Payne* also cautioned against victim impact evidence that invites an improper comparative worth assessment by suggesting that "defendants whose victims were assets to their community are more deserving of punishment." 501 U.S. at 809, 823. Similarly, the FDPA authorizes evidence about "the injury and loss suffered by the victim and the victim's family," not to society or the broader community. 18 U.S.C. § 3953(a). *See also United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008) (approving evidence of personal impact on "friends who (also) worked with the victim," but not "loss of [victim's] contribution to

an office, unit or team").  Evidence that indicates the high regard in which the victim was held in the community, such as well-attended funerals, memorials and tributes, should also be excluded under this principle.





(*Id.*).



**C. The Court must categorically exclude evidence of victims' or their families' misfortunes unrelated to the crime because it encourages a jury to sentence Payton Gendron to death based on events he did not cause.**

Under *Payne,* victim impact evidence must be limited to that which shows "the specific harm caused by the defendant." 501 U.S. at 825; *see also id.* at 832 (government may prove "the specific harm caused by the defendant to the victim's family" that bears on his "culpability."); *id.* at 838 (Souter and Kennedy, JJ., concurring) (victim impact involves "the kinds of consequences" to victim's family "that were obviously foreseeable," and thus have "direct moral relevance" to the offender's culpability). Evidence of other misfortunes that victims have encountered in their lives, wholly unrelated to the crimes of the defendant, are therefore categorically inadmissible. Otherwise, evidence "that had nothing to do with the defendant risk[s] inappropriately affecting jurors who might feel that" the victim impact witnesses "should

---

3

be vindicated for all [their] tragedies, not just for the one caused by [the defendant]." *Floyd v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020). Thus, for example, in *People v. Carrington*, the appellate court approved the prosecutor's decision not to argue that the victim's murder caused her mother to die prematurely and her father to suffer a stroke, because "such an inference would not be appropriate." 211 P.3d 617, 658 (Cal. 2009). When a witness later noted the victim's mother's death, and added, "I think the loss of her daughter took its toll," the district court properly "admonished the witness . . . stating that 'this is an area we can't speculate about.'" *Id.*; *see also United States v. Rust*, 41 M.J. 472, 478 (1995) (non-capital decision, relying on *Payne*, finding error in the introduction of alleged impact evidence because its connection to crime was "too indirect" and "too tenuous.").







**D. Testimony That Is Speculative, Including Evidence of Happenstance That Led To The Victims Being At Tops Store At The Time Of The Shooting, Should Be Excluded.**

The Court should exclude all testimony that is purely speculative. Speculative victim-impact testimony adds the weight of unknown (and unknowable) events to the factors favoring a

death sentence.  In *People v. Carrington*, 211 P.3d 617, 658 (Cal. 2009), the victim's husband testified that her mother had died earlier in the year and added, "'I think the loss of her daughter took its toll.'" The trial court immediately instructed the witness that such speculation about the effect of the victim's death on her mother's health was inappropriate, a response that the California Supreme Court expressly approved. *Id. See also State v. Koskovich*, 776 A.2d 144, 216 (N.J. 2001) (Stein, J., concurring in part and dissenting in part) (noting that portion of victim impact statement by victim's mother that as a result of their loss her husband had given up his business and returned to employment that required him to make a long drive to work on major highways, thus putting him at risk of road accidents, was "speculation that lies well beyond the appropriate boundaries of victim impact statements").





### E. The Court should categorically exclude testimony regarding how the victim-impact witnesses learned of the deaths of their respective loved ones.

The Court should also exclude from the outset testimony of victim impact witnesses recounting how they learned of their family member's death. The constitutionally permissible "quick glimpse" of the decedent and description of the survivor's loss can readily and compellingly be given without reference to such an exquisitely painful and traumatic aspect of the experience. Such testimony is offered precisely because of its extraordinarily heart-wrenching and emotional nature, not because it has any particular probative value, and the government should be prohibited from presenting it.



