UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

     v.                                                22-CR-109 (LJV)

PAYTON GENDRON,

            Defendant.

_____

## DEFENSE MEMORANDUM IN SUPPORT OF DEFENSE
## PROPOSED JUROR QUESTIONNAIRE

     Defendant Payton Gendron, through undersigned counsel, respectfully submits this

Memorandum in support of his Proposed Juror Questionnaire, ECF No. 314 ("Defense Proposed

Questionnaire").  Where appropriate, we also respond herein to the Memorandum of Law filed by

the government, ECF No. 312 ("Gov't Memo").

     The Defense Proposed Questionnaire will best facilitate the Court's ability to do what is

constitutionally required: select "an impartial jury" that is "not [] tilted in favor of capital

punishment." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).  The Court, the government, and

the defense all have a common interest in the selection of an impartial jury capable of performing

the functions set forth in 18 U.S.C. § 3593.  Requiring potential jurors to be upfront about their

beliefs, biases, abilities, and limitations in the questionnaire—before they are called in for

individual voir dire—will ensure a more effective and efficient jury selection process.  The Defense

Proposed Questionnaire is essential to achieving that goal; we urge the Court to adopt it.

## I.    Legal Principles Governing Capital Jury Selection

    1.    <u>There is a heightened need for thorough voir dire in capital cases</u>

    "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to

identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (citing *Rosales-Lopez v.*

*United States*, 451 U.S. 182, 188 (1981); *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950)). While courts have broad discretion in conducting voir dire, the Supreme Court has "not hesitated … to find that certain inquiries must be made to effectuate constitutional protections." *Id.* at 730. Courts must be particularly careful to ensure that voir dire satisfies the Sixth and Eighth Amendments in capital cases, *see id.*, given the enormity of the stakes for the defendant. Any restrictions on the defense's request for particular inquiries must comport with "the essential demands of fairness." *Id.* (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)).

Specifically, the Sixth Amendment entitles a defendant to "inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at 736. "[A] juror's bias [need not] be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.'" *Wainwright v. Witt*, 469 U.S. 412, 424-425 (1985).

Thus, a searching voir dire is necessary for both the government and the defense to gather the information needed to exercise juror challenges—cause and peremptory—in a fair, intelligent, and informed manner. The more the parties know about the potential jurors, the less likely they are to fall back on prejudice and stereotypes in the exercise of peremptory challenges in violation of the Constitution. *See, e.g.*, *Georgia v. McCollum*, 505 U.S. 42 (1992) (defense peremptory challenges subject to equal protection scrutiny); *Batson v. Kentucky*, 476 U.S. 79 (1986) (prosecution peremptory challenges subject to equal protection scrutiny); Jessica M. Salerno, et al., *The Impact of Minimal Versus Extended Voir Dire and Judicial Rehabilitation on Mock Jurors'*

*Decisions in Civil Cases*, 45 L and Hum. Behav. 336, 337 (2021) ("The consequence of [] time limitations in voir dire is that attorneys are left to rely on stereotypes about jurors' demographic characteristics").

A thorough voir dire also provides the court with sufficient information to rule accurately on a motion to remove a juror for cause. *See Morgan*, 504 U.S. at 729-730 ("'Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.'") (quoting *Rosales-Lopez*, 451 U.S. at 188). In a capital case, questioning of potential jurors as to whether they would automatically or nearly always vote for the death penalty on the facts of the case, or whether a potential juror could consider and give meaningful effect to the mitigating factors in the case and vote for life imprisonment without release, is not only appropriate but constitutionally required. *See id.,* 504 U.S. at 729-34.

2.    <u>Jurors With Scruples Against Capital Punishment May Not be Excused for Cause</u>

The Supreme Court has long recognized that the Sixth Amendment protects a capital defendant from being placed on trial before a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521. In *Witherspoon*, the Court held that prosecution cause challenges based on a prospective juror's reservations or scruples regarding capital punishment should be granted only under circumstances where jurors made it "unmistakably clear" that "they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." *Id.* at 522 n.21. The Court explained:

> [A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

3

*Id.* at 522-23.  While the Court has subsequently tinkered with that language, it has never retreated from the basic premise that "[a juror] who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror."  *Id.* at 519.  *See, e.g., Lockhart v. McCree*, 476 U.S. 162, 176 (1986) (noting that even "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases").

Twelve years after *Witherspoon*, the Court decided *Adams v. Texas*, 448 U.S. 38 (1980).[1] Applying *Witherspoon*'s principles, the Court held that jurors could be excluded from service in a capital case on prosecution challenges for cause only if the juror's views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Adams*, 448 U.S. at 45.  The Court further held that it would be (and was in that case) a violation of the Constitution to exclude jurors "who stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally."  *Id.* at 49.  And the Court also held that it would be a constitutional violation to exclude jurors who were "unable positively to state whether or not their deliberations would in any way be 'affected'" by the prospect of the death penalty.  *Id.* at 50.  The Court explained further:

> [I]t is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror.  It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on any broader basis than inability to follow the law or abide by their oaths, the death sentence cannot be carried out.

*Id.* at 47-48.

---

[1] In the years between *Witherspoon* and *Adams*, the Supreme Court both struck down capital punishment, *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), and permitted its return, *Gregg v. Georgia*, 428 U.S. 153 (1976).

Five years after *Adams*, in *Witt*, the Court summarized its prior rulings and reaffirmed that a trial court may not excuse a juror for cause on the basis of the juror's views on the death penalty unless those views are so deeply entrenched that they "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. at 420 (quoting *Adams*, 448 U.S. at 45); *see also United States v. Chanthadara*, 230 F.3d 1237, 1270-73 (10th Cir. 2002) (reversing, on *Witherspoon* and *Witt* grounds, a sentence of death in a federal case because the district judge erroneously excluded a juror for cause).[2]  Since *Adams* and *Witt*, the Supreme Court has consistently held that a juror's views in opposition to capital punishment—even strong views—do not disqualify him or her from serving on a capital case:

> [T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*McCree*, 476 U.S. at 176.

In *Uttecht v. Brown*, 551 U.S. 1, 22 (2007), the Supreme Court again reaffirmed those views:

> Capital defendants have the right to be sentenced by an impartial jury.  The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties.

3.    Jurors Who Favor Capital Punishment Cannot Serve if their Ability to Vote for a Life Sentence is Impaired

The "substantial impairment" gate swings both ways.  In addition to holding that the prosecution may challenge for cause prospective jurors who are "substantially impaired" in their ability to vote for a death sentence, the Supreme Court has held that the defense may likewise

---

[2]  It remains settled law that the erroneous exclusion of even a single juror because of his or her opposition to the death penalty is never harmless error and reversal of any ensuing sentence of death is always mandatory. *See, e.g.*, *Grey v. Mississippi*, 481 U.S. 648 (1987); *Chanthadara*, 230 F.3d at 1268.

challenge for cause any juror whose *pro*-death penalty views render the juror impaired in his or her ability to consider a life sentence. *Morgan*, 504 U.S. at 729. In *Morgan*, the Court noted it was proper—indeed constitutionally necessary—to remove, for cause, "[a]ny juror to whom mitigating factors are . . . irrelevant." *Id.* at 739.

In *United States v. Bowers*, No. 2:18-cr-00292-RJC, ECF No. 1174, Tr. at 80-81 (W.D. Pa. Apr. 28, 2023), the most recent federal capital trial in the United States, jurors were asked about their ability to meaningfully consider mitigating circumstances in the category of case at issue:

> [Defense Counsel]: At the end of the day, if you are convinced that the defendant killed, intentionally with premeditation, multiple innocent victims, based on religious hatred, based on your value system, is it fair to say that in that scenario where the -- the Court is not going to say you have to give death or you have to give life. You have that now -- the Court has said you made the findings. You get to decide.
>
> Prospective Juror: Right.
>
> [Defense Counsel]: In that limited scenario of the guilty intentional murder case, based on your value system, your religious upbringing, is it fair to say that the death penalty in your view is really the only appropriate sentence for that guilty killer?
>
> Prospective Juror: If he met all that criteria. Like he was found guilty because we're to that process? Yes.
>
> [Defense Counsel]: Is that consistent with your response in question 79? Do you believe that the personal circumstances, childhood and background of a defendant are relevant and should be taken into account in making a decision on an appropriate sentence? And you shared with us no.
>
> Prospective Juror: Yeah. I said no. The reason why I said no or how I read that question, and maybe I'm reading it wrong, is, should I take like consideration in how this person grew up?
> …
> (Pause.) Because of that -- like I said, I don't know if I'm answering this right or not. But I don't think they should be taken into consideration, because that person made that decision to commit that crime.[3]

---

[3] The *Bowers* court excused this juror (number 155) for cause on defense request and over

Similarly, prospective jurors must be thoroughly questioned to identify those who are substantially impaired in their ability to impose a life sentence in the case at hand (i.e. "life qualification"). For example, in *Bowers*, No. 2:18-cr-00292-RJC, ECF No. 1207, Tr. at 216-17:

> [Defense Counsel]: …So in that case that we described, the multiple premeditated multiple killing in a single incident at a house of worship, in that kind of case, when the law says you decide based on your consideration of the aggravation and mitigation, the question I have for you…do you think realistically…a sentence of life imprisonment without the possibility of release is not a realistic sentence for you for that kind of guilty killer in a house of worship?
>
> PROSPECTIVE JUROR: I mean, you know, I just feel like I probably wouldn't think that was enough.
>
> [Defense Counsel]: It's not enough.
>
> Prospective Juror: Yeah.
>
> [Defense Counsel]: That's how you feel, that's okay. No one is criticizing you. If that's how you feel. Some people would say it is a realistic option in that kind of case and some folks would say that's not who I am. For someone who did that kind of particular crime, a narrow type of murder case, that's an insufficient penalty, and I will not -- if I'm honest with myself, I will not -- realistically, that's not a sentence that I could vote for in that kind of case. Is that where you are coming from?
>
> PROSPECTIVE JUROR: Yeah. I think so.[4]

In *United States v. Saipov*, No. 1:17-cr-00722-VSB (S.D.N.Y. Jan, 3, 2023),[5] the most recent capital trial in the Second Circuit, jurors were consistently asked the following:

> The Court: Now, let me ask, if you hear that a defendant who commits an act of terrorism and intentionally murders eight people continues to hold radical Islamic anti-American views and continues to support ISIS, do you think it would be difficult for you to

---

government objection.

