IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

           v.                          22-CR-109-V
                                           **(REDACTED)**

PAYTON GENDRON,

                        Defendant.

───────────────────────────────

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S SEALED MOTION TO STRIKE AGGRAVATING FACTORS (DOCKET NO. 268)

The United States of America, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Mac Warner, Deputy Assistant Attorney General, Civil Rights Division, and Joseph M. Tripi and Brett A. Harvey, Assistant United States Attorneys, Daniel Grunert, Trial Attorney, Civil Rights Division, and Michael Warbel, Trial Attorney, Criminal Division, of counsel, respectfully submits this response in opposition to the defendant's Sealed Motion To Strike Aggravating Factors (*see* Docket No. 268).

The defendant moves the Court to strike multiple aggravating factors on various grounds. The defendant's arguments are without merit. He largely fails to cite any support from federal capital cases, and where he does, he misinterprets or misapplies those precedents. Where his claims have been discussed in other federal capital cases, they represent the minority view in federal courts. For the reasons set forth below, this Court should deny the defendant's motion.

## GENERAL PRINCIPLES

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)); *see Tuilaepa v. California*, 512 U.S. 967, 971 (1994) ("To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment."). The Federal Death Penalty Act (the "FDPA") narrows the class of defendants eligible to receive the death penalty by the requirements that the jury find the requisite intent and that the jury find at least one statutory aggravating factor. §3591(a)(2); §3593(c),(e).   The FDPA further provides for individualized sentencing by, among other things: (1) providing the prosecution and defense broad opportunities to introduce aggravating and mitigating circumstances, *see* §3592(a) and (c); and, (2) applying a relaxed evidentiary standard, *see* §3593(c), and prescribing a weighing scheme to decide sentence, §3592(d).

### A. Aggravating Factors Must Be Relevant and Not Vague or Overbroad

Aggravating factors help to channel the jury's discretion by narrowing the class of death-eligible defendants and assist the jury in reaching an individualized sentencing decision based on the facts of the crime and the character and background of the offender.   *See Blystone v. Pennsylvania,* 494 U.S. 299, 308 (1990); *Lowenfield,* 484 U.S. at 244; *Zant v. Stephens*, 462 U.S. 862, 878 (1983).   In general, the Supreme Court has established that aggravating factors must: (1) be relevant; (2) not be vague; and, (3) not be overbroad.   *See Tuilaep,* 512 U.S. at

972-73; *Arave v. Creech*, 507 U.S. 463, 470-71 (1993); *McCleskey v. Kemp*, 481 U.S. 279, 105-06 (1990). Further, the Court has noted that capital juries should be presented with as much information as possible during capital sentencing hearings. *See Blystone,* 494 U.S. at 308-09; *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.").

Under the FDPA, as with several weighing schemes, statutory and non-statutory aggravating factors serve separate and distinct purposes. Statutory aggravating factors serve the dual purpose outlined in *Stephens* of narrowing the class *and* individualizing the sentence. *See Stephens*, 462 U.S. at 878-79; *see also United States v. Runyon*, 707 F.3d 475, 486 (4th Cir. 2013). Non-statutory aggravating factors, on the other hand, serve only to individualize the sentence at the selection stage. *See Stephens,* 462 U.S. at 879; *Runyon*, 707 F.3d at 487; *see also United States v. Mitchell*, 502 F.3d 931, 979 (9th Cir. 2007) ("A non-statutory aggravating factor by itself cannot trigger death eligibility."). Accordingly, while several of the standards for admissibility of these factors may be the same, there are important distinctions outlined below in regard to relevance and breadth.

*Relevance.* Both statutory and non-statutory aggravating factors must focus on circumstances "particularly relevant to the sentencing decision," not "merely relevant, in some generalized sense, to whether the defendant might be considered a bad person." *Gregg*, 428 U.S. at 192. That is, an aggravating factor must serve the purpose of "enabl[ing] the sentencer to distinguish those who deserve the capital punishment from those who do not." *Arave*, 507 U.S. at 474; *see also Mitchell*, 502 F.3d at 974.

Notably, however, while statutory aggravating factors must also be relevant to the narrowing process, non-statutory aggravating factors need not. A non-statutory aggravating factor "need only 'direct the jury to the individual circumstances of the case.' So long as it meets this requirement, a non-statutory aggravating factor ordinarily will pass constitutional muster." *United States v. Sampson*, 486 F.3d 13, 90 (1st Cir. 2007) (quoting *Jones v. United States*, 527 U.S. 373, 402 (1999)); *see also Barclay v. Florida*, 463 U.S. 939, 967 (1983) (establishing a non-statutory aggravating factor is proper if it is relevant to the character of the defendant or the circumstances of the crime). Thus, courts have often rejected motions to strike non-statutory aggravating factors on relevance grounds. *See, e.g.*, *United States v. Hall*, 2014 WL 1356698, *4-*5 (W.D. Mo. Feb. 11, 2014) (denying motion to strike sub-factors of future dangerousness non-statutory aggravating factor); *United states v. Mayhew*, 380 F. Supp.2d 936, 951-52 (S.D. Ohio 2005) (denying motion to strike unadjudicated conduct factors); *United States v. Lentz*, 225 F. Supp.2d 666, 672 (E.D. Va. 2002) (rejecting challenge to "other offenses" non-statutory aggravator, which included allegations of domestic violence by defendant against his capital murder victim, his estranged wife).[1]

---

[1] Where courts have stricken non-statutory aggravating factors on relevance grounds, including in cases cited by the defendant, the factors have generally involved allegations and conduct that do not rival the seriousness of the factors alleged in this case. *See, e.g., United States v. Grande*, 353 F. Supp.2d 623, 634 (E.D. Va. 2005) (striking factor because "a high school fight is unconstitutionally irrelevant to the determination of who should live and who should die"); *United States v. Davis*, 912 F. Supp. 938, 945 (E.D. La. 1996) (striking only portions of "pattern of behavior" factor that dealt with "passive behavior" or "words and warped bravado"); *United States v. Friend*, 92 F. Supp.2d 534, (E.D. Va. 2000) (striking factor that alleged defendant's "discussed killing [Witness] after the murder of [Victim] because she was a potential witness against them" where government did not charge obstruction of justice and defendants committed no overt act in furtherance of purported agreement).

*Vagueness.* Aggravating factors must not be vague. That is, the language of the aggravating factor must be specific enough to furnish adequate guidance to the fact-finder. *See Arave*, 507 U.S. at 470. This requirement is satisfied when the factor, as expressed, furnishes a commonsense core of meaning that a fact-finder can understand. *Jones*, 527 U.S. at 402; *Tuilaepa*, 512 U.S. at 972-73.

*Overbreadth.* Aggravating factors must also not be overbroad. As with relevance, discussed above, this analysis is different for statutory and non-statutory aggravating factors. A statutory aggravating factor cannot apply to every defendant convicted of murder; rather, it must apply to only a subclass of offenders. *Tuilaepa*, 512 U.S. at 972; *see also Mitchell*, 502 F.3d at 974 ("Overbreadth is therefore a relevant concern and the basic rule is that factors 'can be overbroad if the sentencing jury fairly could conclude that an aggravating circumstance applies to every defendant.'" (quoting *Jones*, 527 U.S. at 401)). In contrast, non-statutory aggravating factors, which relate to the "individualized circumstances of the case," are not overbroad as long as they "direct the jury to the evidence specific to this case." *Jones*, 527 U.S. at 400 ("Even though the *concepts* of victim impact and victim vulnerability may well be relevant in every case, *evidence* of victim vulnerability and victim impact in a particular case is inherently individualized. And such evidence is surely relevant to the selection phase decision, given that the sentencer should consider all of the circumstances of the crime in deciding whether to impose the death penalty." (citing *Tuilaepa*, 512 U.S. at 976)); *Sampson*, 486 F.3d at 46; *Fields*, 516 F.3d at 945; *see also United States v. Montgomery*, 10 F. Supp. 3d 801, 812 (W.D. Tenn. 2014).

### B. Aggravating Factors and Evidence That Supports Them Need Not Be Subject to a Test for "Heightened Reliability"

To the extent the defendant argues that aggravating factors must meet a heightened standard of reliability and that penalty phase evidence may only be admitted if it meets such a "heightened standard," such arguments misconstrue applicable law. Although the law does make some distinctions between capital and non-capital cases, those distinctions do not compel pretrial scrutiny and potential preclusion of the government's penalty phase evidence. Rather, the FDPA ensures heightened reliability in capital cases through *procedural* safeguards such as a "bifurcated proceeding, instruction on the factors to be considered, and meaningful appellate review, not by limiting the "particular substantive factors that should be deemed relevant to the capital sentencing decision," or the evidence that would support those factors. *California v. Ramos*, 463 U.S. 992, 998-99 (1983). In fact, the need for reliability does not concern "the appropriate sources of information introduced at sentencing or even, more generally . . . the reliability of evidence." *United States v. Fields*, 483 F.3d 313, 336 (5th Cir. 2007).

As one court explained, "the heightened reliability standard in the Supreme Court's death penalty jurisprudence is actually a reminder that the decision to sentence a person to death must be individualized. It is, in that sense, a call for heightened reliability in ascertaining that this individual should be put to death." *Frank*, 8 F Supp.2d at 28 (citing *United States v. Beckford*, 964 F. Supp.3d 993, 997-1000 (E.D. Va. 1997); *Davis*, 912 F. Supp. at 948-49)). This individualized determination depends, in turn, on the jury receiving "*more* evidence, not less." *United States v. Fell*, 360 F.3d 135, 143 92d Cir. 2004) (citing *Gregg*, 428 U.S. at 203-04) (original emphasis). "[T]he admission of more rather than less evidence

during the penalty phase increases reliability by providing full and complete information about the defendant and allowing for an individualized inquiry into the appropriate sentence for the offense. *United States v. Lee*, 374 F.3d 637, 648 (8th Cir. 2004); *Montgomery*, 10 F. Supp.3d at 813-14; *United States v. Basciano*, 763 F. Supp.2d 303, 358 n. 41 (E.D.N.Y. 2011). Individualized sentencing "must permit consideration of the 'character and record of the individual offender and the circumstances of the particular offense as a constitutional indispensable part of the process of inflicting the death penalty.'" *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).

Essentially, the need for heightened reliability is satisfied by the constitutionally mandated penalty phase *procedures*. Heightened reliability, however, does not license this Court to sit as a pre-trial fact finder, usurping the jury's role and rendering credibility and weight determinations as a precondition to the admission of evidence. The "'acute need for reliable decision making when the death penalty is at issue'" militates in favor of admitting "'as much information as possible'" to the sentencing jury. *United States v. Lujan*, 603 F.3d 850, 859 (10th Cir. 2010) (quoting *Deck v. Missouri*, 544 U.S. 622, 632, (2005), and *Gregg*, 428 U.S. at 204) (reversing district court decision to preclude penalty phase evidence of a "grisly" double homicide, stating: "the importance of reliable, informed decision making actually counsels in favor of admitted evidence of the double homicide, notwithstanding its grisly nature"). "Reliability and accuracy in decision making is actually enhanced by the introduction of evidence that paints a more accurate, fuller picture of the defendant as an individual, irrespective of whether that picture is positive or negative." *Lujan*, 603 F.3d at 859.

**C. The Constitutional Question Whether Aggravating Factors May Be Duplicative of One Another May Be Avoided Where Factors Do Not "Subsume" One Another**

The defendant submits throughout his motion that certain aggravating factors should be stricken as being duplicative of others.  In support, he cites *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996), where the Tenth Circuit held that duplicative aggravating factors alleged under the Anti-Drug Abuse Act skew the weighing process and create the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally.

As an initial matter, aggravating factors are duplicative only when one "necessarily subsumes" the other.  *Fell*, 531 F.3d at 235.  In other words, a jury would "necessarily have to find one in order to find the other."  *Id.* at 236.  Two factors are not duplicative merely because they are supported by the same or similar evidence.  *See Jones*, 527 U.S. at 399 (holding that vulnerable victim and victim impact factors, which both relied on certain characteristics of the victim, "as a whole were not duplicative – at best, certain evidence was relevant to two different aggravating factors"); *Fell*, 531 F.3d at 236 (denying claim that "continuing threat" aggravator impermissibly duplicated "prior conviction" aggravator where the factors arguably overlapped to a certain degree, but no one factor necessarily subsumed the other).

