UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                          v.

                                         22-CR-109 (LJV)

                                         (Redacted Version of ECF No. 454)

PAYTON GENDRON,

                       Defendant.
_____

## REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS<br>EVIDENCE SEIZED FROM DISCORD ACCOUNT

Payton Gendron, by and through his attorneys, respectfully submits this Reply to the

Government's Consolidated Response in Opposition to Defendant's Motions to Suppress, ECF

No. 435, which responds to his Motion to Suppress Evidence Seized from Discord Account, ECF

No. 403.

    **I.**   **Payton Gendron Has Standing to Challenge the Unlawful Search and Seizure of
his Discord Account.**

        **A.**  **An Affidavit Confirming Payton Gendron's Ownership of the Discord
Account and Legitimate Expectation of Privacy in its Contents is Attached**

In its Response, ECF No. 435 at 8-10, the government avers that Payton Gendron has

failed to establish standing to challenge the Discord warrant *inter alia* because he did not submit

an affidavit establishing the required legitimate expectation of privacy in the data contained in

his account. An Affidavit is simultaneously filed herewith.

**B. The Fact That Portions of Payton Gendron's Non-Public Discord Account Were Shared With 65 Selected Individuals and Two Channels Fails to Defeat his Legitimate Expectation of Privacy in the Account or to Relieve the Government of its Obligation to Comply with the Fourth Amendment**

Although he shared certain aspects of the contents of his Discord account with a small number of selected individuals, Payton Gendron nevertheless maintained a reasonable expectation of privacy in his data that prohibited law enforcement from accessing it except in accordance with the requirements of the Fourth Amendment. A "[d]efendant ha[s] a legitimate expectation of privacy in the non-public content on his social media account and thus a valid warrant [i]s required to search such content." *United States v. Chavez*, 423 F. Supp. 3d 194, 201 (W.D.N.C. 2019). That a defendant allows the public to access "*some* content" on such an account "does not render *all* content unprotected by the Fourth Amendment." *Id.* at 202 n.2 (citing *Carpenter v. United States*, 585 U.S. 296, 310 (2018)).

Moreover, a defendant retains a legitimate expectation of privacy in content as to which the public at large is excluded even if he grants access to selected individuals, such as "Facebook friends that he accepted." *Id.* at 200, 204 (rejecting government's argument that defendant's expectation of privacy in content shared with "three to four hundred" Facebook friends, but excluded from the public, was unreasonable). *See also United States v. Turner,* 24-cr-8, 2025 WL 193959, at *7 (W.D. Va. July 15, 2025) (finding no reasonable expectation of privacy in website posts that were "made to a public audience" and were "visible to *anyone* on the website;" noting that "this is not a case, for example, where an individual posted content to a website with the intent that it only be viewed by his chosen circle of friends") (citing *Chavez*). Choosing to restrict public access to one's data in such a way "demonstrates that he maintained a subjective expectation of privacy in that content," *Chavez*, 423 F. Supp. 3d at 202, and that expectation is one "that society is prepared to recognize as reasonable," *id.* at 205. Nowadays,

people routinely use social media platforms to "instantaneously convey intimate, momentous, and sometimes weighty information." *Id.* at 203. "To read the Constitution as entirely failing to protect such private information 'is to ignore the vital role that [social media] has come to play in private communication.'" *Id.* at 204 (quoting *Katz v. United States*, 389 U.S. 347, 352 (1967)).

Like the defendant in *Chavez*, Payton Gendron restricted access to the contents of his Discord account from the general public. The government is thus flatly incorrect when it states that he cannot demonstrate a reasonable expectation of privacy in the contents of the G\ server "because he made it publicly available before committing the Tops attack." ECF No. 435 at 10. To the contrary, as the government acknowledges, creating a Discord server affords the user "'the ability to create private, invite-only spaces for your friends or community.'" *Id.* at 8 n.1 (quoting *Beginner's Guide to Discord*, https://support.discord.com (accessed July 31, 2025)). That is exactly what Payton Gendron did; even those portions of his account to which he granted access most widely were shared only with a small community of fellow Discord users, limited to 65 individuals and two channels.

Also, only portions of the G\ server were shared even with that circumscribed group. For example, as the government notes in its Response, the Word documents containing extractions from the server that Payton Gendron shared in the post he made right before the shooting contained a "substantial portion," but not all, of the server's contents. *Id.* at 13. The omitted material included "the final 56 pages of the G\ server, which covered the time period from May 12, 2022, at 10:14 p.m., through May 14, 2022, at 2:21 p.m." *Id.* Those Word documents also included content from only a subset of the 11 channels that the server contained; the entire contents of multiple channels were omitted and even the invitation to join the G\ server denied users access to the full complement of channels.

And, the G\ server is but one portion of Payton Gendron's Discord account, while the government obtained every last scrap of information pertaining to the account, and more, by virtue of the search warrant that it sought and executed. The hundreds of thousands of direct messages that the government searched and seized were never made public and never shared with even the 65 individuals and two channels that to whom the post was sent immediately before the shooting, with the exception of those in which they themselves directly participated. Similarly, the government searched 128 channels on servers other than the G\ server, again consisting of hundreds of thousands of posts, and seized massive amounts of that data, also. It, too, was not publicly accessible and was never shared by Payton Gendron. Thus, the government's argument, even if it were meritorious, could apply only to a subset of the data produced by Discord in response to the search warrant.

