UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, * Docket Number: 1:22-cv-109-LJV-HKS
*
* Buffalo, New York
v. * FEBRUARY 13, 2026
* 9:38 a.m.
*
PAYTON GENDRON, * ORAL ARGUMENT
*
Defendant. *
*
* * * * * * * * * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the Government: **MICHAEL DiGIACOMO,**
**UNITED STATES ATTORNEY,**
**By: JOSEPH M. TRIPI, ESQ.,** (Buffalo)
**CHARLES MARK KRULY, ESQ.,** (Buffalo)
**MAEVE E. HUGGINS, ESQ.,** (Buffalo)
**BRETT A. HARVEY, ESQ.,** (Rochester)
(Via Teleconference)
Assistant United States Attorneys,
Federal Centre,
138 Delaware Avenue,
Buffalo, New York 14202,
Appearing for the United States.

**By: SANJAY PATEL, ESQ. Civil Rights Div.**
150 M Street NE, 4CON 7th Floor
Washington, DC 20539
For the Plaintiff

For the Defendant: **MARIANNE MARIANO, ESQ.,**
**FEDERAL PUBLIC DEFENDER,**
**By: SONYA ZOGHLIN, ESQ.,** (Rochester)
**MARYBETH COVERT, ESQ.,** (Buffalo)
Assistant Federal Public Defenders,
300 Pearl Street,
Buffalo, New York 14202,
Appearing for the Defendant.

**LAW OFFICES OF THERESA M. DUNCAN, ESQ.,**
**BY: THERESA M. DUNCAN, Esq.,**
1215 Paseo De Peralta,
Santa Fe, New Mexico 87501
And
**LAW OFFICES OF JULIE BRAIN, PLLC**
**BY: JULIE C. BRAIN, ESQ.,**
916 South 2nd Street,
Philadelphia, Pennsylvania 19147
Appearing for the Defendant

The Courtroom Deputy: **COLLEEN DEMMA**

The Court Reporter: **LAUREL S. TUBBS, RPR, RMR, CRR,**
Robert H. Jackson Courthouse,
2 Niagara Square,
Buffalo, New York 14202,
ltranscripts.wdny@gmail.com

Proceedings recorded by mechanical stenography, transcript produced by computer.

**THE CLERK:** All rise. United States District Court for the Western District of New York is now in session, the Honorable Lawrence J. Vilardo presiding.

09:38:14 **THE COURT:** Please be seated.

09:38:16 **THE CLERK:** 22-cr-109, United States of America versus Payton Gendron. Assistant United States Attorneys Joseph Tripi, Maeve Huggins, Charles Kruly; Civil Rights

Division Attorney, Sanjay Patel; and appearing by teleconference is Brett Harvey, all appearing on behalf of the government.

Assistant Federal Public Defenders Sonya Zoghlin, MaryBeth Covert; and Attorneys Julie Brain and Theresa Duncan appearing on behalf of defendant. The defendant is not present.

This is the date set for an oral argument.

**THE COURT:** Okay. Good morning, everybody.

**ALL PARTIES:** Good morning, Judge.

**THE COURT:** We've got a number of things we need to do today. The first thing that I want to take care of -- I know we have Defense's motion to adjourn the *Roper* hearings and the Defense's motion to change venue. We're going to do both of those. But before we do, I want to do some housekeeping matters with respect to the jury selection. That's why I've asked Mr. Drier and Mr. Healy, and almost-clerk Mr. Moeller to be here with us so that we can address some of those issues. And I'd like to do that first.

You waive your client's appearance?

**MS. ZOGHLIN:** Yes.

**THE COURT:** So let's talk about the initial set of disqualifications, the automatic sorts of disqualifications that the -- the -- the jury office generally does. We've had -- we've had several meetings with my -- my staff has had

09:39:53 several meetings with the jury administrator and the clerk and the future clerk to discuss processing the jury summonses and the initial set of disqualifications.

09:40:04 So the plan is to send out 3,000 jury summonses and the initial questionnaires; the standard questionnaires, not the -- not the detailed new one. And -- and we're hoping that we yield about 1,000 to 1,200 to come in to answer the more detailed questionnaire.

09:40:23 Now, at the last appearance, the government suggested that we might need fewer than 1,000 people to take the questionnaire.

09:40:31 Has there been any more thought given to that?

09:40:34 **MR. TRIPI:** Judge, I -- I think the plan that you've just set forth sounds okay.

09:40:38 **THE COURT:** Okay. Have you folks talked about the numbers?

09:40:41 You were going to talk with the Defense about those numbers. Did that ever happen?

09:40:46 **MR. TRIPI:** I don't think that ever happened. And I apologize for that.

09:40:48 **THE COURT:** No, no, it's okay. Look, we all have a lot of stuff going on, but...

09:40:54 **MS. COVERT:** The original joint -- sorry, Judge. MaryBeth here.

09:40:56 The original joint procedures that we had -- when we

discussed before submitting those to the Court --

**THE COURT:** Yes.

**MS. COVERT:** -- provided for between 1,000 and 1200.

**THE COURT:** Yeah. Okay. So -- so let's shoot for that, and if -- if we have too many jurors --

So the jury administrator is going to review the returned summonses with the initial questionnaires. And typically, the jury administrator handles all the disqualifications based on the initial questionnaires. And I understand that it's going to add quite a burden to the clerk's office to have a second or third layer of -- you know. So what I'd like to talk about is the plan for automatic disqualifications prior to the case-specific questionnaires going in.

So there are a number of categories that are exempt; that is, ineligible to serve. So, for instance, members of the active service of the armed forces of the United States. I think the jury administrator should be able to excuse those, disqualify those, without any intervention.

Any objection to that?

**MS. BRAIN:** We do object, Your Honor. We really do want the opportunity to weigh in on those disqualifications.

**THE COURT:** The automatic disqualifications?

**MS. BRAIN:** Well, because there's some subjective elements to a bunch of them, and there's a question of the

facts that prove the fact-finding. And so we -- I don't think it would be unduly burdensome. We're not talking about probably weighing in on very many, if any, but --

**THE COURT:** But tell me -- tell me why, if there are automatic disqualifications that don't require any subject- -- so there's a number of categories that require subjective determinations. I understand that. There are some that don't. If somebody's dead, that doesn't require any subjective determination.

**MS. BRAIN:** That's true. Although again, there is, once again, the factual -- what is the factual basis upon which that determination is going to be made? Is it the paperwork? Is there -- is it just because somebody says so?

I mean --

**THE REPORTER:** Can you speak into the mic?

**MS. BRAIN:** Yes.

**THE REPORTER:** Thank you.

**MS. BRAIN:** It's really -- with the ones that the Court's identified that don't have a subjective element, there is still the -- it really comes down to the issue of proof and -- and whether it's simply the word of the -- whoever fills the form out.

**THE COURT:** So what are we going to do -- so let's say somebody says the person is dead. You want the clerk's office to investigate whether the person is really dead?

09:43:47 We've got 3,000 of these things going out. Do you want the clerk's office to investigate whether the person is really dead? And if the person is not dead, what are we going to do?

09:43:57 **MS. BRAIN:** Well, that's a fine question. Yeah, I'm not sure that I have an answer to what we're going to do.

09:44:03 **THE COURT:** You know, I don't -- I don't want to complicate this any more than it's going to be complicated. It seems to me that there are simple -- simple categories that we're just going -- you know, if somebody says they can't read or write English.

09:44:22 **MS. BRAIN:** That would be one that I believe is very much potentially subject- -- has a subjective element to it. And because of the potential impact on jurors of color, that's one where we would be particularly sensitive to making sure that the person understands exactly what's going to be -- they're going to be called upon to do.

09:44:43 **THE COURT:** Okay. Mr. Drier, do you want to speak to this? Is there a way that this can be done without turning upside down this entire process?

09:44:54 **MR. DRIER:** I actually don't know how we would --

09:44:56 **THE COURT:** Can you speak right into the microphone?

09:44:58 **MR. DRIER:** Yeah. I'm sorry.

09:44:59 I don't know how we would -- we've never done it, so I've never -- I don't know how we would investigate whether

someone is basically, you're saying, lying on the form. So if they're dead, I wouldn't even know how to investigate that, to be honest.

**THE COURT:** And if they're lying, there might be good reason to not want them on the jury.

**MS. BRAIN:** Right. And --

**THE COURT:** Does the government want to weigh in on this?

**MS. BRAIN:** To be clear, Your Honor, we're not asking that the jury administrator investigate anything. It would be for our -- for us to have an opportunity to see, just in case it's patents or for simply --

**THE COURT:** So what I would plan on doing is getting you what we have --

And have you given that to them yet?

**MS. IZZO:** No.

**THE COURT:** Can you hand it to them?

So -- so you would get a disqualified report of all the jurors to make a record -- make any kind of record that you need to make. And I suppose you could do any investigation that you would want to do based on this disqualified report.

**MS. BRAIN:** Right. And that's sort of what I'm envisioning, Your Honor. Certainly not asking the jury administrator to investigate.

**THE COURT:** Okay.

09:46:19 **MS. BRAIN:** However, with the categories in particular that have a subjective component to it, we would immediately be asking for the forms to see what -- what was submitted, what was written, and what was the documentation in support or --

09:46:36 **THE COURT:** Is that doable?

09:46:38 **MR. DRIER:** I think -- I think she was just saying the subjective -- like, so that would be the excusals; that type of thing. I don't think -- I don't think you're talking about deceased at this point or that -- we're talking about more of the excuses. So not the immediate disqualifications. That would be anything with a subjective --

09:46:57 **THE COURT:** So let's go down the categories, as I was -- as I was doing.

