UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, * Docket Number: 1:22-cv-109-LJV-HKS

v. * Buffalo, New York MARCH 20, 2026 1:8 p.m.

PAYTON GENDRON, * STATUS CONFERENCE

Defendant. *

* * * * * * * * * * * * * * *

**TRANSCRIPT OF STATUS CONFERENCE**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**For the Government:** **MICHAEL DiGIACOMO**
**UNITED STATES ATTORNEY**
**By: JOSEPH M. TRIPI, ESQ. (Buffalo)**
**CHARLES MARK KRULY, ESQ. (Buffalo)**
**MAEVE E. HUGGINS, ESQ. (Buffalo)**
**BRETT HARVEY, ESQ. (Rochester)**
Assistant United States Attorneys
Federal Centre
138 Delaware Avenue
Buffalo, New York 14202
Appearing for the United States.

**MICHAEL WARBEL, ESQ.**
U.S. Department of Justice
Civil Rights Division
Criminal Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Appearing for the United States.

**For the Defendant:** **MARIANNE MARIANO, ESQ.**
**FEDERAL PUBLIC DEFENDER**
**By: SONYA ZOGHLIN, ESQ. (Rochester)**
**MARYBETH COVERT, ESQ. (Buffalo)**
Assistant Federal Public Defenders
300 Pearl Street
Buffalo, New York 14202
Appearing for the Defendant.

**LAW OFFICES OF THERESA M. DUNCAN, ESQ.**
**By: THERESA M. DUNCAN, ESQ.**
1215 Paseo De Peralta
Santa Fe, New Mexico 87501
And
**LAW OFFICES OF JULIE BRAIN, PLLC**
**BY: JULIE C. BRAIN, ESQ.**
916 South 2nd Street
Philadelphia, Pennsylvania 19147
Appearing for the Defendant.

**The Law Clerk:** **REBECCA FABIAN IZZO**

**The Courtroom Deputy:** **COLLEEN DEMMA**

**The Court Reporter:** **LAUREL S. TUBBS, RPR, RMR, CRR**
Robert H. Jackson U.S. Courthouse
2 Niagara Square
Buffalo, New York 14202
ltranscripts.wdny@gmail.com

Proceedings recorded by mechanical stenography,
transcript produced by computer.

* * * * * * * * *

(Proceedings commenced at 1:08 p.m.)

**THE CLERK:** All rise. United States District Court for the Western District of New York is now in session, the Honorable Lawrence J. Vilardo presiding.

**THE COURT:** Please be seated.

**THE CLERK:** 22-cr-109, United States of America versus Payton Gendron. Assistant United States Attorneys Joseph Tripi, Brett Harvey, Charles Kruly, Maeve Huggins, DOJ Michael Warbel, civil rights attorney Sanjay Patel, and paralegal April Kelley appearing on behalf of the government.

Assistant Federal Public Defender MaryBeth Covert, and attorneys Julie Brain and Theresa Duncan appearing on behalf of the defendant. The defendant is not present. Also present is Jerry -- administrator Joel Drier.

This is the date set for a status conference.

**THE COURT:** Good afternoon, everyone.

**MS. COVERT:** Good afternoon, Judge.

**THE COURT:** First of all, do you waive your client's

appears.

**MS. COVERT:** Yes, Judge, we do.

**THE COURT:** Are you comfortable starting without her?

**MS. COVERT:** Yes, Judge.

**THE COURT:** Okay. That's good.

Okay. So I'd like to do --

**MS. TRIPI:** Just to briefly correct the record, Mr. Patel -- Sanjay Patel is not here. He's no longer with the department, so --

**THE CLERK:** I'm sorry.

**MR. TRIPI:** -- I just didn't want the record to reflect that he was here.

**THE COURT:** Thank you, Mr. Tripi.

**MR. TRIPI:** So we'll have a different attorney enter the docket from the civil rights division.

**THE COURT:** Great. Terrific. Anything else before I --

**MR. TRIPI:** No. Thank you.

**THE COURT:** I talk too much, I know, but -- so there's a few housekeeping things I'd like to do first and then get to the argument of the JSAA Act.

So the jury administrator is sending out 3,000 summonses and initial questionnaires. I signed the order today allowing that. We're going to make available for inspection the individuals -- the questionnaires for any individuals who

should be excused or who the initial determination is will be excused. The jury administrator has suggested we do this twice a week, maybe like on Tuesday and Friday.

