UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

     v.

PAYTON GENDRON,

        Defendant.

_____

22-CR-109 (LJV)

### JOINT PROPOSED JURY INSTRUCTIONS
**(Instructions Prior to Completion of Juror Questionnaires)**

Dated: May 28, 2026
      Buffalo, New York

*s/Sonya A. Zoghlin*
*s/MaryBeth Covert*
Assistant Federal Public Defenders
Federal Public Defender's Office
Western District of New York

*s/Julie Brain*
Attorney at Law

*s/Theresa M. Duncan*
Law Office of Theresa M. Duncan LLC

*s/Joseph M. Tripi*
*s/Brett A. Harvey*
*s/Maeve E. Huggins*
*s/Charles M. Kruly*
Assistant United States Attorneys
United States Attorney's Office
Western District of New York

*s/Michatel S. Warbel*
Trial Attorney, Criminal Division
U.S. Department of Justice

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

**Instructions Prior to Completion of Juror Questionnaires[1]**

Good morning/afternoon, ladies and gentlemen.

I am Judge Lawrence J. Vilardo. We are here this morning/afternoon to begin the process of selecting a jury in a criminal case. Through this process, we will choose the 12 jurors and 6 alternate jurors who will hear and decide this case.

Before we get started, I want to thank you for being here. Your presence reflects your serious commitment to your civic responsibilities. I recognize that some of you are inconvenienced by this service. Jury service, however, is one of the highest and most important duties of a citizen of the United States. Our system of justice depends on you. I, like all my fellow judges, am grateful for your service.

Each of you is a potential juror in the case of United States v. Payton Gendron. There are representatives here from both parties and I will now ask them to introduce themselves. Defense counsel. [One member of the defense team will rise and introduce the defense team and Payton Gendron.] Government counsel. [One member of the government team will rise and introduce its team.] In addition, my Deputy Clerk [_____] is seated in front of me as is my law clerk [_____].

We are requiring that the jurors who serve on this case be available from [_____], through the end of [_____]. The first several weeks of that period, however, will consist of jury selection, and it is likely that you would only be required to appear in Court on one or two days during that time. Once jury selection is complete, the trial will begin soon after. The jury will sit on [ADD DETAILS OF TRIAL SCHEDULE: EG - Monday through Thursday from 9:00 a.m. to 5:00 p.m. with a lunch break from approximately 12:30 p.m. to 1:30 p.m., with two short breaks, one mid-morning and one mid-afternoon. Once the jury begins its deliberations, the jury may

---

[1] Adapted from *United States v. Saipov*, 17-CR-722 (VSB) (S.D.N.Y.), ECF No. 289.

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

also deliberate on Fridays.] Unexpected events can always occur in a trial, however, and it is possible that the presentation of the evidence and jury deliberations might take a little longer. If there are any changes in our schedule, I will let you know in advance.

Our purpose now is to begin the process of jury selection. In order to do that, we are asking you to fill out a questionnaire. This questionnaire and the jury selection process that we are about to begin seeks to learn about your experiences, views, and feelings on a variety of topics that may be relevant in this case.

It is very important that you answer these questions as completely and accurately as you can. Please write legibly and answer the questions as honestly and candidly as possible. There are no right or wrong answers to these questions. Honesty and candor are of the utmost importance. All of the information you provide will be kept confidential and only viewed by me, the Clerk's Office and the members of the prosecution and defense teams. You [have taken an oath] [will be taking an oath] promising to give truthful answers. The integrity of the process depends upon your truthfulness.

Please keep the following instructions in mind as you fill out the questionnaire:

- Do not consult, confer, or talk with any other person in completing the questionnaire.

- If you are unable to answer a question because you do not understand the question, please write "Do not understand" in the space after the question. Do not ask anyone, including court personnel, for clarification or assistance.

- If you are unable to answer a question because you do not know the answer, please write "Do not know" in response to the question.