In a study ultimately published in a journal of the American Psychological Society, social science researchers investigated commonalities in the presentation of victim impact evidence by

analyzing the transcripts of such testimony by 192 witnesses in over 130 capital penalty phase proceedings. *See* Bryan Myers, Narina Nunez, Benjamin Wilkowski, Andre Kehn & Katherine Dunn, *The Heterogeneity of Victim Impact Statements: A Content Analysis of Capital Trial Sentencing Penalty Phase Transcripts*, 24 Psych., Pub. Pol'y. and L. 474, 478 (2018). Upon review, the researchers were struck by the fact that they "quickly identified a tendency for witnesses to describe the experience of learning the news that the victim had been murdered. In many instances, and often in dramatic fashion, witnesses would provide detailed accounts of how they learned that the victim had died." *Id.* In the end, they determined that such testimony occurred in 33.3% of all victim impact statements analyzed:

> This trauma narrative emerged with a relatively consistent pattern. In some cases, they were prompted by the prosecutor (e.g., "Tell the court how you learned of his death"), while in other instances they emerged unsolicited. In each of these cases, witnesses described how they learned about the crime, and often described their shock or behaviors that illustrated the devastation they felt at the time (e.g., "He called me at my place of employment. I dropped the phone and began to scream"). In many instances, they depicted these trauma narratives as shocking and life-altering events from which they have not recovered.

*Id.* at 481. When they occurred, such statements were elicited by the examining prosecutor in 45.7% of cases; only 22% were read by the witness as part of a prepared statement. *Id.* at 480. Finally, the study revealed that, unlike all other categories of content of victim impact statements studied, presenting jurors with testimony about how the witness learned of the victim's death was associated with sentencing outcome: "These narratives were more than twice as likely to arise in death cases than in cases leading to a life sentence." *Id.* at 484.

Given this empirical evidence, as well as logic and common sense, clearly the probative value of victim impact testimony about learning of the victim's death "is outweighed by the danger of creating unfair prejudice, confusing the issues, [and] misleading the jury" regarding the proper basis for the capital sentencing determination. 18 U.S.C. § 3593(c). The government

will have no difficulty whatsoever establishing the existence of the Victim Impact non-statutory aggravating circumstance in this case without recourse to such incendiary and disturbing evidence. Its only purpose, then, is to encourage a verdict improperly based upon sympathy and outrage, rather than on evidence and reason, and the Court should accordingly exclude it.

IV.    **The "Injury to Surviving Victims" Non-Statutory Aggravating Factor is Improper Under the FDPA and the Eighth Amendment and Should be Stricken.**

The FDPA and the Eighth Amendment both preclude the use of evidence of the impact upon victims of non-capital crimes as a basis upon which to seek a death sentence for other, death-eligible offenses. The "Injury to Surviving Victims" non-statutory aggravator alleged in the government's Notice of Intent to Seek the Death Penalty, ECF No. 125, is therefore invalid and must be stricken. Evidence of non-physical injury to the three surviving victims who are named in the non-capital Counts 21-26 of the Indictment should also be precluded as irrelevant.

A.  **Evidence of non-physical injury to victims of non-capital crimes is inadmissible under the FDPA.**

By its terms, the FDPA limits the admissibility of victim impact evidence to the victims of the capital crimes that trigger its application. The statute provides that aggravating factors "may include factors concerning the effect of *the offense* on the victim and the victim's family." 18 U.S.C. § 3593(a)(2) (emphasis added). As the district court held in *United States v. Sampson*, 335 F. Supp. 2d 166, 193 (D. Mass. 2004), this language "makes no express provision for victim impact evidence concerning the victim of a crime for which the defendant is not being sentenced," for "the offenses at issue" for § 3593(a)(2) purposes are the capital crimes carrying a potential sentence of death. *See also United States v. Gooch*, 2006 WL 3780781 at *22 (D.D.C. Dec. 20, 2006) ("Clearly, the FDPA refers to the victims of a capital crime."); *United States v. Shakir*, No. 3:98-00038, ECF No. 3178 at 2-3 (M.D. Tenn. Apr. 2, 2008) ("The Court finds that

the relevant language of the statute in question, 18 U.S.C. § 3593(a)(2) clearly indicates that the 'victim' in question is the victim of the death-eligible murder.").[4]