[4] The *Bowers* court also excused this juror (number 19) for cause at the request of the defense and over the government's objection.

[5] This transcript was not electronically filed but is available upon request.

> meaningfully consider a sentence of life imprisonment without the
> possibility of release as sufficient punishment as opposed to the death
> penalty?
> …
> If a defendant was guilty of killing multiple individuals for the
> purpose of gaining entrance into a terrorist organization and he was
> not remorseful, would it be difficult for you to vote for a sentence of
> life imprisonment without the possibility of release as sufficient
> punishment, as opposed to the death penalty?
> …
> And why is that?

Id., Tr. At 5854.

In *United States v. Wilson*, No. 1:04-cr-01016-NGG, ECF No. 1486, Tr. 3801 (E.D.N.Y.

Jun. 5, 2013), the second most recent capital case tried in this circuit, jurors were asked for their

views regarding the penalty of life imprisonment as a punishment for a person who killed two

police officers:

> The Court: You were asked this question. "Please describe in detail
> your views and beliefs about the penalty of life in prison without the
> possibility of release as opposed to the death penalty for someone
> who killed two police officers, and why."
>
> You said, "My opinion is based upon economics. I question the logic
> of giving a life sentence and the cost versus the cost of a death
> penalty. Once a criminal is caught and in prison he is permanently
> removed from society. So the difference is rehabilitation a waste."
>
> Is that your view?
>
> Prospective Juror: Pretty much, yeah.[6]

And in *United States v. Basciano*, No. 1:05-cr-00060-NGG, ECF No. 1359 at 13 (E.D.N.Y. Mar. 2,

2011), the third most recent federal case tried in New York, jurors were similarly questioned about

their ability to impose life imprisonment:

> The Court: Okay. Now, in the case of intentional murder, do you
> believe that a sentence of life in prison without the possibility of
> release is -- that you could impose such a sentence as opposed to the
> death penalty?

---

[6] Juror 1841 was qualified after no cause challenges were raised by the parties.

>Prospective Juror: It depends on the circumstances of the case and the actions and everything.
>
>The Court: Well, do you believe that you will always impose the death penalty for someone who has intentionally killed another individual?
>
>Prospective Juror: Yes.
>
>The Court: You would?
>
>Prospective Juror: Yes.[7]

In a federal capital case involving eight homicides (carried out in separate incidents), *United States v. Duong*, No. 01-20154-JF, Tr. 148-50 (N.D. Cal. Feb. 23, 2010),[8] jurors were questioned regarding their ability to meaningfully consider the life penalty in that category of case:

>[Counsel]: Now, before you filled out the questionnaire I believe the judge told you something about the case…and that it is a murder case…that there's a total…of 8…murders and 16 robberies; right?
>…
>And when you answered with respect to the question about the death penalty you were pretty clear.  You said the death penalty is necessary for an intentional murder.
>…
>What did you mean by that when you said that?
>
>[Prospective Juror]: Well, if someone is murdered intentionally but they have a resource but they're still doing that.  If they do something intentionally, okay, on purpose, they know the results but they still kept doing this.  So this is what I mean.
>…
>[Counsel]: And it was your view when you filled out that questionnaire that for that type of person the death penalty is necessary; is that right?
>
>Prospective Juror: I believe so.
>…
>[Counsel]: And tell me what about the sentence of life without the possibility of parole is not a good enough or harsh enough sentence for you in those circumstances?

---

[7] The court excused this juror (number 2) due to a hardship.

[8] Jury selection transcripts in this case were filed under seal but can be provided on request.

Prospective Juror: For me the death penalty is the best choice.

[Counsel]: Okay.  And how strong is your feeling about that?

Prospective Juror: Quite strong feeling.[9]

Questions like these—which root out life-impaired jurors—are common, protective of a defendant's constitutional rights, and should be used in this case.

**II.    The Jury Selection Process Requires Appropriate Questioning**

1.    <u>Case-Specific Questions are Necessary</u>

In capital cases, prospective jurors must be questioned regarding the circumstances of the offense and the aggravating factors alleged by the government.  The ultimate question is whether a juror will be able to consider any other sentence but death, and to meaningfully consider mitigating factors, in a case involving the intentional killing of 10 Black people and the injuring of three more, that was motivated by race.

The Constitution prohibits statutes that mandate death sentences when particular facts exist. *See, e.g., Sumner v. Shuma*, 483 U.S. 66 (1987).  Just as a legislature may not mandate death for inmates who, for example, kill while imprisoned (the situation presented in *Sumner*), neither may a juror's attitude towards a capital case involving allegations of multiple murders or hate crimes accomplish the same result.  Thus, the Eighth Amendment requires that prospective jurors be questioned on the salient facts of this case and their ability to consider mitigating factors in a meaningful way in the face of the aggravating circumstances of the case.

The Court has significant latitude regarding how to conduct jury selection.  *See Morgan*, 504 U.S. at 729 ("It is true that '[v]oir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'") (quoting *Ristaino v. Ross*, 424 U.S.

---

[9] This juror was excused for cause on defense request and over government objection, and for hardship.

589, 594 (1976)) (alteration in original).  As a result of numerous trial courts exercising this

discretion in an effort to protect the constitutional rights described herein, the use of case-specific

questions is common practice in death penalty cases:

> If properly formed, case-specific questions help identify various
> forms of juror bias.  For example, a juror might be excused for
> cause if he or she could not fairly consider the death penalty where
> the victim was involved in drug crimes.  See *United States v.
> Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995).  Similarly, a juror
> might be excused for cause if he or she would refuse to consider
> any mitigating evidence in a case involving the death of a child.
> See [*United States v.*] *Johnson*, [366 F. Supp. 2d 822,] 847-48
> [(N.D. Iowa 2005)].  Other jurors may have biases regarding
> particular forms of mitigating evidence.  For example, some jurors
> may be unable to fairly consider any mitigating evidence relating
> to the defendant's background or upbringing. [Footnote omitted.]
> Such jurors must be excused for cause as the Supreme Court has
> emphasized that the sentencer may not refuse to consider evidence
> relating to the defendant's background or upbringing.  See *Lockett
> v. Ohio,* 438 U.S. 586, 604-05 (1978).

*United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) (holding defense counsel would be

permitted to ask prospective jurors case-specific questions with the primary purpose of achieving

impartiality).  Another district court explained the importance of case-specific questioning based on

its experience:

> [T]his court's own experience with jury selection in the . . . federal
> death-penalty case against Dustin Honken, *United States v. Honken*,
> No. CR 01–3047–MWB (N.D. Iowa) . . . suggests the insufficiency
> of purely "abstract" questions to determine the ability of jurors to
> perform their duties.  In *Honken*, there were numerous examples of
> the phenomenon of jurors who agreed that they could "fairly
> consider" both life and death sentences in the abstract, but quickly
> acknowledged that they could only consider one penalty in a case
> involving certain facts.  For example, in *Honken*, several potential
> jurors readily agreed that they could "fairly consider" both life and
> death sentences in the case if they found the defendant guilty.
> However, several of those same potential jurors stated that they were
> either doubtful that they could consider, or stated expressly that they
> could not consider, a life sentence if they found the defendant guilty
> of the murder of children.  These responses highlight the
> ineffectiveness of purely "abstract" questions to probe, in these cases,

> whether or not a juror would be able to fulfill his or her duty to give
> fair consideration to both life and death sentences no matter what the
> facts are.

*United States v. Johnson*, 366 F. Supp. 2d 822, 847-48 (N.D. Iowa 2005).