Further the jury may permissibly consider multiple aggravators arising from a single set of facts, so long as they focus on different aspects of the crime. *See Jones*, at 398. Subsequent to *Jones*, even the Tenth Circuit has clarified that *McCullah* "does not stand for the proposition that any time evidence supports more than one aggravating circumstance those

circumstances impermissibly overlap, *per se*," but rather the test is whether one aggravator "necessarily subsumes" another. *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998);

Even assuming *arguendo*, any two factors are duplicative, the FDPA does not expressly prohibit so-called "duplicative" aggravating factors. Neither the Supreme Court, nor the Second Circuit, has ever held that they are problematic, much less unconstitutional. In *Jones*, decided three years after the Tenth Circuit's decision in *McCullah*, the Supreme Court expressed doubts about *McCullah*, stating: "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in *McCullah*. . . .  What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor."  527 U.S. at 398.  *See also Fell*, 531 F.3d at 234-35 (noting the Second Circuit "has not addressed the constitutionality of allegedly duplicative aggravating factors and ultimately finding it unnecessary to decide the constitutional question because it found factors at issue were not duplicative).

Moreover, the supposed harm of allegedly duplicative aggravators cited in *McCullah* is that the resulting increase in the number of aggravators will tip the scales in favor of the death penalty. But the FDPA requires juries to weigh aggravating and mitigating factors individually and qualitatively, not merely tally them and compare their respective totals. *See* 18 U.S.C. § 3593(e); *Jones*, 527 U.S. at 399-400 (emphasizing that any risk of skewing may be eliminated through a jury instruction directing the jurors to avoid simply counting the number of aggravating and mitigating factors, and instead consider the factors' weight and value).

Thus, both the Fifth and Eighth Circuits have expressly rejected *McCullah* and the theory that duplicative factors are unconstitutional.  *Purkey*, 428 F.3d 738, 762 (8th Cir. 2005) (rejecting duplicative aggravating factor theory when applied to the FDPA); and *United States v. Robinson*, 367 F.3d 278, 292-93 (5th Cir. 2004) ("Although our case law once [supported the theory], the Supreme Court recently admonished that it does not support that theory of review.").

Though it remains an open question in this Circuit whether a duplicative factor is "invalid," it will not be necessary for this Court to reach this constitutional issue because none of the aggravating factors alleged in this case are duplicative.  As addressed below with respect to the defendant's specific claims, certain aggravating factors may rely on the same evidence or facts, but, as in *Jones*, 527 U.S. at 398, each factor is alleged to highlight a different characteristic of the defendant or his actions, and no factor necessarily subsumes another.

## LAW AND ARGUMENT

### I.    The Statutory Aggravating Factors Alleged By the Government Are Valid

The defendant challenges the statutory aggravating factors of "grave risk of death to additional persons" (18 U.S.C. § 3592(c)(5)), "substantial planning and premeditation" (18 U.S.C. § 3592(c)(9)), and "vulnerable victim" (18 U.S.C. § 3592(c)(11)).  He also attempts to limit the scope of the "multiple killings and attempted killings" factor (18 U.S.C. § 3592(c)(16)).  For the following reasons, each of these factors is validly alleged and the defendant's claims must fail.

**A. The Grave Risk of Death To Additional Persons Is Validly Alleged**

In the Notice of Intent to Seek the Death Penalty (Docket No. 125), the government alleged in pertinent part:

> **Grave Risk of Death to Additional Persons:** PAYTON GENDRON, in the commission of the offense, and in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense. 18 U.S.C. § 3592(c)(5).

Docket No. 125 at 3. This aggravating factor applies where the defendant creates a "significant and considerable possibility under the circumstances that existed at that time that another person could be killed." *United States v. Allen*, 247 F.3d 741, 78687 (8th Cir. 2001); *United States v. Barnette*, 211 F.3d 803, 819 (4th Cir. 2000). In this case, for each capital count, the defendant shot and killed nine (9) additional persons, shot and injured three (3) other persons, and placed all store patrons and employees in grave danger. The factor clearly applies to each capital count.

**1. The Defendant's "Inconsistent Theories" Claims Are Without Merit**

The defendant first argues that this factor must be stricken because the state of mind necessary to prove the factor ("knowingly," according to the statute; "recklessness," according to the defendant) is inconsistent with the government's theory of certain parts of its guilt-phase case-in-chief. The government acknowledges that to prove attempted killings for Counts 21-23 and 27 of the indictment (all alleging violations of 18 U.S.C. § 249(a)(1)), it must prove specific intent to kill the listed victims. The government disagrees, however, with the defense argument that this proof is impermissibly inconsistent with the government's evidence to prove the "grave risk" aggravator or that the government cannot rely on a lesser

state of mind to prove the aggravating factor.  This argument misconstrues the plain language of the "grave risk" aggravator, defies logic, and must be rejected.

The plain text of the statute requires the government to prove that the defendant, in the commission of the offense, "knowingly created a grave risk of death to [one] or more persons in addition to the victim of the offense."  At the outset, the government disputes the defense assertion that, under § 3592(c)(5), to act "knowingly" equates to acting "recklessly." These are distinct states of mind under the criminal law, with "knowledge" ranking higher. *Borden v. United States*, 593 U.S. 420, 426-27 (2021) ("Purpose and knowledge are the most culpable levels in the criminal law's mental state 'hierarchy.' . . .  Recklessnes and negligence are less culpable mental states because they instead involve insufficient concern with a risk of injury.") (citations omitted).  Section 3592(c)(5) requires the government to prove that the defendant acted "knowingly," and "knowingly" means "knowingly."  If Congress had intended for the mens rea in § 3592(c)(5) to be "recklessly," it easily could have done so simply by drafting the statute to read that the defendant "recklessly" created a grave risk of harm to others.  However, contrary to the defendant's claims, Congress expressly chose to impose a more culpable state of mind and expressly required by the plain text that the government prove the defendant acted "knowingly."

The Eighth Circuit Pattern Jury Instruction for the "grave risk" aggravator (also cited by the defendant) states: "Knowingly creating such a risk means that the defendant was conscious and aware that his conduct in committing the offense might create such a risk."  *See also id*, Notes on Use 2 (indicating the instruction given at the *McVeigh* trial stated: "The

defendant must have acted knowingly in creating this grave risk of death to other persons, which means that he must have been conscious and aware of the grave risk of death, must have realized what he was doing, and must not have acted because of ignorance, mistake, or accident."); *United States v. Savage*, 07-550, 2014 WL 4631976, *3 (E.D. Pa. Sept. 17, 2014) (approving similar instruction).  Nothing in these instructions, and nothing cited by the defense, suggests that the government may prove the "grave risk" aggravator by merely demonstrating that the defendant acted "recklessly."

Further, the defendant's argument defies logic.  If the defendant attempted to kill a person in addition to the named victim of the capital offense, it follows that he knowingly created a grave risk of death to that other person, which is all that the text of the statute requires.  It is hard to imagine a situation where a defendant knowingly creates a graver risk of death than attempting to kill a person by aiming and repeatedly shooting a high-powered rifle.  A person can do—and the defendant in this case did do—both.

Finally, the defendant's argument ignores that an attempt crime is complete as soon as the defendant takes a single "substantial step" with the intent to effectuate the object of his crime.  Thus, under the black-letter law of attempt, an attempt to kill is complete well short of a defendant actually pulling the trigger or endangering a single person.  Here, for example, the defendant's mere arrival at the Tops grocery store, armed with a rifle and with the specific intent to kill, would be sufficient for the jury to find him guilty of Counts 21-23 and 27.  The "grave risk" aggravating factor requires more.  There is nothing incongruous with Congress authorizing a jury to find that a defendant is guilty of an attempt to kill and that he is deserving

of the death penalty where, as here, he knowingly takes additional steps (such as shooting at customers) that progress to the point of creating a grave risk of death to others.  Accordingly, this Court should reject the defendant's arguments that the government's theories of liability are irreconcilable.

Even assuming *arguendo* that the government's theories of liability are inconsistent, the defendant is not entitled to relief.  To be sure, the defendant has cited no law from capital cases holding that it is impermissible for the government to pursue the purportedly inconsistent theories.  The Supreme Court has held that "consistency in the verdict is not necessary."  *Dunn v. United States*, 284 U.S. 390, 393 (1932).  Thus, the general rule is that "inconsistent findings in a jury verdict do not invalidate the verdict."  *United States v. Johnson*, 223 F.3d 665, 675 (7th Cir. 2000 (citing, *e.g.*, *United States v. Powell*, 469 U.S. 57, 64-69 (1984)); *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) (reversing district court decision to set aside death sentence where jury verdicts were different on two death-eligible counts).  If consistency in verdicts is not required, it follows that consistency is not required between states of mind to be proven for substantive offenses and aggravating factors.

Moreover, the guilt and penalty phases of trial are separate and distinct.  *See* 18 U.S.C. §3593(b)-(e).  The findings the jury makes will also be separate and distinct, and Congress has specifically found that offenders who knowingly create a grave risk of death to additional persons in the commission of a capital crime are more deserving of capital punishment than those who do not.  In the penalty phase, new evidence may be presented, the parties may make new arguments, and the court will provide new instructions detailing the law and

process to be followed.  The jury will be instructed that, during penalty phase deliberations, it may not rely on guilt-phase state-of-mind findings to satisfy either the gateway intent factors or the state of mind elements of statutory aggravating factors.  Also, this Court and the parties are capable of channeling the jury's discretion through the presentation of evidence, arguments, and well-crafted jury instructions.  *See, e.g.*, *United States v. McVeigh*, 944 F. Supp. 1478, 1490 (D. Colo. 1996) (rejecting pretrial motion to strike the "grave risk" aggravator, finding no vagueness issue when the factor is "read in context of the factual allegations of the indictment," and concluding the "issue is one of scope and a clarifying instruction may validate this factor").

The *Bowers* prosecution cuts directly against the defendant's novel arguments.  Though the "inconsistent theories" issue was not litigated there, the case involved the exact same situation complained of by the defendant herein.  Bowers committed a hate-crime, mass shooting at a Jewish synagogue near Pittsburgh that resulted in 11 deaths.  At least 10 other persons were present inside the synagogue at the time of the murders.  The government charged Bowers with 11 counts of obstruction of free exercise of religion resulting in death, in violation of 18 U.S.C. § 247(a), and 11 counts of firearm murder during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j) – all capital offenses.  *Bowers*, No. 18-292, Docket No. 44 (Indictment) at 3-5.[2]  The government also charged Bowers with 10 counts of obstruction of free exercise of religion involving attempts to kill.  *Id.* at 6 (Counts 34-35) and 9 (Counts 40-47).

---

[2] The government also alleged in *Bowers* violations of 18 U.S.C. § 249, the same crime charged in the instant case, but as this court is aware, the *Bowers* court dismissed those charges, and the government did not file an interlocutory appeal.

With regard to sentencing, among other factors, the government alleged the "grave risk" statutory aggravating factor, which included consideration of the ten persons who were listed as victims of attempts to kill.  The court submitted all of the attempt charges and the "grave risk" aggravator to the jury during separate phases of trial, and the jury found the defendant guilty of all the counts involving the attempts to kill,  Docket No. 1346 (Guilt Phase Verdict Form) at 7-8 and 10-19, and found the government proved the "grave risk" aggravator beyond a reasonable doubt.  Docket No. 1454 (Eligibility Phase Verdict Form) at 7.    Thus, *Bowers* underscores the ability of the government to allege attempt crimes in the guilt phase, and then present harm knowingly caused to those same victims under the "grave risk" aggravator in the penalty phase.  Likewise, this Court should permit the government to proceed with the charges and aggravator in the instant case.

The defendant's "legal impossibility" argument is also misplaced.  He cites cases, almost all of which turn on state law, holding the prosecution may not pursue inconsistent theories of liability to prove substantive crimes (e.g., proof of a reckless state of mind is insufficient to establish specific intent to kill for an attempted murder charge).   Sealed Mtn. at 4-5.  These cases have no applicability to the circumstances of the instant case.

At best, the defense cites to situations where the government had to choose between competing gateway intent factors to avoid possible juror confusion.  *See* Sealed Mtn. at 5-8 (citing *Basciano*, *Tipton*, and *Stitt*).  Though the defendant suggests these cases are "analogous and instructive," *id*. at 5, they do not support the requested relief.  If anything, *Basciano* favors the government's arguments here.

16

First, and foremost, the overwhelming majority of federal courts have found no error in submitting multiple gateway intent factors to a jury under the FDPA. *See*, *e.g.*, *United States v. Bowers*, 498 F. Supp.3d 741, 746-48 (W.D. Pa. 2020) (denying motion to strike gateway intent factors, other than "intent to kill" factor, and discussing cases); *Basciano*, 763 F. Supp.3d at 342, *aff'd*, 634 F. App'x 832 (2d Cir. 2015) (citing *United States v. Wilson*, 04–CR–01016 (NGG), Special Jury Verdict Form (Docket Entry # 360) (E.D.N.Y. Jan. 30, 2007) (finding all four mental states to have been proven beyond a reasonable doubt)). Second, though the concern with permitting the jury to consider inconsistent gateway intent factors is that it could create juror confusion, courts have obviously found this argument unpersuasive, given they have routinely permitted the government to present multiple gateway intent factors. Moreover, any potential risk of juror confusion is even further minimized here, given the jury will consider the substantive attempt charges in a separate and distinct phase of trial from the aggravating factors, the repeated opportunity for clarifying instructions from the Court, and the overwhelming evidence to support the "grave risk" aggravator.