The fact that the recipients of the 13 messages containing the links to the Word documents *could* have shared them with law enforcement—and that the participants in the direct messages and 128 other channels obtained using the warrant *could* have shared the non-public material they were granted access to with the government—doesn't alter the analysis. In the same way that letters and sealed packages are protected by the Fourth Amendment while in transit with the postal service, "it is objectively reasonable for an individual to expect privacy in non-public content that is entrusted to a social media website as the intermediary of the ultimate recipient." *See Chavez,* 423 F. Supp. 3d at 203 (citing *United States v. Jacobsen,* 466 U.S. 109, 114 (1984)). "To be sure, the ultimate recipient of such content may share it with law enforcement, as the Fourth Amendment does not 'protect[] a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' But here, the Government obtained the information from [the social media company] —the intermediary—not

from the recipient." *Id.* (quoting *Hoffa v. United States*, 385 U.S. 293 (1966)). The government was thus required to secure a valid search and seizure warrant in order to compel Discord to produce the data and, for the reasons set forth in the Motion and below, it failed to do so.

Nor do the statements relied upon by the government in support of its claim that it is "evident [Payton Gendron] didn't seek to maintain any expectation of privacy in his Discord writings," ECF No. 435 at 11, affect this conclusion. In the ███████████ channel on the G\ server, he wrote: ███████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████ *Id.* If anything, this passage further evidences the fact that Payton Gendron was intending for the material to be read by a small, targeted audience, i.e., the 65 individuals and two channels he selected to receive the post right before the shooting. It certainly conveys no intent that the Discord material be widely distributed.

Similarly, the statement in the so-called manifesto to the effect that "[m]y discord transcript should also be available, which is much less formal than this and covers some personal and other information," *id.*, is in a section with the heading "Answers to my people/supporters questions," in answer to the self-posed question "Is this your complete writings and views?" *See id.,* Ex. B at 11. The remaining statements concern the stated reasons for the attack itself, and the intent to widely distribute the livestream of the attack and the manifesto; not the contents of the G\ server. *Id.*

## II. Evidence Seized From Payton Gendron's Discord Account Must be Suppressed Because the Warrant Was Unconstitutionally Overbroad

The Discord warrant was unconstitutionally overbroad as to the scope of the authorized search and as to the data that could be seized, both of which extended far beyond any conceivable probable cause established by the warrant application.

5

### A.    <u>The Warrant Was Overbroad as to the Data That Could Be Searched</u>

Even acknowledging that the affidavit in support of the Discord search warrant supplied probable cause to search some aspect of the account, at most it could support a search of data from May 14, 2025, generally, and posts by Payton Gendron himself in the Plateland server. Under no possible interpretation of the requirements of the Warrants Clause could a search of the entire Discord account have been validly authorized. And yet, the government does not dispute that the warrant directed Discord to produce "virtually every single type of record that Discord maintains with respect to an individual account" for law enforcement to search. ECF No. 403 at 10-11.

Among 10 broad categories of data, the warrant explicitly sanctioned the search of: "b. All past and current usernames, account passwords, and names associated with the target account;" "d. All IP logs and other documents showing the IP address, date and time of each login to the account;" "g. All log data, including browser type, operating system, referring web pages, pages visited, location, mobile carrier, device and application IDs, search terms, and cookie information;" "h. Any and all messages and attachments (including photographs, videos and other images) sent to or received by the target account, whether in a server or in direct messages. This includes any and all content sent or received in the messages, date and timestamp of when content was sent or received in the messages, attachments (including photographs, videos and other images), and the date and timestamp of when the attachment was sent or received;" "i. A listing of any and all groups, servers or channels that the target account owns, administers, or is a member of; and j. All records pertaining to communications between Discord and any person regarding the account, including contacts with support services and records of actions taken." *See* ECF No. 403-2 (Exhibit B, Search and Seizure Warrant, Attachment B.I.).

However, the information in the warrant application that pertained to Payton Gendron's use of Discord, and thus was the basis of probable cause to search the account, was far more circumscribed. The application established, at most, that: Payton Gendron livestreamed the shooting on May 14, 2022, on the Twitch application, *id.* at ¶ 12; he planned to have "discord at my house running a live recording of my twitch account," to which he "would send links to the discord servers I'm in and send links to all people on my discord friend list and that he would turn the check [sic] my discord and check the camera to make sure the livestream is working," *id.* at ¶ 42.a.; "I could also live stream the twitch livestream on Discord where many people could also watch and hopefully record the livestream. They would be able to read and download these writings as well, *id.* at ¶ 42.b.; and ███████████████████████████

███████████████████████████████████████████████████████████

████████████████, *id.* at ¶ 42.c." The only other reference to his use of Discord in the warrant application, was the statement that: "My Discord transcript should also be available, which is much less formal than this and covers some personal and other information." *Id.* at ¶ 41.