09:47:00 **MR. DRIER:** Sure.

09:47:01 **THE COURT:** So those in the active services armed forces, can they -- do they just check the box saying they're in the active service and get off?

09:47:09 **MR. DRIER:** Correct. Yeah.

09:47:10 **THE COURT:** There's no -- they don't have to submit anything showing they're in the active service armed forces.

09:47:17 **MR. DRIER:** No, they do not.

09:47:18 **THE COURT:** Okay. So I'm -- I'm going to allow those folks to be disqualified without review by the Court first.

09:47:26 Full-time members of the fire or police departments

09:47:29 of any state, district, territory, possession or subdivision. Same thing.

09:47:36 Public officers of the executive, legislative, or judicial branches of the government of the United States or a state or a territory or possession, et cetera, et cetera. I'm going to allow those to be disqualified without review by the Court.

09:47:52 Those who are not citizens of the United States, I'm going to allow them to be disqualified without prior review. And again, you're going to get this report that will show that.

09:48:04 Those who are unable to read, write, or understand English, I'm going to allow them to be disqualified. And we can -- you know, I don't know what else we would do about that. We're going to have people -- you know, we have people come in all the time who have trouble with English. And -- and I ask that question of jurors. And I actually had a case where I should have allowed a juror -- it was a *Batson* decision that I issued, and -- and I should have disqualified the juror because he couldn't read and write English adequately. We didn't realize it was as bad as it was, but it was. And during the trial, the juror had to be excused. And so -- and so -- so we have those things come up.

09:48:48 But, you know, I don't think it's in anybody's best interest to bring in a juror who says he or she can't read or write or understand English and start questioning that juror

about whether the juror can read, write or understand English. I think we're -- I think we're adding a layer of complexity that does not have to be.

And, look it, I'm willing to reconsider if you folks have, you know, good reasons why, but it just seems to me that we're -- we're causing problems that we -- we should not be causing.

Unable to speak English, incapable by reason of mental or physical infirmity. Now, on these, if the juror -- the jury administrator has a doctor's note of some sort maybe they could share that with us.

Is that -- is that possible?

**MR. DRIER:** Yeah. It usually comes through with facts, or sometimes, paper. But we could probably share that. I don't know -- I don't see how that would be a problem.

**THE COURT:** Okay. So let's -- let's plan on doing that. And if there is no doctor's note, we should request them. If somebody says they can't do it because of a mental or physical infirmity, and there is no doctor's note, we should get a doctor's note.

**MR. DRIER:** Correct. We can do that.

**THE COURT:** Okay. Good.

**MS. BRAIN:** The other thing we would request, Your Honor, is copies of the forms, assuming -- unless that is burdensome.

09:50:24 I notice, for example, there's no -- none of the demographic information is on these lists. And that's really the underlying consideration that is driving our desire to be at least involved or informed, is the underrepresentation that we have alleged.

09:50:42 With respect to the grand jury selection, we assume it's going to be the same with the petit jury selection. So we're just very attuned to the idea that we want to make sure that these excusals are not going to disproportionately impact the --

09:51:00 **THE COURT:** So let me ask this: The forms come in as paper forms. Are they -- are they input into a computer of any sort?

09:51:09 **MR. DRIER:** They are. And the demographics are input in the computer. We can run a special report to get the demographics, but it won't have what person -- you know, it won't have the individual person and their, you know, ethnicity or anything like that.

09:51:24 **THE COURT:** Is there a way to make the forms available so that counsel could come in and look at the forms if they want?

09:51:32 **MR. DRIER:** Oh, the paper forms themselves?

09:51:35 **THE COURT:** Yeah.

09:51:36 **MR. DRIER:** Yeah.

09:51:36 **THE COURT:** Can we set aside a room in the clerk's

office so if defense counsel wants to come in and look at the actual forms --

**MR. DRIER:** Oh, sure.

**THE COURT:** We've got a pile of forms. Can we have a room there that defense counsel can come in and look at them.

**MR. DRIER:** Yeah.

**THE COURT:** Great. Terrific.

**MS. BRAIN:** That's perfect. That's exactly what -- yes, that solves the problem. Thank you, Your Honor.

**THE COURT:** Sometimes I have good ideas.

**MS. BRAIN:** You do.

**THE COURT:** Okay. Conviction of -- of a felony. I think those can be -- that can be done without the Court.

**MS. BRAIN:** Judge, that's the --

**MS. ZOGHLIN:** Happy to defer to Ms. Brain. But this particular issue was an issue that we brought up in some of the JSSA litigation about the grand jury. And I think -- I don't remember the exact details, but I think it was that somebody had said they had been convicted of a felony in Buffalo City Court. Whatever it was they said was not possible.

**THE COURT:** Gotcha. Yeah.

**MS. ZOGHLIN:** So it -- and just my own experiences leads me to believe that people don't always know whether it was a felony or it was a misdemeanor or what happened to it, and they may be taking themselves out when they shouldn't.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** That's a concern.

**THE COURT:** And, actually, this is an issue that the court system is looking at nationally because there are different rules in different states on disqualification.

But, yeah, I think if someone says they've been disqualified because they're convicted of a felony, I'm going to allow the jury administrator to disqualify them. But you're going to have a chance to look at the forms. So if there is an issue, we can -- we can revisit that for individual jurors if you find something on an issue. Okay.

**MS. ZOGHLIN:** And on the form, they would have to say what and when?

**THE COURT:** I would think, yeah.

**MR. DRIER:** They do. Yeah, they're supposed to. And if they don't, we request it.

**THE COURT:** Yeah. But -- so -- so you'll have those forms, and you'll be able to challenge a disqualification. And if there is a disqualification that is challenged, and the challenge has some merit to it, we'll bring the person in. We'll rescind the disqualification.

Okay. That's doable, right?

**MR. DRIER:** Yeah, definitely.

**THE COURT:** Great. Good.

Okay. Now, there are a number of people who can be

09:53:50 excused if they request to be excused. Persons 70 years
09:53:58 or old- -- 70 years old or older.
09:54:01 That's insulting.
09:54:02 **MS. ZOGHLIN:** That is, Judge. I agree with you about
09:54:04 that.
09:54:06 **THE COURT:** But that's part of the jury plan. So if
09:54:10 someone 70 years or older wants to be disqualified, they can be
09:54:14 disqualified and -- or excused, rather. They can be excused.
09:54:19 And I think that's a shame. I think that that number should be
09:54:22 a lot higher than 70 since that's what I just turned.
09:54:28 But -- but I think, you know, if it's part of the jury plan,
09:54:31 there's not a whole lot we can do about it.
09:54:34 **MS. BRAIN:** I think that's absolutely fine, Your
09:54:34 Honor.
09:54:36 Obviously, I think, from a purely logistical matter,
09:54:40 will there be an opportunity for us to look at the forms before
09:54:42 the juror is formally disqualified rather than having just to
09:54:48 walk it back later?
09:54:50 **THE COURT:** Say that again. Our -- our expert staff
09:54:53 over here was talking when you said that. So will you ask that
09:54:56 again, Ms. Brain?
09:54:57 **MS. BRAIN:** Yes. I was just asking whether it would
09:54:59 be feasible for us to have the opportunity to look at the forms
09:55:02 before the actual formal disqualification or excusal was
09:55:07 communicated to the juror so that if we did end up wanting to

09:55:12 challenge one, that we wouldn't be sort of walking back someone
09:55:15 who's already been excused.

09:55:17 **MR. DRIER:** That's a little bit more difficult just
09:55:19 because of the fact that once we put it in the system, it
09:55:22 updates our call system. So if they call, they get that
09:55:26 status. But we would have to do some kind of work-around.

09:55:31 **THE COURT:** Could you -- could you -- I mean, could
09:55:33 the Defense review of the forms be at the same time as your
09:55:39 office's review of the forms?

09:55:43 **MR. DRIER:** Yeah. We can make them available as soon
09:55:46 as we look at them.

09:55:46 **THE COURT:** Yeah.

09:55:47 **MR. DRIER:** Maybe not input them in the system quite
09:55:49 yet.

09:55:49 **MR. MOELLER:** Judge, are you suggesting that --

09:55:49 **THE REPORTER:** Can you speak into the mic? And state
09:55:49 your name, please.

09:55:55 **MR. HEALY:** Patrick Healy.

09:55:58 Is the thought that every noon-ish we get a batch of
09:56:04 mail --

09:56:05 **THE COURT:** Yeah.

09:56:06 **MR. HEALY:** -- that the jury staff would then open
09:56:08 and review?

09:56:09 **THE COURT:** Yep.

09:56:09 **MR. HEALY:** They would make their determinations at

that point. And then you're suggesting -- and then, typically, they would update the system with that information that afternoon.

**THE COURT:** Okay.

**MR. HEALY:** So the idea --

**THE COURT:** So -- so I think then it would be incumbent on defense counsel to have somebody go to the office -- so after you review it, somebody -- defense counsel reviews it, and -- and if there's anything that's going to be challenged, that's done before it's input, right?

So -- so the review takes place simultaneously by defense counsel and by -- and by the government, too, if the government wants to send somebody over.

**MR. TRIPI:** Understood.

**THE COURT:** Obviously, I don't mean to exclude you folks. It's just Defense is making this argument, and that's why I am addressing them.

But -- but that's what I would envision as being the way to make this work in a fashion that's not overly burdensome and that makes some sense.