Make sense?

**MS. COVERT:** That makes sense, Judge. Thank you.

**THE COURT:** Great.

We'll have a room available in the clerk's office. The questionnaires will be in the office for both sides to inspect. And if there are any that either side wants to challenge, they should be emailed to my chambers by 5:30 on the day that you decide that there are issues. Okay?

**MS. COVERT:** Thank you, Judge.

**THE COURT:** We're not going to turn this whole process upside down. So if a jury form indicates a person is diseased, we're not going to run down a death certificate. If someone says that they're in active military service or over 70 years old, we're going to take them at their word. But you folks will have a chance to take a look at the ones that are culled out. And then every Tuesday or Friday, anyone for whom there's not been an objection will get moved along in the disqualification or excusal process. We'll hold the questionnaires for individuals for whom there's been an objection. We'll address those in court at the next status conference. Okay? Great.

**MR. TRIPI:** Yes, Judge.

**THE COURT:** And -- and we should set a date for our next status conference. Is that what --

Colleen, do you have a date?

**THE CLERK:** Are we thinking about a month out, Judge?

**THE COURT:** Yeah, I would say so. Maybe late April sometime.

**THE CLERK:** Okay. So I'm looking at Thursday, April 23rd. Are the parties available at 1:00 p.m.?

**MS. TRIPI:** Yes, Your Honor.

**MS. COVERT:** That's fine with us, Judge. Thank you.

**THE COURT:** Perfect. Good. Okay.

So we'll do that. And this process is going to be fluid, you know. I mean, there may be changes, things that come up -- there may be things that come up during the course of it that -- that are not workable or aren't working well. And I expect you folks to raise anything with me, and we'll deal with them as they come along. But I think this is a good plan to have in place, and we'll proceed and see how it works.

**MS. COVERT:** Judge, just for clarification, are the summonses going out immediately?

**THE COURT:** Yeah.

They're going out next week, right?

**MR. DRIER:** They'll be out by the end of the month, Judge.

**THE COURT:** Yeah.

**MS. COVERT:** And then we should anticipate coming for viewing, the attorneys, starting the work in April?

**THE COURT:** I would think.

**UNIDENTIFIED SPEAKER:** No.

**MR. DRIER:** I would probably say no.

**THE COURT:** Is your mic on?

**MR. DRIER:** Yeah. I'm sorry. Is that better?

**THE REPORTER:** Yes.

**MR. DRIER:** Okay. I'm on vacation the first week of April. So that cuts our jury staff down to 0. So I would say the week after that would probably be better.

**THE COURT:** Okay.

**MS. COVERT:** Thank you, Judge.

**THE COURT:** Yes.

**MS. COVERT:** I just wanted to clarify.

**THE COURT:** Yeah. But Tuesdays and Fridays work for you?

**MR. DRIER:** Yeah.

**THE COURT:** Great.

Okay. Other than the motions to suppress that I'm working on, are there any other pending issues that we need to address today?

**MS. COVERT:** The --

**THE COURT:** And the JSSA motion.

**MS. COVERT:** The only out- -- additional outstanding

motion that comes to mind, Judge, is the motion to dismiss as a result of the Federal Death Penalty Act itself. I don't have the number of that filing before me, but we had submitted last May some additional materials for the Court to address that issues, so that motion remains pending.

**THE COURT:** Okay.

**MR. WARBEL:** It's 181, Judge.

**THE COURT:** 181?

**MR. WARBEL:** Yes.

**THE REPORTER:** I'm sorry. Your name?

**MR. WARBEL:** Michael Warbel.

**THE REPORTER:** Thank you.

**THE COURT:** Okay. Anything else? Anything from the government?

**MR. TRIPI:** No, Your Honor.

**THE COURT:** Okay. So we have our jury administrator, Mr. Drier, here. I want to go through the categories -- I think there's -- there's a lot of things that everybody agrees on with respect to the JSSA motion. Those things that there is a disagreement about we'll talk about, but I'd like to go through them item by item now and see what we need to resolve.

**MS. TRIPI:** Judge, we do have some areas of agreement in addition to what we had in our papers.

**THE COURT:** So let's do them as --

**MR. TRIPI:** As we go.

**THE COURT:** Yeah. As we go, please, yeah.

**MR. TRIPI:** Yeah.

**THE COURT:** So -- so request number 1 is for the jury plan for the Western District of New York currently in effect, and if different in any respect at the time the jurors were summoned in the case. I think this request is moot because the revised jury plan is publicly accessible.