- If you believe that your response to a particular question is of a sensitive or private nature and would like to request that, if you are questioned about this topic and your response,

3

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

that this be done in a private manner, please write the number of that question on the Additional Comments page at the end of this questionnaire and write "Follow-up Privately." Alternatively, if you would prefer not to write an answer to a particular question because of the sensitive or private nature of your response, please write "Private" after the question. I may still need to speak with you about the topic, but I will endeavor to do so bearing your concerns in mind.

- Please do not write on the back of any page. Use the blank space at the end of the questionnaire (front side only) if there is insufficient room on the form for your answer to any question. When using the blank space at the end of the questionnaire, please include the number of the question(s) you are answering.

- You will be permitted to leave for the day when you have completed the questionnaire. Do not discuss any of the questions or your answers on this questionnaire with anyone, including members of your family, co-workers, or other potential jurors. If anyone approaches you and attempts to discuss any aspect of this questionnaire, the jury selection process, or any aspect of this case, you may not answer their questions or engage in any discussion.

- Do not discuss anything about this case or these proceedings with anyone, including members of your family or household, and do not read, listen to, or watch anything relating to this case or these proceedings unless and until you have been excused as a potential juror, or if you are selected as a juror, until the trial is over. You may not discuss this case or allow yourself to be exposed to any discussions of this case in any manner.

- You are directed not to write, post, or otherwise share anything about this case, these proceedings, or your participation in them, on social media or any other format. Do not

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

research this case, or the people involved – including any of the facts presented in this questionnaire, the victims, the defendant, the lawyers and the judge - through any resource including the internet, media publications or other source of information.

- When you have completed the questionnaire, please sign it, affirming the truth of your answers and confirming that you had no assistance in completing it. You will be informed about whether and when you need to return for the next phase of jury selection by calling the juror information line and entering your [EG: juror identification number].

These instructions appear in the introduction section of the questionnaire for you to consult while you fill out the questionnaire.

The defendant in this case, Payton Gendron, is charged in an Indictment with various criminal offenses stemming from a May 14, 2022 racially-motivated mass-shooting at a Tops grocery store in Buffalo that resulted in the deaths of 10 people and shooting injuries of three others. An indictment listing the criminal charges against a defendant is simply the document used to tell a defendant of the accusations against him. Here, the indictment charges Payton Gendron with the following offenses:

1) Ten counts of committing a hate crime resulting in death;

2) Ten counts of firearm murder during and in relation to a federal hate crime (these counts carry a potential sentence of death and are, therefore, considered capital offenses or capital counts);

3) Three counts of committing a hate crime involving an attempt to kill;[2]

4) Three counts of use and discharge of a firearm during and in relation to a federal hate crime; and

---

[2] DEFENSE: *See* forthcoming memo regarding Count 22, 23 and 27.

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

5) One additional count of committing a hate crime involving an attempt to kill.[3]

I want to begin by telling you about the charges. In doing so, it is not my purpose to give you all the details. But I do want to provide you with enough information about this case so that you are in a position to be able to make honest, accurate and informed assessments as you are responding to the questions in the questionnaire.

The charges contained in the Indictment state that, on or about May 14, 2022, the defendant, an 18 year old White male, drove to the Tops grocery store located at 1275 Jefferson Avenue, Buffalo, New York, 14208.  When the defendant arrived at Tops, he got out of his car wearing a tactical style helmet, camouflage clothing, body armor, and a GoPro video camera, and carrying a loaded Bushmaster XM-15 .223 caliber rifle and multiple loaded magazines.  The defendant shot four Black people in front of Tops, killing Roberta Drury, Pearl Young, and Heyward Patterson, and injuring Zaire Goodman.  The defendant entered Tops and shot multiple people, killing seven more Black people: Ruth Whitfield, Celestine Chaney, Aaron W. Salter, Jr., Andre Mackniel, Margus Morrison, Katherine Massey, and Geraldine Talley; and injuring two white people, Christopher Braden and Jennifer Warrington.

The evidence in this case may include graphic video from Payton Gendron's GoPro camera and from the Tops grocery store on May 14, 2022, showing the shooting, including several of the 10 murders and the wounding of the three other people. The evidence may also include Payton Gendron's self-described "manifesto" and posts on his Discord server which contained hateful and racist ideology and a detailed plan to shoot and kill Black people, and which also stated that the defendant's motivation was to prevent Black people from replacing White people and eliminating the White race and to inspire others to commit similar racially-

---

[3] DEFENSE: *See* note 2, *supra*.