The limited scope of permissible evidence under the statute makes sense because "th[e] losses and emotions [of surviving victims] are not relevant to whether the jury selects the death penalty for the alleged murders of [the deceased victims]." *Gooch*, 2006 WL 3780781 at *22 (excluding victim impact evidence regarding victims of non-capital homicides at penalty phase on capital charges); *see also Shakir, supra*, (same); *Sampson*, 335 F. Supp. 2d at 193 (same). In *United States v. Ciancia*, No. CR 13-902, 2015 WL 13798677, at *6-7 (C.D. Cal. Sept. 8, 2015), in which the defendant was capitally charged with the murder of a TSA officer during a shooting at LAX airport, the court struck an aggravating factor that alleged the defendant's actions also terrorized numerous airline passengers and employees and caused them extreme emotional distress. It stated, "[a]lthough the Court in no way discounts the very real terror and continuing trauma that likely resulted from witnessing the murder of Officer Hernandez, this aggravating

---

[4] Consistent with the plain text of this statutory provision, it is clear from Congress's use of the term "victim" elsewhere in the FDPA that it is intended to mean the victim of the capital crime that triggers the operation of 18 U.S.C. § 3593(a)(2). *See, e.g.*, §§ 3591(a)(2)(A) ("killed the victim"); 3591(a)(2)(B) ("death of the victim"); 3591(a)(2)(C) ("the victim died"); 3591(a)(2)(D) ("the victim died"); 3592(a)(7) ("the victim's death"); 3592(c)(5)("a grave risk of death to 1 or more persons in addition to the victim"). *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (noting "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning").

The statement attached by President Bush to legislation he submitted to Congress containing the precise victim impact language that was ultimately enacted provides still further support for this reading. *See* Comprehensive Violent Crime Control Act of 1991, H.R. Doc. No. 102-58, at 166 (1991) ("The subsection specifies that aggravating factors for which notice is provided may include factors concerning the effect of the offense on the victim and the victim's family. *The effect on the victim may include the suffering of the victim in the course of the killing or during a period of time between the infliction of injury and resulting death*, and the victim's loss of the opportunity to continue his characteristic activities and enjoyments and to realize his plans and aspirations *because of the extinction of his life by the defendant.*) (emphasis added).

factor does not highlight behavior that is relevant to whether Defendant receives a death sentence." *Id.* at *7.

The FDPA's limitation on victim impact evidence to deceased victims also makes sense because the impact of non-capital crimes on surviving victims is accounted for by the federal criminal legal system in other ways. Payton Gendron will be sentenced for his non-capital crimes by the Court, in a separate sentencing proceeding, and not by the jury. The sentence set by statute for those offenses presumes and accounts for the general likelihood of adverse psychological effects upon victims of such crimes; where unusually severe psychological injury has resulted, an upward departure may be invoked. *See* U.S. Sentencing Guidelines Manual § 5K2.3 (U.S. Sentencing Comm'n 2021) (providing for departure for "psychological injury much more serious than that normally resulting from commission of the offense").[5]

And, of course, at that non-capital sentencing proceeding the government may present any evidence it deems relevant and the surviving victims will be afforded an opportunity to be heard. *See* Fed. R. Crim. P. 32(i)(4)(B) ("Before imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard."); 18 U.S.C. § 3771(a)(4) (affording crime victims the "right to be reasonably heard" at sentencing proceedings).[6]

---

[5] Given that only extreme psychological injury is a sufficiently aggravating factor to justify an enhanced penalty in the non-capital sentencing context, the use of "serious . . . emotional injury, and severe psychological impact" to surviving victims, (ECF No. 125 at 4), as a basis upon which to urge a jury to impose a sentence of death cannot be squared with the Eighth Amendment.