The courts in *Fell* and *Johnson* explicitly rejected the arguments made by the government in this case regarding case-specific questions.[10] The *Fell* court explicitly rejected the government's reliance on *United States v. McVeigh,* 153 F.3d 1166 (10th Cir. 1998)—i.e. the same argument made by the government in this case, *see* Gov't Memo at 14-16. *See Fell*, 372 F. Supp. 2d at 769. In addition to "disagree[ing]" with *McVeigh*, the *Fell* court found that "*Morgan supports* the use of case-specific questions in some circumstances" because "[t]he entire premise of the *Morgan* decision is that highly general questions may not be adequate to detect specific forms of juror bias." *Id.* (emphasis in original). Similarly, in *Johnson*, the court criticized *McVeigh* for propagating the "misconception … that any 'case-specific' question is necessarily a 'stake-out' question" when, in fact, "a properly framed case-specific question does not necessarily do any of these things." *Johnson*, 366 F. Supp. 2d at 845. The court held instead "that 'case-specific' questions may well be *constitutionally required* in order to impanel a fair and impartial jury,

---

[10] The government does not – because it cannot – argue that case-specific and mitigation-impairment questions are impermissible. Instead, it argues that such questions are simply not required, citing *Morgan*. Gov't Memo at 11-15. Putting aside why the government—charged with the administration of justice, seeking the ultimate punishment—would advocate for the bare minimum necessary to avoid reversal, *Morgan* still does not support the government's arguments. "Indeed, the constitutionality of 'case-specific' questions was not at issue in *Morgan,* because the Court was only presented with the question of whether or not the defendant was entitled to ask an 'abstract' life-qualifying question, 'If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?'" *Johnson*, 366 F. Supp. 2d at 848 (quoting *Morgan,* 504 U.S. at 723).
The government's reliance on *Tsarnaev* is equally unavailing. *See* Gov't Memo at 16-17. In *Tsarnaev*, the First Circuit did not issue a ruling on the proper scope of *Morgan*; instead, it held that the trial court did not abuse its discretion when using a more bare-bones questionnaire, finding "potential jurors knew these details, [therefore,] the voir dire adequately covered [the defendant's] case-specific questions." *United States v. Tsarnaev*, 968 F.3d 24, 63 (1st Cir. 2020), *rev'd on other grounds*, 595 U.S. 302 (2022), and *on reh'g in part*, 96 F.4th 441 (1st Cir. 2024).

because a prohibition on 'case-specific' questions may unconstitutionally impede a party's 'ability to exercise intelligently [a] challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose' either a life or death sentence after a finding of guilt." *Id.* at 848 (citing *Morgan,* 504 U.S. at 733-34) (emphasis in original).

General questioning does not suffice. Consider, for example, a juror who answers "yes" when asked "could you weigh all of the aggravating and mitigating evidence and return a sentence of life imprisonment, depending on the evidence?" That answer could encompass the following wide range of possibilities: the juror might mean that he could only support a life sentence if evidence of guilt was inconclusive; or the killing was accidental or an act of self-defense; or the defendant was legally insane; or only one victim was killed; or the killing was not committed after substantial planning and premeditation; or the defendant did not intentionally injure or risk the lives of other people. The "yes" answer to the general question is therefore inadequate to assess that juror's fitness to serve because it might well mean that the juror would only consider a life sentence under circumstances that are irrelevant to the case at hand. This risk is not theoretical. Based upon interviews with actual capital jurors, one scholar concluded that jurors who say that the appropriate punishment would "depend on the circumstances" are "thinking of 'circumstances' that would make the act or incident a killing in self-defense, an accident, an act in the 'heat of passion,' a product of insanity; that is, they are thinking of circumstances that would make the crime not a murder at all, let alone a capital murder." John Blume et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1244-45 (2001).

Thus, when jurors are questioned about their willingness to consider both life in prison and the death penalty, they must be informed of the specific context in which this decision would need to be made. They must truly be able to consider a life sentence in such a context even after finding the defendant guilty and rejecting any affirmative defenses (such as mistake, accident, insanity, or

self-defense), even after finding beyond a reasonable doubt that the defendant killed intentionally

and with premeditation, and even after finding beyond a reasonable doubt that the defendant's

specific murder was aggravated in the other ways the government has alleged.

There is a substantial body of research regarding the behavior of juries in capital cases.

Those findings reveal disturbing problems:

> The research provides very strong evidence of three primary findings
> derived from seven specific problems.  First, the process of death
> qualification at voir dire produces juries which are biased in favor of
> imposing the death penalty.  This occurs both because jurors who are
> opposed to the death penalty are excluded and because the voir dire
> discussion itself creates an expectation in the minds of many jurors
> that the outcome of the case is likely to be the death penalty.  Second,
> in the course of the trial, a majority of jurors make up their minds
> about the death penalty *before* completing the conviction phase.  In
> many cases, the later balancing of aggravating and mitigating factors
> which *Gregg* relied upon to distinguish defendants who truly deserve
> death from those who do not does not actually take place.  Finally,
> jurors demonstrated a consistent inability to understand and apply the
> courts' instructions concerning the two phases of the trial, the
> different burdens of proof for aggravating and mitigating factors, and
> the other protections intended to guide the jury's discretion.

*United States v. Fell*, 224 F. Supp. 3d 327, 335-36 (D. Vt. 2016) (conclusions after hearing expert

testimony and reviewing research) (emphasis in original).  The court in *Fell* also stressed the

constitutional implications of these problems:

> In considering testimony about the level of inherent bias generated
> by the process of jury selection, the court finds that the social science
> studies conducted since 1980 have converged on a common
> conclusion that the process by which jurors are selected does not
> measure up to the standards of objectivity required by *Gregg*.  The
> exclusion of many people opposed to the death penalty on religious
> or moral grounds and the implicit process of persuasion at voir dire
> that death is the likely outcome create jury populations which stack
> the deck against defendants.  This suspicion originally expressed by
> Justice Stewart has been shown to be true.  The most telling evidence
> is the absence of contrary research results.  The studies brought to the
> court's attention supported the position of the defense that jury
> selection since *Gregg* is not the solution to inherent jury bias but
> rather a substantial part of the problem.

*Id.* at 338.

As the research summarized in *Fell* demonstrates, jurors in actual death penalty cases often believe erroneously that, once an aggravating factor has been found, death is mandatory. *See, e.g.,* U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brooklyn L. Rev. 1011, 1031-41 (2001).[11] Indeed, scientific surveys of capital-case jurors show that a substantial number of jurors who served on capital cases *automatically* vote for death if the defendant is found guilty of murder. S*ee, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L. 1, 46 (1987-88) ("In sum, there were a significant number of jurors sitting on the death recommendation cases who held the view that the death penalty was mandatory or presumed for first degree murder"); S. P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*,  98 Columbia L. Rev. 1538 (1998) ("[M]any jurors wrongly think they must return a death sentence if they find the defendant's crime was especially heinous, or the defendant is especially likely to present a risk of future danger"); T. Eisenberg, et al., *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data"); W. J. Bowers, et al., *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476, 1524 (1998) ("[S]ome jurors also associated specific aggravating characteristics of the crime, especially the killing . . .  of more than one victim, with the presumption that death was the

---

[11] This article draws, in part, on the findings of the Capital Jury Project, in a study funded by the National Science Foundation of decision-making by actual jurors in actual capital cases. As noted in the article, the data analyzed was based on interviews of 1,155 capital jurors from 340 trials in 14 states. *Id.* at 1017.

appropriate punishment"); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 12 (1993) ("The data suggest[s] that the sentencing phase of a capital trial commences with a substantial bias in favor of death. This is not itself an indictment of the death trial phase. But the tilt towards death suggests that a defendant with a confused jury may receive a death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life").

In this case, at a penalty phase, the jury will almost certainly hear heartbreaking evidence from the surviving loved ones of the deceased victims, whose lives were permanently impacted by this attack. Given the aggravated nature of the instant charged crimes, there is a significant likelihood that a number of prospective jurors will enter their service biased or substantially impaired to consideration of a life sentence. The Court's voir dire process must identify and excuse those people to protect Payton Gendron's constitutional rights.

Federal judges have approved and posed case-specific questions in Juror Questionnaires, and then permitted follow-up voir dire, in many capital cases:

> What are your views on the death penalty for a person who plans and premeditates a terrorist attack and intentionally kills eight people, without any legal excuse or justification (e.g., not insane, not defending himself, and not acting under the heat of passion)?

> What are your views of life imprisonment without the possibility of release, as opposed to the death penalty, for a person who plans and premeditates a terrorist attack and intentionally kills eight people, without any legal excuse or justification (e.g., not insane, not defending himself, and not acting under the heat of passion)?

> If you were to find the defendant guilty of the terrorist attack described to you in this case, do you believe the scope and magnitude of the events, injuries and deaths is so significant that the death penalty is the only appropriate punishment in this case?

Juror Questionnaire, *Saipov,* No. 1:17-cr-722 (VSB), ECF Nos. 444-1, 461.[12]

---

[12] The *Saipov* Questionnaire was posted at ECF No. 444-1; pursuant to a Court Order at ECF No. 461, small non-substantive edits were made. The final version (revised 8/8/22), which was printed

In a case in which a defendant has killed or participated in the killing of two people before kidnapping a third person, stealing her car, and later killing her, do you believe that you would always vote for: a. the death penalty? b. life in prison without possibility of parole?

Juror Questionnaire, *United States v. Fell,* No. 5:01-cr-00012-GWC (D. Vt. Jan. 24, 2017).[13]

In general what are your views of the death penalty for a prisoner who intentionally kills a corrections officer with premeditation and malice and without any legal excuse or justification (e.g. not insane, not acting under the heat of passion, etc.)?

If the evidence at trial showed a defendant planned and premeditated intentional murder while having previously been convicted of murder, could you consider either a sentence of life imprisonment without the possibility of release or the death penalty for that defendant?

Based on your feelings and values, could life imprisonment without the possibility of release be a severe enough sentence for a prisoner, already serving a sentence for murder, who then intentionally kills a corrections officer with premeditation and malice?

Juror Questionnaire, *United States v. Con-Ui*, No. 3:13-cr-123-ARC, ECF No. 911-3 (M.D. Pa.

Aug. 18, 2016).

Do you believe that a person who has committed multiple intentional murders should always receive the death penalty?

Do you believe that a person who is already in prison for murder and who then commits a premeditated, deliberate and intentional murder of another prisoner should always receive the death penalty?