Just as it is not impermissible for the government to prove more than one gateway intent factor via the same course of action, it should not be impermissible in this case for the government to present evidence demonstrating the defendant's specific intent to kill certain persons in the guilt phase, and then present evidence that he knowingly created a grave risk of death to such persons in the penalty phase. As recognized by the court in *Basciano*, "many cases" indicate that mental states presented in support of gateway intent factors "need not match the mental state found at the guilt phase." 763 F. Supp.3d at 342. The court also

17

explicitly stated that the government "may be permitted to charge intentional murder together with the mental state required under §3591(a)(2)(D)" (reckless disregard). *Id*.[3]

Finally, to the extent the defendant is arguing (or may argue on reply) that the government must elect between presenting either the "grave risk" aggravating factor or the "multiple killings and attempted killings" aggravator in this case, this claim must be rejected. Federal courts have made clear that the government may do both. *See*, *e.g.*, *Bowers*, 498 F. Supp.3d at 752 ("The majority of courts that have considered similar arguments have rejected them."); *United States v. Robinson*, 367 F.3d 278, 293 (5ᵗʰ Cir. 2004) ("Both factors challenged by Robinson are legitimate. Congress determined, in §3592(c)(5), that a murderer is deserving of greater condemnation if he knowingly created a grave risk of death to one or more persons

---

[3] *Basciano* is further distinguishable in that the government conceded in that case that proceeding on both an intent to kill theory and a reckless-disregard theory would possibly confuse the jury. 763 F. Supp.3d at 344. The court, therefore, struck the "reckless disregard" factor based upon the government's concession, but also stated it was not, as a matter of law, required to do so. *Id*. The government does not concede here that there is any risk of jury confusion.

Moreover, *Tipton* and *Stitt* are wholly inapplicable. Both addressed the since-repealed death penalty scheme set forth in the former version of 21 U.S.C. § 848, the Anti-Drug Abuse Act (the "ADAA"). Though the language of the ADAA's gateway intent factors was the same or essentially same as the FDPA's, the ADAA's process was different. Under the ADAA, the jury was required to find a gateway intent factor as a prerequisite to death-eligibility and was also permitted to weigh the gateway intent factor as an aggravating factor in sentence selection, something not allowed under the FDPA. Thus, the *Tipton* and *Stitt* courts found it improper to permit inclusion of multiple gateway intent factors, not because they may have been inconsistent and caused confusion, but because allowing the jury to weigh multiple intent factors could skew the weighing process. Further, the *Stitt* court restricted the government from pursuing the "intent to kill" and "intent to cause deadly injury" gateway intent factors only on retrial, when it had already previewed the government's evidence in a previous penalty phase and determined that the government did not present evidence sufficient to support these higher gateway intents. 760 F. Supp.2d at 582-83 (finding intent factors were inconsistent with government's evidence that the defendant only ordered the killing, but did not actually participate in it).

in addition to the victim; and in § 3592(c)(16), that greater condemnation is warranted if the perpetrator intentionally killed or attempted to kill more than one person in a single episode. We see no reason to second-guess Congress's judgment that murders bearing these attributes are deserving of enhanced punishment, and under *Jones* their use is none the worse in tandem."); *Bin Laden*, 126 F. Supp.2d at 300 (finding that the two aggravators are distinct because "[t]he first relates to Defendants' mental state with respect to persons who were not the intended victims of the bombings" while [t]he second focuses on Defendants' particular desire that there be multiple victims, rather than just one – i.e., the sheer magnitude of the crime."). Here, the "grave risk" aggravator relates to defendant's conscious decision to attack the store in a manner that created a real and considerable possibility that persons other than targeted victims could be killed; while the multiple killings factor primarily focuses on the 10 people the defendant actually killed – that is, the sheer magnitude of his homicidal conduct. There will be no error in permitting the government to pursue both factors.

### 2. The Government May Present Evidence That the Defendant Created a Grave Risk of Death to Persons Other Than Victims Listed in the Indictment

The defendant next moves to strike the "grave risk" aggravator because, he argues, the government cannot prove that the defendant created a grave risk of death to *every* person identified in the government's Informational Outline as subject to this factor.[4] *See* Sealed Mtn.

---

[4] It is worth noting here that the Informational Outline is not a formal pleading; rather it is a discovery aid for the defense. The defendant, however, is essentially weaponizing the Informational Outline against the government, strictly construing its language to suggest a heightened burden of proof for the government. This is one of the reasons the government stated in opposition to being required to provide the Outline. *See* Docket No. 167 at 27. Regardless, the Court should make clear that, at trial, the government is obliged to prove what is in the Indictment and Notice of Intent to Seek the Death Penalty, not the Informational Outline.

at 11 (arguing that, if the Court allows submission of this aggravating factor to the jury, it would have to instruct the jury that it must unanimously find that the defendant "placed the *entire class* of individuals in a zone of danger") (emphasis added). The Court should reject this argument as it lacks support and misconstrues applicable law.

In support of his argument that the government must prove that *every* person identified in the Informational Outline was within a "zone of danger" sufficient to merit application of this aggravating factor, the defendant cites only to Judge Sand's model instruction. *Id.* at 11 ("In order to find that the Government has proven this factor beyond a reasonable doubt, you must unanimously agree on a particular person or class of persons who were placed in danger by Defendant's actions."). The defendant misconstrues the model instruction, however. As evidenced by the absence of citations in the defendant's motion, no court has found the government may only proceed on this aggravating factor if it establishes, pretrial, that it can prove beyond a reasonable doubt that every person within a certain class of at-risk persons identified in the government's charging documents or discovery was actually in a zone of danger from the defendant's conduct.

Though the jury must agree on whom it finds was placed in grave danger, nothing in the Sand instruction, nor any case law, suggests the all-or-nothing proposition posed by the defendant. Rather, by the plain language of the statute, the jury will be free to find the defendant created a grave risk of death to any one or more persons, in addition to the named victim of each capital offense. Indeed, too, the "grave risk" factor has been routinely utilized in mass-casualty cases without such strict limitation on how the government may prove it.

*See*, *e.g.*, *Bowers*, *supra*, Tr. of Trial on 7/12/23, Docket No. 1556 at 33-34 (instructing consistent with Sand model instruction; no limitations on who may be considered as persons put in danger); [5] *Tsarnaev*, 13-cr-10200, Tr. of Jury Trial – Day Fifty-Nine, Docket No. 1418 at 33-34 (D. Mass. May 14, 2015) (same). *See also Bin Laden*, 126 F. Supp.2d at 300 n. 15 (denying pretrial motion to strike "grave risk" aggravator and noting distinction between possible intended targets of the bombing attack (Americans or embassy employees) and "additional persons" ("Kenyan and Tanzanian casual bystanders")); *McVeigh*, 944 F.

---

[5] The defendant suggests that, in *Bowers*, the court only permitted the "grave risk" aggravator to encompass risk caused to responding law enforcement officers named in the indictment and death notice. Sealed Motion at 10, n. 5. This is incorrect. The "grave risk" factor alleged in *Bowers*, stated the defendant: "committed the offenses . . . creating a grave risk of death to one or more persons in addition to the victims of the offenses, *to include* responding public safety officers [listing initials of twelve responding officers]." Docket Nos. 44 at 12, 86 at 3 (emphasis added). The "to include" did not limit the government to only presenting evidence relating to the 12 listed officers.   In its response to Bowers's motion to strike the "grave risk" aggravator, the government made clear that the factor encompassed persons in the synagogue who were placed in grave danger, as well as the listed law enforcement officers who responded to the scene.   *See* United States Response in Opposition to Defendant's Challenge to the Notice of Intent to Seek the Death Penalty, *Bowers*, *supra*, Docket No. 250 at 25 (W.D. Pa. Jul. 1, 2020) ("While moving throughout the Tree of Life Synagogue, defendant Bowers used an AR-15 rifle to shoot at multiple congregants gathered there, placing every person in the Synagogue at grave risk of death, and to shoot at multiple responding officers, also placing their lives in grave risk.   While he succeeded in killing 11 congregants, he placed many additional individuals at risk of death."); *id*. at 26 ("The United States has already confirmed that the evidence it will rely upon to support this aggravator includes persons present in the synagogue and responding law enforcement officers as identified in the Notice of Intent."). At trial, the government presented evidence and arguments relating to the grave harm Bowers caused to persons inside the synagogue who were not personally killed (i.e., not named as victims to the capital counts in the indictment), as well as the listed officers who responded to the event and were in a zone of danger from a shootout that ensued. *See*, *e.g.*, Tr. of Jury Trial on July 12, 2023, Docket No. 1556 at 58 (Eligibility Phase Closing Argument) ("You should find this defendant eligible for the death penalty because he put so many lives at risk through his attack."); *id*. ("That defendant put every other congregant in the zone of danger and put them at grave risk of death in the course of his killings.").   The verdict form submitted to the jury stated in its entirety: "In committing the offense charged in the particular count you are considering for the violation of the offense, Robert Bowers knowingly created a grave risk of death to one or more persons in addition to the victim of the specific offense." *Bowers*, *supra*, Docket No. 1454 at 8 (W.D. Pa. Jul. 13, 2023).

Supp.1490 at (holding "grave risk" aggravator was not vague when read in connection with factual allegations of the indictment, as it was clear that the government intended to prove that bomb in question was of such force to create a risk to persons who were not physically affected by the explosion; stating further that the "issue is one of scope and a clarifying instruction may validate this factor").[6]

### 3. The Government Should Be Permitted to Present Evidence That Defendant Knowingly Created a Grave Risk of Death to Any or All of the Persons Identified in the Information Outline

The defendant next moves the Court to limit what evidence the government may present to support the "grave risk" aggravator, suggesting that many of the people within the class of persons the government has alleged were put in danger (persons within the relatively closed confines of a neighborhood grocery store during a mass shooting perpetrated by a man bent on racial hatred and wielding a high-powered weapon of war) were not actually in a "zone of danger." *Id*. at 15.  For all intents and purposes, the defendant makes a "sufficiency of the evidence" argument *before* trial.[7]  This argument should be rejected.

---

[6] In *Roof*, the government elected to allege the danger to other persons as a non-statutory aggravating factor. *United States v. Roof*, 15-cr-472, Notice of Intent to Seek the Death Penalty, Docket No. 164 at 6 (D.S.C. May 24, 2016) (alleging "Endangering the Safety of Others" as a non-statutory aggravating factor).  In *Saipov*, the government alleged the factor in its notice of intent to seek the death penalty, *United States v. Saipov*, 17-cr-722, Notice of Intent to Seek the Death Penalty, Docket No. 80 at 3 (S.D.N.Y. Sept. 28, 2018) and defended the factor in pretrial briefing.  By information and belief, the government abandoned the "grave risk" factor shortly before trial to avoid a Fifth Amendment issue, as it had failed to present the factor to the grand jury for inclusion in the indictment (Docket No. 61).  Thus, neither case works against the government here.

[7] Pretrial challenges to penalty phase evidence should be limited, as the Supreme Court has also made clear that in order to achieve . . . heightened reliability, *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors.  *Fell*, 360 F.3d at 142 (original emphasis) (internal quotations omitted).  Further, a pretrial motion

As the government noted in the Informational Outline, the defendant's own writings establish, among other things,  The government intends to prove at trial that he executed his plan, ultimately shooting a high-powered rifle approximately 60 times at individuals in front of and inside the busy grocery store, killing ten, injuring three others, and creating a significant and considerable possibility that persons in and in front of the store during the shooting could have been killed.

Here, out of an abundance of caution, the government included reference in the Informational Outline to all persons it has identified as being at or in front of the store when the defendant conducted his attack (remembering that he started his attack outside the front of the store). The government maintains that each of these person's circumstances could properly be considered as proof of the "grave risk" aggravator. This includes people who

---

is not normally the place to test the sufficiency of the government's evidence with respect to aggravating factors. *See United States v. Williams*, 00-cr-1004, 2004 WL 2980027, *17 (S.D.N.Y. Dec. 22, 2004) ("Before evaluating defendant's [challenges to aggravating factors], however, it is necessary to reiterate the general proposition that pre-trial motion such as the one under consideration here is normally not the place to test the sufficiency of the government's evidence with respect to aggravating factors because notices of intent generally need not list specific evidence."). *See also McVeigh*, 944 F. Supp. at 1490.

were struck but survived, people who were near or behind victims who were struck, and people who fled or sought refuge. That people did, as the defendant expected, run and hide does not mean that they were out of the zone of danger that he knowingly created. Cases cited below illustrate how the government's evidence compares favorably to what has been permitted in other cases.