The data that the warrant authorized law enforcement to search easily could, and reasonably should, have been limited to data pertaining to the day of the attack and livestream, May 14, 2022, and to any channels of the Plateland server in which Payton Gendron's presence was demonstrated. Instead, the government demanded, and received, everything relating to his account, which was created when he was only 14 years old, along with millions of posts from 44 channels that largely related to hundreds of other individuals with no connection to the crime.

Instead of listing 10 separate categories of every conceivable type of data that Discord maintains on an individual account, it would have been a simple matter for law enforcement to have limited the scope of the warrant to those it had shown probable cause to believe might

Case 1:22-cr-00109-LJV    Document 500    Filed 12/03/25    Page 8 of 26


contain evidence of the May 14, 2022, shooting. They did not do so and thus, as in *United States v. Winn*, 79 F. Supp. 3d 904, 919-20 (S.D. Ill. 2015), cited in the Motion, *see* ECF No. 403 at 11, the warrant was overbroad. As the court there held:

> Based on the complaint supporting the search warrant, there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos. The complaint did not offer any basis—such as facts learned during the investigation or Detective Lambert's training and expertise—to believe that the calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files were connected with Winn's act of public indecency. . . . The bottom line is that if the [applying officer] wanted to seize every type of data from the cell phone, then it was incumbent upon him to explain in the complaint how and why each type of data was connected to Defendant's criminal activity, and he did not do so. Consequently, the warrant was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of [the crime charged].

*Id.*

In its Response, *see* ECF No. 435 at 18-20, the government attempts to distinguish *Winn* by arguing that its holding is limited to an overbroad *seizure*, and is inapplicable to a similarly overbroad *search*. To the contrary, the court's reasoning applies equally to an overbroad search, as the language of the opinion makes clear. *See Winn*, 79 F. Supp. 3d at 919 ("The warrant in this case particularly described the place of the search: the white Samsung Galaxy III cell phone. With regard to the objects of the *search*, however, the warrant was facially overbroad") (emphasis added); *id.* ("The major, overriding problem with the description of the object of the search—'any and all files'—is that the police did not have probable cause to believe that *everything* on the phone was evidence of the crime . . . Obviously, the police will not have probable cause to *search through* and seize such an expansive array of data every time they search a cell phone") (second emphasis added); *id.* at 918 ( "'By limiting the authorization to *search* to the specific areas and things for which there is probable cause to *search*, the

requirement ensures that the *search* will be carefully tailored to its justifications'") (emphases added) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)); *id.* at 922 ("In sum, . . . the warrant contained an unabridged template that authorized the police to seize the entirety of the phone and *rummage through every conceivable bit of data, regardless of whether it bore any relevance whatsoever to the criminal activity at issue*") (emphasis added).

    *See also Chavez*, 423 F. Supp. 31 at 206-07 (holding Facebook warrant overbroad because it "'required disclosure to the government of virtually every kind of data that could be found in a social media account. And unnecessarily so' . . . For example, as to private Facebook messages, 'the warrants could have been limited . . . to messages sent to or from persons suspected at that time of being [involved in the criminal activities' . . . And the warrants could have requested data only from the period of time during which [the defendant] was suspected of taking part in the [criminal] conspiracy'") (quoting *Blake*, 868 F.3d at 974 (alterations in original) (internal citations omitted).

    The remaining cases cited by the government are not to the contrary. In *United States v. Yu*, No. 22-cr-208 (CBA), 2023 WL 4687970, at *19 (E.D.N.Y. July 21, 2023), the court resolved the case by applying the good faith exception. In doing so, however, it noted the defense argument based upon *United States v. Shipp*, 392 F. Supp. 3d 300 (E.D.N.Y. 2019), that, in light of the manner in social media companies store account data, the type of broad digital search that might be required in the context of a digital device such as a computer or cellphone is unnecessary and unreasonable when dealing with an online account. *See id.* at 19 (noting that *Shipp* court "noted 'serious concerns regarding the breadth of Facebook warrants like the one at issue,'" observing that "unlike a hard drive or an email account, Facebook does not permit a user to store information wherever they want . . . and therefore the usual concerns that 'necessitate

broad digital search protocols do not . . . exist in the Facebook context'") (quoting *Shipp*, 392 F. Supp. 3d  at 307, 309) (alteration in original)). While acknowledging that *Shipp* and the case on which it extensively relied, *United States v. Blake,* 868 F. 3d 960, 974 (11th Cir. 2017), "raise important privacy concerns," the *Yu* court noted that both ultimately adjudicated the matter based on the good faith exception and followed suit. *Id.* at 19. Payton Gendron submits, however, that over the years, the problem with warrants like the one here has been raised and addressed by courts on numerous occasions, as reasonably well-trained prosecutors and law enforcement personnel should be aware. It is no longer possible to excuse blatant violations of the Fourth Amendment by automatically invoking the good faith exception.

In neither *United States v. Liburd*, No. 17-CR-296 (PKC), 2018 WL 2709199 (E.D.N.Y. June 5, 2018), nor *United States v. Pugh*, No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2018), did the court address the factual issues that led the court in *Shipp* to express concern about the overbreadth of warrants to search social media accounts, instead simply assuming that such breadth was technologically necessary. *See Liburd*, 2018 WL 2709199, at * 3 ("Here, because of the nature of digital media searches, it was proper for the search warrant to allow the FBI to search the entire contents of Defendant's Facebook account"); *Pugh*, 2015 WL 9450598, at *27 (stating that "courts in this circuit repeatedly have recognized that, in the context of such a search, avoiding the intrusiveness of a search while maintaining its efficacy is largely infeasible.") The factual premise upon which these decisions were based is in fact wholly incorrect, and Payton Gendron will so demonstrate at an evidentiary hearing.