**MR. HEALY:** So jury staff would review it.

**THE COURT:** Yep.

**MR. HEALY:** They would take their results. They would hand it to counsel.

**THE COURT:** Yep.

**MR. HEALY:** Counsel would review it.

**THE COURT:** Yep.

**MR. HEALY:** And then, hopefully, that same afternoon get back to --

**THE COURT:** Yeah. So you got -- you've got -- you have 600 that came in one day.

**MR. HEALY:** Right.

**THE COURT:** And there's seven that you think should be excused, and there's only five that they think. So we pull the two out, you don't input those two, and -- and raise it with my chambers or something that day, and -- and we -- and we process all the other ones.

**MR. HEALY:** The -- I don't think there's an issue with the exceptions, the ones that you would challenge. I don't think there's an issue there. It's -- it's just that the following day we're going to get another batch in, and another batch in, and you don't want the data entry component of it to get jammed up.

**THE COURT:** No, no, the data entry will take place the exact same way.

You know -- if -- how long does it take your office to review these things?

**MR. DRIER:** More than a day if we're going to get like 600 in. I mean, that's -- that's a lot. So -- but to review -- so --

09:58:17 **THE COURT:** So you're not going to -- so -- so -- I mean, I thought you said at noon that you receive them, they open them, and then they input that afternoon.

09:58:25 That can't be true.

09:58:27 **MR. DRIER:** No, no, no. Correct. Yeah. I mean --

09:58:28 **MR. HEALY:** Not in that volume.

09:58:30 **MR. DRIER:** Yeah, not in the volume. But, I mean, again, we can try to get as many as we can.

09:58:32 **THE COURT:** Great.

09:58:36 **MR. DRIER:** So it might have to be more on a rotating basis.

09:58:36 **THE COURT:** It will be, yeah. It will be on a rolling basis, but it's going to be -- you're going to get somebody over there on a daily basis.

09:58:42 **MS. BRAIN:** Understood, Your Honor. Absolutely. And the only ones we'd have -- we would want to be actually reviewing will be the ones where there's been a decision to excuse.

09:58:49 **THE COURT:** Yeah.

09:58:49 **MS. BRAIN:** So that could be, as Your Honor suggests, 7 out of the 600.

09:58:54 **THE COURT:** I guess that's true. Right.

09:58:55 **MS. BRAIN:** So we wouldn't -- we wouldn't be looking at the ones --

09:58:57 **THE COURT:** It's going to be more than seven, I know.

Yeah. No. I know.

**MS. BRAIN:** Okay.

**THE COURT:** I was being very, very optimistic.

**MS. BRAIN:** So it would be a subset, so it would be less.

**THE COURT:** Yes.

**MS. BRAIN:** The jury administrative office is going to do a lot more work than we do. And -- but, yes, understood. We would have to do it in that time frame so we wouldn't back up the data processing.

**THE COURT:** Okay. People who have served on a jury within the past two years. Same thing.

Okay. So the next one is a little more problematic. People having active care and custody of a child or children under 12 years old whose health and safety would be jeopardized by their absence. And people who are essential to the care of someone who is aged or infirm. What do we do about those?

**MS. BRAIN:** And if I'm understanding correctly, so that's another one where you don't typically get any kind of documentation in support. It's simply the response on the form.

**MR. DRIER:** Correct.

**MS. BRAIN:** I mean, I think with those -- I mean, again, we're not -- certainly, we've never been asking for the jury administrator's office to investigate, anything like that.

I think our -- our interest, again, is checking the demographics and seeing where this is breaking out and seeing are there going to be remedial measures that we might suggest. For example, if we see that things are affecting the venire in disproportional ways.

So I think that -- I think the Court's procedure of giving us the opportunity to see and being able to weigh in should there be anything that we wish to raise with the Court is the best --

**THE COURT:** The same way. So handle those the exact same way as we handle the other ones.

**MS. BRAIN:** The exact same way, yes.

**THE COURT:** Any problem doing that?

**MR. DRIER:** I don't think so.

**THE COURT:** Good. Great. Terrific.

Volunteer safety personnel such as members of a rescue squad or an ambulance crew. We do that the same way.

Any person whose services are essential to the operation of a business, commercial or agriculture enterprise that the business would have to close if the person were required to perform jury duty. I think that's -- we would handle that the very same way.

My father would have been in that category. He ran a one-person print shop, so...

Full-time students. Same thing, I think.

And then -- and then we've got another cat- -- so those -- that's -- those are the categories of people who are automatically excused upon request or who are ineligible.

Now, we've got a few other categories that are a little trickier -- or two other categories, really.

Somebody who has a planned vacation. Now, I think that the vacation -- we should only excuse people who have a planned vacation for the full -- for the full two weeks of the jury questionnaires. So, in other words, we'll -- we'll -- if they have a planned vacation for August -- two weeks in August, that may not be a problem, right? Because we're going to be doing voir dire then, and that person can be voir dired outside those two weeks, right? So it would really have to be only during the period -- so somebody has -- is going to be away the entire time that we're going to have people coming in and filling out the questionnaires, that would be a problem. But that's the only problem. So people should not be excused for vacation unless there is -- unless their vacation is absolutely the same weeks that we are doing the juror questionnaires.

Okay? Make sense.

**MS. BRAIN:** It does, Your Honor.

**MR. TRIPI:** Yes.

**THE COURT:** Summonses returned as undeliverable. So the jury administrator is going to log and keep undeliverables in a file, and that can be inspected by the -- by the parties.

Okay.

Same thing with the grand -- grand jury.

And then deceased is the last one.

Okay. So I think we have a plan.

Are there any other categories that I've missed?

**MR. TRIPI:** Not that I'm aware of, Judge.

**THE COURT:** Okay. The government want to weigh in on this at all? Do you think this plan works?

**MR. TRIPI:** Judge, the way you've set it up I think works for us. I think between the disqualified report, the Defense and the government's ability to inspect any that they might want to challenge, I think that you've covered all the bases.

**THE COURT:** Terrific. Good.

Okay. What do we do about people who never show up?

So, you know, I guess if it's the first day, we can follow up. But there may be some people who just don't show up during the entire two weeks of the questionnaire, even after several calls. Typically, we don't follow up once the final day has passed. Should we do anything different here?

I mean, do you want me to send out the -- send the marshals out to arrest these people?

**MS. BRAIN:** Certainly not that. I think we're prepared to say right now we're not going to be asking for that. However, if the Court was willing, it would be great for

10:04:51 us to have an opportunity to talk to our jury consultant about
10:04:55 that and see if there are -- see what we might ask for it. I
10:05:01 don't have -- I don't feel confident at the moment to answer
10:05:03 that in terms of what we might be asking for.

10:05:07 **THE COURT:** Yeah. And there's nothing magic about
10:05:09 that two-week period, don't forget. So, you know, if at the
10:05:12 end of the two-week period we have a handful of people who have
10:05:16 not shown up, and your jury consultant says, These people are
10:05:19 people that we should, you know, be -- be concerned about,
10:05:24 we'll have a meeting like this and -- and talk about what to
10:05:27 do. Okay? Make sense?

10:05:29 **MR. TRIPI:** Yes, Judge.

10:05:31 **THE COURT:** Great.

10:05:32 Okay. So let's talk about the questionnaire. We had
10:05:37 22 people in the clerk's office staff take the questionnaire to
10:05:41 test the timing. The average was about two hours to fill out.
10:05:46 The shortest was an hour and 15 minutes, and the longest was
10:05:49 almost four hours, but only one person took more than three
10:05:54 hours. So we had one very, very careful person. And so we
10:06:02 think two groups a day is probably feasible based on that. And
10:06:07 again, you know, if somebody is not finished, we'll let that
10:06:12 person -- we'll let that person stay and finish.

10:06:13 Okay. I think that's all we need for the jury
10:06:21 matters, right?

10:06:23 **MS. COVERT:** Do you have an estimate, Judge, for the volume in the morning and -- the total you're calling in for questionnaires on the morning session and the afternoon session?

10:06:34 **THE COURT:** 65 each session. 65 each session.

10:06:37 **MS. COVERT:** Thank you, Judge.

10:06:39 **THE COURT:** And we're going to bring them into the courtroom first, right? And I'm going to talk to them a little about --

10:06:44 **THE CLERK:** There'll come in like they normally do for our jury selection --

10:06:46 **THE COURT:** Yeah.

10:06:46 **THE CLERK:** -- Judge. And -- yeah.

10:06:47 **THE COURT:** And I'll give them more --

10:06:48 **THE CLERK:** And they'll come up --

10:06:49 **THE COURT:** -- which we will all talk about before I give the spiel.

10:06:52 **MS. BRAIN:** We're including --

10:06:53 **THE COURT:** I'm sorry.

10:06:53 **MS. BRAIN:** We're including some preliminary instructions in our jury instructions that they'll get.

10:07:00 **THE COURT:** Terrific. Yeah. Great, great, great. Okay. Good.

10:07:01 Okay. So I think we can excuse our expert panel here. You can stay as long as you want, but you folks are

welcome to leave if you want.

**MR. MOELLER:** Thank you, Judge.

**THE COURT:** Okay. Now, let's talk about the trial date, the motion to adjourn the *Roper* hearings. The thing that's the sticky wicket with the trial date is the government's appeal is the only thing that I see as the sticky wicket. I think what we're going to do right now is just keep things right on track. We're going to keep the June dates for prospective jurors to fill out the questionnaire. And we're going to ask for conflicts through the end of the year, maybe into early 2027, in the questionnaire. And as I said, we're going to err on the side of not excluding people for scheduling conflicts so that we can address it later. And if we don't have the Second Circuit's decision by early August, that may delay in-person jury selection, and we'll just have to start when we can start. But I think that that's -- that's the best plan that we have.