Does everybody agree with that?

**MS. TRIPI:** Yes, Judge.

**THE COURT:** Ms. Brain, you're -- you're nodding.

**MS. BRAIN:** Sorry. Yes, Your Honor. We -- we do.

**THE COURT:** That's -- that's why I called on you, because you were nodding and no one else was. So -- okay. Good.

Request number 2. Any AO12 form created which relates to the district and divisional master jury wheels and qualified jury wheels that will be used to summon trial jurors. The government does not object to that.

Is there any issue from your perspective, Mr. Drier?

**MR. DRIER:** No issue, Judge.

**THE COURT:** Great. Okay. So that's resolved as well.

Request number 3. AO12 forms completed in the last 10 years. So we litigated this in the context of the grand jury motion, and I directed that the information be provided

for five years. And the defense says that they would be satisfied with the same result here. Is that correct?

**MS. COVERT:** Yes, and I think the proviso is if we saw a need to come back and ask for 10 new allotments --

**THE COURT:** Always without prejudice, right? I mean, things change and, you know, I'm not -- I don't -- I don't beat people out of a record and stuff like that, so...

**MS. COVERT:** I appreciate that.

**THE COURT:** Any issue from the government?

**MS. TRIPI:** No, Your Honor, that's fine with us.

**THE COURT:** Any issues, Mr. Drier?

**MR. DRIER:** No.

**THE COURT:** Great.

Request number 4. Any other statistical or demographic analyses produced to ensure the quality and compliance of the master jury wheels and qualified jury wheels that will be used to summon trial jurors in this case. The government objects to this request.

**MS. TRIPI:** Judge, we've had further conversations with the defense, and we do not object to that request at this time, except to the extent it asks for the clerk's office to undertake additional analysis or create documentation.

**THE COURT:** And you're not asking them to do that.

**MS. COVERT:** That's correct. We're not asking for that, Judge.

**THE COURT:** Okay. Okay. Any -- any problems, Mr. Drier, from your perspective?

**MR. DRIER:** I'm not -- I'm not exactly sure what they're asking for though. Is this, like, for their -- so the AO12 is the demographics of the court. I guess I'm just not sure what they're looking for. Is this for -- through our vendor? Like our vendor does the statistical analysis? If he does, I don't know. I'm just not sure.

**MS. COVERT:** And I think it's just whatever data exists that they have with respect to that. If it exists, they can turn it over. We're not asking them to create any.

**THE COURT:** And I would think it would be vendor data.

**MR. DRIER:** Yeah, I'll --

**THE COURT:** That would be my guess. So give -- give the request to the vendor, and if there is something then turn it over. Okay?

**MR. DRIER:** Okay.

**THE COURT:** Number 5. Any document or data detailing the date when the master jury wheel that will be used to summon trial jurors in this case was refilled, as described in the jury selection plan. The government has no objection to that, to the extent documents already exist.

And I think, again, you're not asking them to create documents, right?

**MS. COVERT:** Correct.

**THE COURT:** Okay. Any issue from your perspective?

**MR. DRIER:** There's no issue, Judge.

**THE COURT:** Great.

Number 6. Any document or data detailing the calculation that ensures that each county within each division is substantially proportionally represented as described in the jury selection plan.

The government objects to that?

**MS. TRIPI:** Your Honor, we have had further conversations with the defense and we -- we withdraw our objection to that.

**THE COURT:** Okay. Mr. Drier, any -- are there responsive documents, first of all?

**MR. DRIER:** I think that would be another question for the vendor.

**THE COURT:** Okay. Great. Okay. You don't have an issue from your perspective?

**MR. DRIER:** I'll ask the vendor.

**THE COURT:** Great.

Okay. Number 7. Any written instructions provided by the Court as described in the jury selection plan.

The government does not object.

Are there any existing documents there?

**MR. DRIER:** I'm not sure. I'll have to look. That

would maybe come from our chief deputy clerk --

**THE COURT:** Okay.

**MR. DRIER:** -- who would send that out. So I'll --

**THE COURT:** Okay. But you don't have an objection to that?

**MR. DRIER:** No.

**THE COURT:** Great. Terrific. Good.

Number 8. Any written instructions specifying the process of creating the master jury wheel used by the clerk or any vendor.