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

motivated attacks. Evidence may also be presented that in planning this attack, Payton Gendron

researched the percentage of the Black population in multiple locations and ultimately chose the

Tops grocery store after visiting the store on previous occasions.

In a separate New York state prosecution for these same acts, Payton Gendron pleaded

guilty on November 28, 2022. On February 15, 2023, Payton Gendron was sentenced in New

York state court to life in prison without the possibility of parole plus 90 years. While the State

of New York does not have a death penalty, this is a federal case, involving violations of the laws

of the United States, rather than a state case, involving the laws of New York. In this case, the

government alleges that Payton Gendron committed murders with a firearm during and in the

course of a federal hate crime. Federal law permits the government to prosecute and seek the

death penalty against Payton Gendron for these offenses.

This case may proceed in two phases – a guilt phase and a penalty phase. In the guilt

phase, the questions before the jury will be to determine whether the government has proven

unanimously and beyond a reasonable doubt that Payton Gendron is guilty of the crimes charged,

including the capital offenses.

In both possible phases, your job as jurors will be to decide questions of fact—that is, to

decide any disputed issues of fact. Those of you chosen as jurors will be the only judges of the

facts.

When it comes to the law, however, you must take your instructions from me, and you are

bound by those instructions. You may not substitute your own ideas of what the law is or what

you think it should be.

If, and only if, the jury finds Payton Gendron guilty of any of the capital murder counts,

there will be a penalty phase of the trial in which the same jurors will have the responsibility of

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

deciding whether Payton Gendron is sentenced to life in prison without the possibility of release or, instead, sentenced to death death or to life in prison without the possibility of release.[4] These are the only two sentences possible for Payton Gendron's crimes. In the federal system there is no parole; therefore, if Payton Gendron is sentenced to life imprisonment, he will spend the rest of his life in prison and never be released.

---

[4] The parties disagree about the order in which the sentencing options should be presented throughout the instructions.

GOVERNMENT: Consistent with the Sand instructions, the government submits that throughout these instructions, when listing the two possible potential penalties, the death penalty should be listed first. The government is seeking this sentence and has the burden of persuasion to obtain this sentence. Thus, it logically should be listed first. Only if the government fails to satisfy its burden should the jury consider a life sentence.

DEFENSE: In the most recent federal capital trial, the Court referred to the option of life without the possibility of release before the option of death through the jury instructions. *United States v. Bowers*, No. 18-CR- 292 (RJC) (W.D. Pa.), ECF No. 1573 at 54 ("your decision on this question of life imprisonment without the possibility of release or death…"). The Court should follow suit here.

The option of a life sentence should be listed first because unless and until the government meets its initial burden to establish beyond a reasonable doubt both eligibility (age, threshold intent, and a statutory aggravating factor) and that the aggravating factors sufficiently outweigh the mitigating circumstances to justify a sentence of death, the sentence must be life imprisonment without the possibility of parole. The government is seeking the most severe and ultimate penalty available under the law, and it is respectfully suggested that it makes the most sense and is most appropriate to present the sentencing options from lesser to more serious. Furthermore, doing so decreases the risk that jurors incorrectly assume that the law or the Court presumes the imposition of a death sentence is the preferred or appropriate sentence in this case. This ordering of the sentencing options was utilized by the Court in *Bowers*:

> As we begin this process, I remind you that a juror is never required to vote for a sentence of death. And I'll explain this in more detail later in these instructions. The law provides you with guidance in making your sentencing decision, but **your decision on this question of life imprisonment without the possibility of release or death** is a uniquely individual moral judgment that the law in the final analysis leaves up to each of you.

*United States v. Bowers*, No. 18-292 (W.D. Pa. July 31, 2023) TR 54 [See ECF No. 351-2 at 15 in the instant case] (emphasis added).