[6] The Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA"), does not, however, confer upon victims of non-capital crimes the right to be heard at a capital sentencing proceeding. *Gooch*, 2006 WL 3780781 at *22 n.20. Rather, the right is afforded only at "a proceeding involving an offense against a crime victim," 18 U.S.C. § 3771(b)(1), and the capital sentencing proceeding "involves" only the capital counts. *Id.* "[A]llowing the victims of noncapital crimes to speak at a

**B.  The Eighth Amendment bars the use of evidence of non-physical injury to victims of non-capital crimes at a capital sentencing proceeding.**

Non-physical injury to surviving victims has no legitimate bearing upon a defendant's blameworthiness or death-worthiness because the particular emotional impact of an injury upon a person entirely unknown to him is unforeseeable. This is so in part because of the vast individual differences in responses to such events. A person's response may be affected by factors unrelated to the crime, including his or her preexisting psychological condition. Additionally, the balance of the evidence at trial will likely turn on the accident of the individual victim's articulation skills. *See* Janice Nadler and Mary R. Rose, *Victim Impact Testimony and the Psychology of Punishment*, 88 Cornell L. Rev. 419, 442 (2003) ("unlike physical harm, emotional harm is a particularly unreliable heuristic [for culpability], because individual emotional responses to a crime vary widely among individuals. In addition . . . how effectively victims and survivors express their experiences in court is likely to vary broadly"). Such vagaries have no place in the determination of a defendant's death-worthiness vis á vis separately charged capital offenses.

To be sure, the general fact that seriously adverse consequences would likely flow from Payton Gendron's conduct on the day of the shooting was eminently foreseeable. By the same token, however, that general fact will be inescapably apparent to the jurors when they hear about the circumstances of the crime. Adding the victims' first-person accounts of their psychic agony and suffering, and directing the jurors to place those accounts on death's side of the scale when deciding punishment, introduces arbitrariness and capriciousness to the operation of the federal death penalty that the Eighth Amendment cannot tolerate.

---

separate sentencing hearing will properly preserve those victims' CVRA rights." *Id.*



These objections, of course, apply also to victim impact evidence with respect to
deceased victims; indeed, the lack of foreseeability and its negation of blameworthiness, and the

arbitrary influence of the characteristics of the victim's family, were the principal grounds for the decision in *Booth v. Maryland,* 482 U.S. 496 (1987), which outlawed such evidence altogether. *See id.* at 504-05 ("Allowing the jury to rely on a V[ictim]I[mpact]S[tatement] therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the jury's attention away from the defendant's background and record, and the circumstances of the crime"); *id.* at 505 (noting that "in some cases, the victim will not leave behind a family, or the family members may be less articulate in describing their feelings, even though their loss is equally severe. The fact that the imposition of the death sentence may turn on such distinctions illustrates the danger of allowing juries to consider this information. Certainly the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant, who may merit the death penalty, should live or die").

When the Court in *Payne* carved out an exception to nevertheless permit limited amounts and types of such evidence with respect to deceased victims, it did so on the ground that, "[b]y turning the victim into a faceless stranger at the penalty phase of a capital trial, [a per se ban on victim impact evidence] deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Payne*, 501 U.S. at 825 (internal quotation omitted). Plainly, this logic cannot support the expansion of the holding in *Payne* to permit evidence of the impact of non-capital crimes upon surviving victims. Far from being "faceless strangers," these victims will have appeared in person before the jury during the culpability phase of the trial to testify about the crime, what they observed and the bodily injuries they received. There is no justification, therefore, for admitting additional, irrelevant testimony at the penalty phase

regarding their feelings about what happened and its psychological and emotional impact on them.

### V.    Conclusion

For the foregoing reasons, Payton Gendron respectfully requests that this Motion be granted and that the Court adopt the procedures requested herein for the admission of victim impact evidence, exclude evidence which is categorically inadmissible, strike the Injury to Surviving Victims aggravating circumstance and preclude the presentation of evidence of non-physical injury to the surviving victims of non-capital offenses.


Dated:  March 31, 2025
        Buffalo, New York

<div style="margin-left:40%">

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Julie Brain, Attorney at Law

*s/Monica Foster*
Monica Foster
Executive Director
Indiana Federal Community Defenders Inc.

</div>