Do you believe that a person who is already in prison for murder and who then commits a premeditated, deliberate and intentional murder of another prisoner, and has a history of making a violent escape attempt should always receive the death penalty?

Juror Questionnaire, *United States v. Watland*, No. 1:11-cr-00038-JLK, ECF No. 1298 (D. Colo.

---

and filled out by the venire, is attached as Exhibit C.

[13] A juror questionnaire was distributed in this case, but the case was resolved with a plea before trial. The questionnaire is not available on ECF but can be provided on request.

Nov. 8, 2023).[14]

> Are your beliefs about the death penalty such that you would never impose a sentence of life imprisonment without the possibility of release in a case <u>where there were many murder victims, one of whom was an unborn child, and the defendant had spent time in prison in the past for prior convictions of murder</u>?

Juror Questionnaire, *United States v. Candelario-Santana*, No. 3:09-cr-00427-JAF, ECF No. 737-2

(D.P.R. Dec. 28, 2012) (emphasis in original).

> Please describe in detail your views and beliefs about the death penalty for someone who killed two police officers, and why, including whether you have ever had a different view.

Juror Questionnaire, *United States v. Wilson*, No.1:04-cr-01016 NGG, ECF No. 1051 (E.D.N.Y.

Mar. 13, 2013).

> Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a government witness?

> What are your views of life imprisonment without the possibility of release for a person who deliberately and intentionally uses arson fire to murder family members of a government witness, including children?

> Based on your feelings and values, could life without the possibility of release be a severe enough sentence for a defendant found guilty of premeditated intentional murder and who has previously been convicted of murder?

Juror Questionnaire, *United States v. Savage*, No. 2:07-cr-00550-RBS, ECF No. 543 (E.D. Pa. Jul.

6, 2012).

> Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a federal prosecutor?

> Are your views on the death penalty such that you would be unable

---

[14] This questionnaire is filed as a restricted document on ECF but a copy can be provided on request.

> to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a cooperating witness?
>
> Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant is already serving a sentence of life imprisonment?
>
> Are your views of the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant was previously convicted of intentional murder?

Juror Questionnaire, *Basciano*, No. 1:05-cr-00060-NGG, ECF No. 1054-1 (E.D.N.Y. Feb. 7, 2011).

> Do you believe that a sentence of life imprisonment without the possibility of release could ever be a severe enough sentence for someone convicted of conspiracy to commit acts of terrorism, conspiracy to commit air piracy, conspiracy to murder U.S. citizens, or conspiracy to use weapons of mass destruction, resulting in the deaths of thousands of people, as in the September 11th attacks on the United States?

Juror Questionnaire, *United States v. Moussaoui*, No. 01-cr-455-LMB, ECF No. 1510 (E.D. Va. Feb. 6, 2006).[15]

Indeed, typically the government and defense both engage in case-specific questioning to ascertain if a potential juror is death- and life-qualified, respectively. For example, in *United States v. Richardson*, No. 1:08-cr-139-CC (N.D. Ga. 2012), Richard Burns, Chief of the Department of Justice's Capital Case Section, who was responsible for overseeing the Department's capital prosecutions,[16] made sure during voir dire that the prospective jurors could still vote for the death

---

[15] This questionnaire is not available electronically on ECF; a copy can be provided on request.

[16] The Department of Justice's Capital Case Section (CCS) within the Criminal Division was created in response to the Department's increased involvement in capital litigation and charged with overseeing the Department's capital prosecutions. In addition to "provid[ing] assistance in capital trials, appeals, and post-conviction litigation," "CCS attorneys provide legal, procedural, and technical assistance to United States Attorneys in capital . . . prosecutions; . . . provide training for Federal capital litigators; draft legal memoranda and pleadings; maintain a resource library on capital issues…" U.S. Dep't of Justice Website, *About the Criminal Division – Capital Case*

penalty for a defendant who had killed a "child molester," in a case where the victim was a fellow

prisoner who had been convicted of possessing child pornography:

> Q. Okay. One other part -- some other information that you're likely
> to hear in the case has to deal with the victim, and you'll learn that
> the victim was in jail because he's a child molester. Do you have
> strong feelings about people who commit child molestation?
> A. No.
> Q. If the defendant is convicted of committing the murder of this
> child molester, do you think you could still consider giving him the
> death penalty?
> A. Like I said, it all depend on, you know, the evidence.
> Q. Would the fact of the victim being a child molester cause you to
> think, well, you know, he kind of got what was coming to him?
> A. No.
> Q. So you're open to considering that a defendant who kills a child
> molester might still deserve the death penalty depending on other
> circumstances of the case?
> A. No.

ECF No. 985 at 596.  The government also asked prospective jurors about the fact that the

defendant was already effectively serving a life sentence at the time of the capital murder:

> Q. You will probably also…hear evidence that the defendant, who's,
> of course, also an inmate in jail, he may be serving a sentence that is
> so long that he's never actually going to get out of jail. That's the
> sentence he was serving at the time he committed the murder. Do you
> think that you could fairly consider imposing a second life sentence
> for that defendant, or do you think that really is giving him a free
> pass?
> A. You know, I don't feel like that would be giving him a free pass. I
> mean, I feel like I could consider that just in the same way I could
> consider the death penalty, it would just -- you know, I'm sorry, I just
> feel like it would be, you know, how everything came together, how I
> saw everything at the very end, and a second life penalty -- a second
> life sentence is still demoralizing, I would say, and still is, you know,
> a significant punishment.

*Id.* at 538-39.

In a study using mock jurors, conclusory, closed-ended questioning (e.g., asking

prospective jurors if they can follow the law and be fair and impartial) identified disqualifying bias

---

*Section*, *available at* https://www.justice.gov/criminal/capital-case-section.

in only 2% of prospective jurors, whereas extended questioning identified disqualifying bias in

42% of the prospective jurors.  Jessica M. Salerno, et al., *The Impact of Minimal Versus Extended*

*Voir Dire and Judicial Rehabilitation on Mock Jurors' Decisions in Civil Cases*, 45 Law & Hum.

Behav. 336, 351 (2021). In addition, judicial rehabilitation (*e.g.*, asking prospective jurors to

confirm that they were able to set aside any biases they may have) was not only ineffective in

eliminating bias, but caused jurors with bias to have "the illusion that they were putting their biases

aside when the impact of those biases remained undiminished." *Id.*

> The judicial rehabilitation manipulation did affect how biased mock
> jurors thought that they had been. Mock jurors in all conditions in our
> study claimed that all potential sources of bias had no impact at all or
> a tiny impact, on average. Ironically, however, mock jurors who had
> gone through judicial rehabilitation and agreed to be impartial
> claimed that they were significantly less influenced by these potential
> sources of biases than mock jurors who had not experienced such
> judicial rehabilitation. Consistent with social psychological research
> on "credentialing" (Effron et al., 2009) and "backfire effects" of
> judicial limiting instructions (Lieberman & Arndt, 2000), **the
> rehabilitation procedure seems to have given mock jurors a false
> sense of security that their judgments would no longer be biased
> by their preexisting attitudes. Judicial rehabilitation might have
> increased mock jurors' "bias blindspot."** (Pronin et al., 2002).

*Id.* (emphasis added).

The government itself began its legal Memorandum citing cases in which the jurors'

qualifications to serve on a capital jury depended on the existence of one of the aggravating factors

of the case at bar, namely mass or multiple murders. Gov't Memo at 5 (citing *United States v.*

*Moore*, 149 F.3d 773, 780 (8th Cir. 1998); *Fuller v. Johnson*, 114 F.3d 491, 499-501 (5th Cir.

1997); *United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996).  The government, *see* Gov't

Memo at 5-7, repeatedly relies on cases that cite prospective jurors' views regarding case-specific

facts, including the number of victims, mutilation of victims, child victims, family-member

victims, victims using drugs, and alcohol-related crimes—i.e. case-specific positions that were

revealed during voir dire.  Thus, the government implicitly recognizes that the Court cannot properly evaluate a jurors' views on the death penalty in a vacuum; they must be probed in a factual context.

      2.    <u>The Court Must Identify "Mitigation-Impaired" Jurors Who Will Not Consider and Give Meaningful Effect to Mitigation</u>

The ability of each individual juror to consider and give effect to mitigating evidence is required by the Constitution.  To be competent to serve—and to ensure the constitutional validity of any death sentence that results—"sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).  Because each juror must have the capacity to consider mitigating evidence, the Sixth Amendment entitles a defendant to voir dire adequate to uncover those who cannot do so.  *See Morgan,* 504 U.S. at 730.  Accordingly, among the many important voir dire tasks will be to discern which potential jurors are "mitigation-impaired," meaning that under the facts and circumstances of the case, they would be unable to fully consider and give effect to evidence in mitigation in general or to classes of evidence in mitigation.[17]

---

[17] The government does not—because it cannot—argue otherwise.  It concedes, as it must, that "jurors must be willing to generally 'consider' mitigation evidence."  Gov't Memo at 12 (citing *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), which also held that a "sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence").  Instead, the government points to the fact that jurors do not have to "be willing to give a particular mitigating factor any particular amount of weight."  *Id.* (citing *United States v. Hall*, 152 F.3d 381, 409 (5th Cir. 1998)).  But that fact does not mean case-specific questions should not be asked.  To the contrary, in *Hall*, the court discussed the prospective jurors' *answers* to mitigation-specific questions; in other words, it condoned mitigation-specific questions being asked of the venire.  152 F.3d at 409 (discussing prospective juror's responses to questions about whether "she could consider evidence of an abusive childhood as a mitigating factor.").  Thus, *Hall*—the only case cited by the government on this topic—does not support the government's argument that "case-specific questioning that pertains to the weight prospective jurors would give certain mitigating or aggravating evidence" should be disallowed, Gov't Memo

The Eighth Amendment also requires jurors in a capital case to be able to consider and give meaningful effect to evidence in mitigation.