In *Bowers*, the defendant methodically killed 11 congregants as he walked through multiple levels of a synagogue. The jury found the "grave risk" aggravator where the prosecution argued that he "put every other congregant in the zone of danger." *Bowers*, *supra*, Tr. of Jury Trial on Jul. 12, 2023, Docket No. 1556 at 58. Other congregants (10 persons in total) included persons who were also shot, those who were nearby deceased victims when they were shot, and some who remained in hiding and were not seen by the perpetrator.

In *United States v. Ciancia*, No. 13-902, 2015 WL 13798674 (C.D. Cal. Sept. 4, 2015), the defendant shot and killed a TSA officer at LAX airport, shot and injured two other officers, and placed countless others at grave risk of death from multiple shots he fired in the crowded airport. The district court declined the defense request for an informational outline related to this factor, *id.* at *4, and the defense did not later challenge this factor when it moved to strike every other aggravating factor alleged in that case. *See id.*, Docket No. 181 (defense motion to strike aggravating factors). In rejecting the defense request for an informational outline, the court emphasized the "crowded area[]" in which the crime took place. 2015 WL 13798674 at *4.

The "grave risk" aggravator has also repeatedly been submitted to juries in federal capital cases involving shootings on public streets while persons were near the intended victim or inside nearby apartments, homes, or businesses. For example, in *United States v. Savage*, No. 07-550, 2014 WL 4631976, *3 (E.D. Pa. Sept. 17, 2014), the defendant shot and killed a rival "on a public street corner, in a densely populated residential area, where the homes are situated adjacent to the sidewalks." In denying a post-trial motion challenging the "grave risk" aggravator, the court found it "cannot be reasonably argued that the other people on the street within feet of this murder *or the people in the homes adjacent to the street* were not knowingly in the zone of danger when the Defendant fired his weapon." *Id.* (emphasis added). Here, it cannot be argued that persons in the Tops grocery store at the time of the defendant's deadly attack were any less at danger than those who were inside homes when Savage conducted his shooting. *See also United States v. Pleau* (holding allegations that the defendant discharged his handgun between four and six times outside a suburban bank branch when several people were nearby were sufficient to support the "grave risk" aggravator): *United States v. Robinson*, 367 F.3d 278, 289 (5th Cir. 2004) (holding that "[n]o rational grand jury would fail to find" evidence was sufficient to support the "grave risk" aggravator where the defendant fired a weapon from a moving vehicle in a residential neighborhood in close proximity to at least two adolescents playing on a nearby porch and across the street from a barbecue attended by approximately 10 other persons).

Bank robbery scenarios are also instructive. In *United States v. Lawrence*, 735 F.3d 385 (6th Cir. 2013), the Sixth Circuit affirmed this aggravating factor where the defendant, during an attempted bank robbery, shot and killed a bank security guard. The evidence showed that

Lawrence fired seven shots at the guard, initiating an exchange of gunfire "in a bank lobby occupied by several employees and customers." *Id*. at 425. This is akin to the shootout in the instant case between the defendant and the Tops security guard, Officer Aaron Salter. Similarly, in *Allen*, the Eighth Circuit found sufficient evidence to support the "grave risk" aggravator where there was testimony that the defendant discharged a rifle five times inside a bank during a robbery with numerous bank employees and customers present. *Allen*, 247 F.3d at 787.

Finally, even mere threats at gunpoint have been found admissible to support the "grave risk" aggravator. In *Barnette*, the defendant shot and killed his girlfriend from relatively close range. 211 F.3d at 819. In support of the "grave risk" aggravator, the Fourth Circuit found sufficient evidence that the victim's mother was "10-12 feet" from her, *and* where the defendant aimed his gun at another person from approximately 50 feet and threatened that person. *See also Unites States v. Brown*, 2008 WL 4965152, *3 (S.D. Ind. Nov. 18, 2008) (finding defendant placed victim's juvenile son in "zone of danger" where defendant pointed a rifle at the boy and threatened him). Here, the defendant fired approximately 60 shots at multiple victims in a crowded grocery store from a high-powered Bushmaster rifle that fired projectiles at such velocity so as to rip through glass, aisles, products, and people. . Surely, this conduct created an even greater risk of death than the mere threats that supported the "grave risk" aggravator in these other cases.

Case law from the Pennsylvania Supreme Court is also instructive. The Pennsylvania "grave risk" aggravator closely tracks its FDPA counterpart, providing: "In the commission

of the capital offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."  42 Pa.C.S. § 9711(d)(7).  In *Pennsylvania v. Roney*, the court applied Pennsylvania's version of the "grave risk" aggravator (§ 9711(d)(7)), stating, "The grave risk of death aggravator applies to situations where the appellant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim."  622 Pa, 1, 79 A.3d 595, 636-37 (2013) (citations omitted)).  The court further explained the record must include sufficient evidence that the defendant's actions in killing the victim establish a "nexus connect[ing] other persons in close proximity to the intended or actual victim to the zone of danger."  *Id*.  This nexus exists, for example, "where there is potential for an errant, ricochet, or pass-through bullet; the endangered bystander need not be in the direct line of fire to be in grave risk of death."  *Id*. (affirming jury finding of "grave risk" factor where the defendant shot and killed a police officer during a bank robbery).

Applying the rationale from the above-cited cases, evidence in this case strongly suggests that the defendant knowingly created a grave risk of death to any and all of the 69 persons identified in the government's Informational Outline.  This unquestionably includes the three persons shot by the defendant who survived their injuries – Zaire Goodman, Christopher Braden, and Jennifer Warrington.  It also must include the over 60 other people in the store (or in front of the store during the shootings there) who were present but not injured.  These persons represent a class of victims whom the defendant consciously put in grave danger by his actions.

For example,





Testimony from at least some of these zone of danger victims may be presented at trial to detail the sheer terror they experienced at the time. The danger to them was not abstract or attenuated, even if they never took the time to personally view the shooter, or the shooter never saw them.

As described in the Informational Outline and pictured above, ██████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

These are just some examples demonstrating the frailty of the defendant's claims. It defies reality, logic, and common sense to suggest that the defendant did not create a grave risk of death to everyone in and in front of the store as he targeted Black people with a high-powered rifle. He sought to kill as many people as he could, and there was a significant and considerable possibility that any of the persons in and in front of the store at the time of the shootings could have been struck intentionally or incidentally by an errant shot, ricochet, or pass-through bullet. This includes persons who had sought refuge in other rooms outside the defendant's immediate sight. Further, protestation from the defense that this factor may only apply to individuals in a direct line of fire must be rejected because it flies in the face of the reality of modern gun violence. The defendant specifically selected a high-powered rifle to inflict maximum damage, modified the firearm and magazines to carry as much ammunition as possible to increase his odds of maximizing casualties, meticulously chose the ammunition he used to increase lethality, and practiced and trained to kill as many black people as possible.

The government must be permitted to present evidence to tell the stories of the persons present but not injured and demonstrate how the defendant acted with conscious awareness that any of the persons in this class could have been fatally shot.  *See Fell*, 360 F.3d at 143 (holding the admission of more evidence, not less, enhances reliability of capital sentencing).  Ultimately, it will be for the government to choose what evidence to present at trial, and it would be premature for this Court to now preclude any of this evidence as being insufficient to prove this aggravating factor, particularly where it will be a question of fact for the jury to determine whether any additional persons were placed in "grave risk."  *See* Footnote 7, *supra*.

For the reasons set forth above, this Court should deny the defendant's motion to strike the "grave risk" aggravating factor.

### B. The Substantial Planning and Premeditation Factor Is Validly Alleged and Is Properly Supported By Evidence Listed In the Government's Informational Outline

In the Notice of Intent to Seek the Death Penalty, the government alleged in pertinent part:

> **Substantial Planning and Premeditation.** PAYTON GENDRON committed the offense after substantial planning and premeditation to cause the death of a person.  18 U.S.C. § 3592(c)(9).

*See* Docket No. 125 at 3.  The defendant challenges the substantial planning and premeditation factor, 18 U.S.C. § 3592(c)(9), on two grounds.  First, he argues that that evidence regarding his consideration of other targets should not be admitted.  Second, he submits that evidence demonstrating purported "abstract beliefs" should not be admitted.  Neither claim amounts to a cognizable request to *strike* the "substantial planning" aggravator.

Rather, both would better be considered as motions in limine to preclude certain evidence. Regardless of how they are viewed, both arguments must be denied.

*Consideration of Other Targets.*  Regarding the former issue, the defendant avers that evidence regarding his consideration of other targets is "not probative of his planning and premeditation for the crimes he ultimately committed."  Sealed Mtn. at 16.  This is simply untrue.  The "substantial planning" aggravator "charges the jury to consider the degree of planning associated with the crime."  *United States v. Taylor*, 316 F. Supp.2d 730, 738 (N.D. Ind. 2004).  The defendant's careful consideration of how and where to commit the crime, including evidence he considered other sites/locations to maximize his ability to successfully kill as many Black people as possible—settling on the Tops because it was in the zip code with the highest percentage of Black people drivable from his residence in Conklin, New York—is directly probative of the depth of his planning and the meticulous process that led him to ultimately choose the Jefferson Avenue Tops as his target.

To the extent the defendant claims that the jury may use evidence regarding other targets to speculate about what may have happened if the defendant would have attacked those other targets, this is not grounds for striking the "substantial planning" aggravator or the specified evidence.  To be sure, the defendant has cited no case in which the extraordinary relief he requests was granted.  Regardless, after evidence is presented, if the defendant still harbors these concerns, he may request a limiting instruction from the court.  *See Lujan*, 603 F.3d at 860 ("In the trial context we regularly allow the admission of evidence for one purpose

but not another, and we use a limiting instruction to channel the jury to consider that evidence properly.").

*Ideology.*  The defendant next asks the Court to preclude evidence of his "ideological thoughts about the need for the attack," Sealed Motion at 17.  He argues this evidence does not assist the jury in determining the extent of his planning and is unduly prejudicial.  *Id*. However, his ideological thoughts, which he posted extensively online and in his manifesto, are the genesis of his plan to kill Black people, who he views as replacing the white race and in need of extermination, and are fundamental to the hate crimes charged in the indictment. Among other things, this evidence is essential to demonstrate to the jury the defendant's purpose for committing the attack (to kill Black people because of his bias against them), commitment to his mission, how he selected the location for the attack (a location where he thought he would find as many Black people as possible), and the manner of the attack (wanting to inflict maximum damage due to his contempt for Black people).

The Fourth Circuit's decision in *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), is instructive on the relevance of motive in relation to the "substantial planning" aggravating factor.  In *Tipton*, the government alleged the substantial planning and premeditation factor found in the former version of 21 U.S.C. § 848(n)(8), which mirrors the language of the FDPA's substantial planning aggravator. Defendant Roane challenged the sufficiency of the evidence to support the aggravator as it related to Roane's murder of Douglas Moody, a rival drug dealer.  *Id*. at 896-97.  The government presented evidence at trial that Roane and Tipton had grown concerned that Moody's drug organization was hindering their control of sales in

a certain area.  *Id.*  In finding sufficient evidence to support the "substantial planning" aggravator, the appellate court noted, among other things, that "well before Moody's murder, a motive for it, to which Roane was privy . . . had developed."  90 F.3d at 896.  In the same case, Tipton was sentenced to death for a separate double-homicide of two fellow members of Tipton's drug organization.  In denying a sufficiency of the evidence challenge to the substantive murder charge and the "substantial planning" aggravator, the court considered the defendant's motive for planning to kill the victims – treachery for one, and thievery for the other.  *Id.* at 897, 890.  Here, as in *Tipton*, the development and publication of the defendant's motives for this race-based attack cannot be separated from other acts of planning to commit the attack.[8]

The defendant's "undue prejudice" arguments are equally unpersuasive.  The defendant does not deny in his motion that he substantially planned his crimes, and the development and publication of his racist ideology was part and parcel of this planning.  As cited above, the FDPA "permits balancing of probative value against '*unfair* prejudice,' not all prejudice," *Lujan*, 603 F.3d at 858, and there is nothing unfair with permitting the jury to

---

[8] Evidence of the defendant's racist ideological beliefs also directly prove required elements of the substantive hate crime charges alleged in this case and the non-statutory aggravating factors of "racially-motivated killings" and "selection of site."  It is simply not appropriate for the Court to preclude presentation of this evidence, as preclusion would amount to prohibiting the government from proving necessary and fundamental aspects of its case.  The government requests a pre-trial ruling on the admissibility of this evidence.  To the extent the Court may find that the evidence is admissible for one purpose but not another, such that it is somehow not sufficiently probative of substantial planning, preclusion of the evidence is not warranted: rather, the appropriate remedy is, instead, a limiting instruction.  *See Lujan*, 603 F.3d at 860 ("In the trial context we regularly allow the admission of evidence for one purpose but not another, and we use a limiting instruction to channel the jury to consider that evidence properly.").

consider the defendant's unsavory racist ideology, particularly when those beliefs were the impetus for the attack and he broadly disseminated his racist ideology via a manifesto and online journal in which he detailed his planning and preparation for the attack as a how-to guide of sorts for the next attacker he intended to inspire. As in *Lujan* with regard to the graphic evidence of the defendant's other homicidal conduct, no matter how grisly that evidence was, the jury in the instant case has an "acute need" to consider the defendant's motive for his attack in assessing whether he, as alleged, substantially planned and premeditated it. Further, the defendant will be afforded the broad opportunity to present mitigation information relating to potential positive characteristics and to possibly contextualize his ideological statements and postings. *See id*.