##### B.    The Warrant Was Facially Invalid Because it was Overbroad as to the Data That Could Be Seized

With respect to the authorized seizures, the government asserts that "all" of the 15 categories in Attachment B.II "were tied to the defendant's planning, preparation, motivation,

and execution of his attack." ECF No. 435 at 18. They should have been, for, as noted in the Motion, the Fourth Amendment requires that "the 'description of the objects to be seized . . . [be no] broader than can be justified by the probable cause upon which the warrant is based.'" ECF No. 403 at 10 (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). And the affidavit in support of the warrant application established probable cause for a single crime, namely the mass shooting at the Tops Market on May 14, 2022. The application did not even attempt to establish probable cause for any other crime and the government does not suggest that it did.[1]

However, the government's assertion is wrong. Far from being limited to evidence "tied to . . . the attack," the warrant authorized law enforcement to seize any information that it deemed to be potential evidence of any imaginable permutation of hate crimes and or gun crimes. The scope of the authorized seizures was dictated by the opening paragraph of Attachment B.II., which states:

**II.    Information to be Seized by Law Enforcement Personnel**

Any and all records and information described in Section I that constitutes

evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 249, and

---

[1] The government does state that the premise "that probable cause is limited to the shooting at the Tops Market on May 14, 2022," is incorrect. ECF No. 435 at 21. However, it then proceeds to discuss only the racial motivation for the shooting, and some slogans written on the gun used during the shooting. *Id.* at 18-19. It therefore appears that the government does not – and indeed could not – truly dispute the premise that probable cause was shown only for the May 14 attack. Rather, its point seems to be that the probable cause showing included the bias-motivation element of the offense, a fact that, as it acknowledges, the defense does not contest. *Id.*

The government's argument in essence is that probable cause as to the bias motivation for the shooting entitled law enforcement to search for and seize any evidence of beliefs, thoughts or expressions of animus by Payton Gendron about any racial or ethnic group whatsoever, at any time, even if wholly unconnected to the planning or commission of the offense. For the reasons stated in the Motion and above, this assertion is contrary to law and must be rejected.

924(c)(1)(A)(iii) and 924(j)(1) ("Target offenses") from January 1, 2020, through

and including the present, relating to the following:

ECF No. 403-2 (Exhibit B, Search and Seizure Warrant, Attachment B.II.).

Thereafter, the warrant goes on to authorize law enforcement to seize 15 categories of

information, only two of which even mention the May 14, 2022, attack. *See id.* at a., k.. The

remainder are wholly untethered to it and plainly encompass any number of imaginary other

crimes and a whole lot more non-criminal and constitutionally protected activity besides. The

complete and utter absence of probable cause to support the seizure of such information is

glaringly apparent, and the warrant is thus overbroad.

### III.    The Warrant Was Facially Invalid Because it was Insufficiently Particular Regarding the Data That Could Be Seized

The parties are in agreement that, "[t]o satisfy the Fourth Amendment's particularity

requirement, a warrant must: (1) 'identify the specific offense for which the police have

established probable cause;' (2) 'describe the place to be searched;' and (3) 'specify the items to

be seized by their relation to designated crimes.'" *United States v. Motovich*, 21-CR-497-WFK,

2024 WL 2943960, at *9 (E.D.N.Y. 2024) (quoting *Galpin*, 720 F.3d. at 445-46); *see* ECF No.

435 at 20. As set forth in the Motion, *see* ECF 403 at 12-15, the Discord warrant satisfies none of

the particularity requirements. First, as noted above, it fails to identify the only specific offense

for which probable cause was even arguably established, namely the shooting at the Tops Market

on May 14, 2022, instead extending to *any* violation of 18 U.S.C. § 249 or *any* violation of 18

U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1).

In its Response on this point, the government declines to address any of the extensive

authority cited by the defense establishing that reference only to broad criminal statutes that can

be violated in innumerable different ways is insufficient to satisfy the first particularity

requirement. *See* ECF 403 at 13-14. *See also Winn*, 79 F. Supp. 3d at 921 (noting that "'[a]n

unadorned reference to a broad federal statute does not sufficiently limit the scope of a search

warrant'") (quoting *United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988)) (citing *United

States v. Spilotro*, 800 F. 2d 959, 965 (9th Cr. 1986); *United States v. Roche*, 614 F.2d 6, 8 (1s t

Cir. 1980); *Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009)).

As noted, the government argues that "the premise that probable cause is limited to the

shooting at the Tops Market on May 14, 2022" is incorrect. ECF No. 425 at 21. Again, however,

its argument is not that probable cause for any criminal activity other than the shooting was

established; rather, it extrapolates from that truism that probable cause as to the bias motivation

for the shooting entitled law enforcement to search for and seize any evidence of beliefs,

thoughts or expressions of animus by Payton Gendron about any racial or ethnic group

whatsoever, at any time, even though unconnected to the planning or commission of the offense.