And I urge both sides to do everything they can to let the Court know -- the Second Circuit and the panel know that we've got these issues. I think that it would be, you know, incumbent on -- I said, by designation, the "Second Circuit" a number of times. And I know if I were on the panel and -- and understood that a case of this magnitude was scheduled to be tried and that they -- they needed a decision quickly, I'd do everything I could to move heaven and earth to

make that decision. Whether my friends' level above me are of that same mind, I don't know. But I would urge you to let them know the -- the -- what we're facing and why it's important for them to get us something sooner rather than later. I know you've asked for an expedited appeal already.

I think they've set an expedited briefing schedule; haven't they?

**MR. TRIPI:** Yes, Judge.

**THE COURT:** Yeah. And so, you know, I can only hope that they understand what we're up against and what we're trying to do here. So I'd like you to do that.

Now, I'd like to set a date for proof to start. You know -- and I understand that that's going to have to be -- that's not cast in stone as I usually do it. But I'm thinking -- you know, so we have questionnaires for the last two weeks in June, in-person voir dire to start on August 17th. Is that right?

**MR. TRIPI:** Yes.

**MS. ZOGHLIN:** That's right.

**THE COURT:** So -- so I'm thinking we should -- we should estimate how long the voir dire is going to take and then have a date for proof to start so that -- and again that date can move, but -- so that everybody has an idea. And so if we finish the voir dire in a really expedited fashion, we're not going to go right into -- you know, I think that would be

unfair to everyone to do that. So I'd like to have a proposed date.

So how long do we think the voir dire is going to take?

**MR. TRIPI:** Judge, I'm looking at some of the dates in the *Bowers* case.

**THE COURT:** Yeah.

**MR. TRIPI:** And I'm thinking a date for proof five or six weeks out, something like that.

**THE COURT:** Yeah, I think that probably makes sense. So maybe -- maybe October, right?

**MR. TRIPI:** That makes sense to me, Judge.

**THE COURT:** Yeah, like the second week in October, right after -- when is -- when is the Columbus Day holiday?

**THE CLERK:** It is October 12th.

**THE COURT:** So maybe the 13th of October.

**MR. TRIPI:** That's kind of how I mapped it out in my mind.

**THE COURT:** Does that make sense for an aspirational date?

**MS. BRAIN:** If I'm recalling correctly, I believe the government has previously said they anticipated jury selection would be three or four months.

**THE COURT:** Yeah, that's what I understood. But I think they're amending that now.

10:11:21 So -- so let's -- let's shoot for October 13th as -- as the date -- trial won't begin -- proof won't begin before that date. It may begin after that date, but it won't begin before that date.

10:11:38 Okay. Does that make sense? Is Defense on board with what I'm talking about?

10:11:43 **MS. BRAIN:** I think this -- yes, I don't see a problem with the Court setting it as an aspirational date. Without being able to do the math on the fly in terms of how many jurors we're going to have to interview --

10:11:57 **THE COURT:** I understand, as I say, but I'm setting that date as the earliest date.

10:12:00 **MS. BRAIN:** The earliest.

10:12:01 **THE COURT:** That's the earliest date trial would start. We may have to move it because it takes longer to select a jury. I understand. But that's the earliest date that trial will start. Okay.

10:12:14 And that gives us -- and so that gives us some -- so if a juror says, Oh, gee, I've got a vacation for Labor Day during September, we say, That's not a problem. Okay.

10:12:26 **MS. BRAIN:** That makes sense, Your Honor.

10:12:28 **MR. TRIPI:** May I ask one question regarding the conduct of the trial?

10:12:32 **THE COURT:** Yes, sir.

10:12:32 **MR. TRIPI:** I know oftentimes Your Honor goes four

10:12:36 full days and then Fridays you handle other matters that are on your docket. Is that -- are you of a mind to continue that, Your Honor?

10:12:44 **THE COURT:** Yeah, I think so. I think -- unless -- unless folks have a problem with that. That's what I -- what I generally do is -- is when I'm on trial -- and I've had some long trials -- the trial goes four days a week, and then Fridays are for everything else.

10:12:58 **MR. TRIPI:** Okay.

10:12:58 **THE COURT:** And that's what I would like to do. I can't do five days a week because I've got other cases. And so -- unlike you folks. You know, that's one of the differences between being a judge and being a lawyer on trial is that when you're a lawyer on trial, you're focused on one case and only one case. As a judge, you have a whole bunch of cases.

10:13:19 On the other hand, the focus that you folks have and the focus that I have is a little bit different. So it's harder for you than it is for me. And if any judge tells you that it's not, they're lying. But -- but it is hard for the Court, too, because you're juggling other stuff as well, so...

10:13:35 **MR. TRIPI:** We -- we have no issue with that normal process.

10:13:38 **THE COURT:** Okay. Good.

10:13:39 Okay. Motion to adjourn the *Roper* hearings. I'm

frustrated by Defense's request, but I'm inclined to grant it because I think that it does make sense.

I wish you would have thought of it a while back, but -- but I think it makes sense. The government has really taken no position.

**MR. TRIPI:** I feel like our response can echo the Court's little bit of frustration, but we understand.

**THE COURT:** Yes.

**MR. TRIPI:** I mean -- so we're taking no position.

**THE COURT:** Yeah, that's exactly where I am, Mr. Tripi.

I get it. I wish you would have brought it up sooner and we would have scheduled it down the road. Maybe we don't need to do these hearings. So, you know, let's -- let's take them off.

So I'll grant -- I'll grant that motion to adjourn the *Roper* hearings. And it gives defense counsel time to focus on the trial and not on those hearings.

**MS. BRAIN:** Thank you, Your Honor.

**THE COURT:** Okay. I think the only thing left is the motion to change venue; is that right?

**MR. TRIPI:** Yes, Judge.

**THE COURT:** Okay. And I've -- and I've read everything. I -- I understand, I think, the law and the factors that are listed in -- I've forgotten the name of the

case now.

**MR. TRIPI:** *Skilling*.

**THE COURT:** I'm sorry?

**MR. KRULY:** *Skilling*.

**THE COURT:** Yeah, *Skilling* factors, yeah.

So talk to me. Tell me -- tell me what the -- what the -- well, let me ask a few questions.

First of all, much of your motion focuses on the City of Buffalo.

Isn't that the wrong focus? Shouldn't the focus be on the Western District of New York?

**MS. BRAIN:** I think the focus was on the City primarily because of one of the sources of prejudice that we identified. Excuse me. We -- as we said in our pleadings, we -- there are three distinct and interactive sources of prejudice in this case. One is the publicity and the exposure to it. And the fact that so many people in the district are aware of aspects of this case. The other is the emotional impact. This is not just a straightforward case. It's something that affected the community deeply and profoundly, much like the -- in the *McVeigh* case that we cited extensively in our pleadings. And the third is the diversity issue, the impact it will have on the jury. And that's where we were focusing on the city, not because the city is its own independent unit, but because of the forces, the historical and

systematic forces that have been at work. That has had a really significant impact on where folks live within the district.

**THE COURT:** Sure. But, I mean, you say that the racial diversity should be diversity consistent with diversity in the community where the crime was committed. And you say that it's overwhelmingly likely that the jury will be primarily all white persons. But the community is the Buffalo division of the Western District of New York, which is predominantly white. It's 80 -- 80 -- more than 80 percent white.

**MS. BRAIN:** Right. But --

**THE COURT:** And, you know, very often my juries are white. It's a problem. We -- we try to deal with that, and it's a tough thing to deal with. But I don't know that this would be any different than any other case that we have here where we have predominantly white jurors.

**MS. BRAIN:** I think the difference here is the thumb is on the scale to ensure that it's -- that it's almost all white. You know, that's a risk just based on the demographics of the district, as the Court said. I mean, the district is -- Rochester and Buffalo divisions are approximately, roughly, 10 percent minority. But because of the forces I was alluding to, that 10 percent is not distributed on a random or equal basis throughout the whole district. That's the focus.

**THE COURT:** Should -- so -- so the -- if we just take

the statistics, a jury would have -- the statistics for the Buffalo division of Western District of New York, a jury would be 10 white people, one Black person, and one person of color.

**MS. BRAIN:** Correct, Your Honor.

**THE COURT:** Shouldn't we at least try to do that before we say we can't?

I mean, because that's not -- we're not talking about a lot of -- you know, the distinction on the jury is not -- it's not that big a number. So -- so shouldn't we -- shouldn't we at least make an attempt to pick a jury; and if we can't do it, we can't do it?

**MS. BRAIN:** No, that's the problem, because the Court is not going to be in a position to remedy it once we figure out that it's a problem. You know, it's one thing to start voir dire -- the voir dire process and realize that we can't qualify enough jurors. The Court can abandon and start over. If what happens is we get to the end of the jury selection process, we've qualified jurors from -- with respect to publicity and -- and the impact of the crime, but it's -- we've -- along the way, we've excluded all the people of color, the Court can't then turn around and say, Well, I'm just going to dismiss this jury panel and start over.

**THE COURT:** The -- the data that I have found for the Southern District of New York is 21 percent Black and almost 30 percent Hispanic. That is -- that is very, very tilted and

very different than here.

So are you suggesting that your client has a right to a jury drawn from a more diverse pool than Western?

**MS. BRAIN:** Certainly not. Indeed, there's no constitutional right, Your Honor. There's no -- indeed, there's no constitutional right to a soon-to-be jury that is even a fair cross-section.