The government doesn't object.

Any problem?

**MR. DRIER:** No. We can reach out to the vendor again.

**THE COURT:** Great.

Okay. Number 9 I think is moot. The general notice described in the jury selection plan. The general notice is on the website, right? Everybody agree with that?

**MS. TRIPI:** Yes, Judge.

**MR. DRIER:** I don't think it's on the website, Judge. I think we posted at the clerk's office.

**THE COURT:** Oh, okay.

**MR. DRIER:** It's just a -- it's out in front of the clerk's office.

**THE COURT:** Okay. But it is public- -- it's publicly

available?

**MR. DRIER:** Yeah.

**THE COURT:** Okay. Great.

Okay. We're halfway through, almost.

Number 10. A description of the procedures for juror qualification and summonses. I'm not so sure what -- what that means. That's a little general and broad. Can you drill down on that a little bit for me? You're not asking for information on individual people, are you?

**MS. COVERT:** Judge, I think we're just asking for the procedures. What happens to the forms when they're returned as --

**THE COURT:** Okay.

**MS. COVERT:** -- undeliverable or when a response hasn't been received. Is there any records that indicate what happens in those circumstances?

**THE COURT:** Okay.

**MR. DRIER:** No objection, Judge.

**THE COURT:** Great.

And the government doesn't object to that either?

**MS. TRIPI:** No, Your Honor.

**THE COURT:** Number 11. Documents or data detailing the number of persons or any statistics on persons summoned after failing to return the juror qualification questionnaire as described in the jury selection plan.

The government doesn't object.

And again, you're not seeking information about individual people. You're just talking about general numbers and statistics and those kinds of things; is that right?

**MS. COVERT:** That's correct, for these categories. Yes.

**THE COURT:** Do we have that?

**MR. DRIER:** Yeah, we're talking about what we -- what -- how many undeliverable, how many non-responded. Is that what we're getting to?

**THE COURT:** Yeah.

**MR. DRIER:** Just -- yeah, I believe we have some -- I think we can make up statistics on that.

**THE COURT:** Okay.

**MR. DRIER:** Who we -- I don't know -- is this going to be for the whole -- I guess I'm asking for a time period. Is this for the -- the pool that we're summoning or is it just -- what are we -- what are we asking for, I guess?

**MS. COVERT:** For the wheel.

**MR. DRIER:** For the --

**THE COURT:** The current wheel.

**MR. DRIER:** The current wheel. Okay.

**THE COURT:** Okay.

**MR. DRIER:** Yeah.

**THE COURT:** Great.

Number 12. Document -- or any document or data that described the procedure used once a temporarily excused potential juror attends on the deferral date.

The government doesn't object.

Can -- can you -- welcome, Ms. Zoghlin.

**MS. ZOGHLIN:** Thank you, Judge. Sorry about that.

**THE COURT:** No, not at all. You can't do anything about traffic, can you?

**MS. ZOGHLIN:** I should have -- I should have carpooled with Mr. Harvey.

**THE COURT:** There you go.

**MR. DRIER:** We would -- we would have a document that showed that they were deferred.

**THE COURT:** Right.

**MR. DRIER:** I don't know if it would show -- I'd have to look into that a little bit more, Judge. We can provide -- we have a document that shows who was deferred though. Is that --

**THE COURT:** Is that good enough? Is that -- is that what you're looking for?

**MS. COVERT:** If that's -- if that's all that exists, Judge, yes.

**THE COURT:** Okay. Well, you're -- it looks like you want the procedure used when a potential juror comes in after being deferred, right?

**MS. COVERT:** Right.

**THE COURT:** So -- so tell me -- his deferment ended. So if someone is deferred, what do they do with respect to that juror? So someone gets deferred. How do you decide when that juror comes back? If the juror says I can't make it now because I have a work commitment that's going to take two months, does that -- do you -- does that person automatically get asked back in -- in three months? Does he get put back into the, you know --

**MR. DRIER:** Pretty close to that, Judge. It might be four months depending on the situation. It could be six months. We -- we allow the jurors to defer for a lot of reasons, depending on who may be coming back.

**THE COURT:** Mm-hmm.

**MR. DRIER:** So, yeah, I guess it all just depends. But there's no -- there's no standard. If they say they need -- you know, they're a snow bird, and they're in Florida for three months, you know, we'll defer them until they come back from those three months.