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

The decision whether to impose a sentence of life imprisonment without the possibility of release or the death penalty death or life imprisonment without the possibility of release is one the law leaves entirely up to the jurors. If there is a penalty phase of the trial, your job as jurors will be to decide questions of fact and then, in addition, each juror must ultimately make a unique, individual moral judgment about whether to sentence Payton Gendron to life imprisonment without the possibility of release or to death death or life imprisonment without the possibility of release.

During a penalty phase, jurors consider certain evidence referred to in the law as aggravating factors and mitigating circumstances.

Aggravating factors are certain specified factors that could support a death sentence. In order for an aggravating factor to be considered, all 12 jurors must agree that the factor has been proved by the government beyond a reasonable doubt. Jurors may not consider anything else in support of imposing a sentence of death.

Mitigating circumstances are facts about the circumstances surrounding the crime, or[5] Payton Gendron's life, personal circumstances, or background, or anything else relevant to the

---

[5] The parties disagree regarding the inclusion of this clause in the definition of "mitigating circumstances." The defense does not want this clause included in the definition and the government seeks to include this language in the definition.

DEFENSE: As the government concedes, mitigating circumstances need not have a nexus to the charged crimes. *See Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Smith v. Texas*, 543 U.S. 37, 45 (2004); *see also, e.g., United States v. Fell*, 531 F.3d 197, 222 (2d Cir. 2008) ("A capital defendant's mitigating evidence need not have a nexus to the murder for which he has been convicted, but need only allow 'the sentencer to reasonably find that it warrants a sentence less than death.'") (quoting *Tennard*, 542 U.S. at 285).

Here, the defense has proposed a definition without reference to the charged crimes because we do not anticipate it being relevant to the list of mitigating circumstances that will ultimately be submitted to the jury (and which the defense will be responsible for establishing by a preponderance of the evidence).

Note:
<mark>Green</mark> highlight indicates proposed language by the defense.
<mark>Yellow</mark> highlight indicates proposed language by the government.

punishment decision that would suggest, for any individual juror, that life imprisonment without the possibility of release rather than death is the more appropriate punishment. A mitigating circumstance is not offered to justify or excuse Payton Gendron's conduct, and the law does not require that there be a connection between a mitigating circumstance and the crime committed.

Unlike aggravating factors that the government must prove beyond a reasonable doubt to all 12 jurors, the defense need only prove mitigating circumstances to any individual juror by a preponderance of the evidence – that is to say, a juror need only be convinced that a mitigating circumstance is more likely true than not true in order to find that the mitigating circumstance exists.

After the jurors determine the aggravating factors found proven to all 12 jurors unanimously and the mitigating circumstances found by any individual juror or combination of jurors, the jurors weigh these factors and circumstances.

Each juror weighs the aggravating factors against the mitigating circumstances and then decides if the government has persuaded the juror, beyond a reasonable doubt,[6] that the

---

The government's suggestion that the jury should be told about mitigating circumstances that might exist in another case, but are not present here, would invite the jury to entertain a plainly improper consideration: the absence of particular mitigating circumstances. The Court should use the defense definition.

GOVERNMENT: This phrase is included in the Sand definition of mitigating factors, as well as relevant Supreme Court caselaw. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding the Eighth and Fourteenth Amendments "require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record *and any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death") (second emphasis added). Regardless of whether the defense believes there may be any circumstances surrounding the commission of the offense that may be deemed mitigating, the government submits that the jury should be given this full definition of what a mitigating circumstance may be, particularly because the jurors are free to individually identify a mitigating circumstance not previously listed by the defense.

[6] GOVERNMENT: The government objects to the use of the "beyond a reasonable doubt" standard when describing the weighting process. Though the government acknowledges that the

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

———————————

Sand model instructions reference the "beyond a reasonable doubt" standard when describing the government's burden at the weighing stage, the government maintains this is an incorrect statement of law. Each of the seven circuit courts of appeals to have reached this issue has rejected capital defendants' claims that the "beyond a reasonable doubt" burden of proof applies to the weighing process. *See, e.g.*, *United States v. Gabrion*, 719 F.3d 511, 531-31 (6th Cir. 2013) (en banc) (listing cases). *See also Untied States v Saipov*, 2023 WL 5199415, *9 (S.D.N.Y. Jun. 27, 2023) (granting government motion to preclude defense "from arguing or suggesting to the jury that the beyond-a-reasonable-doubt standard applies when determining what sentence is justified under the circumstances"). The government restates this objection to any further attempts to apply the "beyond a reasonable doubt" standard to the weighing process throughout these instructions.