> Once this low threshold for relevance [of mitigating evidence] is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence.

*Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v. California,* 494 U.S. 370, 377-78 (1990); *id.* ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death … [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances") (quoting *Payne v. Tennessee,* 501 U.S. 808, 822 (1991), quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)) (alterations in original).[18]

In fact, the law has long been explicit that, in capital cases, the sentencer may not refuse to consider any evidence in mitigation, or be precluded from giving it whatever effect it may merit. *See id.*; *Eddings*, 455 U.S. at 113-15; *see also McKoy v. North Carolina*, 494 U.S. 433, 435 (1990) (ruling state's "unanimity requirement violates the Constitution by preventing the sentence from considering all mitigation evidence"). In *Eddings*, the Court held explicitly that, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.* at 113-14 (emphasis in original). The Court noted that, whereas those who impose the sentence in a capital case "may determine the weight to be given relevant mitigating evidence, [] they may not give it *no weight* by excluding such evidence from their consideration." *Id.* at 114-15 (emphasis added).

---

at 17. That argument is simply unsupported and should be rejected.

[18] The government's arguments about the scope of mitigation evidence, *see* Gov't Memo 28-32, are premature at this juncture. The Defense Proposed Questionnaire's brief and general description of mitigating evidence is accurate and has been used in many cases, *see* Section III.1, *infra*, and does not come close to the boundaries advocated for in the government's brief; thus, we do not respond to them at this time.

Therefore, prospective jurors who would ignore mitigation evidence are not qualified to serve.

In short, "a sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating

circumstances." *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (quoting *Johnson v. Texas*, 509 U.S.

350, 381 (1993) (O'Connor, J. concurring)) (emphasis and alteration in original).

In *Penry v. Lynaugh*, the Court spoke in strong terms:

> Underlying *Lockett* and *Eddings* is the principle that punishment
> should be directly related to the personal culpability of the criminal
> defendant.  If the sentencer is to make an individualized assessment
> of the appropriateness of the death penalty, 'evidence about the
> defendant's background and character is relevant because of the
> belief, long held by this society, that defendants who commit
> criminal acts that are attributable to a disadvantaged background, or
> to emotional and mental problems, may be less culpable than
> defendants who have no such excuse. *California v. Brown*, 479 U.S.
> 538, 545 (1987) (O'Connor, J., concurring).  **Moreover, *Eddings***
> **makes clear that it is not enough simply to allow the defendant to**
> **present mitigating evidence to the sentencer.  The sentencer must**
> **also be able to consider and give effect to that evidence in**
> **imposing sentence.** *Hitchcock v. Dugger*, [481 U.S. 393 (1987)].
> Only then can we be sure that the sentencer has treated the defendant
> as a 'uniquely individual human bein[g]' and has made a reliable
> determination that death is the appropriate sentence.  *Woodson* [*v.*
> *North Carolina*, 428 U.S. 280, 304-5 (1976)].  **'Thus, the sentence**
> **imposed at the penalty stage should reflect a reasoned *moral***
> **response to the defendant's background, character, and crime.'**
> *California v. Brown, supra, at 545* (O'Connor, J., concurring)
> (emphasis in original).

492 U.S. 302, 318-19 (1989) (*abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304

(2002)) (emphasis added).

The only way to reliably identify those jurors who may be unable to give full consideration

and effect to mitigating factors is a searching voir dire.  The district court in *Fell* recognized these

principles and applied them:

> [T]he FDPA requires jurors to make an individual finding regarding
> each mitigating factor proposed by the defense.  Thus, it is important
> for the court to ensure that every prospective juror is able to fairly
> and impartially consider the categories of mitigating evidence that

the defendant would introduce at a penalty phase.

*Fell*, 372 F. Supp. 2d at 789-90  (granting defense challenge for cause because although the juror "expressed moderate and balanced views on the death penalty, he indicated that he would not consider certain categories of mitigating evidence").

Given this clear mandate, federal judges regularly include questions in the Juror Questionnaires and then permit follow-up voir dire questions regarding prospective jurors' ability to consider mitigation:

> Do you believe that the personal circumstances, childhood, and background of a defendant are relevant and should be taken into account in making a decision on an appropriate sentence?
>
> Do you believe that whether a person has a mental illness or abnormal brain development or brain damage should be taken into account in making a decision on an appropriate sentence? *Id.*

*United States v. Bowers*, No. 2:18-cr-00292-RJC, ECF No. 1004-1 (W.D. Pa. Mar. 3, 2023).

> Do you believe that the personal circumstances, childhood and background of a defendant is relevant and should be taken into account in making a decision on whether to impose a sentence of life imprisonment without the possibility of release or the death penalty?

*United States v. Williams*, No. 4:08-cr-00070-YK, ECF No. 712 (M.D. Pa. Jan. 9, 2013).[19]

> If Mr. Lujan is found guilty of kidnapping resulting in death, without any legal excuse or justification, the defense may present evidence during the sentencing phase of the trial about Larry Lujan's childhood and background in support of a sentence other than the death penalty.  Would you be able to consider such evidence when making a decision about his punishment for capital murder?

Juror Questionnaire, *United States v. Lujan*, No. 2:05-cr-00924-RB, ECF No. 762-4 (D.N.M. Apr. 12, 2011).

The court asked about these principles directly in *Saipov*:

> The Court: If you are considering punishment as a juror in this case, you will already have found that the defendant intentionally and with

---

[19] This questionnaire was approved by the court before the case resolved before trial.

premeditation killed eight people in a terrorist attack and that he had no legal excuse or justification such as being insane or being coerced.  **At a punishment phase, the jury will be presented evidence of aggravating and mitigating factors.  Aggravating factors are factors that could support a sentence of death. Aggravating factors could include things like Mr. Saipov being a danger to others even from prison, his lack of any remorse, his continued support of ISIS, the extensive nature of his planning and premeditation, his causing death while committing a separate crime, his killing of multiple people, and the severe impact he had on victims and deceased victims' families, and the amount of pain and loss they suffered.  Now, knowing that, could you hear that evidence, consider it, weigh it against any mitigating evidence, and give meaningful consideration to voting for the death penalty if the facts and law support it**?

…

If, after careful review of the evidence, weighing aggravating factors and mitigating factors and deliberation with fellow jurors you did not think the aggravating factors sufficiently outweighed the mitigating factors to justify death and that life imprisonment was appropriate, could you vote to impose a life sentence?

…

If, after careful review of the evidence, weighing aggravating factors and mitigating factors and deliberation with fellow jurors, you believe the aggravating factors did sufficiently outweigh the mitigating factors to justify death, and you believed the death penalty was appropriate, could you vote to impose the death penalty?

*Saipov*, No. 1:17-cr-00722-VSB, Tr. 3785-87 (emphasis added).[20]  This Court should follow suit.

3.    Jurors Must Be Able to Follow the Principles of Law Applicable to Capital Cases[21]

During jury selection, it is also essential to ensure that prospective jurors understand the gravity of the life-or-death sentencing decision they may be called upon to make and are willing and able to fulfill that role. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985).

a.    Each Juror is Charged with Making an Individual Moral Judgment

---

[20] Transcripts available upon request.

[21] The defense anticipates filing additional and more complete briefing on these topics, as the parties litigate the appropriate jury instructions in this case.  But, given that the government raised objections to these principles in the abstract in its Memorandum, *see* Gov't Memo at 18-28, we respond briefly here to the extent the principles are relevant to the proposals in the Defense Proposed Questionnaire.

In this context, the word "moral" comes from Supreme Court capital jurisprudence. *See*, *e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 254 (1988) ("The capital sentencing jury is asked to make a *moral* decision about whether a particular individual should live or die") (emphasis added); *Abdul-Kabir*, 550 U.S. at 252 (noting "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J. concurring)) (emphasis in original); *Penry*, 492 U.S. at 318-319 (reversing death sentence because the Court could not "be sure that the jury's answer to the first special issue reflected a 'reasoned *moral* response' to [the defendant's] mitigating evidence") (emphasis added). Given this clear precedent, trial courts regularly include such language in jury questionnaires in capital cases:

> If after evaluating all the evidence, following the Court's instructions and deliberating with fellow jurors **you come to a personal and reasoned *moral* decision about the appropriate sentence** (either life in prison without the possibility of release or death), will you be able to stand by your decision even if one or more of your fellow jurors may disagree with your personal decision about the appropriate penalty?

> Guided by the Court's instructions and the evidence presented, each juror ultimately makes the life or death sentencing decision for themselves **based on the juror's own unique individual *moral* judgmen**t. If you serve as a juror in this case, will you respect the right of each juror to arrive at an individual decision, even if you disagree with any of that juror's sentencing decision?

> Will you ensure that every juror is treated with respect and dignity and is not intimidated, coerced, or bullied about a vote one way or another on aggravating factors, mitigating circumstances, and the ultimate punishment decision, even if you or other jurors disagree?