In addition, evidence is generally not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *See United states v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Here, though the defendant's racist postings, including his adoption of statements, photographs, and memes created by others, are patently offensive, he took the deliberate steps of including these items in his online journal and manifesto, and the postings are no more sensational or disturbing than his conduct in intentionally killing ten Black people by shooting them in the head and body with a high-powered semi-automatic rifle, injuring three others persons, and terrorizing dozens of others who were in the zone of danger at Tops on May 14, 2022.

Finally, while this evidence may also support multiple non-statutory aggravators, the factors are not duplicative. By enacting this aggravating factor, Congress has stated that

murders that are substantially planned and premeditated are more deserving of capital punishment than those that are not. This factor focuses on the depth of planning for the attack. The others (e.g., "racially-motivated killings" and "selection of site") go to motive and purpose, among other things. No one factor necessarily subsumes the other. *See Fell*, 531 F.3d at 235.

For these reasons, this Court should reject the defendant's motion to strike the substantial planning and premeditation factor or preclude relative and probative evidence of his motive and underlying racist beliefs.

### C. The Vulnerable Victim Factor Is Valid and Properly Applies to the Listed Victims

In the Notice of Intent to Seek the Death Penalty, the government alleged in pertinent part:

> **Vulnerable Victim.** PAYTON GENDRON committed the offenses charged in Counts 12, 13, 14, 15, and 19 against a victim who was particularly vulnerable due to old age and infirmity. 18 U.S.C. § 3592(c)(11).

*See* Docket No. 125 at 3. As recognized by the defense, the government has clarified that it intends to proceed only on the "old age" prong of this factor, and not "infirmity." The defense argues that the Court should strike this factor because there is no nexus between the listed victims' old age and the crime – to wit, murder with a semi-automatic assault rifle. Multiple federal courts, however, have rejected this same argument in similar factual situations.

The Seventh Circuit soundly rejected this type of argument in *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008). There, the Court was not persuaded by the claim that "six well-placed bullets will kill anyone, so vulnerability cannot be in issue." *Id*. at 717. The court instead observed that other courts have held that "disabilities making it hard for the victim to resist or flee support a vulnerable-victim finding under § 3592(c)(11)." *Id*. (citing *Sampson*, 486 F.3d at 48-49; *Paul*, 27 F.3d at 1001-02 (8th Cir. 2000)).

The *Mikos* court expressly rejected the dissenting argument made by Judge Posner and cited by the defendant in the instant motion that the morbidly obese victim's disabilities were irrelevant because "the average person would not have escaped in this case with his life" and the victim "could not have outrun [the] bullets even if she had been an Olympic sprinter." Sealed Mtn at 20-21 (citing *Mikos*, 539 F.3d at 721 (Posner, J., dissenting)). The majority countered that the dissent's position "ignore[d] everything that occurred before [the defendant] was standing inches from [the victim] with a loaded revolver. . . . Even a trained user of handguns has trouble hitting a moving target, so had [the victim] been able to run out of her apartment as [the defendant[ entered, she might be alive today." *Id*. at 717.

The defendant in *Bowers* also made the same argument in support of a pretrial motion to strike the vulnerable victim aggravator, which was based on "old age" for six of the 11 victims of capital offenses. *See Bowers*, 498 F. Supp.3d at 754. In *Bowers*, as in the instant case, the defendant used an AR-15 style weapon, armed with multiple high-capacity magazines, to systematically shoot and kill as many people as possible as he walked through the targeted location. The district court denied Bowers's pretrial motion to strike the

vulnerable victim aggravator on the ground that it was akin to a challenge to the sufficiency of the evidence that would be "more properly addressed at or closer to trial." *Id*. Nonetheless, review of the record reveals that the court ultimately instructed the jury on this aggravating factor as it was alleged in the government's notice of intent to seek the death penalty. *See Bowers*, *supra*, Tr. of Jury Trial on July 12, 2023, Docket No. 1556 at 36 ("To establish the existence of this factor, the government must prove that [listing six victims] were particularly vulnerable due to old age . . . . It means that once targeted, the victim was more susceptible to death because of the vulnerability."). The *Bowers* jury then found the aggravator proven beyond a reasonable doubt for each of the "old age" victims. *Id.*, Eligibility Phase Verdict Form, Docket No. 1454 at 9.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Unlike others in the store who were able to run to safety, or at least attempt to run to safety or take cover, the victims were unable to do so due to, at least in part, limitations in mental and physical capacity that were natural results of their advanced ages. It would be an absurd result if the lethality of a defendant's firearm of choice could negate application of the vulnerable victim aggravator, as urged by the defendant.

Accordingly, this Court should deny the defendant's motion to strike the vulnerable victim aggravating factor.

### D. The Multiple Killings and Attempted Killings Factor May Include the Defendant's Attempts to Kill

In the Notice of Intent to Seek the Death Penalty (Docket No. 125), the government alleged in pertinent part:

> **Multiple Killings and Attempted Killings.** PAYTON GENDRON intentionally killed and attempted to kill more than one person in a single criminal episode. 18 U.S.C. § 3592(c)(16).

Docket No. 125 at 3. The defendant asserts that the government is limited to presenting evidence to support this factor only relating to the killings of multiple victims, and not any attempts to kill. In support, the defense cites only to a statement made by the government in its response to the defendant's motion for an informational outline, suggesting the factor only applies to actual killings, and not attempted killings. The defendant, however, misconstrues what the government said.

The defendant did not request an evidentiary outline on the "multiple killings" factor. He stated, however, that the government's notice of "each" of the statutory aggravators was "quite summary." Docket No. 160 at 3. Though he stated this summary notice "may suffice" for the "multiple killings" aggravator because "the facts encompassed are necessarily clear, narrow, and concrete," *id.*, the government included discussion of this factor in its response to the request for an informational outline "out of an abundance of caution." Docket No. 167 at 36. In pertinent part, the government then stated: "As the Court knows, the defendant pleaded guilty and was sentenced in state court for killing all ten victims, and as the defendant conceded, the factual basis for this factor is clear from its plain language and the substantive charges of the indictment." *Id.*

Nothing in this statement should be construed as a concession from the government that it does not intend to include evidence of attempts to kill in support of this aggravating factor. The "plain language" of the factor, as set forth in the statute, the indictment, and the government's Notice of Intent to Seek the Death Penalty ("NOI") (*see* Docket No. 125), encompasses both actual killings and attempts to kill. The substantive charges in the indictment also encompass attempts to kill Z.G, C.B, J.W., and any Black person at the Tops grocery store (*see* Count 27). Thus, the defense is on full and fair notice that this aggravating factor may include references to attempts to kill.

To the extent the defense may suggest in reply that this factor is then duplicative of the "grave risk" aggravator, or that the government must elect between the two factors, such argument must also fail. As set forth in Section I.A.1, above, federal courts have repeatedly held that the government may present both factors. *See*, *e.g.*, *Bowers*, 498 F. Supp.3d at 752.

Accordingly, this Court should reject the defendant's request to limit the scope of the "multiple killings and attempted killings" aggravating factor.

## II.    The Non-Statutory Aggravating Factors Alleged By the Government Are Valid

### A.  The Racially-Motivated Killings Factor is Valid

In the Notice of Intent to Seek the Death Penalty, the government alleged in pertinent part:

> **Racially-Motivated Killings.** PAYTON GENDRON expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings of Roberta Drury, Pearl Young, Heyward

Patterson, Ruth Whitfield, Celestine Chaney, Aaron W. Salter, Jr., Andre
Mackniel, Margus Morrison, Katherine Massey, and Gearldine Talley.

*See* Docket No. 125 at 4. The defendant moves to strike or limit this factor on First
Amendment grounds. In the alternative, he asks the Court to strike this factor because it
purportedly conflicts with congressional intent in enacting 18 U.S.C. § 249, which does not
provide for the death penalty as a sentencing option. Finally, he avers that this factor conflicts
with the anti-discrimination provisions of the FDPA. For the following reasons, each of these
arguments is without merit.

As charged in the indictment, this factor mirrors language used in similar aggravating
factors in *Roof* and *Bowers*. *See Roof*, *supra*, Docket No. 164 at 6 (D.S.C. May 24, 2016); *Bowers*,
*supra*, Docket No. 86 at 4 (W.D Pa. Aug. 26, 2019). Though the defendants in those cases
did not raise the First Amendment arguments raised here, the district courts in both cases
denied pretrial motions to strike these aggravators on other grounds. *See Roof*, 225 F. Supp.3d
at 418; *Bowers*, 498 F. Supp.2d at 760-61. In both cases, too, the factors were submitted to the
juries, and the juries found the factors proven beyond a reasonable doubt. *See Roof*, *supra*,
Docket No. 871 at 11 (D.S.C. Jan. 10, 2017) (Sentencing Phase Verdict Form); *Bowers*, *supra*,
Docket No. 1537 at 4 (W.D. Pa. Aug. 2, 2023) (Sentence Selection Phase Verdict Form).

In *Roof*, the court noted this factor (as well as other challenged non-statutory
aggravating factors) "ensures the individualized determination required by" Supreme Court
precedent. 225 F. Supp.3d at 418 (internal quotations and citation omitted). Similarly, the
*Bowers* court stated the factor was proper because it "relate[s] to the character of the defendant

or the circumstances of the offense" and because "motive is an appropriate consideration for the jury in determining what sentence should apply."  498 F. Supp.3d at 760-61.  Here, the defendant's racist beliefs and statements (including those he adopted from others) and publication of those beliefs (including adoption of writings and illustrations from other persons) directly reflect on the defendant's character and the circumstances of the offense, as well as his motive for acting.  He acted on his beliefs, and his statements and internet postings cannot be separated from his criminal conduct.  *See Zant*, 462 U.S. at 879 ("What is important at the selection state is an *individualized* determination on the basis of the character of the defendant *and the circumstances of the crime*.").  Thus, this factor, focusing on the defendant's motive, is properly used as a non-statutory aggravating factor.

*First Amendment*.  The defendant avers that this factor violates the First Amendment because it seeks to punish him for his "abstract beliefs and expressions . . . irrespective of whether they have any direct connections to the killings."  Sealed Mtn. at 25.  The defendant's First Amendment arguments are unpersuasive.

The Supreme Court has made clear that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment."  *Dawson v. Delaware*, 503 U.S. 159, 165 (1992).  Rather, the "sentencing authority has always been free to consider a wide range of relevant conduct."  *Id*. (citing *Pyane v. Tennessee*, 501 U.S. 808, 820-21 (1991) (holding victim impact evidence may be admitted at capital sentencing)).  Indeed, in *Barclay*, the Court held that a sentencing judge in a capital case properly considered

the "elements of racial hatred" in the Black defendant's murder of a white victim.  463 U.S. at 949.

It is fundamental that "[t]he First Amendment […]does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  In *Mitchell*, the Supreme Court affirmed the use of racial bias evidence in finding a Wisconsin hate crime statute to be constitutional.  Mitchell and his confederates brutally beat a young white boy because of his race.  508 U.S. at 480.  The defendant was convicted of aggravated assault, and his sentence was increased by application of a hate crime sentence enhancement statute.  *Id*.  The Wisconsin Supreme Court overturned the sentence.  It held that the state statute unconstitutionally punished the "'*reason* the defendant selected the victim, the *motive* behind the selection.'"  *Id*. at 481 (citing state supreme court decision) (emphasis in original).  The court also held the state statute was overbroad in that it would invite the prosecution to "introduce evidence of the defendant's prior speech, such as racial epithets he may have uttered before the commission of the crime."  *Id.*

The Supreme Court reversed.  It again found that courts have "traditionally . . . considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant."  *Id*.  The defendant's motive for committing the offense is one important factor.  *Id*.  Further, the Court found that is permissible to single out bias-inspired conduct for enhancement because this conduct is thought to inflict greater individual and societal harm.  *Id*. at 487-88 ("As Blackstone said

long ago, 'it is but reasonable that among crimes of different natures those should be most severely punished, which are the most destructive of the public safety and happiness.'").

Finally, in rejecting Mithcell's claim that the Wisconsin statute was overbroad and risked chilling speech, the Court found that the contemplated "chill" was too "attenuated and unlikely. The Court concluded:

> The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trial, subject to evidentiary rules dealing with relevancy, reliability, and the like.

*Id.* at 489.