For the reasons stated above, this contention should be rejected.

The fact that the government can make that argument based on the terms of the warrant

provision underscores its fatal lack of particularity. As discussed in the Motion, to satisfy the

particularity requirement a warrant must specify the items to be seized so as to "permit the

rational exercise of judgement by the executing officers in selecting what items to seize," and

distinguish between items that are evidence of the crime under investigation and those that are

not. *See* ECF No. 403 at 13 (quoting *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir.

2000)). The 15 vague and ambiguous descriptions of material listed in Attachment B.II. would

fail to perform that function even if the warrant had also been properly limited to evidence of the

planning and execution of the May 14, 2022, shooting at Tops Market that was the only crime for

which probable cause could have been established. In light of the fact that the warrant instead

purported to authorize the seizure of evidence of *any* violations of the hate crime and gun statutes it cited, it offered so little guidance to executing officers as to what could be seized that it was the equivalent of the reviled general warrants that the Fourth Amendment is designed to prevent.

### IV.    The Good Faith Exception Should Not Excuse the Government's Fourth Amendment Violations

The government argues that Magistrate Judge Schroeder's decisions to issue the various warrants in this case despite their facial deficiencies should excuse any Fourth Amendment violations because of law enforcement's good faith reliance on his determinations that the warrants passed constitutional muster. *See* ECF No. 435 at 82-86. There are four circumstances in which the good-faith exception does not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Wey*, 256 F. Supp. 3d at 395 (quoting *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015)). Here, the last of these circumstances defeats the applicability of the exception.

The Discord warrant was so facially unparticularized and overbroad that reliance on it was objectively unreasonable. As noted above, the warrant authorized the seizure of exceedingly broad categories of information, most of which permitted the seizure of information that had nothing to do with the May 14, 2022, shooting, and none of which was temporally limited in a meaningful way. *Wey*, 156 F. Supp. 3d at 398 (refusing to apply the good-faith exception where the warrant "authorize[d] the seizure of multiple expansive categories of records . . . without any meaningful linkage to the suspected criminal conduct."). In *Wey*, the court held that "[w]hen, as here, a warrant plainly fails to comport with well-settled particularity requirements, officers'

14

reliance upon it—especially in the absence of a credible circumstance-specific explanation—can hardly be deemed objectively reasonable." 256 F. Supp. 3d at 398-99 (collecting similar cases). The same rationale should apply here. *Id.*; *Harvey*, 2022 WL 684050, at *10.

Not only was law enforcement's reliance on this facially deficient warrant objectively unreasonable, but the government itself bears culpability for applying for, and then executing, it. And that culpability should weigh heavily against the application of the good-faith exception and heavily in favor of suppression. The court in *Wey* distilled four factors from the Second Circuit's decision in *United States v. Rosa* that guided its determination that the good-faith exception could not excuse the government's reliance on facially defective warrants, and that suppression was the proper remedy. The factors are designed to answer whether "the officers' conduct in applying for or executing the Warrants [was] insufficiently culpable for suppression to carry meaningful deterrence benefits or otherwise support a finding that any such benefits would not be worth the 'price paid by the justice system.'" *Wey*, 256 F. Supp. 3d at 399 (quoting *Rosa*, 626 F.3d at 64). As the *Wey* court explained, in *Rosa*, the Second Circuit held that suppression was *not* warranted after recognizing:

> (i) that the warrant application, issuance, and execution had all occurred under intense 'time pressures' in 'the three hours from 2:00 to 5:00am' of a single morning; (ii) that the application's affiant led the execution team and was later responsible for searching recovered digital media; (iii) that there was 'no evidence that . . . [the] officers actually relied on the defective warrant, as opposed to their knowledge of the investigation and the contemplated limits of the town justice's authorization, in executing the search'; and (iv) that there was 'no evidence that the team of officers searched for, or seized, any items that were unrelated to the crimes for which probable cause had been shown' in the application.

*Wey*, 256 F. Supp. 3d at 397 (quoting *Rosa*, 626 F.3d at 64-66) (alteration in original). In *Wey*, the court applied these factors and found that, unlike in *Rosa*, suppression *was* warranted. This Court

15

should hold a hearing to develop a factual record related to these four factors. Ultimately, though, like in *Wey*, the *Rosa* factors weigh in favor of suppression here.

First, unlike in *Rosa*, the warrant here was not cobbled together in a few hours as a terrorist attack or other emergency was unfolding. Rather, the application was submitted the evening of May 16, 2022, two days after the shooting. Second, SA Dlugokinski, who signed the affidavit, was not the agent who conducted the initial responsiveness review on the return when it was produced. *Id.* Third, the evidence here suggests that agents unreasonably relied on the defective warrant rather than their own knowledge of the investigation because, as explained below, they seized a trove of information that had nothing to do with the May 14, 2022, shooting. Fourth, and similarly, there is evidence here, unlike in *Rosa*, that "'the team of officers searched for, [and] seized . . . items that were unrelated to the crimes for which probable cause had been shown' in the application." *Wey*, 256 F. Supp. 3d at 397 (quoting *Rosa*, 626 F.3d at 65). Therefore, as the court found in *Wey*, these factors weigh against the application of the good-faith exception and in favor of suppression as the appropriate remedy.