**THE COURT:** Okay.

**MS. BRAIN:** It's -- the focus is on the process. And so there would be absolutely nothing wrong with being in the Southern District. And the, sort of, overcorrection would -- would perhaps help us, again, ensuring that there's a diverse jury. There's no such thing as a too-diverse jury, at least from our perspective.

So although there's a difference, I don't think it's a constitutional or other legal problem. What is -- what would be a problem is no jurors of color at the end of the process. We won't know that until we get to the end of the process and then it will be too late.

**THE COURT:** Let me ask you this: Do you have any -- do you have any capital case other than *McVeigh?*

**MS. BRAIN:** No, I don't believe so. But by the same token, we don't have one where we have this diversity issue. This is unique.

**THE COURT:** I understand.

10:21:47 **MS. ZOGHLIN:** When you said "transfer," Judge, you mean a venue. I just want it made clear, we're not talking about the intradistrict?

10:21:53 **THE COURT:** No, no, we're going to get to -- we're going to get to that in a second. We're going to get to that in a second.

10:21:56 So why isn't the answer -- if we have to move this, why isn't the answer moving it to Rochester and not New York? Why is New York so much better than Rochester?

10:22:19 You make some arguments that have me thinking that Rochester may be a better place to do this than Buffalo. But why New York City? That just really turns everything on its head.

10:22:36 **MS. BRAIN:** It is -- it's a -- it's a big request, Your Honor. No doubt about it. The trouble is that the data in Rochester is -- or the comparison between Buffalo and Rochester is significantly poorer, from our perspective, than it is with the Southern District because of the results of the survey, principally, that show really quite alarming levels of -- of non-transient fixed beliefs that are --

10:23:03 **THE COURT:** But -- but that shouldn't be what we're -- I mean, that could be because folks in New York City are just generally more opposed to the death penalty than folks in Western New York.

10:23:15 **MS. BRAIN:** No, we did survey -- I mean, we asked,

10:23:18 I'm sure, as part of the survey, what their opinions were, but that's not the results that we're relying on here. What we're talking about is -- is case knowledge and attitudes towards the case, towards the defendant, and those kinds of things, which are dramatically different. They're, better in Rochester than they are here, for sure, which is why we filed our intradistrict transfer as an alternative just in case. But by no means do we submit that Rochester would be as good as -- or as sufficient remedy for the problems that we've identified in our pleadings.

10:23:56 **THE COURT:** Mr. Tripi, you want to -- are you going to argue this?

10:23:59 **MR. TRIPI:** Yes.

10:24:00 **THE COURT:** Yeah.

10:24:00 **MR. TRIPI:** So, Judge, I think -- so I'll touch on the three things that they've cited to: publicity, the emotional impact, and this diversity issue.

10:24:10 First, their only case where they can cite to any type of capital case that there was a change of venue is *McVeigh*. That case was 40 [sic] years ago. And just to contextualize that --

10:24:21 **THE COURT:** Was it really 40 years ago?

10:24:21 **MR. TRIPI:** I believe it was almost 40 years ago.

10:24:23 **THE COURT:** Oh, my goodness.

10:24:25 **MR. TRIPI:** *McVeigh* involved 168 people who were

killed, including nine children, and 600 injured, and 300 buildings that were damaged. And Oklahoma City at that time in 1995 had a population of about 450,000.

**THE COURT:** 30 years ago.

**MR. TRIPI:** Is it 30?

**THE COURT:** Yes.

**MR. TRIPI:** I was -- Judge, the only thing I can say is that I'm terrible at math.

**THE COURT:** I know. I know.

**MR. TRIPI:** That makes -- that makes me feel a little better.

But -- and so the -- the impact in terms of just sheer numbers was larger. And the community from which the jury was going to be drawn from was smaller, 450- to 460,000 versus the 2024 census numbers, which have come out for the Buffalo part of the district, those eight counties that this court will be drawing from are about 1.5 million. I think their numbers were the 2023 census in the survey.

And so in order to get 64 cause-free jurors, which is what we will need, that seems, just in terms of numbers out of 1.5 million potential jurors, very doable on its face.

So now you talk about the type of publicity. And you're aware of the case law through the years that talks about pretrial publicity, but I'll just hit on a few key points if I can.

10:26:03 Back in 1883, the Supreme Court said, He who seeks equity must present himself to the Court with clean hands.

10:26:11 And so use that to contextualize the media coverage of this case, particularly earlier, closer in time to the crime. It's -- it's ironic that the defendant who sought to maximize worldwide media coverage of the mass murder of Black people by live broadcasting it to the internet and publicizing racist writings over the internet --

10:26:36 **THE COURT:** Just -- just wait. Let me stop you. This argument suggests that by committing a crime in a certain way, a defendant waives his right to a fair jury.

10:26:47 That can't be --

10:26:48 **MR. TRIPI:** No, I'm going to -- just follow the logic through just for a second.

10:26:53 That sets this case apart. You don't have -- in the sea of other capital cases, mass shootings, *Bowers*, for example, *Roof*, you have similar facts, but you don't have that extra level of internet publicity that this case generated by the defendant's own conduct early on. And so when you -- when you then overlay the defendant's conduct with some of the comments, the media coverage that their motion cites to early on, public officials speaking out, all of that was closer in time to the trial. One of the factors that you look at is the time from that coverage to now.

10:27:32 **THE COURT:** Right.

**MR. TRIPI:** So that's where I was going with that.

**THE COURT:** Yeah.

**MR. TRIPI:** So we've never seen a case, even among terrible cases, with that type of factual predicate that led to that type of media coverage. Now, of course, the internet has -- has diluted media coverage worldwide in the sense that people all over the world see things within seconds.

**THE COURT:** And the coverage here was national and international coverage.

**MR. TRIPI:** And every court appearance is national. But the distinction is now, as opposed to closer in time to the event -- we're four years later -- it's pretty mundane coverage of what happened in court, what the Court said, what the parties argued. And that's -- that's the same in any case that gets coverage.

And so the crux of my argument is -- is if the Boston Marathon bombing case could be tried in Boston, if the Tree of Life shooting case could be tried in Pittsburgh, that's *Bowers*; if the Charleston church shooting could be tried in Charleston, that's *Roof*, this certainly can be tried here.

And -- and to the extent that the Defense's motion -- pardon me, Judge -- is -- is premised on -- on their survey, well, they filed their initial venue motion March 31st, 2025. Their survey didn't begin till about a month later, in April. But they told you what the results would be.

10:29:03 So -- so there's bias inherent in -- in the survey. It's not
10:29:08 just a simple reporting of data and numbers to the Court.
10:29:12 It's -- it's survey questions that -- by their own standards.
10:29:19 They provided the link to their own rules. You're not supposed
10:29:22 to ask leading questions. They ask leading questions. They
10:29:25 order the questions in a certain way.

10:29:27 But if we want to look at even just their numbers,
10:29:30 there's a 1 percent difference between SDNY and Buffalo as to
10:29:34 the question of -- and I'm not putting, necessarily, stock in
10:29:39 their numbers, but even by their own numbers as to the
10:29:43 question, Is there something the Defense could present that
10:29:47 would convince you that Payton Gendron should receive life
10:29:48 without the possibility of release instead of the death
10:29:51 penalty? In Buffalo, the answer "yes" was about 18 percent.
10:29:55 In Rochester, it was about 25 percent, and in the Southern
10:29:59 District, it was about 17 percent. So between Buffalo and the
10:30:02 Southern District, there's 1 percent difference.

10:30:04 **THE COURT:** Let me ask you this: One of the
10:30:05 suggestions you have is expanding the jury pool here to include
10:30:09 Rochester. We can't do that, can we? If -- we violate the
10:30:13 plan.

10:30:14 **MR. TRIPI:** Judge, I saw that argument come up in
10:30:17 their papers when -- when we initially looked at the plan. We
10:30:20 didn't perceive that as an issue. If --

10:30:24 **THE COURT:** Why? Why?

10:30:26 The plan said -- let me -- the plan is the Buffalo division and the Rochester division. And -- and I think it -- it provides that the jurors here are taken from the Buffalo division. And the jurors -- you know, the district is hereby divided into two divisions for jury selection purposes as follows. It has the Buffalo division and the Rochester division. I don't know how we could change that without changing the jury plan.

10:31:05 **MR. TRIPI:** We would certainly need to brief it further, Judge --

10:31:08 **THE COURT:** Okay.

10:31:09 **MR. TRIPI:** -- if it was a realistic possibility.

10:31:11 **THE COURT:** Okay. And maybe that should be briefed in connection with the Rochester motion that you haven't had a chance to respond to yet, right.

10:31:20 **MR. TRIPI:** I -- we've -- we've been working on a response, but we --

10:31:22 **THE COURT:** Yeah.

10:31:24 **MR. TRIPI:** -- Your Honor indicated to hold off. And we're going to argue it today --

10:31:26 **THE COURT:** Yeah.

10:31:27 **MR. TRIPI:** -- and then we could file it later.

10:31:29 **THE COURT:** Let me give the Defense the last word on New York City first before I turn it to Rochester.

10:31:35 **MS. BRAIN:** Yeah, just a couple of responses to the

government's question. Obviously, this Court doesn't sit in equity, so -- it sits in law. And the Constitution guarantees the right to a fair trial. Enough said about that.