**THE COURT:** Okay.

**MR. DRIER:** So it's kind of case specific.

**THE COURT:** So it sounds like it's a relatively simple thing, that you can get them that information, and then you can get them the statistics on the deferral too.

**MR. DRIER:** We can get the -- the who was de- -- who

was deferred, the amount of people that were deferred.

**THE COURT:** Sure. Okay. Terrific.

Okay. Any document or data detail when the trial jurors will be summoned in this case.

What are you asking for? And we know the notices are going out this week. Do you need more than that?

**MS. COVERT:** I think we just need a date, Judge.

**THE COURT:** Okay. It's going to be --

**MR. DRIER:** I plan on having everything out by the end of the month. So March 31st is what my goal is.

**THE COURT:** Great.

Okay. Number 14. Any document or data detailing the number of persons summoned from the master jury wheel to be considered. And I think we just said it was 3,000, right?

**MR. DRIER:** Mm-hmm.

**THE COURT:** That's all you're asking for.

**MS. COVERT:** That's right, Judge.

**THE COURT:** Great.

Okay. Now, for 15 through 20 -- or maybe 15 through 17 -- whatever. For the next few we should talk about the protected information -- the personal information, identifying information, that --

**MS. ZOGHLIN:** I think, Judge, that applies to 16 through 20.

**THE COURT:** You're right. 16 through 20. You're

right. Yeah, my mistake. My mistake. 15 is specifications, description, or statistics relating to the merging of source lists and the creation of combined source lists, as described in the Jury Selection Plan. And I ordered the jury administrator to seek written answers from the vendor to those follow-up questions, and it looked like the information was not preserved. Is it being preserved now?

**MR. DRIER:** Yes, for this master wheel, it's -- but that's for the -- so we're talking about the raw source list and the master wheel, yeah.

**THE COURT:** Okay. So we have that now.

Does the government object to that?

**MR. WARBEL:** We do not, Judge. We originally thought that those records would include PII.

**THE COURT:** Right.

**MR. WARBEL:** And after further conversations with counsel, we determined that was not the case. So we have no objection.

**THE COURT:** Okay. So -- so the same sort of stuff that you produced for the grand jury you can produce -- that they asked for for the grand jury, you can produce now for them on this?

**MR. DRIER:** Yeah, we have to talk to IT. They're going to have to handle the -- we've got to get rid of the PII that's in the file.

**THE COURT:** Well, we're going to talk about that now. So -- yeah, so let's talk about the PII.

Why do you need PII?

**MS. ZOGHLIN:** We need it because -- you may recall from the grand jury litigation, there was an issue about how the de-duplication process was handled. So if you were on a voter registration list and a DMV list, there has to be a process of how do you pull out one of those two so that the same person isn't in there twice. The -- that's one of the points our expert made in his declaration. The -- we asked --

**THE COURT:** So you need personal identifying information only insofar as it distinguishes that person from any other person in the world. You don't need all the personal identifying information, do you?

**MS. ZOGHLIN:** I don't know what all of it is exactly. We certainly do need more than the names. We would need at least the names and the date of births --

**THE COURT:** Because two people could have the same names.

**MS. ZOGHLIN:** Right.

**THE COURT:** Right?

**MS. ZOGHLIN:** The -- the problem was that -- although it was never exactly clear, what Mr. Sutera said, as I recall, is we -- they looked at exact matches. And what our expert said is that's really not the standard. There's -- sometimes

there's the -- there's the same number, I guess, on the DMV as the registration. You could -- you could match those.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** But whatever proceed it is, it's not just making sure -- you can't just look for exact matches because people have hyphenated names, people use their middle initial, people change their last name. So that's why we wanted --

**THE COURT:** My father and I were both Lawrence J. Vilardo. He was Lawrence John and I was Lawrence Joseph. But it gave him an excuse to open all my mail.

**MS. ZOGHLIN:** Exactly.

**THE COURT:** Yeah.

So what's the problem with giving them some personal identify -- what's the term of art? PII?

What's the -- what's the problem with giving them PII, especially if -- they don't object to a protective order. If I issue of a protective order that's attorneys' eyes only, what's the problem with that?