DEFENSE: The Sand instruction states: "The Government, at all times and as to (all) the capital count(s), has the **burden of proving beyond a reasonable doubt that the appropriate sentence for Defendant is in fact the death penalty**." Leonard B. Sand, *et al.*, 1 Modern Federal Jury Instructions-Criminal, ¶ 9A.02, Instruction 9A-3.

> Specifically, that means that **the Government must prove as to (each/the) capital count all of the following beyond a reasonable doubt**: (1) the existence of at least one gateway factor; (2) the existence of at least one statutory aggravating factor; (3) the existence, if any, of non-statutory aggravating factors; **and (4) that all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist so as to make a sentence of death appropriate, or, in the absence of any mitigating factor, that the aggravating factors found to exist alone make a sentence of death appropriate**." *Id.*

The defense has used this standard. *See, e.g.*, *United States v. Barnes*, 04-CR-186 (SCR), Court Exhibit at 37 (S.D.N.Y. May 29, 2008) ("This weighing process asks whether the government has persuaded each and every one of you, beyond a reasonable doubt, that the aggravating factor or factors found to exist (1) outweigh the mitigating factors found to exist and, if they do, (2) whether they sufficiently outweigh the mitigating factors to justify a sentence of death on the particular capital count you are considering.") (court exhibit can be provided upon request); *United States v. Williams*, 00-CR-1008 (NRB), Court Exhibit at 14 (S.D.N.Y.) ("This weighing process asks whether you are unanimously persuaded, beyond a reasonable doubt, that the aggravating factors sufficiently outweigh any mitigating factors or, in the absence of any mitigating factors that the aggravating factors are themselves sufficient to call for a sentence of death.") (court exhibit can be provided upon request).

The Supreme Court has repeatedly held that the Due Process Clause and the Sixth Amendment's right to jury trial require that any determination increasing the maximum or the minimum statutorily permissible sentence must be made by a jury and only on proof beyond a reasonable doubt. *See, e.g. Alleyne v. United States*, 570 U.S. 99 (2013); *United States v. Haymond*, 588 U.S. 634, 655 (2019) (plurality opinion). The Court in *Alleyne*, in overruling its prior decision in *Harris v. United States*, 536 U.S. 545 (2002), eviscerated the distinction between facts that change only the sentencing floor and those that trigger imposition of the maximum sentence or

11

Note:
<mark>Green</mark> highlight indicates proposed language by the defense.
<mark>Yellow</mark> highlight indicates proposed language by the government.

aggravating factor or factors found to exist sufficiently outweigh the mitigating circumstances found to exist to justify a sentence of death rather than a sentence of life imprisonment without the possibility of release on the particular capital count being considered.

And even if a juror has found that no mitigating circumstances have been proven, the juror must consider whether the government has persuaded the juror, beyond a reasonable doubt, that the aggravating factor or factors found to exist are themselves sufficient to justify a sentence of death rather than a sentence of life imprisonment without the possibility of release on the particular capital count being considered.

In weighing the aggravating factors and mitigating circumstances, each juror is called upon to make a unique, individual moral judgment of whether to sentence Payton Gendron to life imprisonment without the possibility of release or death a sentence of death is justified. It is

---

an increase in the maximum sentence. "The essential point is that the aggravating fact produced a higher range, which in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt." *Id.* at 115-16.