Juror Questionnaire, *Saipov,* No. 1:17-cr-00722-VSB, at Exhibit C, at Q131, Q129, Q130 (bold emphasis added).

> **Each juror ultimately makes a unique individual moral judgment about the life or death sentencing decision**. If you serve as a juror in this case, will you respect the right of each juror

> to arrive at an individual decision regarding punishment, even if
> you disagree with the decision reached by the other juror?
>
> If after evaluating all the evidence and deliberating with fellow
> jurors **you come to a personal and reasoned moral decision
> about the appropriate sentence** (either life in prison without the
> possibility of release or death), will you be able to stand by your
> decision even if one or more of your fellow jurors may disagree
> with your personal decision about the appropriate penalty?

Juror Questionnaire, *Con-Ui*, No. 3:13-cr-123-ARC, ECF No. 911-3 (emphasis added).

The government, too, has recognized the importance of questioning about this bedrock

principle:

> Q. At the end of that [sentencing]hearing the juror will be called
> upon to decide whether to impose a death sentence or life without
> parole. **The law is not going to tell you which way to go; it's your
> choice as a juror to make for yourself.** Does your opposition to the
> death penalty, would that impact your ability to decide whether to
> sentence somebody to death?

*Richardson*, No. 1:08-cr-139-CC, ECF No. 983, Tr. 80-81 (Feb. 27, 2012) (questioning by

(Richard Burns, Chief of DOJ's CCS)) (emphasis added).

> Q. And you can make that decision **based on your moral structure,**
> your religious beliefs, if that's the appropriate sentence in this case
> you can reach that sentence?

*Id.* at ECF No. 987, Tr. 1204 (Mar. 2, 2012) (questioning by government) (emphasis

added).

> Q. [E]ven after the jurors have all agreed on a statutory aggravating
> factor or a non-statutory aggravating factor, **the decision about how
> much weight to give that factor is also an individual decision**. Do
> you understand that?

*Id.* at ECF No. 985, Tr. 505-06 (Feb. 29, 2012) (defense counsel questioning) (emphasis

added).

> Q. And if you're on a jury and it came down to having to decide life
> or death and **you had an individual moral choice about what you
> thought the decision should be**, do you think the other jurors should

respect that?

…

Q. And if **somebody else had an individual moral choice**, do you think they should be respected?

…

Q. And if somebody's not respecting an **individual moral choice** about what the ultimate decision should be, do you think you could step in and say, Wait a minute, we don't challenge individual moral choices, respect is appropriate?

*Id.* at Tr. 679 (defense counsel questioning) (emphasis added).

        b.       <u>A Death Sentence is Never Required</u>

"A capital jury … is never required to return a death sentence."  *United States v. Aquart*, 912 F.3d 1, 52 (2d Cir. 2018) (internal citations omitted); *see also* Leonard B. Sand et al., Modern Federal Jury Instructions—Criminal ¶ 9A.04, Instruction 9A-19 (Matthew Bender 2012) ("no juror is ever required by the law to impose a death sentence").  *See also Saipov*, No. 1:17-cr-722 (VSB), 2023 WL 371531, at *9 (S.D.N.Y. Jan. 24, 2023) ("The FDPA makes this clear: even 'in the absence of a mitigating factor,' the jury must determine 'whether the aggravating factor or factors alone are sufficient to justify a sentence of death'") (quoting 18 U.S.C. § 3593(e)).  Accordingly, the large majority of district courts in capital cases have instructed that a death sentence is never required.  *See, e.g., United States v. Jones*, 527 U.S. 373, 384 (1999) (noting that jury instructed below that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence"); *United States v. Caro*, 597 F.3d 608, 632 (4th Cir. 2010) (approving lower court's instruction that "[w]hatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death, but your decision must be a reasoned one, free from the influence of passion, prejudice, or arbitrary consideration"); *see also United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) (district court decision approving such an instruction); *United States v. Haynes*, 265

F. Supp. 2d 914 (W.D. Tenn. 2003) (same).[22]

Jurors must understand that, in the end, the law dictates that the decision about life or death is an individual and personal decision; it is not a mathematical tallying of mitigating and aggravating factors. For some prospective jurors, that knowledge may greatly impact their ability to serve, and thus, they must be advised of this fact during the vetting process. In *United States v. Sampson,* No. CR 01-10384-WLW, 2014 WL 1093128, at *11 (Mar. 17, 2014 D. Mass.), for example, the trial court instructed all prospective jurors, before they filled out the questionnaire: "You should understand that a jury is never required to find that a sentence of death is justified." The Court should follow suit here.

   c. <u>Any One Juror's Decision Can Result in the Imposition of a Life Sentence</u>

If the jury is unanimous for life imprisonment or death, that sentence will be imposed; if the jury is not unanimous, a life sentence will be imposed. *See* Sand et al., *supra,* Instruction ¶ 9A.04, Instruction 9A-20:

> If, after engaging in the balancing process I have described to you, all twelve members of the jury do not unanimously find, beyond a reasonable doubt, that the Defendant should be sentenced to death (on any of the capital counts), then you may not impose the death penalty (for that count). In that event, Congress has provided that life imprisonment without any possibility of release is the only alternative sentence available.

Despite the fact that this is an undisputed and entirely accurate statement of law, the government seeks to hide this principle from the jury. *See* Gov't Memo at 18-23. Its arguments should be rejected.

While the Supreme Court does not require a non-unanimity instruction in every capital

---

[22] Given this precedent, the government's reference to a single district judge who refused to let defense counsel argue that a death verdict is never required, Gov't Memo at 27 (citing *United States v. Rodriguez*, 2007 WL 466752, *60 (D.N.D. Feb. 12, 2007)), should be afforded little weight.

case, it has never held that such an instruction is improper.  *See Jones*, 527 U.S. at 381.  To the contrary, *Jones* itself reaffirmed the well-established principles that the Eighth Amendment "requires that a sentence of death not be imposed arbitrarily," and that "a jury cannot be 'affirmatively misled regarding its role in the sentencing process.'" *Id.* at 381-82 (quoting *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)); *see also Gregg v. Georgia*, 428 U.S. at 190 (joint opinion of Stewart, Powell and Stevens, JJ.) ("accurate sentencing information is an indispensable prerequisite to a [jury's] determination of whether a defendant shall live or die").

Moreover, the government's position that "[f]ollowing *Jones*, Courts of Appeals, including the Second Circuit, have uniformly agreed that capital defendants are not entitled to a jury instruction on the effect of a penalty-phase deadlock," Gov't Memo at 22, is extremely misleading. The fact is an instruction regarding the consequences of non-unanimity has been given in the vast majority of federal capital trials. Courts choose to give such an instruction because, without it, there is an unnecessary and unacceptable risk that the jury will speculate about the effect of a non-unanimous decision and that their decision-making will be influenced by misconception.  For example, jurors may assume that a non-unanimous decision would require a whole new sentencing proceeding with all the attendant trauma, time, and expense that would entail. Some jurors may also believe that such an outcome could necessitate not only resentencing but also a retrial of the culpability phase, thus potentially jeopardizing their guilty verdict.[23]  If the jury is divided, these false assumptions may improperly influence the decision-making of those taking the minority view and can even be used by those in the majority to pressure them to surrender their conscientiously held views as to the appropriate punishment for the sake of avoiding those illusory evils.

---

[23] This concern is not just theoretical. In *United States v. Taylor*, 814 F.3d 340, 378 (6th Cir. 2016), after the district court refused to give a non-unanimity instruction, the jury sent a note during penalty phase deliberations asking "whether the case would result in a mistrial and whether the guilty verdict would be null and void if the jury could not reach a unanimous decision."

In the thirty-four (34) federal capital trials that proceeded to a jury sentencing since 2010, courts instructed the jurors that the consequence of a non-unanimous vote on the ultimate issue of life or death was the imposition of a sentence of life imprisonment without release in twenty-seven (27), (i.e. 79%). *See* Exhibit B, Declaration Regarding the Prevalence of Trial Courts Instructing Jurors of the Consequence of a Non-Unanimous Vote on the Ultimate Issue of Life Imprisonment Without Release or Death by Matthew Rubenstein, Esq. (Jun. 24, 2024) ("Rubenstein Declaration II"). In the twenty-seven (27) trials in which the instruction was given, eight trials (8) resulted in one or more unanimous death sentences (i.e. 30%)). *Id.* Most recently, in *United States v. Bowers*, the requested non-unanimity instruction was given to the jury at the conclusion of the penalty phase, *see id.* Ex. B at 3, 5, and the option of recording a non-unanimous verdict was included in the verdict form, *id.* at 7. The jury, of course, returned unanimous verdicts of death on all capital counts. This data establishes that fears about giving a jury "'an open invitation to . . . avoid its responsibility and to disagree,'" *Jones*, 527 U.S. at 384 (quoting *Justus v. Virginia*, 266 S.E.2d 87, 92-93 (Va. 1980)), are unfounded. However, in the seven (7) trials in which the courts did not instruct the jurors of the consequence of a non-unanimous vote, the jury sentenced every defendant except one to death (eight (8) of the nine (9) defendants) (i.e. 89% of the sentences were death). *Id.*

In *Saipov*, No. 1:17-cr-00722-VSB, the most recent capital trial in this Circuit, the Juror Questionnaire included this instruction in the introduction to the questions concerning punishment:

Juror Number: _____

## SECTION 10:  QUESTIONS CONCERNING PUNISHMENT

### INTRODUCTION

In a case where jurors may have to decide between lifetime incarceration or death as possible punishments, it is important that we know your opinions and feelings regarding punishment.