In *Dawson*, the Court held that association evidence was improperly considered in a capital sentencing hearing in violation of the First Amendment, but the case nonetheless supports inclusion of the "racially motivated killings" factor in the instant case. The defendant in *Dawson* had been charged and found guilty of the capital offense of home-invasion murder after escaping prison, and the prosecution presented evidence by stipulation at the capital sentencing hearing that Dawson was a member of the Aryan Brotherhood prison gang and that the Aryan Brotherhood entertained white supremacist beliefs. *Id.* at 165.

The Court found that the stipulation did not sufficiently connect Dawson to the gang or its racist beliefs. *Id.* at 165-66 (noting the Aryan Brotherhood evidence was not specific to the Delaware chapter and was not tied in any way to the murder of Dawson's victim, and that "elements of racial hatred were . . . not involved in the killing"). Thus, the Court

concluded that "the inference the jury was invited to draw . . . tended to prove noting more than the abstract beliefs of" Dawson and the Delaware chapter of the Aryan Brotherhood, and that "on the present record one is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find those beliefs morally reprehensible." *Id*. at 166-67. In the present case, unlike in *Dawson*, the defendant's arguably protected speech is directly connected to his criminal conduct, including his motive and intent.

Applying the above principles, cases from lower courts provide guidance on distinguishing the line between the attempt to punish mere "abstract beliefs" and the proper use of speech and expression to prove elements of crimes or sentencing factors. Where, as here, the ideological beliefs are closely linked to the defendant's motive for committing the crime, courts have found such evidence admissible.    The following cases are instructive:

- *United States v Fell*, 531 F.3d 197 (2d Cir. 2008). In *Fell*, the defendant was convicted of a carjacking murder, and evidence also established he had killed his mother and her male companion. At the penalty phase, the government elicited during cross-examination of defense mitigation witnesses testimony that the defendant had worshiped Satan and had a "666" tattoo. The court recognized that "the government may introduce evidence of beliefs or associational activities so long as they are relevant to prove, for example, *motive or aggravating circumstances*, to illustrate future dangerousness, or to rebut mitigating evidence." *Id*. (emphasis added). Ultimately, however, the court found that it was a "mistake" for the government to elicit the testimony

regarding Fell's Satanic beliefs because there "must be a stronger connection" to the defendant's motive for the murders and the carjacking based on the specific facts of that case. *Id.* at 230 (finding, nonetheless, that the error was harmless). Thus, contrary to the defendant's claim, *Fell* actually supports the government's position that where, as here, the defendant's beliefs are strongly tied to the crime itself, that evidence is admissible.

- *United States v. Saipov*, 17-cr-722, 2023 WL 371531, *14 (S.D.N.Y. Jan. 24, 2023). In this mass-murder/terrorism case, the government alleged as a non-statutory aggravating factor that the defendant "engaged in acts to support a terrorist organization." The defendant moved to strike this aggravator on First Amendment grounds, arguing "'it would . . . be unconstitutional to base a death sentence on [his]personal beliefs approving of ISIS's ideological goals.'" *Id.* The district court rejected the motion, finding the defendant's argument "specious." *Id.* The court stated: "As contemplated by this factor, Saipov would not be penalized for mere association with a foreign terrorist organization, or for his beliefs, but for committing particular acts of violence in furtherance of those beliefs." *Id.* (internal quotations omitted).

- *United States v. Abu Khatallah*, 151 F.Supp.3d 116 (D.D.C. 2015): Abu Khatallah was charged with myriad federal crimes, including material support of terrorism, in violation of 18 U.S.C. § 2339A, in connection with the September 2012 terrorist attacks on the United States diplomatic outpost in Libya that resulted in the deaths of multiple persons, including the U.S.

Ambassador.  He challenged the material support statute on First Amendment grounds, arguing that as applied to him, the government sought his conviction based on his "beliefs and communications."  *Id*. at 143.  The district court denied the defendant's motion to dismiss, finding the defendant's "beliefs and communications either provide evidence of his motive for soliciting and procuring illegal attacks against the United States," or "constitute speech integral to criminal conduct."  *Id*. at 144 (internal quotations and citations omitted).

- *United States v. Mills, et al.*, 367 F. Supp.3d 664 (E.D. Mich. 2019): In the prosecution of multiple gang members for racketeering conspiracy and related offenses, including capital murder, one of the defendant's objected to the government's plan to introduce evidence of rap lyrics and music videos depicting the defendants.  The defendant argued that introduction of this evidence would violate his First Amendment rights, suggesting the video depicted only "abstract beliefs" and was being introduced to show the defendant was "morally reprehensible due to his abstract beliefs."  *Id*. at 668. Agreeing with the government, the court found the evidence was admissible for valid evidentiary purposes, *i.e.*, to establish the existence of the underlying enterprise and the defendant's participation in it.  *Id*.  The court stated the government's proffered purposes for introducing the evidence "were entirely distinct from any incidental portrayal of [the defendant] as a morally reprehensible person [because] they bear on issues relevant in this case."  *Id*. The court also observed that "[b]ecause the Government has tied the lyrics to

the actions of the defendants, the rap lyrics and videos are not simply Defendants' abstract beliefs as contemplated in *Dawson*." *Id.* at 669 (internal quotations omitted).

Here, viewing this aggravating factor facially, it does not run afoul of the First Amendment.  As cited above, the Supreme Court has traditionally recognized that the sentencer may consider a wide variety of relevant conduct when determining sentence.  In *Barclay*, this included *sua sponte* consideration of the defendant's racial hatred.  Though the first clause of the factor points to the defendant's expressions, the factor does not seek to increase the defendant's punishment because of those expressions alone, but because the defendant acted upon those expressions to kill 10 innocent Black persons.  Like the sentencing enhancement statute in *Mitchell*, this factor singles out bias-inspired conduct for enhancement because this conduct inflicted greater individual and societal harm.  *Mitchell*, 508 U.S. at 487-88.  *See also Fell*, 531 F.3d at 228 (recognizing "the government may introduce evidence of beliefs or associational activities so long as they are relevant to prove, for example, motive or aggravating circumstances")  Accordingly, this Court should reject any argument that this factor must be stricken in its entirety.

Further, the Court must not strike this factor as applied to this defendant.  Contrary to the defendant's protestations, the evidence listed in the Informational Outline to support this aggravating factor does not merely demonstrate the defendant's "abstract beliefs."  Nor is it intended to inflame the jury by suggesting the defendant is morally reprehensible because he holds these beliefs, alone. Unlike the wanting evidence in *Dawson* or *Fell*, the defendant's

statements, beliefs, and ideology are, here, directly related to his criminal conduct.  Like in *Mitchell* and *Abu Khatallah*, the evidence goes to prove the defendant's reason for committing his criminal acts.  It is classic motive evidence that may be admitted without offending the First Amendment.  Also, as the defendant in *Saipov* committed his acts in furtherance of his terrorist beliefs, the defendant here committed these murders to further his racist agenda.

The evidence to support this factor may not be parsed as the defendant submits it might.  *See*, *e.g.*, Sealed Mtn. at 26 (delineating statements in the defendant's Manifesto that are "probative of" motive and others that defendant purports are "inadmissible expressions of constitutionally protected abstract beliefs").  Rather, the evidence is collectively probative of the defendant's motive.[9]  It shows his disdain and disrespect for Black people, which fueled his intent and personal justification to kill as many of them as possible.  This encompasses his direct statements, as well as his adoption and reposting or republishing of other people's racist ideas, including symbols, memes, cartoons, videos, and the like.  All of it is relevant, as all of it formed the basis of the defendant's hate.  It is particularly galling to see the defendant, a confessed race-based mass-murderer, suggest that statements in his manifesto and journal ███████████████████████████████████████████████ are "abstract," or that

---

[9] Indeed, in the hate-crimes context, courts have routinely admitted evidence of defendants' bias that is not directly linked to the crime to prove, among other things, motive and intent. *See*, *e.g.*, *United States v. Whitt*, 752 F. App'x 300, 304 (6th Cir. 2018) (holding defendant's previous vandalism including "a swastika and markings associated with white supremacist gangs" was admissible as evidence defendant "harbored a racial animus that could have motivated his alleged involvement" in the charged crime); *United States v. LaFond*, 783 F.3d 1216, 1222 (11th Cir. 2015) (holding evidence of gang membership was admissible to prove motive and intent in prison-murder case involving race-related killing); *United States v. Felton*, 417 F.3d 97, 101-02 (1st Cir. 2005) (the defendant's white supremacist ties and beliefs could be offered by government to explain defendant's motive to participate in bomb-making activities).

████████████████████████████████████ had nothing to do with the

crime.   *See* Sealed Mtn. at 26-28. Any notion that any of these statements may just be

expressions of abstract beliefs was destroyed when the defendant acted upon that hate in

carrying out his murderous attack that left 10 people dead, three severely injured, and

countless others emotionally and psychologically scarred, including the family and friends of

the deceased victims.

None of the evidence set forth in the Informational Outline may be set aside in light

of the direct link between the defendant's ideology and his conduct.  Nor may any evidence

be precluded as "unfairly prejudicial," under 18 U.S.C. § 3593(c).  As argued above, more

evidence, not less, is preferred in capital sentencing.  The evidence at issue here is relevant

and highly probative of the defendant's biased motive for committing his attack.  The jury

must hear and see it.  Presentation of this evidence is not "unfair," particularly where the

defendant will have broad latitude to present mitigation.  Further, to the extent the defendant

fears the jury may draw improper inferences from the motive evidence, this concern may be

cured by a limiting instruction.

Finally, any statements included in the Informational Outline that the defendant

drafted and/or posted before his 18th birthday are admissible.  In arguing for preclusions of

these statements, the defendant cites to *Roper v. Simmons*, 543 U.S. 551 (2005), in which the

Supreme Court categorically excluded capital punishment for any person who was under the

age of 18 at the time he committed a capital offense.  Sealed Mtn. at 27-28.  *See also* 18 U.S.C.

§ 3591(b)(2) ("[N]o person may be sentenced to death who was less than 18 years of age at

the time of the offense.").  The defendant posits, without citing any cases in support, that the "logic of *Simmons* precluding the possibility of a death sentence for crimes committed before 18 also precludes a capital jury from considering, in support of a death sentence, a capital defendant's actions as a juvenile, too."  Sealed Mtn. at 27-28.  He also argues that "heightened reliability" in capital sentencing demands preclusion of the defendant's juvenile conduct.

Citing the principle from *Gregg*, that heightened reliability in capital sentences requires the consideration of more evidence, not less, multiple federal courts, however, have rejected these exact arguments.  *See United States v. Stitt*, 760 F. Supp. 2d 570, 585–86 (E.D. Va. 2010) (admitting some, but not all, evidence of defendant's juvenile conduct to support non-statutory aggravating factors); *United States v. Duncan*, No. 07-23, 2008 WL 711603, at *6 (D. Idaho Mar. 14, 2008) (holding defendant's adult conviction for rape offense that he committed when he was 17 years old was admissible to support "previous conviction" statutory aggravating factors under the FDPA); *United States v. Coonce*, No. 10-3029, 2014 WL 1018081, at *8 (W.D. Mo. Mar. 14, 2014) (holding defendant's adult conviction for assault of a corrections officer that he committed when he was 17 years old and in a juvenile detention facility was admissible to support a previous conviction statutory aggravator).  In *Stitt*, the district court explained in pertinent part:

> [T]his Court finds Defendant's argument that his juvenile adjudications or conduct are *per se* excluded without merit.  The Supreme Court has also stated that "it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision."  *Gregg*, 428 U.S. at 204.  As such, relevant and reliable aggravating factors that consist of conduct Defendant committed as a juvenile are factors that can and should be weighed by the jury.

*Stitt*, 760 F. Supp.2d at 585-86.  *See also Duncan*, 2008 WL 711603 at *6 ("The Supreme Court's concerns in *Roper* regarding imposition of capital punishment upon a minor are not present in this case.  The Defendant was over the age of eighteen at the time of the conduct making up the charges in this case for which the Government alleges the death penalty is appropriate."); *Coonce*, ("[F]ederal courts must exercise great reluctance to exclude any information – favorable or unfavorable to the defendant – when the possibility of a death sentences is at issue." (citing *Gregg* and *Jurek*)).

To be sure, these courts have assessed the reliability and gravity of the proposed juvenile conduct evidence, but this has not caused a blanket preclusion of such evidence.  *See Stitt*, 760 F. Supp.2d at 585-86 (excluding minor juvenile delinquency adjudications and acts that were too remote in time, but still permitting presentation of more-serious acts of juvenile violence, including robberies); *United States v. Jones*, No. 01-282, 2003 WL 1873088 at *6 (E.D. La. Apr. 10, 2003) (admitting some juvenile misconduct, but not all, based on balance of probative value and undue prejudice).[10]  Here, the evidence is reliable, in that it is excerpted from the defendant's personal writings and demonstrates his motive and intent in committing his heinous crimes.  For like reasons, the evidence passes muster under any test for gravity/seriousness.  The defendant's statements and postings before his 18th birthday are one and the same in kind to the statements and postings he continued to make right up to the time he pulled into the Tops parking lot and initiated his attack.  They are not mere musings of youth, nor are they equivalent in any way to misdemeanor or minor juvenile conduct that

---

[10] Though the *Jones* decision preceded *Roper*, the FDPA's prohibition on imposing the death penalty upon juveniles predated *Roper* and was in effect when the district court decided *Jones*.

may have been excluded in other cases. Accordingly, the juvenile statements/postings must not be precluded.