### V.   The Execution of the Warrant Violated the Fourth Amendment in Multiple Respects

#### A.   Law Enforcement Searched and Seized Evidence From Payton Gendron's Discord Account in Flagrant Disregard of the Scope of the Warrant.

As stated in the Motion, ECF No. 403 at 17-18, law enforcement unconstitutionally searched and seized large quantities of data from the Discord return that were outside of the scope of the warrant. Because the officers executing the warrant acted "in flagrant disregard of the warrant's terms," the appropriate remedy is "suppression of *all* evidence seized" pursuant to the warrant. *United States v. Matias,* 836 F.2d 744, 747 (2d Cir. 1988). "Executing agents are considered to have 'flagrantly disregarded' the warrant's terms where '(1) they effect a

widespread seizure of items that were not within the scope of the warrant and (2) do not act in

good faith.'" *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 309 (S.D.N.Y. 2018) (quoting

*United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). The search of the entire Discord

return, which included data outside the scope of even the grossly overbroad terms of the warrant,

and seizure of whole categories and hundreds if not thousands of individual items that were

outside the scope of the warrant was, by any measure, a "widespread" unlawful search and

seizure.

  Discord responded to service of the search warrant upon it by producing data to the FBI

beginning at approximately 2:39pm on May 17, 2022. In its Response, ECF No. 435 at 8, the

government implies that the production by Discord was limited to the terms of the warrant. This,

however, is not the case. The initial production by Discord included not only the account

demanded by the warrant, ███████████, but also data for a second account not covered by

the warrant, associated with the username ███████████. It also included data for two Discord

servers, the G\ server owned by Payton Gendron and the ██████ server which belonged to

and was administered by unrelated individuals. The data produced regarding the ██████

server was far in excess of that which was associated with the ███████████ account whose

production was authorized by the warrant. To illustrate, the ██████ data included in the

production of the ███████████ account consisted of 27 attachments, many of them

duplicative, and data from six channels. The separate ██████ production, in contrast,

contained 40,233 attachments and data from an additional 25 channels.

  Overall, the data produced by Discord dated back at least to September 10, 2017.

Recognizing that the warrant granted them authority to seize only data relating to on or after

January 1, 2020, the FBI states that it reviewed that material only to the extent necessary to

determine that it was outside the scope of the warrant and then locked the data from any further review. However, there is no indication in provided discovery that the FBI placed any similar restrictions on the review of data from the ███████████ account or of that from the ████████ server that was also plainly outside the scope of the warrant.

Following communications with the FBI, Discord subsequently produced additional data, including a list of the usernames of its subscribers who were members of the ████████ server. Once again, this production was outside of the scope of the search warrant, which was limited to the search and seizure of the ████████████ account only. However, upon information and belief, the FBI specifically requested this data and made free and extensive use of it once it was received.

As set forth in the Motion, ECF No. 403 at 16-18, in addition to conducting searches that were beyond the scope of the warrant, law enforcement also seized large amounts of data that were outside of even the unconstitutionally overbroad terms of the warrant. Law enforcement ultimately seized the entire contents of Payton Gendron's G\ server and all 11 channels contained therein, without regard for whether the posts that were seized had any relationship whatsoever to the May 14, 2022, shooting at the Tops Market. *Id.* at 16. Many of the seized posts were in fact wholly irrelevant to the crime and plainly outside the scope of the warrant. For instance, the agents seized: posts that were of a purely personal nature, such as online test results, medical and mental health information, diet and exercise records, comments on family life and information about Payton Gendron's thoughts and feelings wholly unrelated to the crime; reposts of cartoons, YouTube videos, movies and TV series, and discussions thereof; posts relating to hobbies such as coin collecting and hunting; pet photos and selfies; and reposts of memes and infographics

conveying abstract political, racist and ███████ beliefs unconnected to the planning or execution of the shooting.

The government also seized direct messages between Payton Gendron and 17 other individuals, none of whom were involved in any way in the May 14, 2022, shooting. Many of these thousands of messages were also outside the scope of the warrant, *id.* at 18, covering such topics as: family life and relationships; firearms, body armor, accessories and outdoor gear; and videogaming. And the government seized irrelevant data from at least 44 channels across 11 different servers, again including large numbers of posts, the overwhelming majority, made by people other than Payton Gendron, related to: videogaming; firearms and related gear with no connection to the events of May 14, 2022; and abstract political, racist and ███████ beliefs unconnected to the planning or execution of the shooting.

The fact that the executing agents seized so much irrelevant material further underscores that the warrant was grossly overbroad and lacking in particularity, and that the government took advantage of the warrant's defects in the same manner condemned by the court in *United States v. Wey*, 256 F. Supp. 3d 355, 404-05 (S.D.N.Y. 2017):

> [The amount of unresponsive material] presen[t] in the search fruits thus suggests that the execution teams affirmatively wielded the nearly unfettered discretion afforded them by the Warrants' expansive terms to appropriate documents that were perhaps of interest to some broader investigation of the [defendants'] lives and finances but that bore little or no discernible connection to the securities fraud probable cause showing actually submitted to the Magistrate Judge. Put another way, it appears to be, as much as anything else, a product of the intentional execution of what amounted to general warrants.