With respect to the internet diluting the publicity, in fact, it's had entirely the opposite effect. It has made publicity, and more importantly, comments and un- -- unmoderated, unsolicited, anybody-who-wants-to content not only available 24/7, but targeted -- importantly, targeted by the algorithms that we said in our -- in our papers towards people in this district. So it -- there is no -- there is no global -- although the internet reaches global, the way that it operates, the money makers who are behind it, it operates in a very targeted way.

So with respect to other cases, as I've mentioned before, neither *Bowers* or *Sarnaiev* have this issue with respect to the diversity of the seated panel. And then with respect to the survey, obviously you can't interpret a survey with respect -- just by looking at one, question, to the extent that the government is disputing the validly of that survey and prob- -- and asserting problems with methodology, we -- we submit that there are no search problems.

And if the Court is inclined to do anything other than credit it on its facts, we need an evidentiary hearing to establish that.

**THE COURT:** Okay.

**MR. TRIPI:** Judge, could we -- just two -- two quick references to -- to cases. I want to provide two case quotes for the Court to think about --

**THE COURT:** Go ahead.

**MR. TRIPI:** -- and then just one point on the algorithm.

We quoted in our papers *Rideau, R-i-d-e-a-u, v. Louisiana*. There, the Supreme Court stated, The defendant must show that prejudice from pretrial publicity is so overwhelmingly and deep-seated that this trial has been transformed into a, quote, grossly brutal kangaroo court.

And then there's one other case quote from the Second Circuit that I wanted to -- to highlight. I think we only put a partial quote in our brief. It's *Application of Cohn*. It's a Second Circuit case from 1964. Back in 1964, the Second Circuit said, Moderate means of news communication have taken away many of the reasons for transfer of the cause célèbre which may have existed 50 years ago.

But then they went on -- then went on to -- that's what they were saying in 1964. They went on to say -- and I think this goes to -- parts of the survey sort of talk about jurors who aren't forthcoming in group settings. Well, first of all, Your Honor is conducting individual voir dire. So that's not a valid point. But the law presumes that jurors are honest. And the Second Circuit said, It would indeed be

cynical -- a cynical approach to believe jurors who give their assurance that we can fairly and impartially decide the fact issues before them would deliberately conceal deep prejudices. Despite the fact that every individual who enters the jury box, of necessity, must bring his own personality and point of view with him and may not be exempt from the general feelings prevalent in the society in which they live, such individuals, once they take their oath, must be trusted to act as honest and impartial fact judges. If there be human frailty, we must do as best we can with the means that we have.

And I think that that applies with as great of force today.

And just lastly, as to the algorithms, Judge, I think that that's a bit of a red herring because nobody really knows how the algorithms work on social media companies. They all protect that stuff pretty -- pretty carefully.

But anecdotally, I can tell you as a prosecutor on the case from the beginning, who lives in the world and has a cell phone and read about media coverage in the case on -- on their phone, on social media apps, most of the quotes and most of the things they put in their motion were news to me. In other words, even though I looked at some of that stuff early on, the algorithms aren't bombarding me on a daily basis, such that I learned quotes from their filing. And I think we know from our real-life experience that's how the world works.

You've conducted high-profile jury selections. A lot of people didn't even hear about some of those facts, even though they were in the news daily, particularly in this area. And those that did, the Court knows how to handle that situation. And so we --

**THE COURT:** Of course, this is different. I mean, this -- this is more pervasive than those cases. But on the other hand, we're doing individual jury selection here.

**MR. TRIPI:** We are taking more precautions here. But at the same time, at a certain point, Judge, that case actually -- those cases -- I'm talking about the Bongiovani and Gerace cases -- they actually had more media coverage, because I did that comparison back when we were -- we were asking for some relief in that case.

So there was a point in time where that media coverage actually surpassed the media coverage here.

**THE COURT:** Okay.

**MR. TRIPI:** And so -- so that -- that's my points on that. And then I'll -- if you have any questions --

**THE COURT:** I'll give the Defense the last word, and then we'll wrap up.

**MR. TRIPI:** Okay.

**MS. BRAIN:** We addressed those points in our papers, Judge, and I don't want to belabor it. The government may not know how the algorithms worked, but our expert whose

declaration's in our papers does. And they have a very profound effect. The end of one is -- Mr. Tripi's phone is not the last word on this. And we're going to have to -- if -- to the extent the Court relies on that, once again, that's a factual issue, and if they're disputing it, we stand ready to prove it.

**MR. TRIPI:** Their own expert said they do not deny that behavior is, in fact, behavior. It's behaviors. It's not both --

**THE COURT:** I got it. Okay. Okay.

So -- so we're going to move to Rochester in a second, but I'm going to rule on New York City right now. We're not going to New York City. I find the Defense has not met the burden to transfer venue of the case to the Southern District of New York. I've analyzed those four *Skilling* factors: the size and characteristics of the community, prejudicial coverage, time elapsed, and trial outcome.

So with respect to the first factor, I think the community is the Buffalo division of the Western District of New York, not the city of Buffalo as the Defense suggested in its papers. And I understand the Defense argument that the city of Buffalo is an important component of that. I don't disagree with that. But I think the size and the characteristics of the community, more than a million people in the Buffalo division of the Western District of New York is a

substantial jury pool. So I think that the first factor cuts against transfer.

The second factor. There's been a great deal of news coverage, and some of that news coverage may well be prejudicial. But I think that factor weighs only slightly in favor of transferring venue. First of all, the news coverage has been national. And as the government observes in its papers, transferring this case to New York is going to result in a firestorm of news media coverage, more national coverage, and I would imagine some very, very significant coverage that I think would resurrect a lot of what happened -- a lot of news coverage that happened four years ago.

Second, most of the coverage is either not prejudicial or is of evidence that is likely to be admitted at trial, such as the state court guilty plea, the video footage of the shootings, that's unlike cases like *Rideau* where the prejudicial coverage involved an inadmissible confession.

I do want to make clear that I don't agree with the suggestion -- and I made this clear just a few minutes ago in one of my questions to Mr. Tripi -- that the manner that the defendant committed this crime and his choice to broadcast it means that he somehow has waived his right to an unbiased jury. I think he has a right to a fair and impartial jury, regardless of whether he caused the publicity and the news coverage. But I think the second factor is only slightly in favor of

10:40:13 transferring.

10:40:14 Third, the time since trial weighs against transfer. 10:40:17 By the time the case goes to trial four years will have elapsed 10:40:21 since the crime. And there's certainly news coverage. It's 10:40:24 much less than it was right after the crime. And the coverage 10:40:27 is no longer as dramatic and factual about the event as it once 10:40:35 was. As Mr. Tripi says, it's largely about legal proceedings 10:40:39 now.

10:40:40 And the fourth factor, the outcome of the trial 10:40:43 doesn't apply because the trial hasn't happened yet.

10:40:47 So the factors weigh in favor of keeping the trial in 10:40:51 the Western District of New York.

10:40:53 I also don't think the Defense's argument about the 10:40:56 risk of having an all-white jury warrants transfer. The 10:41:02 Defense relies on the fact that many of the Black jurors in the 10:41:05 Buffalo division who live on the east side of Buffalo, you 10:41:07 know, are more likely to be struck for cause. But that doesn't 10:41:11 mean that they're all going to be struck for cause. And it 10:41:14 doesn't mean there are no Black jurors who live elsewhere. And 10:41:17 there are a number of Black jurors who also live elsewhere in 10:41:19 the Buffalo division.

10:41:20 So the bottom line is we don't know whether the trial 10:41:23 here will result in an all-white jury. And I -- I hope it does 10:41:29 not. But even if it does, I think that still would not warrant 10:41:33 transfer, because, as I mentioned earlier, the population of

10:41:38 the Buffalo division as opposed to the city of Buffalo is such
10:41:41 that statistically, by mathematics, you know, whether you only
10:41:43 have one Black juror out of 12 -- in fact, many juries that we
10:41:49 have picked in this court don't have any Black jurors --
10:41:49 jurors.

10:41:52 And I don't doubt the research the Defense has
10:41:56 presented on the value of diversity, but I don't think that
10:41:58 there's a right to a jury that's more diverse than the Buffalo
10:42:02 population, and I think we can pick a fair jury. Here.

10:42:05 And, finally, Defense has made a number of arguments
10:42:09 why the Southern District is more appropriate than Buffalo, but
10:42:13 while it has alluded to some arguments with respect to
10:42:17 Rochester, I really don't see why the Southern District would
10:42:20 be a better venue than Rochester, which would not require
10:42:24 moving the case out of this district.

10:42:26 So while Rochester is still on the table, for all the
10:42:30 reasons I just said, I'm going to deny the motion to transfer
10:42:35 venue to the Southern District of New York.

10:42:37 So let's talk about Rochester. What's -- what's
10:42:39 the -- and I understand that Rochester is an inconvenience.
10:42:42 But tell me why that in- -- and it will be a tremendous
10:42:49 inconvenience to me too. But why should that inconvenience
10:42:54 trump Mr. Gendron's right to a fair trial?

10:42:56 **MR. TRIPI:** First, I'd just start with the legal
10:42:58 concept. There's no constitutional right to a trial in a

particular division -- in a particular part of a judicial district. *Franklin v. United States.* It's a Fifth Circuit case.

Obviously, Rule 18 says the Court must set the place within the district with due regard for the convenience of the defendant, any victim, and the witnesses, in the prompt administration of justice. So those are the -- so those are the factors.

So as to the why, Judge, in large part, the things that you look at when you're -- when you're evaluating a Rule 18 intradistrict transfer, they mirror a lot of the same things that you look at under -- under Rule 18. In other words -- excuse me, Rule 21. You can still consider the media coverage, things like that.