**MR. WARBEL:** Well, Judge, I think you have for a couple of reasons.

First of all, as Your Honor noted himself in one of your prior decisions in this case, courts don't always turn this information over in the first place to litigants. And in cases where they do, it is routinely redacted because it's a

violation of the privacy of the prospective jurors who are included on both of those lists. And I think the reason that they've offered to get access to that information here in this case is speculative. Already we know from the responses with respect to how the grand jury means is created that the vendor goes through both lists, the voter registration list and the DMV list, and accounts for name, date of birth, and, I believe, county of residence. And we submit that that process is more than sufficient to catch any duplicates that may exist between the two lists. Your Honor --

**THE COURT:** But -- it may be, but I think the defense wants to check and make sure that that's the way it's being done.

Is that correct?

**MS. ZOGHLIN:** Right, Judge. Then it wouldn't be speculative.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** If we had the information we need. And I've given Mr. Harvey the names of several federal cases where our experts got it. But he also said that there are a lot of states that routinely provide it.

**MR. WARBEL:** And, Judge, we did get that list. We're trying to track down those cases just to get a sense for exactly what's been ordered. We've not been successful. We got the list this morning. But we are trying to take a look at

that list.

**THE COURT:** Can you limit the PII that you would -- that you would -- I mean, so you -- you don't need a social security number, do you?

**MS. ZOGHLIN:** No.

**THE COURT:** Date of birth?

**MS. ZOGHLIN:** Yes, we absolutely need date of birth. We need name, date of birth, and preferably address because that would -- that is an additional way to check to make sure -- we're trying to be more flexible on how the de-duplication is done so we can make sure that people aren't counted twice or taken out mistakenly. The other thing, of course, Judge, is I'm not sure what the concern is, which is what the Court asked the government.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** You're not releasing it to the public. What you'd be releasing to, under a protective order, is this information, and it's -- of jurors who've been, you know, added to the -- to the master wheel. So I'm not -- I'm not sure what their concern is about what we would do with it. There have been certainly protective orders issued by the Court before and we -- I don't think the Court has any concern that we've violated them.

**MR. WARBEL:** Your Honor, if that were the standard, this would be routinely granted, the disclosure of this

information to litigants, and it's not. It's the opposite. It's routinely denied.

**THE COURT:** Let me -- let me ask this: Why -- why would you need -- you get the -- the town where the person is from, right? You don't get the address. But don't -- don't they give us the -- don't you get the town or the --

**MR. WARBEL:** I believe the county, Judge.

**THE COURT:** The county? So -- so why would -- why would you need the -- I mean, you might not need the address, right? If you have John X. Smith from Erie County and John X. Smith from Niagara County, they're different people. If you're John X. -- if you have two John X. Smiths in Erie County, then maybe you need the address. But the address may not be necessary.

**MS. ZOGHLIN:** Well --

**THE COURT:** Or if you have two people and two different dates of birth. John X. Smith was born on 6/6/55. And John X. Smith who was born on 7/8/96. You've got -- you've got two different people. You know that.

**MS. ZOGHLIN:** Well, obviously, the town might be one thing. The more narrow it is, obviously, the more you can be sure. But the county -- you know, the County of Erie is not narrowing it down all that much. And again, what -- what is the concern exactly that the government has about that information being attorneys' eyes only -- you know, legal team,

obviously, eyes only. You know, our expert has to see it.

**THE COURT:** I mean, other than saying that they don't -- we don't do it, I will take that answer that, you know, we don't do that.

**MR. WARBEL:** Right.

**THE COURT:** But other than that, you know, why? What is the problem?

**MR. WARBEL:** Judge, whenever information like this is turned loose, things can happen, and it can get out where it shouldn't. And this is no -- I'm not disparaging anybody in the media, to be perfectly clear on that, but things can happen.

**THE COURT:** Let me ask you this: What if we -- we allow the defense to see this with an in-person inspection rather than sending it out? It's something that's here already. You're not -- you're not sending it out. You know, so it's not -- we're not creating another data set that we would be sending them.

**MR. WARBEL:** Well, like we did with the AO12s I think we did the last time?

**THE COURT:** Yeah. Actually that should solve that problem, shouldn't it, especially if there's a protective order that I issue.

**MS. ZOGHLIN:** You know, Judge, obviously, I don't know what the process is. But how many people are we -- would

that be? I mean, in terms of -- is the Court suggesting that the expert could come here and look at them in the courthouse?