*Alleyne*'s reasoning is directly applicable to the structure of the FDPA. Because the jury's weighing determination is a necessary aspect of imposing a death sentence under the FDPA, it is "the functional equivalent of an element of a greater offense" that the Sixth Amendment demands must be found beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 585 (2002) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)) (state capital sentencing scheme violated the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of a fact raising the defendant's maximum penalty to death). As Justice Antonin Scalia stated: "[All] facts essential to imposition of the level of punishment that the defendant receives— whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." *Ring*, 436 U.S. at 610 (Scalia, J., concurring); *see also Hurst v. Florida*, 577 U.S. 92 (2016) (the Supreme Court extended *Ring*, to hold that Florida's scheme violated the Sixth Amendment in giving the judge the authority to make the critical findings necessary to impose the death penalty).

The government is correct that multiple circuits have declined to do what the defense urges here, but the Second Circuit has not decided this question. *See United States v. Aquart*, 912 F.3d 1, 16, n.5 (2d Cir. 2018) ("We do not decide the question here because the jury was specifically instructed that its weighing determination had to be made beyond a reasonable doubt, and the government urges a lesser standard only in a footnote.").

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

important that you understand the law never requires any juror weigh the aggravating factors and

mitigating circumstances in a manner that requires a juror vote to impose a sentence of death and

never assumes that any defendant found guilty of committing capital murder must be sentenced

to death. It is important that you understand that a jury is never required to find that a sentence of

death is justified. [7] The law is always satisfied with a sentence of life imprisonment without the

---

[7] DEFENSE: The Sand instructions utilize this clear statement of the law: "**no juror is ever required by the law to impose a death sentence**." Sand, ¶ 9A.02, Instr. 9A-19.  Sand also specifically highlights this point in the introductory instructions as well: "As we begin this process, there are two final points I wish to make, or, perhaps, emphasize. The first, mentioned briefly before, is that **you are never required to return a verdict of death**." *Id. at* Instr. 9A-1.

The Second Circuit has affirmed the same:  "A capital jury … is never required to return a death sentence." *United States v. Aquart*, 912 F.3d 1, 52 (2d Cir. 2018) (internal citations omitted); *see also United States v. Jones*, 527 U.S. 373, 384 (1999) (noting that jury instructed below that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence").

As such, many district courts have included this language in its instructions: "As we begin this process, I remind you that a juror is never required to vote for a sentence of death." *Bowers*, No. 18-CR-292 (RJC) (W.D. Pa.), ECF No. 1573 at 54 ( "The law never requires that any defendant found guilty of committing capital murder must be sentenced to death.");  *Saipov*, ECF No. 770 at 3 (Mar. 8, 2023 S.D.N.Y.) (transcript of charge also available upon request); *see also United States v. Barnes*, No. 04-CR-186 (SCR), Court Exhibit at 4 (S.D.N.Y. May 29, 2008) ("The first is that you are never required to return a verdict of death.") (copy available upon request).  The Court should do so here.

GOVERNMENT: The government objects to any and all proposals herein stating that "the law never requires" the jury to impose a death sentence or "never requires" a defendant be sentenced to death. Such instructions are inconsistent with the language in 18 U.S.C. § 3591, which states that "[T]he defendant . . . *shall* be sentenced to death *if,* after consideration of the factors set forth in section 3592 [delineating possible aggravating and mitigating circumstances] in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is *justified . . .*" 18 U.S.C. § 3591(a)(2) (emphasis added). Furthermore, there is never a requirement that a jury return a verdict on any issue before it in any civil or criminal case. This language suggests that the jury can ignore the Court's instructions with respect to the aggravating and mitigating factors, and the weighing of those factors in determining the appropriate sentence in this case, improperly injecting arbitrariness into its sentencing decision. *See United States v. Allen*, 247 F.3d 741 (8th Cir. 2001) (holding the FDPA precludes jurors from arbitrarily disregarding its unanimous determination that a sentence of death is justified), *vacated on other ground by Allen v. United States*, 536 U.S. 953 (2002); *United States v. Montgomery*, 635 F.3d 1074, 1099 8th Cir. 2011) (holding the FDPA "requires" imposition of the death penalty "once a jury makes a final unanimous determination that a sentence of death is justified"); *United States*

13

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

possibility of release.[8] The decision whether the government has proven beyond a reasonable

doubt that Payton Gendron should be sentenced to death ultimately must be made by each juror

himself or herself.