If there is a punishment phase of the trial, it will be the jurors' responsibility to determine whether Sayfullo Saipov will be sentenced to life imprisonment without the possibility of release or sentenced to the death penalty. In the federal system there is no parole; therefore, if Defendant Saipov is sentenced to life imprisonment he will spend the rest of his life in prison and never be released.

The decision whether to impose a sentence of life imprisonment without the possibility of release or death is one the law leaves entirely up to the jurors. Each juror must ultimately make a unique individual judgment about whether to sentence a defendant to life imprisonment without the possibility of release or to death.

If, and only if, all twelve jurors unanimously find that death is the only appropriate sentence for Sayfullo Saipov, will a death sentence be imposed. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Defendant Saipov, the judge will impose a sentence of life imprisonment without the possibility of release.

During a punishment phase, jurors consider certain evidence referred to in the law as "aggravating factors," and "mitigating circumstances." Aggravating factors are factors that could support a sentence of death. In order for an aggravating factor to be considered, all twelve jurors must agree that the factor has been proved by the government beyond a reasonable doubt. Jurors may not consider anything else as an aggravating factor.

Mitigating factors pertain to the circumstances of the offense, or the personal traits, character, or background of the Defendant, or anything else relevant to the sentencing decision that would suggest, for any individual juror, that life imprisonment without the possibility of release rather than death is the appropriate punishment. Mitigating circumstances do not excuse or justify the crime and the law does not require that there be a connection between the mitigating circumstances and the crime committed.

The sentence imposed by the jury, whether a unanimous vote for life, a non-unanimous vote for life or a unanimous vote for death, is final. The judge must follow the jury's sentencing determination.

This is only an overview of the law about jurors' consideration of life imprisonment without the possibility of release and the death penalty. If this case requires a punishment phase, the judge will instruct jurors in greater detail about their duties.

33

*See* Exhibit C. And the Juror Questionnaire included a question to ensure prospective jurors

understood that a single vote for life would ensure Mr. Saipov was sentenced to life rather than

death:

90.   Under the law, if the jury is unanimous for a death sentence, that sentence will be imposed. If the jurors are not unanimous about the appropriate punishment, then a sentence of life imprisonment without the possibility of release is imposed. In other words, if one juror votes to impose a sentence of life imprisonment without the possibility of release that sentence will be imposed. Whether you agree or disagree with this principle, if you are chosen as a juror you must apply this principle. Would you have difficulty applying this principle?

☐ Yes        ☐ No

Please explain: _____

_____

*Id.*

The court in *United States v. Wilson*, No. 1:04-cr-01016-NGG, ECF No. 1051 (E.D.N.Y.

Mar. 13, 2013), likewise included this legal principle in the introduction to the Juror Questionnaire:

JUROR # _____

## INTRODUCTION

This juror questionnaire is part of the process of selecting a **sentencing jury** in a federal criminal case in which the jury will determine whether to punish the defendant, Ronell Wilson, by imposing a sentence of life imprisonment without the possibility of release or a sentence of death.

In March of 2003, Ronell Wilson killed NYPD Police Detective James V. Nemorin and NYPD Police Detective Rodney J. Andrews. The police officers were working undercover when they were shot in the back of the head while seated in the front seats of a car during a gun sale.

In December of 2006, Ronell Wilson was found guilty of two counts of intentional murder. A sentencing proceeding was then held in which the jury sentenced Ronell Wilson to death on January 30, 2007. After these proceedings were held, the death sentence was overturned due to errors. The jury selected in this new sentencing proceeding will determine whether Ronell Wilson shall be sentenced to life imprisonment without the possibility of release or be sentenced to death.

At a sentencing proceeding, the decision whether to impose a sentence of life imprisonment without the possibility of release or to impose a sentence of death is one the law leaves entirely to members of the jury. The law **never** requires any member of the jury to vote for a sentence of death. If even one juror concludes that death is not appropriate, then the judge will impose a sentence of life imprisonment without the possibility of release. An individual who is sentenced to life imprisonment without the possibility of release will spend the rest of his life in prison and never be released.

During a sentencing proceeding, the jury may consider certain evidence referred to in the law as "aggravating factors" and "mitigating factors." Aggravating factors are circumstances that could support a sentence of death. In order for an aggravating factor to be considered, all twelve jurors must agree that the factor has been proven by the government beyond a reasonable doubt.

Mitigating factors are circumstances about the crime, the defendant or anything else that would suggest, for any individual juror, that life imprisonment without the possibility of release rather than the death penalty is the appropriate punishment. Mitigating factors do not justify or excuse the crime and the law does not require that there be any connection between the mitigating evidence and the crimes committed.

Unlike aggravating factors, the law does not require mitigating factors to be proven beyond a reasonable doubt or be found unanimously by all twelve jurors. Any single juror may find, and consider, any mitigating factor proved by a preponderance of the evidence.

If all twelve jurors unanimously find that death is the appropriate punishment, a sentence of death will be imposed. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence the judge will impose a sentence of life imprisonment without the possibility of release. Each juror ultimately makes an individualized moral judgment about the life or death sentencing decision. If even a **single juror** concludes that death is not the appropriate sentence, the judge must impose a sentence of life.

The sentence imposed by the jury, whether a unanimous vote for life, a non-unanimous vote for life or a unanimous vote for death, is final. The judge must follow the jury's sentencing determination.

**With the above overview in mind, please turn your attention to the questionnaire. Please answer the following questions completely and honestly, always remembering that there are no right or wrong answers.**

And the court in *Basciano*, No. 1:05-cr-00060-NGG, ECF No. 1054-1, the third most recent federal case tried in New York, likewise included this critical concept in the introduction to the punishment questions:

> Case 1:05-cr-00060-NGG    Document 1054-1    Filed 02/07/11    Page 47 of 67
>
> but are facts and circumstances about the defendant or the crime that could cause you to believe that a sentence of death is not called for. If even a **single juror** concludes that death is not the appropriate sentence, the Judge must impose a life sentence. The alternative to a sentence of death is life imprisonment without the possibility of release.
>
> In order to impose a sentence of death, all 12 jurors must agree that death is the only appropriate sentence. The sentence imposed by the jury is final. The law **never** requires any member of the jury to vote for a sentence of death.
>
> This is only an overview of the law applicable to a jury's consideration of the death penalty. If this case requires a sentencing hearing, the Court will instruct the jury in much greater detail about its duties.

Congress created the federal death penalty scheme in a manner that places before the government a high hurdle to obtain a death sentence. In determining the appropriate sentence, each juror decides if the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors the individual juror found to exist to justify a sentence of death. Each juror assigns the weight or significance he or she believes is appropriate to the aggravating factors that were unanimously found to exist and to the mitigating factors that the juror individually (or with others) found to exist. If a juror determines that the aggravating circumstances do not sufficiently outweigh the mitigating circumstances, that the juror votes for life. Under the Federal Death Penalty Act, the defendant will be sentenced to life imprisonment if one or more jurors votes for

life. Death is only imposed if all twelve jurors find that the aggravating circumstances sufficiently outweigh the mitigating circumstances to justify death. 18 U.S.C. §3593 (e); *Jones*, 527 U.S. at 381 (majority agrees with conclusion but best described by dissent: Federal Death Penalty Act does not provide the Government with a second shot at death if jurors are not unanimous for life or for death).

In *Hooks v. Workman*, 606 F.3d 715, 733-734, 742-744, 750 n.33 (10th Cir. 2010), the Tenth Circuit reversed a death sentence where the prosecutor's misleading arguments that a non-unanimous sentencing vote would require a retrial contributed to unconstitutional coercion of the jury.[24] "[I]t is clear the prosecutors' misconduct achieved its intended purpose: the jury was misled to believe it was the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence. The coercion flowing from this misconduct, when combined with coercion flowing from the trial court's *Allen* charge, undoubtedly coerced the jury's death sentences." *Id.* at 746. Such misconceptions about the consequences of a non-unanimous verdict risk coercing jurors to abandon their conscientiously held views as to the appropriate punishment. *See Lowenfeld*, 484 U.S. at 241 ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."). If a juror, exercising his or her unique individual judgment, determines that the aggravating factors do not sufficiently outweigh the mitigating factors to justify death, the juror is legally obligated to vote

---

[24]The Tenth Circuit later said of the prosecutor who made those arguments in *Hooks* that his "persistent misconduct . . . has without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career." *Duckett v. Mullin*, 306 F.3d 982, 994 (10th Cir. 2002). *See also America's Top Five Deadliest Prosecutors: How Overzealous Personalities Drive the Death Penalty*, Fair Punishment Project, Harvard Law School (June 2016) at 8, https://files.deathpenaltyinfo.org/documents/FairPunishmentProject-Top5Report_FINAL_2016_06.pdf (last accessed August 28, 2022) ("[Macy] sent more people to death row than any other individual district attorney in the United States").

for a sentence of life imprisonment.  The concept of "nullification" – a violation of a juror's oath to apply the law as instructed by the court[25] – thus has no application here.