*Congressional Intent of § 249.* The defendant next submits that the Court should strike this aggravating factor because "Congress explicitly elected not to authorize the death penalty for homicides motivated by racial animus" (i.e., violations of § 249(a)). Sealed Mtn. at 30. This argument is without merit and was squarely rejected in *Bowers*. There, the court noted the defendant, as here, provided no authority "directly supporting" this proposition. 498 F. Supp.3d at 760. The court also explained that non-statutory aggravating factors do not perform a narrowing function or otherwise determine eligibility for the death penalty. Because the "religious motivation" factor there properly individualized the sentence, therefore, the court denied the defendant's motion to strike.

Similarly, in *Roof*, the court denied a motion to strike the violations of § 249 as predicates of capital charges under § 924(j) (the same charging predicate alleged in the instant case), where the defendant argued it violated separation of powers to use § 249 as a predicate for a capital charge where Congress had specifically elected not to prescribe the death penalty for violations of § 249. The Court rejected the defense argument in short order, clarifying that the defendant did not face a potential sentence for violating § 249, but only for violating §924(j). 225 F. Supp.3d at 417. The Court further explained that a "plain-language reading of § 924(j) makes it clear that the purpose of the statute is to make other federal crimes involving violence or drug trafficking death-penalty eligible when the defendant uses a firearm to commit murder.

Here, it is appropriate for the government to seek the death penalty under § 924(j), and it is further appropriate for the government to present evidence of the defendant's racially-biased motive for committing these firearm murders as a non-statutory aggravating factor.

*FDPA Anti-Discrimination Clause.*  Finally, the defendant asks the Court to preclude the government from presenting the "racially motivated killings" factor to the jury because doing so would ask the jury to consider race in sentencing, which is prohibited under the FDPA's anti-discrimination clause, 18 U.S.C. § 3593(f).  He cites no support for this new and novel claim.  The government has found no indication that the same issue has been directly raised in any prior capital prosecution of federal hate crimes.  It defies common sense to suggest the anti-discrimination clause would preclude the government from seeking the death penalty in any case involving murder motivated by racial or religious animus.  Given the lack of support for this argument, the Court should deny it.

Indeed, in slightly other contexts, courts have repeatedly held that §3593(f) does not preclude evidence related to race, religion, gender or other protected characteristics that are otherwise necessary to understand the offense, the defendant's background, or the effect on the victims.  *See*, *e.g.*, *United States v. Mikhel*, 889 F.3d 1003d, 1053-54 (9th Cir. 2018) (holding that victim impact testimony about the victim's deep faith in Judaism was admissible and proper); *Untied States v. Bernard*, 299 F.3d 467, 479 (5th Cir. 2002) (holding victim impact testimony about religious activities was admissible); *United States v. Webster*, 162 F.3d 308, 356-57 (5th Cir. 19998) ("[A]lthough race per se is an irrelevant and inadmissible factor, *effects and experiences of race* may be admissible." (emphasis added)).  *See also Bowers*, *supra*, Docket

No. 1272 at 40-41 (W.D. Pa. May 26, 2023) (denying defense *Daubert* motion that was based in part on claim that racial references in expert's statistics ran afoul of § 3593(f)).[11]   As these cases make clear, §3593(f) prohibits relying on protected characteristics *in and of themselves* as justifications to impose or not impose the death penalty.  Evidence related to the defendant's (or victim's) race, however, is distinguishable from such impermissible discrimination and may be properly admitted as relevant information that the jury can consider.

Moreover, courts have repeatedly recognized a fundamental distinction between discrimination based solely on an individual's membership in a protected class – which is clearly impermissible – and the identification of relevant characteristics and beliefs of individuals, even if those characteristics and beliefs may stem from certain protected characteristics.  *See*, *e.g.*, *United States v. DeJesus*, 347 F.3d 500, 510-11 (3rd Cir. 2003) (holding that "[e]ven assuming that the exercise of a peremptory strike on the basis of religious *affiliation* is unconstitutional, the exercise of a strike based on religious *beliefs* is not" (emphasis added)); *United States v. Stafford*, 136 F3d 119, 1114 (7th Cir. 1998) (assuming without deciding that striking a juror based on religious affiliation may constitute unconstitutional discrimination, but stating that "[i]t would be proper to strike him on the basis of a belief that would prevent hi from basing his decisions on the evidence and instructions, even if the belief had a religious backing"); *modified on other grounds*, 136 F.3d 1115).

---

[11] The district court did not discuss § 3593(f) in its order, but the parties had included discussion of the issue in their briefs.  *See* Docket No. 1222 at 9-10 (defendant's motion) and Docket No. 1260 at 20-21 (government response in opposition).

Finally, § 3593(f) "requires jurors to conclude (and certify) that they would have recommended a death sentence 'no matter what' the characteristics of the victim or the defendant were." *United States v. Council*, 77 F.4th 240, 263 (D.S.C. 2023) (rejecting challenge to § 3593(f) jury instruction).   The "racially-motivated killings" factor does not ask the jury to sentence the defendant to death because he is white or the victims were Black.  Rather, it asks the jury to aggravate the sentence because he killed the victims because of their race and his desire to eliminate Black people living on white lands.  The jury can consider this factor, and if it returns a death verdict, conclude at the end of trial that it would have made its recommendation "no matter what" the race of the defendant or the victims.  Accordingly, this Court should deny the defendant's anti-discrimination clause claim.

For the reasons set forth above, this Court should deny the defendant's motion to strike the "racially-motivated killings" non-statutory aggravating factor.

## B.  The Attempt to Incite Violence Factor Is Valid

In the NOI, the government alleged in pertinent part:

> **Attempt To Incite Violence.** PAYTON GENDRON, in preparation for and in committing the acts of violence charged in this case, attempted to incite violent action by others.

*See* Docket No. 125 at 4.[12]

---

[12] Again, this factor mirrors the language of a non-statutory aggravator submitted to and found by the jury in *Roof*.  *See Roof*, *supra*, Docket No. 871 at 11 (D.S.C. Jan. 10, 2017) (Sentencing Phase Verdict Form).  The district court in *Roof* denied a pretrial challenge to the incitement factor in that case, but that challenge was made on different grounds than raised by the defendant here.  *See Roof*, 225 F. Supp.3d at 417-18.  A similar factor was also submitted to the jury in *Tsarnaev*, though the jury did not find it had been proved beyond a reasonable

This factor is relevant to sentencing as it demonstrates to the jury a distinct element of his character and another purpose for his conduct, which was not only to kill as many Black people as possible but to encourage others to join him in his fight against would be "replacers." The wording of this non-statutory aggravating factor ensures the jury will hear evidence about key aspects of the defendant's character and crimes that make him more deserving of the death penalty than other murderers. That, in turn, will help ensure that the jury makes "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *Zant*, 462 U.S. at 878, and will diminish the risk of an "arbitrary and capricious" sentencing decision. *Gregg*, 428 U.S. at 195.

The defendant moves to strike this factor because, he argues, it relies upon the introduction of protected speech, in violation of the First Amendment, and because the evidence to support the factor is not sufficiently serious to support a potential sentence of death. As set forth herein, both of defendant's arguments are without merit.

*First Amendment.* Citing *Brandenburg v. Ohio*, 395 US. 444 (1969), the defendant argues that his statements proffered to support this factor are protected speech and do not rise to the level of incitement. Sealed Mtn. at 35. In *Brandenburg*, the Supreme Court recognized that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is

---

doubt. *See Tsarnaev*, *supra*, Docket No. 1434 at 12 (D. Mass. May 15, 2015) (Penalty Phase Verdict) ("In conjunction with committing acts of violence and terrorism, DZOKHAR TSARNAEV made statements suggesting that others would be justified in committing additional acts of violence and terrorism against the United States."

directed in inciting or producing imminent lawless actions and is likely to incite or produce such action." *Id.* at 447.

The defendant in *Brandenburg*, a Ku Klux Klan member, had been convicted under an Ohio syndicalism statute that outlawed "advocating . . . the duty, necessity, or propriety of crime, sabotage, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." *Id.* at 444-45. The defendant's conviction was based upon a filmed KKK rally that depicted hooded Klansmen, including the defendant, brandishing firearms, parading around a burning cross, and shouting racial epithets. The film also showed the defendant proclaiming to the crowd that if certain conditions were not met, "there might have to be some revengeance [sic] taken." *Id.* at 446. The Supreme Court invalidated the Ohio statute and reversed the defendant's conviction. *Id.*

The *Brandenburg* Court did not explain whether the defendant's conduct may have satisfied the incitement test. Rather, it found that the state statute was infirm because it "purport[ed] to punish mere advocacy." *Id.* at 448. Regardless, the instant case is distinguishable. Unlike the syndicalism statute in *Brandenburg*, the "incite violence" aggravating factor does not seek to punish "mere advocacy." Rather, the factor signifies that the defendant acted in killing 10 people for the shared purpose of encouraging others to do the same.

Further, while Brandenburg's actions and statements were reprehensible, they lack the direct link to inviting violence by others that is demonstrated by the defendant's statements in

the instant case.  As the defendant planned his attack, he detailed his actions for others, hoping and encouraging them to model after him, just as he had tried to, at least in part, model his actions and statements after other mass-murderers.  Further, though the defendant now tries to pawn off many of his statements as mere bravado, each of the statements identified in the Informational Outline is specifically meant to excite and encourage others to act.  The defendant made the statements because he wanted to produce "imminent lawless action" by others.  He shared his thoughts and actions with at least 65 other persons.  He wanted them, and countless others, to act like him.  This was not "mere abstract teaching."  It was a call to action.  *See Brandenburg*, 395 U.S. at 448 (quoting *Noto v. United States*, 367 US. 290, 297-98 (1961)).

Conversely, in *United States v. Al Bahlul*, 829 F. Supp.2d 1141 (C.M.C.R. 2011), a case involving the prosecution of an al Qaeda operative for material support of terrorism and other offenses in the Military Commissions, the appellate court affirmed the introduction of an al Qaeda recruitment video created by the defendant over the defendant's protestations that the video constituted protected political speech.  The video was broken down into three parts: "The Problem," "The Cause," and "The Solution."  829 F. Supp.2d at 1160.  Among other things, it depicted Muslim women and children being mistreated, the presence of American diplomats and troops in the Middle East, and incensing images of violence.  *Id*.  It then concluded with videos and images of men training, attacks on American targets (including the U.S.S. Cole) and calls for men to travel to Afghanistan and join the jihad.  *Id*.  The appellate court held the video was not protected speech where it went beyond mere advocacy, was aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction,

and where the intended target was not limited to a specific, named individual.  *Id.* at 1249.

*Al Bahlul* is more applicable to the instant case.  Though on a different scale from the al Qaeda recruitment video introduced in *Al Bahlul*, the defendant's manifesto, Discord journal, and other statements and postings in the present case serve the same purposes as the recruitment video. ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████     ██████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████  Sealed Informational Outline at 30. The defendant's statements and postings were classic "incitement" and should be admitted as such at trial.

Even if the defendant's statements and postings that support this aggravator are found to not pass the incitement test under *Brandenburg*, as explained above with regards to the "racially-motivated killings" factor, the government may still introduce evidence of protected speech for relevant evidentiary purposes, such as to prove motive or aggravating factors.  *See Fell* 531 F.3d 228.  In *United States v. Rahman*, 189 F.3d 88, 118 (2d Cir. 1999), the Second Circuit held that Government's use in a conspiracy case of the defendant's speeches, writings, and preachings were admissible, even if the statements did not "in themselves constitute the crimes of conspiracy or solicitation."  189 F.3d at 117-18.  The *Rahman* court stated in pertinent part:

> While the First Amendment fully protects Abdel Rahman's rights to express hostility against the United States, and he may not be prosecuted for so speaking, it does not prevent the use of such speeches or writings in evidence when relevant to prove a pertinent fact in a criminal prosecution. The Government was free to demonstrate Abdel Rahman's resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States and against President Mubarak of Egypt.

*Id.* at 118.

Here, the evidence that will support the "incite violence" factor, like the evidence that supports the "racially-motivated killings" factor, is classic motive evidence. It shows one of the defendant's reasons for committing his murderous attack – i.e., to arouse others to act.