(internal citations omitted). All evidence seized pursuant to the warrant must therefore be suppressed.

**B.    Law Enforcement Conducted Multiple Searches of the Discord Data Without Obtaining Additional Search Warrants, in Violation of the**

Fourth Amendment.

The FBI first conducted a responsiveness review of the data produced by Discord pursuant to the warrant on May 18, 2022. The agent responsible reviewed the return to identify users who directly communicated with ███████████ and discussed information pertinent to the investigation. During the course of this review, the agent seized large amounts of data, including thousands of direct messages and channel posts by five separate Discord users on many different servers and channels, and data from one channel that included posts by multiple users.

The FBI again searched the data produced by Discord on multiple occasions. As noted in the Motion, ECF No. 403 at 16-17, agents conducted another search of all direct messages and all posts on the 128 channels provided in addition to the G\ server owned by Payton Gendron. That review was completed on June 7, 2022, and documented in a report. "On or about" that date, the executing agent wrote, he "completed a review of records provided by Discord Inc. responsive to" the search warrant at issue herein.  The report states that the direct messages included in the return "were comprehensively reviewed," and that ████████████████ ████████████████████████████████████████

█████  The attachments included seven Excel spreadsheets ██████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████

With respect to servers and channels other than the G\ server, the report states that Payton Gendron's activities therein were also "reviewed for relevance," and the resulting seizures also documented in attachments. Agents seized data from 17 channels across nine different servers

which altogether included tens of thousands of posts. The report concludes by stating that the executing agent "access[ed] and review[ed] over one million posts and hcats [sic], which includes written chats, attachments, images, videos, and links . . . and documented particular messages deemed relevant and within the scope of the search warrant."

The FBI then conducted a third search of the direct messages and posts on other channels data in August, 2022. A report, dated August 19, 2022, documents that another search had been conducted, that additional direct message data had been extracted for 10 correspondents, and that additional data from two Discord Servers, namely ███████████████, had been seized. With respect to the direct message data, four of the correspondents were those for whom direct message data had been seized during the first search of the return conducted in May, 2022. The remaining six users were new; none of them was among the seven whose direct message data had been seized during the search conducted in June, 2022. From the ███████ server, data from one channel, general, was seized. From the ██████ server, data was seized from four channels.

In May of 2022, SA Dlugokinski conducted a review of the G\ server data. In a report documenting his actions, SA Dlugokinski states that he "completed" his review "on or about May 25, 2022." He states that he identified 11 separate channels in that server and "comprehensively reviewed" each of them. In total, he reviewed "approximately 5,050 posts," which is the entirety of the G\ server. He reviewed each individual message and "tagged particular messages deemed relevant and within the scope of the search warrant." He then produced .pdf and .docx files of the material deemed relevant and attached them to the report.[2]

---

[2] The attachments to the report, as provided to the defense in discovery, contain no annotations that reveal which items were tagged for relevance and which were not. In a letter dated March

In July, 2022, without obtaining a new search warrant, SA Dlugokinski went back and rereviewed the G\ server data a second time. In a report documenting this re-review, SA Dlugokinski states that, "on or about July 25, 2022," he "compiled additional records" from the Discord search warrant return. "Pursuant to this review, Gendron's personal server, self-identified by Gendron as his G\ server, was recaptured to fully include screen grabs of *all* imagery included in the G\ server channel, ███████." (emphasis added). In other words, the agent went back through the G\server data, including that which had previously been identified as non-responsive to, and beyond the scope of, the search warrant. This time, he seized the entire contents of the server without regard to its relevance or the scope of the warrant, increasing the size of the original seizure by approximately 15%.

In its Response, the government claims that all of law enforcement's separate searches and seizures of the Discord warrant return data were in fact simply parts of one continuous review process that began on May 18, 2022, and was ongoing until August 19, 2022. ECF No. 435 at 24-26. It then asserts that three months is not an unreasonably long period of time for law enforcement to take to review a data set the size of the Discord warrant return in this case, and thus no Fourth Amendment violation occurred. *Id.* at 25-26. An evidentiary hearing is required to establish the facts necessary to decide this issue. Upon information and belief, however, the

28, 2025, the defense team asked the government to inform us whether such documents existed. The government declined to provide this information, stating only that "every item that was tagged has been provided." It also cited the Bates ranges of two different documents containing data extracted from the G\server data, both of which turned out to contain the entire contents of the ███████ channel. It was not until an extremely time-consuming manual review of all versions of the extractions of the G\ server data by law enforcement at different times had been completed that the defense team was able to discern that only a subset of the G\server posts and attachments had been deemed relevant and within the scope of the warrant at the conclusion of the government's first search of the data.

government's reference to the time period in which the various searches were conducted is a red herring.