Now, I think the -- the key problem and all of the ink that's been spilled on this issue is that what's lost -- and certainly what the defendant's motion casts aside is the harm that moving the trial will have to the victims, the victims' families, the victims' friends who will be devastated if they cannot attend the trial. And for those who are unable to travel, their lives will be turned upside down even if we transfer the case to Rochester. I can't overstate the importance of the trial in Buffalo for the victims and the victims' families.

Now --

**THE COURT:** Why -- why can't arrangements be made to bring the victim and the victim's family to Rochester.

**MR. TRIPI:** Well, let me explain -- let me explain why.

**THE COURT:** Go ahead.

**MR. TRIPI:** So these arguments are going to be anchored in the CVR, the Crime Victims' Rights Act. Okay. And I know you're acutely aware of that act, Judge. But -- you've given trainings on it. I understand all of that. But I want to highlight just a few --

**THE COURT:** I was never -- I was not as attuned to it until someone in your office asked me to speak on it once about eight or nine years ago. Be careful what you ask for, right? Because I studied it, and I am very aware of it now.

**MR. TRIPI:** Well, there -- there are three provisions that I want to talk about. 3771(a)(2) talks about the right to reasonable, accurate, and timely notice of public court proceedings. (a)(5) talks about the reasonable right to confer with the attorney for the government in the case. And (a)(8) talks about the right to be treated with fairness and respect for dignity and privacy. And here's -- here's some of the issues with being in Rochester that strongly outweigh transfer to Rochester.

First of all, if the case is moved to Rochester, many of the victims and their families will have trouble attending.

They need to juggle work schedules, children, eldercare, medical appointments, and other pressing issues. There are several vulnerable victims who were killed in this case. A lot of their families are older, and the strain that it places on them to have to make -- the support systems and networks that they're going to rely upon to get through a lengthy four- to five- to six-month-long grueling capital trial are here in Buffalo; they are not in Rochester. And they are certainly not in SDNY, which I know is now off the table.

The things that are going to allow them to take a couple of hours off work and be here or have someone watch their child for a few hours or have someone sit with their -- their elder family member are here. It's not as simple as a bus ride down the thruway. If it were, sure, Judge, I'd agree with you. But those things we're talking about -- now, let's look at the scale.

**THE COURT:** So what you're saying is, you know, people who want to take -- not be here all day every day will come in for a couple of hours every day.

**MR. TRIPI:** Yeah, when they're not --

**THE COURT:** A couple or not every day. A couple hours --

**MR. TRIPI:** Well, when they're not testifying, you know, things like that.

**THE COURT:** Okay.

**MR. TRIPI:** It's a lot easier for someone who is going to later testify perhaps as -- as one of the prime victim witnesses to -- for us to give an estimate. Hey, you're likely going to be on after the lunch hour. They could work the morning or they could take their child to -- to the doctor or sit with their elder family member. They can't do those things in Rochester. And we're not talking about one or two victims.

Now, the statute requires that you -- you have to take into account for any victim. That means every single one. And so you have 10 deceased victims, with two or three family members that are going to be actual witnesses in the case per victim in the -- in the -- penalty phase. That's what you said you would allow. But that doesn't capture the scope of all of the family members who will want to be here. Certainly not. It's much more than that. And so then you get to the three surviving victims. They have family members. They have -- also have a right under the CVRA to attend every day. There are physical limitations --

**THE COURT:** Right.

**MR. TRIPI:** -- caused by their injuries, that even getting here makes it difficult for some people. And then you have a whole other category of victims who were in the zone of danger, the other count of the indictment related to the -- that's 60-plus additional victims who might also have family and friends who want to attend. But -- so you're

talking about upwards of 90 victims who we would be carting down to Rochester to sit on benches in a packed courthouse, and they -- and a lot of them won't be able to do it.

And so then it creates another scenario where, okay, let's talk about the few who can do that and who can make it or we can arrange to at least drive them there. Well, there's a whole bunch of people back here in Buffalo who would be attending who can't and who qualify as representatives of the deceased, potentially, under the CVRA who have a right to talk to government attorneys and be updated on the case.

See, the courthouse here has set a system up. After every court appearance, there's courthouse space that's dedicated. We go and we meet with any of the victims and their families who want to meet with us. We provide updates. We try to explain what's happening in court. That's been going on for four years. And so that will be taken away.

**THE COURT:** Why?

**MR. TRIPI:** For people who can't travel to Rochester --

**THE COURT:** Well, no.

**MR. TRIPI:** -- it will create -- just to get my last sentence out, Judge, it will create two ties, potentially. The people who can go and talk to us on a daily basis after every day trial and people who can't. In the heat of a trial, they're going to have less access to the government attorneys

than they otherwise would. And so that creates a division between victims now who can travel to Rochester and who can't, who gets to talk to the prosecutors after the trial days and who can't, who has to get a follow-up phone call maybe days later. You know how trials go, Judge. I'm going to do my best, but there's only so many hours in a day, and most of them are going to be spent in court. And so we need to be thinking about those people.

And then just the regular rank-and-file witnesses. You'll see it when we do file, but we have 185 currently on our list. 133 of the witnesses, whether they be civilian or victim or family, are from Buffalo. The ones that aren't mostly consist of law enforcement who lived around the Conklin area -- Conklin, New York, where the defendant was from, that part of -- that part of New York -- or records custodians or experts.

So almost every witness is in the Buffalo area. The evidence is in the Buffalo area. The evidence is locked up right across the street. Now we've got to -- we've got to transfer it. We've got to -- we've got to get more -- more space. Those logistics we need to be thinking about.

I'm sure the US Marshals have been preparing for a year to get the trial ready to go in Buffalo. There's those logistics and costs.

Contrary to the Court's staff -- I know you -- you deserve to decide where your staff goes. But all of the --

**THE COURT:** There's no question that the inconvenience for a whole lot of people will be significant. The question is -- is that tremendous inconvenience warranted --

**MR. TRIPI:** And it's not --

**THE COURT:** -- by the defendant's fair trial rights?

**MR. TRIPI:** -- because I would say if he had a right to move the trial, he had a right to move the trial. But Rochester is --

**THE COURT:** He's got a right to a fair trial.

**MR. TRIPI:** Yes, he does, absolutely. But they heard about this case in Rochester as well.

**THE COURT:** Yeah.

**MR. TRIPI:** You know, it's -- it's 45 minutes -- or excuse me -- an hour and 15 minutes down the road. And even by their own numbers, it's not significantly different. Who heard about the case, who knew some facts about the case, who said he was guilty in the context of someone who's already pled guilty in state court, mind you. That factual information about the case isn't disqualifying.

**THE COURT:** Don't you think the feeling about the case, though, is different in Buffalo than it is anywhere else in the country?

**MR. TRIPI:** I really don't think so, Judge. I really don't think so because, you know, you go to Rochester, and you

talk to someone who knows about the case -- I mean, it's anecdotal. Sure. But -- but anyone who is aware of this case and what happened have the same reaction to it if they saw it on the internet or anything like that.

**THE COURT:** So let me hear -- let me hear from the Defense.

**MS. ZOGHLIN:** Sure, Judge.

So Mr. Tripi has just said a lot there. He has spoken passionately about one factor, and we appreciate that. We didn't ignore that. We acknowledged it. Okay. It is not convenient. It was -- I -- believe me, I understand quite personally how inconvenient it is. But it is night and day between Rochester and Buffalo and Rochester and Manhattan. We all know that. The -- cases are tried in either place. It's -- the standard is: Which is more appropriate?

Mr. Tripi read Rule 18, but he read only those words in Rule 18, and not the interpretation of it that every court has taken, which is that other things are also relevant, including pretrial publicity.

His, frankly, anecdotal experience is -- is worth as much as his cell phone experience. I can tell you my anecdotal experience, it is not the same. But that doesn't matter either. What matters is what the survey shows. The surveys shows that it's not the same. And the government's interpretation of the survey is that it is significantly

different.

Their -- one of their major pitches in their opposition to the change of venue motion was you people didn't consider Rochester. The -- the -- your own --

**THE COURT:** Right. They -- they even suggested that we -- we open the jury pool to Rochester here.

**MS. ZOGHLIN:** Right. They made a suggestion which is inconsistent with the -- with the jury plan, but it was based on their assertion that there -- essentially, an acknowledgment that there's an issue and the resolution is that we should include Rochester jurors because they read the survey data and they said there's a significant difference between Rochester and Buffalo. They can't now say there isn't. Okay. So the survey shows that there is.

So, you know, we've gone through every category. But just take personal connections. So in -- approximately 25 percent of the survey respondents in the Buffalo division who recognize the case reported that they or someone they knew were directly or indirectly affected by the shooting; a quarter of them. Okay. That's compared to 9 percent in Rochester. The media market -- the map that we've -- we've shown is almost exactly -- with all due respect to the people in Orleans County, which is the only thing that's different -- is exactly the same as the divisions of the jury pool between the two places.

So the inconvenience, we acknowledge. But it is -- and we've given cases which say, specifically, greater inconvenience but, you know, on interstate highways, it's directly from here to there.

I credit most of what Mr. Tripi says. I don't entirely credit the idea that the government is not going to be able to communicate with the victims' families as well. Of course, they can. And, of course, they do that in Rochester all the time. So that's -- it's a factor, but there are -- as the Court suggested, there are remedies for that. It's not going to make it convenient, but they certainly can make it less inconvenient. They can provide transportation. It's an and 15 minutes. Or -- there's going to have to be, presumably, an overflow room with a closed-circuit connection.