**THE COURT:** Yeah.

**MS. ZOGHLIN:** I just -- I don't know whether that's logistically possible in terms of the number.

**THE COURT:** Well, I'm trying to -- I'm --

**MS. ZOGHLIN:** No, I appreciate that. I appreciate that. It's just -- a dataset, you know, people can do magic with data sets that they can't do sitting at a table.

**THE COURT:** Would you -- would you have a problem with that?

**MR. WARBEL:** We would have -- not have a problem with that as long as, obviously, the information can't be taken from the room --

**THE COURT:** Great.

**MR. WARBEL:** -- by either party.

**THE COURT:** Okay. Okay. So let me -- let me think about that. Let me think about that.

Okay. We omitted number 17 now. The divisional master jury wheel data for each division as described in the Jury Selection Plan. The government doesn't object to the request with respect to the Buffalo division, excluding PII.

**MR. WARBEL:** Judge, we -- we are withdrawing our objection to that because you did order that with respect to the grand jury after further review. So I think that we did

not ultimately object to that on the grand jury motion, even though we did in the first instance. So we withdraw that.

**THE COURT:** Terrific. Good. Thank you.

Any -- any problems with that, Mr. Drier?

**MR. DRIER:** Again, I'm not -- I guess I don't know exactly what we're -- are we talking the -- yeah, I'm not sure what we're looking for. Yeah, what does that mean, "data"?

**THE COURT:** What -- what is the divisional master jury wheel data that you're looking for?

**MS. ZOGHLIN:** That's an excellent question, Judge, that I think I would have to defer to our expert. Could I -- could I get more information from him?

**THE COURT:** Yeah.

**MS. ZOGHLIN:** But if the Court ordered it last time, I assume there was some understanding of what it is, but I would have to go back to Mr. Martin to understand that --

**THE COURT:** Okay.

**MS. ZOGHLIN:** -- better to communicate with the jury commissioner.

**THE COURT:** Okay. And then 17 through 20, there's no objections except for the personal identifying information, right?

**MR. WARBEL:** That's right, Judge.

**THE COURT:** Okay. Status codes for persons on the master jury wheel, any document or data with the juror ID

number, the raw source list of data in electronic form, and a combined source list as described in the Jury Selection Plan. Got it.

**MR. DRIER:** Yeah, but there's -- there's no status codes for persons just on the master jury wheel. There's no status there. They -- they have to be summoned before there's a status. They have to respond or not respond or -- that's the status. So it wouldn't be status codes, but if we're just talking about the raw data, the -- the names of the jury -- the name --

**THE COURT:** Okay.

**MR. DRIER:** -- addresses, we have -- we have that information.

**THE COURT:** Okay. So it sounds like the only real thing that we have to -- that I have to decide is the PII.

**MS. ZOGHLIN:** I believe so, Judge.

**THE COURT:** Yeah. Okay.

Does either side want to be heard on that anymore than we've already talked about?

**MS. ZOGHLIN:** I think I've -- I've made the points, Judge. But I just -- my -- and I -- I appreciate the concern, but I do think it would be possibly more than cumbersome for our expert to come in and sit in the courthouse with the dataset as opposed to being --

**THE COURT:** Well --

**MS. ZOGHLIN:** -- using it. It could -- you know, there are cases -- he gets it in many cases and there are -- there's sometimes stipulations that it be destroyed after he's done with it. He's done that. So it's not going to -- as Mr. Harvey suggested, not -- we're not letting it loose.

**THE COURT:** Let me give that some thought. Let me give it some thought. We may do it in steps and stages. It may be he comes in first and he takes a look, and then if he thinks he needs more he can tell us exactly what he needs in terms of more. So let's -- let's just think about a way to do that that satisfies both sides somewhat.

Anything more you want to say about it, Mr. Harvey?

**MR. HARVEY:** No, Your Honor.

**THE COURT:** Okay. Is there anything else we should do today?

**MS. COVERT:** Judge, two things. I wondered if we could get a copy of a summons that goes out just to see the --

**THE COURT:** Just a generic summons?

**MS. COVERT:** The -- yeah, not -- not the -- not the completed form. Do you know what I mean? The form the court sends. Not -- like there's -- there's one online, but it doesn't have all the information that the court would fill out. We just want to see what the court's putting on the summons.