Before a sentence of death could be imposed, every juror would have to be persuaded

beyond a reasonable doubt that Payton Gendron is eligible for the death penalty and also be

persuaded beyond a reasonable doubt that any proven aggravating factors sufficiently outweigh

any mitigating circumstances to justify a death sentence. If every juror is persuaded that the

---

*v. Rodriguez*, 2007 WL 466752, *60 (D.N.D. Feb. 12, 2007) (holding there was no error in prohibiting defense counsel from arguing that a death verdict is never required). Should the Court use any such language, the government suggests it would be better to state that the "law never requires a jury to find that a sentence of death is justified" or "under the law, a sentence of death is not mandatory for any capital crime." Should the Court use any such language, the government suggests it would be better to state that the "law never requires a jury to find that a sentence of death is justified." *See United States v. Sampson*, Case No. 0110384-LTS, Dkt. No. 2498 at 5 (D. Mass. Sept. 13, 2016) ("Statement to the Venire").

[8]DEFENSE: The Eighth Amendment mandates that jurors understand that they and they alone are responsible for the decision whether to sentence a defendant to life imprisonment without possibility of release or to death. Jurors must be "confronted with the truly awesome responsibility of decreeing death for a fellow human" to ensure that they "act with due regard for the consequences of their decision." *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (quoting *McGautha v. California*, 402 U.S. 183, 208 (1971)).

The penalty phase instructions must clearly and unambiguously inform the jurors that the law (and the Court) never requires a juror vote to sentence a capital defendant to death and does not presume that the death penalty is justified or favored in this (or any) case. "A capital jury … is never required to return a death sentence." *United States v. Aquart*, 912 F.3d 1, 52 (2d Cir. 2018) (internal citations omitted); *see also United States v. Jones*, 527 U.S. 373, 384 (1999) (noting that jury instructed below that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence"). Language advising the jurors that the law is satisfied with a sentence of life imprisonment helps to ensure the jurors do not decide these life-or-death questions laboring under the misapprehension that they would be disappointing the Court or otherwise failing to return a verdict favored or presumed by the law if they vote to sentence Payton Gendron to life imprisonment without the possibility of release.

GOVERNMENT: The government particularly objects to this statement. The law is "satisfied" with either a sentence of death or life imprisonment, as long as the jury follows the correct procedures in reaching its decision.

Note:
<mark>Green</mark> highlight indicates proposed language by the defense.
<mark>Yellow</mark> highlight indicates proposed language by the government.

death penalty should be imposed, I would be required, as the judge, to sentence him to death. I could not change the jury's decision, and that sentence would be final. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Payton Gendron, I would be required to impose a sentence of life imprisonment without the possibility of release on that capital count and that sentence would be final. You should also understand that if you vote to impose the death penalty as to any count, the death sentence will control, regardless of any life sentence you might vote to impose as to any other count or counts.

This is only an overview of the law about jurors' consideration of a sentence of life imprisonment without the possibility of release or the death penalty the death penalty or a sentence of life imprisonment without the possibility of release. If this case requires a penalty phase, I will instruct jurors in greater detail about their duties. Please understand, however, that by talking about the possible punishments in this case, I am in no way suggesting to you that Payton Gendron is guilty of the offenses charged or that we will ever proceed to a penalty phase in this case. The defendant is presumed innocent of all charges and, again, we will only reach a penalty phase if the jury finds unanimously and beyond a reasonable doubt that Payton Gendron is guilty of one or more of the capital offenses charged.

This completes my preliminary remarks, ladies and gentlemen. I will now ask my Deputy Clerk [_____] to administer the oath that will govern your completion of the questionnaire and any further participation in the jury-selection process.

[OATH ADMINISTERED]

15

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.

Thank you. I now ask that you follow our courtroom personnel who will take you to the location where you will complete the jury questionnaire. On behalf of the United States District Court for the Western District of New York, I thank you for your service.

Note:
Green highlight indicates proposed language by the defense.
Yellow highlight indicates proposed language by the government.