In the context of jury selection, informing the jurors of the consequences of non-unanimity "appropriately emphasizes the individual responsibility of each juror. Ensuring that jurors [a]re cognizant of this responsibility [i]s also an important government interest."  *United States v. Sampson*, 335 F. Supp. 2d at 240-41; *see also Caldwell*, 472 U.S. at 320 (noting that responsibility for sentencing a defendant to death rests firmly on each individual juror and that jurors must be "'confronted with the truly awesome responsibility of decreeing death for a fellow human'" to ensure that they "'act with due regard for the consequences of their decision'") (quoting *McGautha v. California*, 402 U.S. 183, 208 (1971)).  Given the risks identified by the *Fell* court, particularly regarding the jurors' "consistent inability to understand and apply the courts' instructions," 224 F. Supp. 3d at 335-36, this Court must ensure that Payton Gendron's jury has full and accurate information. It must also determine during jury selection whether each juror has the ability to carry out their legal responsibilities in this case and scrupulously avoid seating those who do not.

> d.    Mercy is a Permitted Consideration

The government agrees—as it must—that mercy can be "considered by a juror when personally conducting the weighing process."  Gov't Memo at 28.  There is a substantial body of caselaw establishing that mercy is a relevant and crucial consideration for a capital jury.  In *Caldwell*, 472 U.S. at 331, for example, the Supreme Court discussed approvingly the fact that trial counsel had "asked the jury to show mercy" in closing argument at the penalty phase of a

---

[25] "Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court-in the words of the standard oath administered to jurors in the federal courts, to 'render a true verdict according to the law and the evidence.'" *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (quoting Federal Judicial Center, *Benchbook for United States District Court Judges*, at 225 (4th ed. 1996)).

capital trial, noting that "[t]the mercy plea is made directly to the jury" because it is the jury that engages in "the thought processes required to find that an accused should be denied mercy and sentenced to die." *Id.* (internal quotations omitted).  Writing for a majority of the Supreme Court, the late Justice Scalia affirmed this legal concept in the following manner:

> Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course **the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained.**

*Kansas v. Carr*, 577 U.S. 108, 119 (2016) (emphasis added).

As such, courts regularly include inquiries about jurors' views on mercy in jury questionnaires, including the following examples:

> In your personal view, what role should mercy or forgiveness play in the decision to sentence a murderer to life without the possibility of release or to impose the death penalty?

Juror Questionnaire, *Fell*, No. 5:01-cr-00012-GWC, *see* n. 13, *supra*.

> What role should mercy or forgiveness play in the decision to sentence a person who is guilty of intentionally killing two police officers to life in prison without release or the death penalty?

Juror Questionnaire, *Wilson*, No.1:04-cr-01016 NGG, ECF No. 1051.

The government's argument against the jury's consideration of mercy after the weighing process, *see* Gov't Memo 25-28, is a straw man; no such statement is included in the Defense Proposed Questionnaire, nor will Payton Gendron be advocating for an instruction to that effect.[26]

---

[26] Payton Gendron also has not proposed any language in his questionnaire regarding the government's burden of proof at the penalty phase, thus the defense will reserve its response on this topic, *see* Gov't Memo 23-25, for future litigation.  Similarly, Payton Gendron has not yet made a motion for additional peremptory strikes, *see* Gov't Memo 32-35; *see also* ECF No. 272 (the defense anticipates requesting additional peremptory challenges, depending on the outcome of the venue motion).  Therefore, we do not here respond to the government's "preview" of this unripe issue.

Moreover, the government's reliance on *Rodriguez*, 2007 WL 466752, in this context is

misplaced.  Contrary to the government's suggestion, the *Rodriguez* decision emphasized that, in

fact, the consideration of mercy alone could outweigh all of the aggravating factors:

> The jury retained sole discretion to determine the weight of each
> mitigating and aggravating factor, and whether the sum of one
> outweighed the other. Certainly, a sentence of death was never
> required. **Considerations of mercy alone could have outweighed
> any and all aggravating factors**. However, once the jury determined
> the aggravating factors outweighed the mitigating factors, a death
> sentence was required under the FDPA. Allowing the defense to
> argue otherwise would have constituted a misstatement of the law.

2007 WL 466752, at *60 (emphasis added).

An understanding that a single juror's consideration of mercy alone may outweigh any and

all aggravating factors is critical and indispensable to a full appreciation of the personal

responsibility for the ultimate sentencing determination that each juror will be asked to shoulder if

seated in this case. The Eighth Amendment requires that jurors be fully apprised of that awesome

responsibility at the time that they reach their decisions; common sense dictates that prospective

jurors must understand that reality *before* they are selected if the voir dire process is to serve its

purpose of ensuring that every juror seated is qualified to serve.

## III.    The Defense Proposed Questionnaire Faithfully Incorporates These Principles and Should Be Adopted by the Court

The Court has significant latitude regarding how to conduct jury selection, as described

above. *See Morgan*, 504 U.S. at 729; *Ristaino*, 424 U.S. at 594.  But why the Court would use that

discretion to opt for a less than thorough juror questionnaire and jury-selection process—indeed,

why the government would advocate for a less complete process—when the Supreme Court

permits a more robust one is unclear.  A thorough jury questionnaire that addresses jurors' capacity

to consider mitigation and fully assesses their views regarding the death penalty is far more likely

to ensure that jurors will be able to perform their constitutional duties at a potential penalty phase.

*See Morgan*, 504 U.S. at 729-30 ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored") (quoting *Rosales-Lopez*, 451 U.S. at 188) (alteration in original).

1.    <u>The Defense Introduction to the Punishment Questions Should be Included</u>

Before it can determine whether venirepersons could fulfill the constitutionally mandated responsibilities if selected, the Court must first ensure that prospective jurors understand what those responsibilities are.  The jurors must understand the basic principles of what capital jurors are asked to do, so that their answers to questions about whether they are up to the task can be informed and accurate.  The government's proposed questionnaire omits this information altogether. The introduction to the punishment section in the Defense Proposed Questionnaire, on the other hand, is consistent with– and in some cases, taken verbatim from – statements used in multiple other cases.  *See* Exhibit A, Declaration Regarding Language Providing a Brief Overview of the Sentencing Hearing Process in Juror Questionnaires from Recent Federal Capital Cases by Matthew Rubenstein, Esq. (Aug. 1, 2024) ("Rubenstein Declaration I").

In the examples provided in the Declaration, district courts around the country have included instructions that define aggravating and mitigating factors and describe how they must be evaluated at a penalty phase.  *See id*.  Doing so enables courts to root out substantial impairment among those in the venire.  Because the Supreme Court requires that jurors be open to considering mitigating factors, and requires that the court determine a juror's openness to mitigating factors during voir dire, the Court should start by defining the terms aggravating and mitigating factors and explaining to the jurors how they may be called upon to consider such factors at the second phase of the trial. The Defense Proposed Questionnaire introduction does exactly that.[27]

---

[27] Declining to inform the potential jurors during voir dire about their responsibilities in a capital case creates a real risk that a juror could be sworn in and only learn during the penalty phase that she will be personally called upon to make a determination about the death penalty by considering

The defense introduction also provides additional factual information regarding the penalty phase: that life imprisonment means life with no release, that the jury selects the sentence and the sentence is final, that each juror must make an individual moral decision about the sentence, and that 12 votes are required for a death verdict. As shown by the attached Exhbits, questionnaires utilized by other courts have included these facts. *See id*. There is no reason to hide these principles of law from the jurors until after they are sworn in. Sharing them up front will ensure that the jurors do not answer the subsequent questions based on false assumptions or gaps in knowledge or understanding.

2.    The Defense-Proposed Punishment Questions (**Q112-Q134**) Should be Included

The proposed defense questions regarding punishment are designed to root out substantial impairment by probing jurors' views on the death penalty and life imprisonment, asking if jurors can consider mitigation in the context of a defendant who commits racially motivated mass murder, and assessing jurors' ability to consider various categories of mitigation. Unlike improper "stake-out" questions, these questions do not seek to commit jurors to any particular position; they merely assure that the jurors are able to comply with the Court's instructions in light of the particularly inflammatory facts of this case. Jurors' abstract thoughts about the death penalty, divorced from the general facts of this case, will not provide the information needed to ensure a fair and impartial jury. Precisely for this reason, as described above, *see* Sections II.1, II.2, *supra,* the defense-proposed punishment questions are adopted from the case-specific questions asked in numerous other death penalty cases.

3.    The Defense Questions Regarding Principles of Law (**Q128-Q132, Q134**) Should Be Included

---

and weighing aggravating and mitigating factors. If the juror in fact cannot comply with that directive, the Court will have inadvertently allowed a mitigation-impaired juror to sit in judgment of Payton Gendron in violation of his constitutional rights.

In order to ensure that each prospective juror can adhere to principles of capital law, questions about them should be included in the juror questionnaire. As described above, *see* Section II.3, *supra*, nearly identical questions have been asked in other federal capital cases.

## IV.    Conclusion

For all of these reasons, Payton Gendron urges the Court to adopt the Defense Proposed Questionnaire in its entirety.[28]

Dated:       May 9, 2025, 2025
             Buffalo, New York

                                        Respectfully submitted,

                                        *s/Sonya A. Zoghlin*
                                        Assistant Federal Public Defender

                                        *s/MaryBeth Covert*
                                        Senior Litigator

                                        *s/Julie Brain*
                                        Attorney at Law

---

[28] To facilitate the Court's review and reconciliation of the parties' two proposed questionnaires, we separately provide via email a Word document of an annotated version of the Defense Proposed Questionnaire that indicates where the government's proposal covers the same topic(s) and adds the government's questions where not already included in the defense version. This same annotated version was provided to the government who recently took defense counsel up on our offer to negotiate a joint proposed questionnaire. We anticipate submitting a joint proposed questionnaire to the Court following those negotiations.