Further, the evidence would be presented to support a valid aggravating factor, which is also permissible under *Fell* and *Barclay*. The factor relates specifically to the circumstances of the offenses and the defendant's character. This factor makes the defendant's conduct worse and makes him more worthy of the highest punishment. It shows that the defendant killed 10 persons not just to kill, and not just to target Black people, but to also encourage others to follow him and commit similar acts. Just as juries were permitted to consider similar factors in *Roof* and *Tsarnaev*, the jury should be permitted to consider this factor in the instant case. Accordingly, even if the Court finds that the proffered evidence is protected speech under the First Amendment, it must permit the government to present such evidence at trial.

*Gravity/Seriousness:* To the extent the defendant suggests his statements are not sufficiently serious to be considered by the jury in the capital decision-making process, he misses the mark. The government fundamentally disagrees with the assertion that his

incitement of others to act like him did "not, an any rational sense, make [the] homicide[s] worse." Sealed Mtn. at 37.[13]  This defies common sense and decency.  Not every murderer, not even every mass-murderer, drafts a manifesto that includes propaganda so clearly intended to arouse others to act.  Not every murderer or mass murderer (few, indeed), drafts a months-long journal that is meant to serve as a ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████

This is also not the "threatening words and warped bravado, without affirmative acts" that was cautioned against in *Davis*.  *See* Sealed Mtn. at 37 (citing *U.S. v. Davis*, 912 F. Supp. 938, 944-45[14] (E.D. La. 1996).  In *Davis*, the government alleged as a non-statutory aggravating factor, the defendant's pattern of misconduct as a police officer.  912 F. Supp. at 944.  The district court precluded some, but not all proffered evidence to support this factor, including two items the court characterized as merely "threatening rhetoric."  *Id*. at 945.[15]

---

[13] Indeed, other hate-motivated mass murderers, such as Bowers, Tarrant, Roof, and Breivik, called for violence in a manner similar to this defendant and actually inspired this defendant to violence. The defendant lacks any credulity in claiming, after he copied large swaths of Breivik's writings and put the names of others on his murder weapon, that these acts do not sufficiently express an incitement to violence.

[14] The defense pinpoint cited to page 943.  The correct citation is to pages 944-45.

[15] The items excluded in *Davis* (Items "g" and "i") were as follows:

> g. On or about October 6, 1994, Len Davis, in a telephone conversation with Paul Hardy told Paul Hardy that he would, in his capacity as a then-New Orleans police officer ". . . get the fucking report.  We'll know where they live at and every fucking thing else," in response to Paul Hardy's request to Len

Here, the defendant published a high volume of material that was intended, at least in part, to encourage others to act like him. And, of course, he affirmatively acted, conducting a meticulously planned, quick, and tactically precise assassination of innocent Black victims—most of whom were shot in the head—at their neighborhood grocery store while the defendant livestreamed it for "maximum effect."

Defense attempts to parse the evidence should also be rejected. The defendant cites no support for his repeated suggestions that only direct statements of incitement should be admissible. ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████████ Further, the evidence must be taken as a whole, and even statements that don't directly incite give context to those that do. ████████████████████████████

---

Davis to obtain the names of individuals who had earlier stolen Paul Hardy's Jeep Cherokee, to that Paul Hardy could retaliate.

i.    On or about October 19, 1994, Len Davis, in a telephone conversation with Damon Causey, indicated Davis' willingness to keep a dying shooting victim quiet in order to protect Damon Causey, whom Len Davis suspected of shooting said victim.

*Davis*, 912 F. Supp. at 950-51. *See also United States v. Gilbert*, 120 F. Supp.2d 147, 152-53 (D. Mass. 2000) (excluding as lacking sufficient gravity, evidence the defendant had eight years earlier scalded a young, mentally retarded patient with hot bath water, and had assaulted her husband with a large kitchen knife.

It is worth noting here, that at least one district court interpreting the FDPA, has rejected the notion from *Davis*, *Gilbert*, and *United States v Friend*, 92 F. Supp.2d 534, 543-45 (E.D. Va. 2000), that non-statutory aggravating factors, to be relevant, must meet a certain "gravitas" or "seriousness" requirement. *See United States v. McCluskey*, No. 2013 WL 12329344, *26 (D.N.M. Oct. 7, 2013) (explaining the distinction between statutory and non-statutory aggravating factors, the need for as much information as possible in the penalty phase to allow individualization of the sentence, and appellate court ruling that "relevance" in capital sentencing hearing is same as F.R.E. 401 definition of relevance).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ They are attempts

to arouse others to act or to stir up others.  By attempting to spread beliefs and make an

impact, the defendant sought to persuade others to act like him. ████████████████

████████████████████████████████

Likewise, the Court should also reject defense arguments that only statements

authored by the defendant, himself, may be admissible to prove this aggravator.  When the

defendant copied and republished statements of others, including those who have committed

other mass-attacks or other acts of racial hatred, he adopted those statements and expressions

as his own.  Notably, when publishing others' thoughts and words, the defendant generally

did not attribute those thoughts and words to their original authors but republished them as

if they were his own.  He is personally responsible for finding and republishing these things,

which all are consistent with the general thoughts and tenors of his manifesto and journal.

They reflect on his state of mind and character and must be considered by the jury.

For the reasons set forth above, this Court should deny the defendant's motion to strike

the "incite violence" non-statutory aggravating factor.

### C.  The Selection of Site Factor Is Valid

In the Notice of Intent to Seek the Death Penalty, the government alleged in pertinent

part:

> **Selection of Site.** PAYTON GENDRON selected the Tops Friendly Market, located at 1275 Jefferson Avenue, Buffalo, New York, in order to maximize the number of Black victims of the offense.

*See* Docket No. 125 at 5.[16]  The defendant moves to strike this aggravator, arguing it is impermissibly duplicative of the "substantial planning and premeditation," "multiple killings and attempted killings," and "racially-motivated killings" factors.  The defendant's arguments are without merit.

As detailed in the "General Principles" section, above, neither the Supreme Court nor the Second Circuit has addressed the constitutionality of allegedly duplicative aggravating factors.  Though the defendant relies on *McCullah's* double-counting theory, it is inapplicable here.  As in *Fell*, this Court need not reach the constitutional issue because the "selection of site" factor is valid (a point not contested by the defense) and is not duplicative of any other aggravating factor.

In *Jones*, the Supreme Court stated, "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid. . . .  What we have

---

[16] This factor closely tracks non-statutory aggravating factors alleged and found by juries beyond a reasonable doubt in *Roof*, *supra*, Docket No. 871 at 13 (Sentencing Phase Verdict Form) ("The defendant targeted men and women participating in a Bible-study group at the Emmanual Church in order to magnify the societal impact of the offenses charged in the Indictment"); *Tsarnaev*, *supra*, Docket No. 1434 at 13 (Penalty Phase Verdict) ("Dzokhar Tsarnaev targeted the Boston Marathon, an iconic event that draws large crowds of men, women, and children to its final stretch, making it especially susceptible to the acts and effects of terrorism."); and *Bowers*, *supra*, Docket No. 1537 at (Sentence Selection Phase Verdict Form) ("Robert Bowers targeted men and women participating in Jewish religious worship at the Tree of Life Synagogue, located in the Squirrel Hill neighborhood of Pittsburgh, Pennsylvania, which is home to the large and oldest urban Jewish populations in the United States, in order to maximize the devastation, amplify the harm of his crimes, and instill fear within the local, national, and international Jewish communities.").

said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor." 527 U.S. at 398. Here, the "selection of site" factor is valid, as it directs the jury's attention to the defendant's character, state of mind, and specific circumstances of the crime. *See Zant*, 462 U.S. at 878 (explaining need of individualized sentencing). As reflected in the plain language of this aggravating factor, the defendant chose to commit his attack at the Tops market to "maximize the number of Black victims." He did not choose to kill people in their homes, on the street, or at any randomly selected place of business. He chose the specific location after careful deliberation, which included ██████████████ ████████████████████████████████████████████████████ ██████████████████████████ and the evidence will demonstrate he believed he could maximize the impact of his attack by conducting it at the Tops market. Supreme Court capital jurisprudence and the FDPA "anticipate[] that the jury will confront a broad array of information and enjoy considerable leeway in addressing it." *Runyon*, 707 F.3d at 491 (rejecting defendant's challenges to aggravating factors). Thus, the "selection of site" factor is appropriate for jury consideration in this case.

The factor is not duplicative of any of the other factors identified by the defendant. The "selection of site factor" focuses on the location of the offense itself – and especially the defendant's decision to carry out his attack there in order to maximize the number of Black victims."

The "substantial planning and premeditation" factor considers the defendant's state of mind/intent and his detailed preparations for the attack. The fact that his murderous hate-

crime was substantially planned and premeditated makes him more deserving of capital punishment. So, too, does the fact that he targeted the Tops market. Again, he did not target people in their homes or streets, but in their neighborhood hub where the defendant knew he would find a high number of Black people.

The "multiple killings and attempted killings" factor focuses on the sheer magnitude of the attack – *i.e.*, that actual results of the defendant's attack. The fact that the defendant selected a site for his attack in order to maximize its effect, and the fact that he actually killed 10 persons and attempted to kill others, are different, and both make him more deserving of capital punishment.

And, finally, the "racially-motivated killings" factor zeroes in on the defendant's biased motive for his attack—his demonstrated hatred of Black people and desire to kill them. The "selection of site" factor, on the other hand, focuses on his specific decision to conduct the attack at the Tops market because that is where he thought he could find the most Black people to kill and where he could maximize the effect of his attack.

None of these factors "subsumes" the "selection of site" factor (or vice versa). Though there may be some overlap among the factors, the jury could find any one of the identified factors while not finding the "selection of site" factor (or vice versa). These factors are, at worst, intersectional, but the "selection of site factor" is not necessarily and wholly subsumed by any of the identified factors. For example, in *Saipov*, the district court rejected a defense motion to strike the "selection of site" factor as duplicative of "substantial planning and

premeditation" and "multiple killings" factors.  *Saipov*, *supra*, 2023 WL 371531 at *16.  The court stated: "A jury could find that intersection in this factor – maximizing carnage and death at a popular location to instill fear – is more than the sum of its parts, and as such that this factor is unique in why Saipov may deserve the death penalty."  *Id. See also Roof*, 225 F. Supp.3d at 418-19 (rejecting argument that non-statutory aggravating factors, including "selection of site" and "racially motivated killings" were duplicative, stating: "Like a five-circle Venn diagram, there may be areas of overlap between the five aggravating factors. However, no two factors are identical, which means it [. . .] may play some role in the weighing process."); *Bowers*, 498 F. Supp.3d at 759 (rejecting argument that "selection of site" aggravator was duplicative of "victim impact" and "injury to surviving victim" factors). Accordingly, the defense duplicity argument fails.

Though these factors may rely on much of the same evidence, this is not grounds for dismissal of any of the factors.  *See Jones*, 527 at 398-99, *Fell*, 531 F.3d at 236 ("Two factors are not duplicative merely because they are supported by the same evidence.").  It is well-established that even if the supporting evidence is similar, the mere fact that multiple aggravating factors may rely on the same or similar evidence does not render those factors impermissibly duplicative.  *See, e.g.*, *Jones*, 527 US. At 399-400 (finding aggravating factors were not duplicative, stating "at best, certain evidence was relevant to two different aggravating factors"); *Fell*, 431 F.3d at 236; *Bowers*, 498 F. Supp.3d at 759.

In sum, here, each of the alleged aggravating factors the defendant cites may in some way address overlapping parts of the evidence, but they also highlight different aspects of the

defendant's crimes, and so, are not duplicative.  Neither "necessarily subsumes" the other.

What is more, the Court can avoid any risk of prejudice by instructing the jury to not simply

count the number of aggravating and mitigating factors, but rather to consider the weight and

value of each factor.  *Fell*, 531 F.3d at 236.  Accordingly, the defendant's motion to strike the

"selection of site" aggravator must be denied.


## CONCLUSION

For the reasons set forth above, this Court should deny the defendant's motion in its

entirety.


DATED:        Buffalo, New York, March 14, 2025


MICHAEL DIGIACOMO                           MAC WARNER
United States Attorney                       Deputy Assistant Attorney General
Western District of New York                 Civil Rights Division


BY:   s/JOSEPH M. TRIPI              BY:   s/DANIEL GRUNERT
      s/BRETT A. HARVEY                    Trial Attorney
      Assistant United States Attorney's    Civil Rights Division
      United States Attorney's Office       U.S. Department of Justice
      Western District of New York          150 M Street NE
      138 Delaware Avenue                   Washington, DC 20530
      Buffalo, New York 14202               202-598-1141
                                            Daniel.Grunert@usdoj.gov


BY:   s/MICHAEL S. WARBEL
      Trial Attorney
      Criminal Division
      U.S. Department of Justice
      1331 F. St. NW, 6th Floor
      Washington, DC 20004
      (202) 514-5605
      Michael.Warbel@usdoj.gov