Certainly, it is the case that the length of time taken by law enforcement to complete a search of a defendant's digital data once it has begun, like all other aspects of their execution of a search warrant, is governed by a reasonableness standard. It may well be reasonable for review of an extremely large data set to take a correspondingly lengthy period of time to complete. What executing agents cannot do, however, is complete one review of a data set, seizing all evidence deemed to be within the scope of the warrant at that time, only to then conduct a second review of that same data, no matter how close in time to the first completed review, whenever they come up with new investigative theories or leads that make them want to search for an seize data that was previously deemed irrelevant. *See, e.g., United States v. Wey*, 256 F. Supp.3d 355, 406 (S.D.N.Y. 2017) (noting that "the Government cites, and the Court is aware of, no authority suggesting that simply because it has retained all originally searchable electronic materials, the Government is permitted to return to the proverbial well months or years after the relevant Warrant has expired to make another sweep for relevant evidence, armed with newly refined search criteria and novel case theories . . . [p]erhaps most plainly problematic on this score are . . . searches which  . . . include[e] those materials *already sorted out as impertinent* two years earlier"); *United States v. Sun*, No. 24-cr-346 (BMC), 2025 WL 1220040, at \*3 (E.D.N.Y. Apr. 28, 2025) (holding that execution of warrant for Gmail account "was complete when the FBI agents generated a responsiveness report . . . Any search after that . . . would include data the Government had already found non-responsive and would have required a new warrant").

At a hearing, the evidence will make clear that it is the latter that occurred here. Indeed, in its Response the government acknowledges as much, conceding that the August, 2022, search

was conducted because "the FBI had identified additional, potentially relevant Discord servers
and chats during a search of the defendant's iPhone 11 pursuant to a federal search warrant (Case
No. 22-MJ-114)." ECF No. 435 at 25.[3] The report of the August, 2022, search, too, confirms that
its impetus was information newly obtained from the review of the iPhone data, stating:

> On or about July 25, 2022, FBI Buffalo received access to review the contents of
> Payton Gendron's iPhone. Following the review of Gendron's mobile device,
> several additional Discord servers and chats were identified and determined
> potentially relevant to the ongoing investigation, specifically to Gendron's
> involvement in Discord-hosted chats and his engagement with chat
> correspondents. As such, records provided by Discord Inc. responsive to Search
> Warrant 22-MJ-112 for Discord account username ███████████ and user ID
> ███████████[4] were extracted from the Discord search warrant returns
> and documented herein.

Accordingly, "[t]he Government's temporal reasonableness argument is irrelevant; the
unreasonableness of the Government's [second] search stems not from the time that had passed
between the . . . Warrant and the [second] search, but from the fact that the government
conducted an additional search not authorized by the . . . Warrant." *Sun*, 2025 WL 1220040, at
*4.

### C.    The Government Disregarded the Requirements of the Warrant and Seized the Entire Disclosure from Discord.

As noted in the Motion, *see* ECF No. 378 at 27-29, the government has retained a
complete copy of the Discord warrant return, including all data that it concedes is outside the

---

[3] Although the federal warrant to search the iPhone was issued on May 16, 2022, law
enforcement was unable to access the data on the device until approximately July 25, 2022.

[4] This is the original search warrant that was issued on May 16, 2022, and is the subject of the
instant Motion.

scope of the search warrant, not only in the files of the FBI but also as part of the trial file maintained by the prosecution team at the United States Attorney's Office. In its Response, it claims to have done so only so it could provide the complete return to the defense in discovery. *See* ECF No. 435 at 26. To do that, however, it was wholly unnecessary for it to have received and retained the data in its own working files. Rather, government counsel could have simply directed the FBI to deliver a copy of the return to the defense on a hard drive, without affording access to the material to the government trial team. Additionally, the government's claim is belied by the fact that it also furnished a complete copy of the return, including all illegally seized data, all data from before January 1, 2020, that the FBI claims to have locked away from its own review and all other data produced by Discord that was beyond the scope of the warrant, to the Erie County District Attorney's Office for its use in prosecuting Payton Gendron in New York State Court for these offenses.

If it perceived no constitutional problem with delivering a copy of the entire Discord return to the state prosecution team, it is highly unlikely that the government considered its own use of the data constrained in any way. And, indeed, the government's Response leaves unanswered many questions about the way in which the data has been reviewed and by whom. As an initial matter, it does not dispute the assertion in the Motion, *see* ECF No. 403 at 17, that the FBI failed to segregate or lock down the full return from the portion extracted as relevant at the conclusion of the responsiveness review, as required by the Fourth Amendment, and instead maintained it in its regular filing system. It therefore appears that the full return has remained readily accessible to law enforcement throughout the pendency of this case. At a minimum, the prosecution team indexed, applied Bates numbers to and filed the complete return in its own

filing system, intermingled with other discovery material and inferably with no attempt to label the material off limits to members of the team.

The government's assurance that it is "aware that it may not re-search the account without a new search warrant," ECF No. 435 at 26, is thus inadequate and underscores the need for an evidentiary hearing to establish the extent to which government personnel have accessed and reviewed the non-responsive material that it possesses in violation of the Fourth Amendment.

Dated:  August 28, 2025
           Buffalo, New York

                                        *s/Sonya A. Zoghlin*
                                        Sonya A. Zoghlin
                                        Assistant Federal Public Defender

                                        *s/MaryBeth Covert*
                                        MaryBeth Covert
                                        Senior Litigator

                                        *s/Julie Brain*
                                        Julie Brain
                                        Attorney at Law

                                        *s/Theresa M. Duncan*
                                        Theresa M. Duncan
                                        Law Office of Theresa M. Duncan