There's -- there's no reason that that couldn't be here as well as -- it doesn't have to be in a room in Rochester. If we're not getting --

**THE COURT:** One thing that I had not thought about that Mr. Tripi is talking about are the folks who maybe can't come all day every day. If it were just a question of folks coming all day every day, then I think the inconvenience could be minimized, but -- you know, by having a bus, taking people there. And you're talking about two and a half hours extra every day. That's not that much of an inconvenience. We could live with that.

It would be my inconvenience to drive to Rochester every day or stay in Rochester, but -- and that's -- and that's okay. I'm willing to do that. But what about the people who can't come every day, but, you know, somebody wants to come in on a lunch break, take an extended lunch break for a day and come in, or what about witnesses who, you know, can't afford to take that much time off work and are going to have to now go to Rochester instead of Buffalo to testify? Those things are things I didn't think about.

**MS. ZOGHLIN:** Well --

**THE COURT:** What do you say about that?

**MS. ZOGHLIN:** -- it is -- it is that -- that amount of extra time. That's true. People who can only take a couple of hours can come to the courthouse here and see exactly what's going on. I presume the Court -- I'm sure the Court would accommodate an overflow courtroom here.

**THE COURT:** Yeah. Well, it's -- but it -- but it's not the same as being here. It's not the same as being in the courtroom. And if they are victim representatives, if they are -- if they are the representative of the decedent who has a right to be in court as much as the person wants to be and can't be because the case is somewhere else, that's significant. That's -- that's a problem.

**MS. ZOGHLIN:** Understood, Judge. And it goes certainly in the one -- the one category that Mr. Tripi has

talked about --

**THE COURT:** Yeah.

**MS. ZOGHLIN:** -- which is convenience. You know, I don't want to belabor it. We all know how far it is. We all know how convenient or inconvenient --

**THE COURT:** Yeah, yeah, I know.

**MS. ZOGHLIN:** -- it is to get from this courthouse to that courthouse. It would add -- add some extra time to their journey. They --

**THE COURT:** It does not just add some extra time to the journey; it's -- it would make it impossible for some people to go. I mean, you -- you make too light of it when you say it would add some time to the journey. For somebody who can only come in for two hours a day, that person -- because the person has to work, that person is not going to drive an hour and come back in an hour. That person is not going to be able to see anything, then. So -- so it's a little more than simply adding a couple of hours to someone's day. It's -- it's making it impossible for some people to come to court to see what's going on.

So -- but I understand what you're saying. I understand. You're right. It is really only one of the factors, but it's quite an important factor.

Let's do -- you want to respond in writing?

**MR. TRIPI:** Yeah. We can do that in short order. We

have a response largely prepared, Your Honor.

**THE COURT:** So what do you think? How long do you need?

**MR. TRIPI:** I could file it later today.

**THE COURT:** Well, I'm not going to make you do that. How about a week from today?

**MR. TRIPI:** Okay.

**THE COURT:** A week from today. And -- and I'd also like you to address the question -- you said you wanted to address about the Rochester jury pool being used in the --

**THE REPORTER:** I'm sorry. I didn't hear that.

**THE COURT:** Whether it violates the plan, whether there is a way consistent with the plan to get jurors from the Rochester division.

**MR. TRIPI:** Understood.

**THE COURT:** I don't think there is, but I'm willing to hear the government's take on that.

**MR. TRIPI:** If it turns out we dig harder into the research and we're wrong on that, we'll let you know.

**THE COURT:** Yeah, absolutely. So -- but I want that response at the same time. Okay? So you've got a week to do that.

**MR. TRIPI:** Okay.

**THE COURT:** And we'll give the Defense a week to reply.

**MS. ZOGHLIN:** Certainly.

**THE COURT:** Great.

**MS. ZOGHLIN:** Thank you, Judge.

**THE COURT:** And if I need more argument on the Rochester question, I'll schedule that.

**MR. TRIPI:** Yes, Your Honor. Thank you.

**THE COURT:** Okay. Is there anything else we need to do -- it's still morning -- this morning.

**MR. TRIPI:** Not from the government's perspective -- oh, yes, Judge. I think this is my confusion. I don't think maybe anyone else is confused about this. But the 17th, my understanding is we're supposed to exchange jury instructions informally with each other. I want to clarify that that's correct and we're not supposed to be filing them with you. I've been confused about that several times, so I just wanted a clarification.

**MS. COVERT:** Let me just double-check.

**MR. TRIPI:** We'll be prepared either way, but I just don't know who I'm instructions to.

**THE COURT:** Does the Defense have a view on that?

**MS. COVERT:** My understanding, Your Honor, was that it was not time for us to file joint instructions. But I can tell you that we probably aren't going to be ready to do that because we haven't exchanged them yet, so...

**MR. TRIPI:** They're drafted on our end, but I was --

I was unclear if we're exchanging those.

**THE COURT:** Ms. Izzo is filling in for Ms. Stelianou.

**MS. IZZO:** Yeah, I believe that date was for the joint submission to the Court. So if you need an extension --

**THE COURT:** Okay. So you want to change that.

**MS. COVERT:** I would ask for a couple of weeks --

**MR. TRIPI:** Can we have maybe two weeks to try to hash out what we can hash out then? And we'll exchange informally with them on the 17th and then get anything we can jointly propose to you two weeks after that.

**MS. IZZO:** That's fine with me.

**THE COURT:** If it's fine with Ms. Izzo, it's fine with me.

**MR. TRIPI:** Okay.

**THE COURT:** Okay.

**MS. IZZO:** March 3rd.

**THE COURT:** March 3rd. Okay. So we'll kick that date off to March 3rd, but let's make sure we get the cross-pollination between both sides first. Okay.

**MR. TRIPI:** Yes.

**MS. ZOGHLIN:** Thank you, Judge.

**THE COURT:** Okay. Anything else.

**MR. TRIPI:** Nothing from us.

**THE COURT:** Anything else?

**MS. COVERT:** Just one thing, Judge. I think last

time I put on the record that we had -- the government still had not provided us an exhibit -- their exhibit list. And that was in November. We then, in December, had asked for copies of those exhibits. We did get them -- get them, Judge, but we've had several issues with respect to those exhibits. We sent them a letter today -- or I'm sorry -- we sent a letter earlier this week advising them of what the issues are. Some of the -- the exhibits don't play. Some of the Bates numbers aren't identified in any -- it's a range of Bates numbers; it's not particular to a particular exhibit. It lists -- you know, it lists for a bunch of them.

We've set all that out, Judge. I had a conversation with Mr. Tripi. I understand they are working on it. And we just ask the Court to set a deadline so we have a time in which they need to get us that stuff.

**THE COURT:** Yeah. I'll do two things.

**MR. TRIPI:** Judge, could I just respond to that just very briefly?

A, we are working on it, but, B, I don't think the Court needs to set a deadline. And here's why: They have everything.

**THE COURT:** Well, if they have things that don't play --

**MR. TRIPI:** We are working on the things that don't play. Or if there's a -- if there are issues -- I was with

Agent Burns yesterday. We're going to meet again today. But even if we copied something a fourth time and said, This is the exhibit, it's stuff they already have. So to hit us with another deadline for something that we're doing out of convenience to them, no other -- I said this last time. No other case have we Bates annotized [sic] our exhibit list for them. So we're going above and beyond. But to then take us going above and beyond because we recognize the type of case this is, and then say now there's an obligation, I don't think that's right. I don't think that's fair.

**THE COURT:** Okay. Give me a date by which you think you can get them this stuff.

**MR. TRIPI:** I'm going to give myself more time than I think, but it would be no further than the deadline you just said.

**THE COURT:** Two weeks.

**MR. TRIPI:** Yeah.

**THE COURT:** Great. So two weeks. Deadline in two weeks.

And let me say this, in addition to that: By not getting them this stuff, you are giving the Defense ammunition for a motion to put off the trial date. And while I am very, very, very opposed to putting off this trial date, I just urge you to get them this stuff as soon as you can so that they don't have ammunition to make a motion that makes me have to

think about this again. Because I don't want to have to think about this again.

**MR. TRIPI:** And, Judge, I hear you. And every time, I just say "okay." But if I were to proffer a defense, many of the things they're complaining about, they shouldn't be.

**THE COURT:** I get it.

**MR. TRIPI:** Okay.

**THE COURT:** I understand. I understand. And you can put that in your opposing papers. All I'm saying is don't give them ammunition.

**MR. TRIPI:** That's the first time I've said more than just "okay." I just wanted to say that.

**MS. COVERT:** I will take issue with that, Judge, because, you know, you can't put an exhibit list together and then say these 20 exhibits, the -- the range for that exhibit is, you know, 800 pages of Bates numbers for every single one of them. It doesn't tell us what that exhibit is. So, you know --

**MR. TRIPI:** Ms. Zoghlin, I'm sure she can --

**THE COURT:** I -- I don't want to get into a back-and-forth right now. We've accomplished -- you both made a record on this, and I've said what I'm going to say. Done.

Anything more?

**MR. TRIPI:** No.

**THE COURT:** Anything more?

11:05:30 **MS. COVERT:** No, Your Honor. Thank you.

11:05:33 **THE COURT:** Thank you-all very much.

11:05:35 **THE CLERK:** All rise.

11:05:36 (Proceedings concluded at 11:05 a.m.)

* * * * * * *

**CERTIFICATE OF REPORTER**

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on March 3, 2026.

s/ Laurel S. Tubbs
LAUREL S. TUBBS, RPR, RMR, CRR
Official Court Reporter
U.S.D.C., W.D.N.Y.