**MR. DRIER:** For the people that we're summoning, the 3,000?

**MS. COVERT:** Correct.

**MR. DRIER:** We have that, Judge.

**THE COURT:** Great.

**MS. COVERT:** Thank you.

**THE COURT:** And you have no objection to that, right?

**MS. TRIPI:** I'm not sure I heard.

Judge, the only thing that -- that I would add to the discussion, just going back to -- we're not withdrawing anything that Mr. Harvey said at all. Just to go back to your general question about sort of what's the harm, and I've heard Your Honor asked that question in other contexts. When we're responding just as to what the standard is and what the case law generally holds, there's certain times, and this is one of them, where that's the standard we're just trying to -- to uphold because we understand that this case has some differences and distinctions because it's a death penalty case. But where there's a standard, if it's -- if it's not met or if it's only met through speculative evidence, then that impacts potentially other -- or other future cases or every case. And you see the amount of time that Your Honor is spending on this issue, the clerk's office is spend- -- then the system grinds to a halt.

**THE COURT:** Yeah.

**MS. TRIPI:** And so it doesn't mean we don't think Your Honor has come up with a practical solution here. So

don't hear me the wrong way. But when we're pushing back certain times to answer Mrs. Zoghlin's question, What are we worried about, that's what we're worried about. So I just wanted to add that.

**THE COURT:** Yeah, yeah. No, no. My god --

**MS. ZOGHLIN:** Judge, I just want -- I'm sorry.

**THE COURT:** Go ahead.

**MS. ZOGHLIN:** I'm just not sure what standard Mr. Tripi is talking about. It's something I've been --

**THE COURT:** What he's saying -- the personal identifi- -- in most cases you don't get personal identifying information.

**MS. ZOGHLIN:** Well, most cases don't do this -- this challenge. Right.

**THE COURT:** Of course, yeah.

**MS. ZOGHLIN:** And -- and we've, I think, set forth more than a good forth explanation of why we're concerned about the de-duplication process that the vendor used --

**THE COURT:** And I get it.

**MS. ZOGHLIN:** -- in the grand jury.

**THE COURT:** And I get what the defense is saying, and I get what the government is saying, and I'll make a decision that I hope will -- at least everybody will understand why I did it. Somebody is going to think I was wrong. Maybe both you will think I'm wrong. If both of you think I'm wrong then

I certainly got it right.

Okay. Anything else that we should do today?

**MS. TRIPI:** Not from us, Judge, no.

**THE COURT:** From the defense?

**MS. BRAIN:** The only other thing we wanted to flag for the Court, Your Honor, was the oral argument is set as of yesterday in the interlocutory appeal that's pending for May 20th, which virtually guarantees, I think, that we're not going to have a resolution even from the panel before the time that we're scheduled to begin having jurors come in to fill out questionnaires. And we just wanted to flag that for the Court because of the concern that part of what we're going to be asking them on the written questionnaires is hardship and availability, and if we don't have a date certain at that point, it seems awfully difficult to do.

**THE COURT:** Well, I think we're going to keep the dates the way they are now, and we'll deal with that, you know. And if there are problems that arise because of the hardship question we're asking and what they're answering, we'll just have to deal with it. You know, I think we should just assume that it's going to go forward when it's going to go forward. You folks at oral argument are going to tell them we need a decision right away, please. And, you know, hopefully they will get a little behind us.

**MS. TRIPI:** I think that's consistent with what Your

Honor said last time on that issue. A similar -- similar point was raised --

**THE REPORTER:** Can you get the mic?

**MR. TRIPI:** A similar point was raised last time, and that was the Court's inclination before. Frankly, I thought May 20th was relatively quick --

**THE COURT:** It's not bad.

**MS. TRIPI:** -- in terms of an argument date.

**THE COURT:** In all things considered, it's not bad.

**MR. TRIPI:** So I was hopeful.

**THE COURT:** Yeah.

Okay. Anything else?

**MR. TRIPI:** No, Your Honor. Thank you.

**THE COURT:** Anything else from the defense?

**MS. COVERT:** Nothing, Your Honor. Thank you.

**THE COURT:** Okay. Thank you-all very much.

**THE CLERK:** All rise.

(Proceedings concluded at 1:44 p.m.)

* * * * * * * * *

**CERTIFICATE OF REPORTER**

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on March 30, 2026.

s/ Laurel S. Tubbs
Laurel S. Tubbs, RPR, RMR, CRR
Official Court Reporter
U.S.D.C., W.D.N.Y.