**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

Plaintiff,

vs.

**PAYTON GENDRON,**

Defendant.

Case No. 1:22-cr-109 (LJV)

MAY 21, 2026
1:43 p.m.

**TRANSCRIPT OF STATUS CONFERENCE**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES:**

**MICHAEL DiGIACOMO, ESQ.**
**UNITED STATES ATTORNEY**
**BY: JOSEPH M. TRIPI, ESQ.**
**CHARLES MARK KRULY, ESQ.**
**MAEVE E. HUGGINS, ESQ.**
**ASSISTANT UNITED STATES ATTORNEYS**
138 Delaware Avenue
Buffalo, New York 14202
For the Plaintiff

**UNITED STATES DEPARTMENT OF JUSTICE**
**BY: MICHAEL S. WARBEL, ESQ.**
**CIVIL RIGHTS DIVISION**
**CRIMINAL SECTIONS**
950 Pennsylvania Avenue, NW
Washington, DC 20530
For the Plaintiff

**UNITED STATES DEPARTMENT OF JUSTICE**
**BY: KEVIN C. NUNNALLY, ESQ.**
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
For the Plaintiff

**MARIANNE MARIANO, ESQ.**
**FEDERAL PUBLIC DEFENDER**
**BY: SONYA ZOGHLIN, ESQ. (Rochester)**
**MARYBETH COVERT, ESQ. (Buffalo)**
**ASSISTANT FEDERAL PUBLIC DEFENDERS**
300 Pearl Street, Suite 200
Buffalo, New York 14202
For the Defendant

**LAW OFFICES OF THERESA M. DUNCAN**
**BY: THERESA M. DUNCAN, ESQ.**
1215 Paseo De Peralta
Santa Fe, New Mexico 87501
For the Defendant

**LAW OFFICES OF JULIE BRAIN, PLLC**
**BY: JULIE C. BRAIN, ESQ.**
916 South 2nd Street
Philadelphia, Pennsylvania 19147
For the Defendant

**LAW CLERK:** **REBECCA FABIAN IZZO, ESQ.**
**LAURA A. STELIANOU, ESQ.**

**COURT CLERK:** **COLLEEN M. DEMMA**

**COURT REPORTER:** **LAUREL S. TUBBS, RPR, RMR, CRR**
Robert H. Jackson Courthouse
2 Niagara Square
Buffalo, New York 14202
laureltranscripts@gmail.com

Proceedings recorded by mechanical stenography,
transcript produced by computer.

* * * * * * * * *

(Proceedings commenced at 1:43 p.m.)

**THE CLERK:** All rise. United States District Court for the Western District of New York is now in session, the Honorable Lawrence J. Vilardo presiding.

**THE COURT:** Please be seated.

**THE CLERK:** 22-cr-109, United States of America versus Payton Gendron. Assistant United States Attorneys Joseph Tripi, Charles Kruly, Maeve Huggins; DOJ trial attorneys Kevin Nunnally, and Michael Warbel, who's appearing by teleconference, and paralegal April Kelley appearing on behalf of the government.

Assistant Federal Public Defenders Sonya Zoghlin and MaryBeth Covert, and attorneys Julie Brain and Theresa Duncan appearing on behalf of defendant. The defendant is not present.

Also present is jury administrator Joel Drier.

This is the date set for a status conference.

**THE COURT:** Good afternoon, everyone.

**ALL PARTIES:** Good afternoon, Your Honor.

**THE COURT:** So you waive your client's appearance?

**MS. ZOGHLIN:** Yes.

**THE COURT:** Okay. So there's a number of things I want to cover this afternoon. I want to cover the judicial dis- -- or the juror disqualifications and the excuses -- excuses, I want to cover the special questionnaire, the CIPA, and the trial schedule, and then anything else the parties want to address at the end. Okay.

So let's start with the disqualifications. So the government has run a criminal background check on number -- last four digits 1878 and 1828, and they're excused because felonies have been confirmed. On the other hand, 0303 and 4317, felonies could not be confirmed, so we're going to bring them in. Okay?

And then there was a student who I did not excuse at the last status conference because we needed to find out whether the person has been -- was a full-time student. That's Participant Number 4985. And we have confirmed that she's going to be a full-time student.

And I understand the Defense has withdrawn their objection to that; is that right.

**MS. COVERT:** That's correct, Judge. Thank you.

**THE COURT:** Okay. There are two court employees -- a

deputy marshal who was involved in Mr. Gendron's transport and an administrator in the court -- in our clerk's office who have both been summoned, and -- and I have excused both of them for obvious reasons. The person in the clerk's office is actually participating in the process for getting the jury ready. And those two are -- 9280 is the -- is the deputy marshal, and 2189 is the court employee. Okay?

**MS. COVERT:** Yes.

**MS. ZOGHLIN:** Yes, Your Honor.

**MR. TRIPI:** Yes, Your Honor.

**THE COURT:** Okay. So let's talk about the current objections. And so the first one -- hang on. I'll try to do it in the order that I have them. So let's start with the April 21st objections. The first one is Juror Number 0884. And I'm trying to find the reason for the excuse.

**MR. KRULY:** It's in the bottom right of the questionnaire.

**THE COURT:** The bottom right?

**MS. COVERT:** It's a caregiver excusal, Judge.

**THE COURT:** Oh, I see. Caregiver of 80-year-old --

**MS. COVERT:** Correct.

**THE COURT:** -- with Parkinson's. Okay.

Tell me -- tell me what the reason for the objection is.

**MS. COVERT:** That one, Judge, is it's unclear whether

or not the prospective juror is essential to the care of the mother-in-law. And so that's why it was just unclear in the details under -- under the excusal for the, you know, young children or people who are infirm, you need to be essential to the care. And that was where that's not clear there. And that's because -- in part, Judge, because there's full-time employment elsewhere.

**THE COURT:** Yeah. Okay. Okay. Let's bring that person in. We can ask.

The next one is 7751, a person who is concerned about blood sugars and who has a letter from the physician or a nurse practitioner, I guess.

Why are we going to make this person come in?

**MS. COVERT:** So just -- Judge, that one is -- you know, that's not typically disqualifying or it would be something that was -- rise to that level. But in the doctor's note it just says it might -- might aggravate the medical condition. So we weren't -- weren't clear that it was -- some of the other notes are much more specific about --

**THE COURT:** I understand, but there's several of them in this category where -- where people have concerns about coming in -- about, you know, anxiety and other things like that coming in. And I've dealt with jurors who have suffered anxiety. And it's awful to see them when they're -- when they're in the courtroom. And it's just -- you know, it really

troubles them. And I'm not going to make somebody come in under circumstances like that.

**MS. COVERT:** I understand.

**THE COURT:** I just don't want to be responsible for somebody's health taking a turn for the worse because they came in for jury service at a time when we're probably going to excuse them anyway when they tell us that.

So -- so I'm going to excuse Number 7751.

I'm also going to excuse the next one. And I'm not finding a number now. 1357.

**MS. COVERT:** Yeah, this --

**THE COURT:** This is a category we've had before. Someone says they don't speak English, and they did not fill out this questionnaire by themselves, and --

**MS. COVERT:** Actually, this one, Judge, I -- my note is that it was filled out by themselves because it's signed by the juror.

**THE COURT:** Well, he says -- he says -- to the question "Do you read, write, and understand English well enough to complete this form without help," he says, "No" -- or she -- and said he doesn't speak English and speaks Spanish.

So I'm going to excuse that person.

**MS. COVERT:** Okay.

**THE COURT:** Juror Number 6039 says that we're going to get a doctor's note.

Did we ever get a doctor's note for that?

**MR. DRIER:** No.

**THE COURT:** No? Okay. If we don't get a doctor's note, we'll bring that person in. I mean, she says she's going to send us the doctor's note. We can reach out to her and get the doctor's note. But if we don't get the doctor's note, then we'll bring her in.

The next one is -- hang on -- 1329. And this is the same as the last one. He says, If you need a note, call my counselor.

I don't know that we should call his counselor.

**MR. KRULY:** This juror did, in fact, provide a note, I believe.

**THE COURT:** Oh, is that right?

**MS. ZOGHLIN:** Yes. I think on the next page.

**MS. COVERT:** I'm sorry.

**MR. KRULY:** I think there's a note from the juror -- from the juror's counselor on the next page.

**THE COURT:** Is that a note from the counselor? We know that's from -- oh, I see. It says "Horizon" at the beginning, doesn't it?

**MR. KRULY:** Correct.

**THE COURT:** Yeah, I see that. Oh, okay. Yeah, it's sort of almost contrary to what he said, right?

**MS. COVERT:** Right.

**THE COURT:** I think we'll bring that person in. We'll bring that person in.

The next one is 3679. And we do have a note from Catholic Health. And this is an anxiety -- this is one of the ones I was talking about earlier.

**MS. COVERT:** That one came in earlier -- that came in in the interim, and so we withdrew that one.

**THE COURT:** Oh, great. Okay. Good. Good.

The next one is 9865. Did this juror ask to be excused?

**MS. COVERT:** Judge, the box for requesting an excusal that might apply was not checked off.

**THE COURT:** Right. So why are we excusing this person? I mean, it's an obvious excusal based on age if he wants to be excused. But if he didn't ask for it, why are we excusing him?

**MR. DRIER:** I don't know where we are, Judge. I'm sorry. Which one?

**THE COURT:** This is -- this is 9865. It's filled out by hand.

**MR. DRIER:** I didn't process this, Judge. I'm not sure.

**THE COURT:** Okay. So let's bring this person in because it doesn't look like the person is requesting to be excused.

The next one is 1900. The person says that he or she is 100 percent disabled. Happy to serve, but needs a ride to and from.

Why are we going to make this person come in if the person can't drive and can't get in?

**MS. COVERT:** So the -- the frequently asked questions on jury service on the court's website do provide for -- indicate you're responsible for your own transportation. If you cannot drive, you should arrange to take a bus or have someone drive you and the court will reimburse you.

So because she said, I'm happy to serve and want to serve, I'm not sure that -- that it fits. You know, that an excusal is appropriate when they're -- when the court is representing that if you cannot drive, we have means to get you here for jury service. That's not a reason to excuse. And she wants -- and the -- and the juror at least indicates that they're happy to serve and -- "I'm happy to serve."

**THE COURT:** She's happy to serve. So -- so what -- can we reach out to the juror and tell the juror that we can pay the costs of transportation to and from?

**MR. DRIER:** Well, we can't -- we can only pay for reimbursement of mileage. We don't pay for transportation. That's a little different.

**THE COURT:** So we can't pay a taxi?

**MR. DRIER:** No, we can't pay taxis. We can only pay public transportation.

**THE COURT:** Yeah, I think we'll excuse this juror, then.

7019. We have a doctor's note. So that juror is excused.

1135.

**MS. COVERT:** Judge --

**THE COURT:** Go ahead.

**MS. COVERT:** I don't have a note on 7019.

**THE COURT:** Oh, I do. Do you want to see it?

**MR. KRULY:** I've got a copy.

**MS. COVERT:** Oh, wait. I'm sorry. No, I don't have that.

Thank you, Judge.

**THE COURT:** Juror Number 1135 is excused. Yeah. And the same with Juror 0031.

**MS. COVERT:** This one, Judge, was a little confusing because there is full-time employment and just contradicts that they're a sole provider who can't be left alone. So that -- that was a little unclear on the age of the child.

**THE COURT:** Yeah, but I just -- I don't want -- again, given the circumstances that the juror explains, I don't want to force that person to come in.

7281 is the next one. Oh, yeah, this is one who says

they don't speak English, but don't give us anything about their language. I don't know.

Thoughts? Tell me. Bring them in and we'll just find out?

**MS. COVERT:** Yeah, the form is filled out by themselves. It was not clear.

**THE COURT:** Yeah. Okay. We'll bring that person in.

And the same thing with the next one, which is the same, 1020.

Okay. The next group are May 18th. No, I'm sorry. The next group is May 1st. Yeah. And this is someone who said on the questionnaire that they were a full-time student taking summer classes. And we asked whether they would be a full-time student in the fall semester and they say "yes." So that's Juror Number 3465, and that juror is excused.

**MS. COVERT:** And that just came in after, Judge. That --

**THE COURT:** Yeah, I assumed that.

2568 asks for a six-month deferral because he or she is getting married.

Why do you object to that?

**MS. COVERT:** Well, Judge, we have a date that the commencement of the trial was going to be in October. And her unavailability -- it wasn't clear to me from the additional info she indicated on when those celebrations and things were

taking place that she would be unavailable for one day of questionnaires and then for one day of in-person voir dire with the trial commencing in, tentatively, October.

**THE COURT:** Yeah, but she's asking for a six-month deferral based on the fact that she's getting married. I don't see why we wouldn't do that.

Oh, I see. You're saying the sixth months would run from March to September.

**MS. COVERT:** Yeah, she's otherwise available. That's -- it wasn't --

**THE COURT:** Okay. Yeah, I guess we could bring that person in. I guess we could bring that person in, given the fact that the deferral might be over by the time that proof starts, and she may be able to come in for a day of filling out the questionnaire and a day of voir dire.

Okay. Okay. Now, the May 18th.

The first one is 8502. Hang on. And why -- why is this one deferred?

**MR. KRULY:** They wrote that --

**MS. COVERT:** It's not -- it's a conviction, this one, Judge.

**THE COURT:** Say it again.

**MS. COVERT:** It's a felony conviction.

**THE COURT:** Felony conviction. I don't see where it says "felony conviction."

**MR. KRULY:** Question 6.

**THE COURT:** Got it.

Okay. So I guess we should follow our protocol. Let the government take a look at this.

**MS. COVERT:** They already ran the NCIC, Judge, but the NCIC, from our perspective, isn't clear on there being a felony conviction.

**THE COURT:** Okay. Let's bring the person -- we'll bring the person in, then.

And then the same -- I'm sorry.

Somebody say something?

**MS. HUGGINS:** No, Your Honor.

**THE COURT:** Okay.

**MS. HUGGINS:** It makes sense to bring them in. It appears it was a felony arrest, but resulted, likely, in a misdemeanor conviction.

**THE COURT:** I see.

6210 says "felony, but rights restored."

**MS. COVERT:** That's correct, Judge.

**THE COURT:** So we probably -- we should bring that person in.

**MS. COVERT:** I think so, Judge.

**THE COURT:** Yeah.

Okay. So the next one is 2748. Has kids who are 1 and 4, and he or she takes care of them three or four times a

week.

**MS. COVERT:** Yeah, but, Judge, the issue was there's -- also works as a full-time -- in employment. It's not clear to me whether it's full-time employment. And that was -- the question was, is that -- you know, is that full-time employment in conflict that you're the sole caregiver of the children at this time.

**THE COURT:** Okay. We can bring that person in and question that.

The next one is 2803. And this is a felony. Has the government checked that one?

**MS. HUGGINS:** We have, Your Honor. It appears that it's not a felony conviction.

**THE COURT:** Not a felony. Okay. We'll bring that person in.

How about 7130? Same thing. Says, Felony, rights restored.

Have you checked that?

**MS. HUGGINS:** Your Honor, the -- there are felony convictions; however, as far as I've seen, the NCIC does not indicate whether rights are restored or not --

**THE COURT:** Okay. Well, we can -- we can --

**MS. HUGGINS:** -- on any of these.

**THE COURT:** Let's bring that -- let's bring that person in, and we'll -- we'll find that out.

The next one is 3752, aggravated DWI, circa 2011.

"But I have a certificate of relief. I'm unsure if I can serve on a jury."

So I think we bring that person in and --

**MS. COVERT:** Yeah.

**THE COURT:** -- follow up.

**MS. HUGGINS:** Your Honor, for what it's worth on there, the -- on the certificate of relief, there's a specific box that's checked. I think if the Court reads it, it's not -- it says, Relieve the holder of all disabilities and bars to employment.

(Reporter clarification.)

**MS. HUGGINS:** Relieve the holder of all disabilities and bars to employment, excluding the right to be eligible for public office.

It does not indicate that, like, it's -- the felony conviction's expunged or anything to that effect.

**THE COURT:** Oh, so the one that follows that juror, it's a different name than the juror.

**MS. HUGGINS:** Oh, I apologize. I may have read from the wrong line of my notes, Your Honor. Could you remind me what number juror we're on?

**THE COURT:** It might be the same number, though, because it's the same first name. It may be just a different last name because of a marriage or a divorce. It's Juror

Number 3752.

**MS. HUGGINS:** Yes.

**THE COURT:** Hang on. Okay. So tell me. The form says?

I'm looking at it now, and it's very hard to read.

**MS. HUGGINS:** If you look at the form that's in front of you, in sort of the middle box that's labeled 14, it's box B that's checked.

**THE COURT:** Yes.

**MS. HUGGINS:** I don't read that to mean that it's expunged the felony conviction or restored the rights to serve on a jury.

**MS. ZOGHLIN:** Part of the problem -- and we've looked into this, and there's not a lot of law on it. It's not clear, frankly.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** The little law that we found is contradictory, so that makes it more difficult.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** It's not clear what rights are restored with this.

**THE COURT:** Yeah.

**MS. ZOGHLIN:** That's what -- we need to look into it, I think, a little further.

**THE COURT:** Yeah. And -- so let's bring this person

in, and we can look into it further. I know the, law is very difficult in this area because I've dealt with it in other contexts, and I know that.

So let's bring the person in. That doesn't do any harm, especially since the person doesn't seem to be opposed to coming in.

Okay. I guess the same is true with respect to 4927.

**MS. COVERT:** That's correct, Judge.

**THE COURT:** So we'll bring that person in.

And we've got a dis- -- I'm sorry, not a disability, but someone who takes care of a child, and she says her -- his or her disabled mother. This is 9257.

**MS. COVERT:** And also indicated employment, Judge, as a --

**THE COURT:** As a housekeeper.

**MS. COVERT:** -- housekeeper. And personal aide, so that --

**THE COURT:** Okay. We can bring that person in for that reason.

5163. The same thing.

0015.

**MS. COVERT:** This one is sort of similar, Judge. Caring for children that -- with no one else, but does have employment.

**THE COURT:** Employment. Yeah. We'll bring that

person in.

6213. Did the government check -- this is a felony.

**MS. HUGGINS:** One moment, Your Honor. We did check.

**THE COURT:** And?

**MS. HUGGINS:** The NCIC check was inconclusive on this --

**THE COURT:** Okay.

**MS. HUGGINS:** -- individual. I think we'll have to bring them in for verification.

**THE COURT:** Okay. Let's bring them in.

1127. Why is that -- I don't know why this juror was excused.

**MR. KRULY:** Judge, I -- there's some indications on this questionnaire that the juror is a sovereign citizen. I don't -- at least it suggests that, yeah. I would venture to guess that was why the juror was excused.

**THE COURT:** Why is that an automatic excusal?

**MR. KRULY:** Right. Also -- the juror also, in response to Question 1, wrote that they are not a citizen -- they wrote -- well, the question asks, "Are you a citizen of the United States?" They wrote -- they struck out the word "citizen," wrote "national," and answered "no."

**THE COURT:** I don't understand it.

**MR. KRULY:** Right. Right.

**THE COURT:** I get it. I get it. But I just don't

know why that -- that means the person is going to be automatically excused.

Let's bring the person in and find out what's going on.

Look it, I don't want to make my -- headaches for myself any more than I have to, but on the other hand, you know, I don't see a good reason to say no at this point. We may find out very good reasons as soon as the person comes in.

Okay. And then, finally, we have a -- the last one is another felony, 5151.

Has the government taken a look at that one? It says, "felony rights restored" and "yes" -- and answered "yes" to both of those.

**MS. HUGGINS:** The government did do an NCIC check. It appears that there are felony arrests that resulted in misdemeanors, as well as potentially one felony arrest that I believe results in a felony conviction. But it's --

**THE COURT:** If it's inconclusive, let's bring the person in.

**MS. HUGGINS:** It doesn't --

**THE COURT:** And you could do more research in the meantime, right? We can -- we can --

**MR. KRULY:** Right.

**THE COURT:** -- always say "no" to the person when the time comes.

**MS. HUGGINS:** Absolutely. Yeah.

**THE COURT:** But let's -- let's bring the person in, for the time being.

**MS. COVERT:** Thank you, Judge.

**THE COURT:** Okay. So let's just talk about the plans for the questionnaires. So -- and we're going to discuss the appendices and the instructions in a couple of minutes. And I'm going to edit the questionnaire so that my oral instructions match the written instructions. And so because we are finalizing the questionnaire and the appendices so that the clerk's office can prepare to print them, we're going to finish the edits today. We've got to get this done. We've got to get this sent out.

We have 1274 qualified jurors so far; is that right.

**MR. DRIER:** Yeah. Some of these, if they were excused, may come off that list. There may be a couple of more that might go on because of this, so -- but pretty close to that number.

**THE COURT:** Okay. Potential jurors have been told to call in on Tuesday, May 26th, to get more information about when they may need to come to fill out the questionnaires. And we need to also finalize the group. I think we have enough jurors who are qualified at this stage. So any questionnaire that the Court receives after today is not going to be part of the group. Okay. We have our group. Any questionnaire we

receive after today is not going to be part of the group.

**MS. COVERT:** Okay. I'm told there are some questionnaires that had been received. Those --

**THE COURT:** Fine. You can take -- you can take a look at those. If there are excusals that you want to contest, you can get them in to me by the end of the day today --

**MS. COVERT:** Okay.

**THE COURT:** -- and -- or first thing tomorrow morning, let's say, and I can rule on them tomorrow morning. But I want to get this done by the end of the week so we have -- so we have a jury pool.

The jury administrator is going to call 130 jurors per day; is that right?

**MR. DRIER:** Correct.

**THE COURT:** You're going to call enough to get us in 130 per day; 65 in the morning and 65 in the afternoon.

**MR. DRIER:** Yep.

**THE COURT:** Yeah. So you may call a few more than 130 to gauge about 130 to appear. Is that the idea?

**MR. DRIER:** Sure. We can do, like, 135 or something or --

**THE COURT:** Yeah.

**MR. DRIER:** -- 70 per group, something like that.

**THE COURT:** Great.

Okay. Jurors are going to be called in order of

their randomized sequence number. And the goal is to have nine complete days and approximately 1000 to 1200 questionnaires completed. If we have more qualified jurors than we need, not every qualified juror is going to be asked to come in. And they're going to be called in order of their sequence number, which are randomized, so that should not affect the randomization.

**MR. WARBEL:** Judge --

**THE COURT:** Yes.

**MR. WARBEL:** -- question. When will the randomization take place?

**MR. DRIER:** It's already taken place.

**THE COURT:** Yeah. We have the randomized numbers now, right?

**MR. WARBEL:** Okay.

**THE COURT:** Yeah.

**MR. WARBEL:** And we're -- so -- and we're going to keep this order throughout the process?

**THE COURT:** That's -- that's what I -- right?

**MR. DRIER:** Yeah. The only thing that might change that a little bit is if they have dates that they aren't available to come in.

**THE COURT:** Sure.

**MR. DRIER:** So we might have to move those people. So those people might not come in direct order. But we will,

you know --

**THE COURT:** But we're working with them in direct order.

**MR. DRIER:** Correct.

**MR. WARBEL:** Great. Thank you.

**THE COURT:** So, yeah, if jurors say they can't come in on the date that they're scheduled, they could be rescheduled within that two-week period. And -- and rescheduling jurors in that window you can do on your own. You don't need to involve me in that.

If jurors say they can't reschedule within the two weeks -- so they're on vacation during that entire two weeks or there's something that they can't do, provide that to me, and I'll make a decision about deferring the juror or not. And if there's new requests for excusals or disqualifications or additional documentations -- documentation sent in -- so if we have a juror, for instance, who says "a felony," and they have a record of the felony, or someone has a medical excuse who we said has to come in anyway, and they get a doctor's note, send that to the parties and to me so that we can deal with that. Okay?

**MR. DRIER:** Okay.

**THE COURT:** Okay. Good.

And the jury administrator is going to update the parties weekly on a rolling basis regarding any new deferrals,

excusals, or disqualifications. Is that the idea?

**MR. DRIER:** Yeah, I don't know that was actually discussed, but we can definitely do that.

**THE COURT:** Yeah.

Okay. So on the day of the questionnaires, jurors are going to report at 8:00 a.m. and at noon. They will check into the jury assembly room and watch the jury orientation video and the unconscious bias video, return -- return to the jury assembly room at 9:30 in the morning and at 1:30 in the afternoon to complete the questionnaires. And jurors -- we expect the questionnaires to take about two hours to complete. In our practice session, only one out of 22 took more than three hours. So we're going to give the jurors a couple of hours -- two and a half hours, I guess, to complete.

And at about 11:50 in the morning, jurors from the morning session who might not have completed their questionnaires are going to be moved to a conference room in the clerk's office so that they can complete the questionnaire under the supervision of court staff. The conference room holds about 12 people, so with any luck, we won't have more than 12 that are still working on it by then.

Okay. And so having said that, let's talk about the appendices. The government has --

**MR. WARBEL:** Judge, before we go there, can I ask a couple of questions about the process?

**THE COURT:** Yeah.

**MR. WARBEL:** Okay. First will be: How are you intending to -- to give your statement or instructions to the court -- or to the -- to each pool of prospective jurors? And, particularly, would you entertain recording that or do you intend to do that live twice a day?

**THE COURT:** Oh, I intend to do it live twice a day.

**MR. WARBEL:** Okay.

**THE COURT:** Yeah, I intend to do that live twice a day. Yeah, they're going to come in the courtroom, and I'll take the bench, and I will talk to them the same way I talk to any other panel of jurors.

**MR. WARBEL:** Okay. And -- and attorneys will be open -- will be free to attend that session?

**THE COURT:** Heavens, yes. Yeah, I would expect them to.

**MR. WARBEL:** Yeah. But not when they're actually filling out the questionnaires.

Can we agree that attorneys should not be present for that?

**THE COURT:** Yes, I think that's right.

Right? Anybody have a problem with that?

**MR. KRULY:** No.

**THE COURT:** Yeah. Everybody is shaking their head "no." So, no, the attorneys will not be present when they're

filling out the questionnaires.

**MR. WARBEL:** Understood. Thank you.

**THE COURT:** Okay. So let's talk about the appendices. The appendices are so long -- both of them are so long. And I don't know that it's necessary at this stage --

Thank you. Yeah, you're free to leave. Thanks very much.

And I don't know that it's necessary at this stage to vet all these names and all these --

**MR. WARBEL:** Judge, I'm sorry to interrupt.

Did you just excuse the jury administrator?

**THE COURT:** I did, yeah. Why? Do you have something you want to ask?

**MR. WARBEL:** I think -- yeah, I think we have a question, and we need to go over something that's going to include -- need him.

**THE COURT:** Okay. Come back. Just in time. Just in time.

You snatched victory from the jaws of defeat. So go ahead. Do you want to ask him now?

**MR. WARBEL:** Yes. Thank you, Judge.

**THE COURT:** I'd like to send him on his way so that he doesn't have to be here while we discuss these things.

**MR. WARBEL:** Sure.

The questions -- questions relate to how we are going

to receive the questionnaires to start reviewing them and how often.

So -- so, you know, I think what we're hoping for, that we'll receive them on a rolling basis via USAFx. I think we're using USAFx now, and it's working well, or we intend for it to work well. So that's our proposal, that -- and the parties start getting these things as soon as possible so we can start our review as soon as possible.

**MR. DRIER:** So we plan on having someone scan them the day that they're taking them, and then they would probably be available the very next day so we can --

**THE COURT:** On a -- on a rolling basis?

**MR. DRIER:** Yeah, on a rolling basis. So we don't really know exactly how long it's going to take to scan and do all these things, but if there's no problems with it, we should be able to get them in that day or the next day.

**THE COURT:** So we're talking -- we're talk- --

**MS. COVERT:** And then they'd be uploaded --

**THE COURT:** I'm sorry. Go ahead. Ms. Covert, go ahead.

**MS. COVERT:** I didn't know if -- the intention is that they would get uploaded to USAFx.

**MR. DRIER:** Correct.

**MS. COVERT:** Okay.

**THE COURT:** So we're talking one or, at most, two

days is what we're thinking now?

**MR. DRIER:** I would think by the next day they should be --

**THE COURT:** Great.

**MR. DRIER:** Yeah, as long as we have time to do it.

**MR. WARBEL:** And we should get batches of about 130 at a time?

**THE COURT:** That would be -- yeah, presumably, if that's how many we have come in --

**MR. WARBEL:** Sure.

**THE COURT:** -- which is -- which is the idea.

**MR. WARBEL:** Great. Thanks, Judge.

**THE COURT:** Okay. Thank you.

**MS. COVERT:** I just have one question, Judge, while he's here, if that's all right.

**THE COURT:** This is like an episode of *Columbo*.

**MS. COVERT:** We had talked last time about getting a list -- an Excel spreadsheet of the demographic information that's for all the qualified jurors in advance of the questionnaire part starting. And so we would just ask that we have that in short order if we could.

**MR. DRIER:** After I -- after I do the qualifications on all these jurors that we talked about, I can create that list. It will be a full list of the qualified jurors, with demographics.

**MS. COVERT:** Thank you.

**THE COURT:** Okay. Anything else for our jury administrator before we excuse him?

**MR. WARBEL:** No, Your Honor.

**MS. COVERT:** No, Your Honor.

**THE COURT:** Great. Thank you.

**MR. DRIER:** Thanks, Judge.

**MR. WARBEL:** Oh, yes. I'm sorry, Judge.

So I think one of the things we --

**THE COURT:** Do you have a raincoat on? Do you have -- do you have an old raincoat on right now? Go ahead.

**MR. WARBEL:** One of the things we want to talk about before we're done today with you, Judge, is probably how we're going to do, you know, our motions for -- for -- to strike jurors based on the questionnaire.

But the question for the jury administrator would be: What's the deadline that you need to know who the pool of remaining people is to summons them for the start of individual voir dire in August?

**MR. TRIPI:** Because I think -- just to supplement what Mr. Warbel just said, I think we were going to propose to the Court something along the lines of July 17th for agreed-upon strikes --

**MR. WARBEL:** Yeah.

**MR. TRIPI:** -- you know, and -- but we wanted to know

if that date would work and give enough lead time.

**MR. DRIER:** So we've talked about this recently. And I think the most current thing that we want to do is have the -- send the jurors out another piece of paperwork basically telling them when to call again, and then they would get their status at that time. So whenever the date would be for the start of the voir dire section would be probably the date. But we would obviously need some information to process all of that and -- and put it in the system.

As far as an exact date, we -- I haven't figured that out yet.

**MS. COVERT:** I think, from our perspective, that -- July 17th would be far too soon for us to be able to review the volume and be able to engage in meaningful negotiations with the government.

**THE COURT:** What is the date we're going to start the actual --

**MR. TRIPI:** I think you had August 16th, Judge.

**MS. COVERT:** The 17th.

**THE COURT:** The 17th?

**MR. TRIPI:** 17th. So we were thinking a month early. Basically, a month to have the stuff and then a month early, but --

**THE COURT:** How much time are you going to need to let the jurors know?

**MR. DRIER:** We usually want to send something out about two weeks ahead of time. So, really, just two to three weeks before the start of the date -- is it in August?

**THE COURT:** So why don't we -- you suggested July 17th. Why don't we say July 24th.

**MR. TRIPI:** That's fine.

**MS. COVERT:** Can we do it the 31st, Judge?

**THE COURT:** No. I think the 24th.

**MS. COVERT:** Two weeks?

**THE COURT:** I think the 24th to give us enough time to let the jurors know and to get them. Let's do the 24th.

**MS. COVERT:** I'm just pausing, Judge, because I think in our joint procedures we asked for 8 -- closer to 8 to 12 weeks. And that's certainly shorter than -- than what we had jointly proposed.

**THE COURT:** Look it, I understand. I understand. We're all -- we're all under, you know, significant time constraints here. But I think the 24th is a reasonable date. So we're going to go with that.

**MR. TRIPI:** And then, Judge, the last thing I had I don't think Mr. Drier would need to stay for, but I had one more thing on the questionnaires.

**THE COURT:** Well, let's let Mr. Drier stay, just in case. Go ahead.

**MR. TRIPI:** Okay. The only other thought that we had

was that we should -- we should only agree to strikes on the -- based on the questionnaires that are agreed upon. If there's disagreement between the parties, those people should come in based on the questionnaires, right?

**THE COURT:** Yes. Oh, yeah. That's easy. That's easy. Yeah. Great. Okay. Good.

Thank you, Mr. Drier.

**MR. DRIER:** Thank you.

**MR. WARBEL:** Thank you.

**THE COURT:** Now, let's talk about the appendices.

Yeah, get out of here quickly.

So the appendices are just too long. And one of the reasons -- well, there's a few reasons they're too long. Number 1 is it's just going to take way too much time for the jurors to have to go through this. And with respect to the places, no -- what -- I mean, they're asked a question about places. What do you know about the place or what's your relationship to the place or whatever? And there's just too much.

**MR. TRIPI:** So, Judge, the thought process that I -- that I had was, having done other jury selections with you is I don't know -- I thought the appendices were almost to replace you reading the long lists in court. And so if that's not the case --

**THE COURT:** No. I think it's going to take too long

for them to read the list and have to make notations on them. I think it's much better if we do that in court with -- with the jurors and I read the list of people who we really think are going to be wit- -- the -- so I -- I don't have a problem with giving them a list. We can have a list of the -- the victims' names, for instance.

**MR. TRIPI:** Okay.

**THE COURT:** And on the list can be the Defense witnesses who -- you've given us a short list of witnesses. That's fine. If you have, you know, a handful -- half a dozen investigators who you think are certain to testify, you know, maybe -- maybe those people on the list. But -- but having how many pages -- I don't know how many pages there were.

**MS. ZOGHLIN:** 188 names.

**THE COURT:** 188 names, yeah.

**MR. TRIPI:** Well, yeah, that was basically everyone on our list.

**THE COURT:** I understand. Anybody you might call. I get it. But -- and plus -- and plus, the victims.

**MR. TRIPI:** Right.

**THE COURT:** And, you know, just -- so I think we should -- we should give them a much shorter list of names, you know. Half a page or a page long.

And then with respect to the places, I don't know that we have to give them anything other than Tops right now.

And Tops is throughout the entire questionnaire, so I don't even know if we need to say --

**MR. TRIPI:** Yeah. My -- again, I was thinking of it in the way I've seen you --

**THE COURT:** Yeah.

**MR. TRIPI:** -- handle other cases and try to be over-inclusive. If that's not the purpose of the appendix at this point, then I would agree --

**THE COURT:** Yeah.

**MR. TRIPI:** -- at this juncture just "Tops" is fine.

**THE COURT:** Great.

**MR. TRIPI:** I don't even think at that point you need an appendix, you know.

**THE COURT:** Great. Yeah. I think that's probably right. I think for that one, maybe just the appendix and names.

**MR. TRIPI:** And then going back to Appendix A, I guess I'm thinking of just the victims and -- and maybe the lead case agents who will be here --

**THE COURT:** Yeah. Exactly.

**MR. TRIPI:** -- on a day-to-day basis.

**THE COURT:** And if the Defense wants to put some names on that list too, that's fine. If you don't, that's okay too.

**MR. TRIPI:** Okay.

**THE COURT:** But again, we will vet the names in court with them.

**MR. TRIPI:** All right.

**THE COURT:** But what I don't want to have happen is we're taking, you know, three or four hours now to fill out the questionnaire --

**MR. TRIPI:** Okay.

**THE COURT:** -- that I think is unnecessary at this point. And I think it's just going to -- we're going to run into problems with timing, especially because -- don't forget, the time that the people took to fill out these questionnaires in our practice sessions were without --

**MR. TRIPI:** Right.

**THE COURT:** -- the list of names.

**MR. TRIPI:** Yeah. No. This was helpful. I have a better understanding of what you're looking for.

**THE COURT:** Yeah. Okay. Good.

Okay. Oh, we want to talk about what to call Tops.

**MR. TRIPI:** We have no problem with it -- whatever version of Tops you want. That was just a corporate name.

**THE COURT:** I think "Tops Market" --

**MR. TRIPI:** That's fine.

**THE COURT:** -- is the best way to say it.

**MS. ZOGHLIN:** That's fine.

**THE COURT:** Okay. Now, let's talk about the -- my

instructions. I have rewritten those instructions. And I think we sent them to you yesterday. I rewrote them in my voice and in the way I generally do jury selection. So the beginning is kind of a pep talk to them about why they should want to be here. And -- and it really works pretty well. I mean, I have -- I think fewer jurors want to get out of jury service after they hear the little pep talk than before. At least my history with jurors has changed because of that. And -- and so I've done things like that. And I've -- I've, again, reworded things in my voice.

Have you folks had a chance to go through them?

**MR. WARBEL:** Yes, Your Honor.

**THE COURT:** Do we have objections to that?

**MR. WARBEL:** A couple, Your Honor.

**THE COURT:** So let's -- let's do it the way I generally do charge conferences.

Who's got the first objection? Defense or -- what's your first objection the Defense has.

**MR. WARBEL:** Judge, I think mine's a general -- may I go first?

**THE COURT:** You can go first. Sure.

**MR. WARBEL:** Yeah. Sure.

So, Judge, I'm not paraphrasing you, but I think, you know, you've said before that you feel like you're doing your job when -- when each of us is a little bit happy and a little

bit unhappy. And I think, you know, the parties worked very hard on these instructions and proposals. And I appreciate defense counsel for taking the lead on compiling the proposals.

I think this is a fair compromise of our proposal. And one -- two points I'd like to make. One is just a point for the record. One is an objection.

The point for the record is you have adopted a definition of "mitigation" that is requested by the Defense. We have -- we have suggested that it is incomplete because it does not include a reference to mitigation; maybe something about the circumstances of the offense. The concern is you're going to also instruct jurors later that they can come up with their own mitigating factors, but they're not going to get a complete definition of "mitigation." We're okay with that, Judge.

We just -- I just want the record to reflect that you're doing this at the request of the Defense. So should there ever be an appeal on this issue, it's clear here that this definition was requested by the Defense.

**THE COURT:** Yeah. And the reason I'm doing that, Mr. Warbel, is because I think that mitigation is the Defense's issue. And I think they ought to be able to define it the way they want to define it, you know, just as the government has -- has defined "aggravating circumstance."

We had oral argument yesterday at the Second Circuit

on that -- the way -- the way the government wants to. And I've -- and I've excluded some of the government's categories in that. Because I think -- well, for the reasons that I said. I think the Defense should be able to define "mitigating circumstances" the way they want to. And if they want to object to part of that because they think it's going to hurt their client, I think they can do that. So -- so I think your point is very well-taken.

The Defense wants it the way I've done it; is that right?

**MS. BRAIN:** It is, Your Honor.

**THE COURT:** Okay. Yeah. So I think -- I think we're fine. But, Mr. Warbel, I think your point is well-taken, and you've made the record. Thank you.

**MR. WARBEL:** Thank, Judge.

And then the only point that, I guess, would be an argument from the government here on your -- on the entire summary, Judge, is just we oppose application of the -- or reference to the beyond a reasonable doubt standard when talking about the weighing process. And we have -- we have briefed this to you at -- in our memo of law regarding jury selection docket 312 --

**THE COURT:** Yeah.

**MR. WARBEL:** -- 22 to 24. And it's also in our -- our arguments -- our marginal arguments in our proposal.

Judge, we just -- we -- I -- this is an incorrect statement of the law. Seven circuits have -- have touched on this issue. All seven have said the -- the -- the beyond the reasonable -- or the weighing process is not a finding of fact. And it's not amenable to applying the beyond a reasonable doubt standard. In fact, it could raise confusion to the jurors when they're doing it because we're also going to be instructing them this is a unique, personal, moral decision that each of them has to make about whether the death penalty is justified. That's the term from the -- from the statute, and the statute does not reference beyond a reasonable doubt. And each person has got to make their own decision about what's justified, and beyond a reasonable doubt doesn't play into that. So we would oppose your references to the -- to the beyond a reasonable doubt --

**THE COURT:** Let me tell you my thought process, and it's this: The Second Circuit has not weighed in on this. And what we're using is the Sand charge. So while I understand that other circuits have come out that way, the Second Circuit has not. And I think that the safe way to go, under those circumstances, is to use Sand. I'll give it some more thought. I understand what you're saying. I'll give it some more thought, but that's my thought process.

**MR. WARBEL:** Thank you, Judge. I have just one brief response to that. And we'd ask you to take -- maybe the Second

Circuit -- we understand Sand being -- being the gold standard for -- for instructions in the Second Circuit. Those penalties phase instructions in the introductory session -- section to the penalty phase instructions reference that they were drafted with assistance from -- from Capital Resource Counsel, but there's no reference to any government -- you know, any Prosecution assistance on drafting those instructions. So we ask you to take those with -- with some skepticism.

**THE COURT:** Yeah. Okay. Okay.

**MR. WARBEL:** Thank you, Judge.

**THE COURT:** Okay. Thanks.

Okay. So let's do page by page if you want.

Defense has some objections. Go ahead.

**MS. BRAIN:** We do have some requests, Your Honor --

**THE COURT:** Yeah. Go ahead.

**MS. BRAIN:** -- as to these. The first one is: Throughout, we'd ask that the Court consistently refer to our client as Payton Gendron. The Court uses that in -- in multiple situations, but then there are other times when the Court shortens it to just "Gendron." Our request would be that it be "Payton Gendron" throughout.

**THE COURT:** Any -- any objection from the government on that?

**MR. WARBEL:** No objection, Judge.

**THE COURT:** Okay. That's fine. We'll do that, then.

**MS. BRAIN:** Thank you.

The next one is on the first and second page. We were troubled by their reference to "your community" and "our community" only because of this particular case and its high-profile nature and the risk, perhaps, of focusing the jurors on the wishes of the community rather than they're all independent jurors.

So our suggestion would be, on the third paragraph on page -- is this page 2? Well, it's the first one.

**THE COURT:** Yeah.

**MS. BRAIN:** That it say this is your chance to serve your civic duty.

In paragraph 5, the bottom paragraph, we would request excising after the sentence that says, "You would want no less," it then says, "from the members of your community."

**THE COURT:** Right.

**MS. BRAIN:** If that were excised, I think it would still flow quite well.

**THE COURT:** Fine.

**MS. BRAIN:** "And you should give no less."

**THE COURT:** I have no problem with that.

The government have any objection?

**MR. WARBEL:** We'll defer to you, Judge.

**THE COURT:** Pardon me?

**MR. WARBEL:** We defer.

**THE COURT:** Great. Yeah.

I think -- I think that's fine. I don't have any problem with that.

**MS. BRAIN:** Very good.

In the top -- top paragraph on page 3, we would ask, "Important to our nation, to our system of justice."

**THE COURT:** Yeah. Yeah.

**MS. BRAIN:** Terrific. Thank you.

Then we have --

**MR. KRULY:** I want to clarify.

I'm sorry. The top of page 3, are we removing "Important to your community and to our nation," or -- or just "our community"?

**THE COURT:** No. "It's important to our nation and to our system of justice."

**MR. KRULY:** Okay. Thank you.

**MS. BRAIN:** Very good.

Moving to page 8, Your Honor, a couple --

**THE COURT:** The government have anything before page 8?

**MS. BRAIN:** Sorry.

**MR. WARBEL:** No, Your Honor.

**THE COURT:** Go ahead.

**MS. BRAIN:** A couple of inserts in the -- in paragraph -- the first paragraph, if we could, it starts out?

"May include graphic video from Gendron's GoPro camera." We'd like to insert a clause, "which he used to live stream the attack," if we may.

**THE COURT:** Any objection from the government to that?

**MR. WARBEL:** No, Your Honor.

**MS. BRAIN:** And then, just to make the sentence sort of balance and flow, and so after that clause, we would propose "from" -- "video from the Tops grocery store."

**THE COURT:** And video from -- yeah.

**MS. BRAIN:** Yeah.

And we also wanted to add in -- we understand the Court declined to add in some of our proposals. And also we recognize we've not been consistent in our -- our factual requests. But in the -- in the final sentence of that paragraph, it says, "Ultimately chose the Tops grocery store." We would ask to insert a clause "three hours away from his home in Conklin, New York."

**THE COURT:** "Ultimately chose the Tops grocery store three hours away from his home in Conklin, New York, after visiting the store on previous occasions."

**MS. BRAIN:** Yes, sir.

**THE COURT:** Okay. Any objection from the government to that?

**MR. WARBEL:** Judge, we can't look at each other

to -- to kind of give thumbs up here, so I'm going to defer to the -- to the table there in Buffalo.

**MR. KRULY:** Yeah. No objection.

**THE COURT:** They're not objecting.

**MR. WARBEL:** Okay.

**MS. BRAIN:** On page 11, the very top carryover paragraph, it starts out "that a jury is never required to find."

**THE COURT:** Mm-hmm.

**MS. BRAIN:** Elsewhere in the paragraph the Court refers to juror in the singular, which we believe to be appropriate based on the nature of the decision.

**THE COURT:** Oh, sure.

**MS. BRAIN:** Yeah.

**THE COURT:** It should be "juror," yeah, because we refer to "juror" throughout that paragraph.

**MS. BRAIN:** Yeah.

**THE COURT:** Any objection to that?

**MR. WARBEL:** No, Your Honor.

**THE COURT:** Great.

**MS. BRAIN:** And then the only other thing was slight movement of clauses in the first full sentence on that -- on that page. So the final sentence, "And if the jury votes," we were proposing --

**THE COURT:** I'm sorry. Where are we?

**MS. BRAIN:** Beg pardon.

The first full paragraph on that page --

**THE COURT:** Oh, I've got it. Yes.

**MS. BRAIN:** -- beginning before -- yeah. If the last -- the very last sentence could be moved up to become the third sentence. So it would then read that --

**THE COURT:** "If every juror is persuaded beyond a reasonable doubt that the death penalty should be imposed" --

**MS. BRAIN:** Yeah.

**THE COURT:** -- "then I will be required to sentence to that. I cannot change the jury's decision. That sentence would be final."

**MS. BRAIN:** We would insert the last paragraph in between those two.

**THE COURT:** In between those two.

**MS. BRAIN:** Yeah.

And then in what would then be the final sentence, just for clarity --

**THE COURT:** Okay. Hang on. Hang on. Let me just --

**MS. BRAIN:** Beg pardon.

**THE COURT:** -- move it so I can read it myself.

Okay. Go ahead.

**MS. BRAIN:** And then what would then be the final sentence, "Life without the possibility of release is the appropriate sentence for Gendron on all counts, I then will be

requires..."

**THE COURT:** I think that's right.

**MS. BRAIN:** Okay.

**THE COURT:** Okay. So it would read this way. Let me read it, and -- and you folks can then let me know on the government's side whether you object to it. So -- and the Defense side can let me know whether I got it right.

So "Before a sentence of death may be imposed, every juror must be persuaded beyond a reasonable doubt both that Gendron is eligible for the death penalty and that any proven aggravating factors sufficiently outweigh any mitigating circumstances to justify a death sentence. If every juror is persuaded beyond a reasonable doubt that the death penalty should be imposed, then I -- then as the judge, I will be required to sentence him to death. And if the jury votes to impose the death penalty as to any counts, then the death -- as to any count, then the death sentence will control, regardless of any life sentence that the jury votes to impose as to any other counts. I cannot change the jury's decision, and that sentence would be final. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Gendron on all counts, then I will be required to impose a sentence of life imprisonment without the possibility of release, and that sentence would be final."

I take out "on the capital count," right?

**MS. BRAIN:** Yeah, I think that flows better, Your Honor.

**THE COURT:** Yeah. And that sentence would be final.

Okay. Any objection?

**MR. TRIPI:** No objection.

**MR. KRULY:** No.

**THE COURT:** I think that's right. I think that that improves it. So thank you.

Okay. Anything else from the Defense?

**MS. BRAIN:** That's it, Your Honor. Thank you.

**THE COURT:** Anything else from the government?

**MR. WARBEL:** No, Your Honor.

**THE COURT:** Great. Terrific.

Okay. So let's talk about CIPA. As I see -- we're not going to do another hearing. As I see this, I need to -- the next step needs to be -- needs for -- to be for me to look at what the stuff is so that I can make an intelligent decision about what to do after I look at it. So that's what I'm going to do. We're not going to do another hearing. I'm going to look at the top-secret material, probably be bored by it, and then decide whether it's significant and -- and follow the procedures after that. I think we've had whatever hearings we need. I think now it's just a matter of me -- you know, we're talking about the stuff in a vacuum now. I have no idea

what it is. And -- and I want to look at it before I start making decisions on the issues that the Defense is bringing up. So -- so the procedure we're going to follow is -- is that procedure.

Is there anything more that the Defense wants to put on the record about this now? Any more of a record you want to make.

**MS. DUNCAN:** Your Honor, I think what I understand that you're saying is that you want to look at the material and then, after the material, decide whether to have additional briefing on these issues.

**THE COURT:** Yes.

**MS. DUNCAN:** Is that correct?

**THE COURT:** Yeah. And what we need to do and whether -- you know, based on what I see in the material, whether there's anything that I think is of any moment to anything.

I mean, the reason I say this -- I went through this process once before in a trial. And the stuff was not only boring, but I didn't see any relevance whatsoever, and -- and I just didn't see any reason why it should, you know, be an issue for anybody.

So I don't know what it is, and until I know what it is, it's hard for me to make these kinds of decisions. Okay.

**MS. DUNCAN:** I understand.

**THE COURT:** You can make whatever record you want to make. I don't want to cut you off from making a record.

**MS. DUNCAN:** Sure. I just want to figure out the timing of this, Your Honor, so that we can make sure we are preserving it.

So as I understand what you're saying, then, you would be looking at the material. There wouldn't necessarily -- you're not asking for the government to submit a CIPA Section 4 memo, which is what we were wanting to brief, but, rather, you're intending to just look at the material itself. Is that correct?

**THE COURT:** I think -- no. The government is shaking its head.

**MR. NUNNALLY:** May I approach, Your Honor?

**THE COURT:** Yeah. Come on.

**MR. NUNNALLY:** Your Honor, we'll be providing, if the Court wants, the documents to the Court with our CIPA Section 4.

**THE COURT:** Okay.

**MR. NUNNALLY:** That's the way it's normally done.

**THE COURT:** Fine. Great.

**MR. NUNNALLY:** But the other thing I want to suggest to the Court is it might be very beneficial if you were to meet ex parte with the Defense to discuss with them their defenses and mitigation so that you could have that in mind when you're

reviewing the documents.

**THE COURT:** You think I should do that before. I was going to meet with them after I look at the documents.

**MR. NUNNALLY:** Whatever the order the Court wants. But it's -- I always think it's a good idea for the Court to do that just to ensure that everything is handled properly.

**THE COURT:** Mm-hmm.

Do you want to do that?

**MS. DUNCAN:** Your Honor, at the very least, we want to do that. I think that we -- I mean, we have specific objections to the -- the way that the government is proposing to proceed under CIPA Section 4. I mean, not only just, generally speaking, the ex parte nature of it, but also in their reply they indicated they intend to do legal briefing in that pleading that we would not have access to.

**THE COURT:** And again, I want to look at that and see what the legal briefing is. And maybe you get access to the legal briefing once I look at that. So -- so I will take into account what -- but the question I have for you now: Do you want to meet with me before I look at the stuff?

**MS. DUNCAN:** I think -- Your Honor, so we would defer to the Court on that, as long as we have an opportunity to meet with the Court before it decides whether to hand over the evidence or to exclude it.

**THE COURT:** Let me -- let me look at it first. Let

me look at it first. My -- my instinct is for me to look at it first, then I'll meet with the Defense, and then maybe look at it again, and then make the decision. Okay?

**MS. DUNCAN:** Thank you, Your Honor.

**THE COURT:** Okay. So -- so do we have a schedule for this now?

**MR. KRULY:** June 12th.

**THE COURT:** June 12th. Okay. Good. Great. Terrific.

Okay. Anything else on the C-I-P-A?

CIPA. Is that what we call it?

**MR. NUNNALLY:** CIPA.

**THE COURT:** Yeah.

**MR. NUNNALLY:** Not from the United States, Your Honor.

**THE COURT:** I hate acronyms. I hate acronyms. But I'll call it CIPA, just to sound cool.

Okay. Let's talk about the trial schedule. We're going to do the individual voir dire -- my plan is to do that Monday through Thursday from 9:00 to 5:00. And then for trial, my inclination is to do Monday through Friday, from 9:00 to 2:45, with about a half-hour lunch.

**MS. ZOGHLIN:** I have something to say about that, Judge.

**THE COURT:** Go ahead.

**MS. ZOGHLIN:** This is purely logistical. But from talking to some people --

**THE COURT:** Yeah.

**MS. ZOGHLIN:** -- Ms. Covert happens to know another lawyer that practices here -- that that half hour just doesn't really serve much purpose. Not that I want to go straight to 2:45, but by the time the Court personnel has gotten the jury down in the elevators and then the spectators down, there's really not time for people to do things like use the bathroom or eat anything. And then to just come back for an hour and 45 minutes, I just -- it seems somewhat impractical. So if the Court wants to do the shorter days, we would submit -- we would suggest maybe going to noon and then taking an hour and then maybe going till -- to 3:00 or going straight through till some reasonable time. But it's just that trying to take a half hour to do anything and then come back in a timely fashion I think would be difficult.

**THE COURT:** Thoughts?

**MR. KRULY:** Your Honor, the -- the government's preference would be to go four days a week, 9:00 to 5:00. But if we're going to do the five-day week, from 9:00 to around 2:45, I think we're in agreement that if we could move up the lunch a little bit earlier. We defer to the Court on how long a lunch to take.

I think, though, that the Court has ordered that the

jurors will be sequestered during lunch, so they --

**THE COURT:** Yeah.

**MR. KRULY:** -- won't have to go out and find lunch. It should save time.

**THE COURT:** Yeah. Okay. Let me -- let me give that some thought. I think what you're saying is probably right. I'm trying -- you know, we've got court reporter concerns here too. And I'm trying to do this in a way that -- that scratches all the itches. I think it's probably impossible, but I'm trying to figure out the best way to do it, so...

And speaking about court reporters, let me -- let me ask this question: For voir dire, do you really need two-hour transcripts? For voir dire, you've got the realtime. Why isn't realtime good enough for you? It's going to be such a burden on the court reporters to do a polished transcript in a short period of time. And you're going to have the realtime and be able to ask questions on the break if there's something you don't understand on the realtime.

**MS. COVERT:** Judge, I think the -- the request for having daily -- well, first of all, I think we would be requesting that the Court not excuse as we go, that we would have an opportunity to sort of reconsider and be able to refile with the Court for excusals in the overnight hour, at a minimum, so that we would need a daily transcript in order for us to do those.

**THE COURT:** Why?

**MS. COVERT:** Because we can't cite to a realtime transcript.

**THE COURT:** Well, why not? Why can't we use a realtime transcript to make the record? There's got to be a way to do that without creating unnecessary work that is going to really create significant issues in terms of staffing and court reporters. I don't -- I don't understand why you need something that is going to be polished as opposed to a realtime transcript that is certainly understandable and readable. And if it's not, we can ask the court reporter to fix it for us.

**MR. WARBEL:** Judge, may I say something?

**THE COURT:** Yeah. Go ahead.

**MR. WARBEL:** I'm concerned about this idea of never putting to rest the challenge to a juror. You know, you were an experienced trial judge. We are all experienced practitioners. We are capable of questioning these jurors, making our challenges for cause, and you reasonably, you know, assessing those challenges for cause in the moment. And this shouldn't be a never-ending process where we get two, three, four bites at the apple. We're capable of moving this process forward.

**MS. BRAIN:** Your Honor, I don't think we need, you know, two, three, four bites at the apple. But certainly from experience, the need to seek reconsideration, especially after

having the opportunity to look at the transcript, is -- is not infrequent at all. We're sensitive to the Court's concern about court reporters.

One potential solution would be that we can -- we can use the realtime to prepare our challenges. But if the Court is -- does not insist upon any reconsiderations being done overnight for the next day, like if the Court were to give us a few days to do that, then I think that we would then have a transcript that we could cite without having to have two-hour turnaround from the court reporter.

I have seen, you know, for a couple of trials, the realtime. It's -- it's incredibly valuable to have. But it's really very, very different, in my experience anyway, from the actual polished transcript. I mean, it can get garbled at times. The best --

**THE COURT:** Yeah, when it gets gar- -- I agree. And I have not worked with this court reporter with realtime for any significant period of time, but I know that when I worked with Ann Sawyer, there were times when the transcript got garbled. But I, on a break, would say, Ann, this -- this doesn't read very well. What did I say here, or what did the lawyers say here? And then she'll go back and tell me in 20 seconds or 30 seconds. She doesn't have time to go over the entire transcript to do a polished transcript. So -- so I don't think those things are going to be issues.

As far as when we're going to do the objections, I really hadn't thought that through, myself. Let me think that through. But -- but I'm hoping that -- that we're not going to need daily two-hour transcripts of the -- of the jury selection. I think that that is asking a little too much. And there's got to be a way that we can fashion this, even if -- even if, you know, we make an argument, I make a ruling, and then give you the chance to make a more fulsome argument on the record later on, even after the ruling has been made, with -- with the transcript that's been prepared on the usual three-day process.

So let's -- let's -- let's plan on that tentatively right now. We can -- we'll revisit this, but let's plan on that tentatively right now, and we'll do the two-hour transcripts for the -- the trial.

**MS. BRAIN:** And would the Court, while giving us that opportunity to revisit if -- in the few that might be necessary, would the Court not excuse the juror in the moment?

**THE COURT:** We'll see. I want to think that through. As I said, I haven't -- Mr. Warbel just raised this. I mean, you've just raised this. You know, the way I generally do it is challenges when they come up, and -- and I rule on them and that's it. But on occasion, I've, you know, entertained challenges sometime after. The lawyer will say, I have something that I want to bring up about, you know, Juror

Number 7 that I didn't bring up earlier. And I've done that. And I just want to think about what the process is going to be like.

Because we're doing individual voir dire of each juror, my thought process was that we'd know whether that juror was qualified enough or not when the juror left the room. That certainly was my -- my thought -- or shortly after the juror left the room.

**MR. WARBEL:** Once again, this is our expectation too, Judge.

**THE COURT:** Yeah.

**MS. BRAIN:** I think --

**THE COURT:** That certainly was mine. It sounds like that's not the Defense's.

**MS. BRAIN:** Well, I think in the ordinary course, it is, and that is -- that -- for most instances, that will certainly be true. But I also think that there will be -- likely be a handful for which it's not. We just want to make sure that we have the opportunity to, you know, take a breath and really assess. It's not -- it's not so easy, you know, with -- applying in a capital case, trying to figure out what is -- what is an impairment and what is not in the moment. And we just -- we're fallible. And if the Court was willing -- could give us a safety net, we would be very grateful.

**THE COURT:** So -- so are you saying what you want the safety net for are jurors who are qualified? You want to be able to raise an objection to that juror as not being qualified, or jurors who have been disqualified, maybe bringing them back in?

**MS. BRAIN:** I think either is a possibility. It would be -- if we -- obviously, the Court -- we would object at the time or make our cause strike or our objection to cause -- the government's cause strike. The Court would rule. I think in most cases, it's going to be clear and we will not need to revisit it. But I do -- I have -- you know, multiple times throughout the course of a jury selection process, have found the need to do -- to say, Wait a second, we missed something, or We really need to revisit this question. This -- what -- when you look -- when you really look at what the juror said, they are impaired or they're not impaired.

**THE COURT:** Let me -- let me give this some thought. I want to think of a way that we might be able to accomplish this. But -- but as I say, I'm going to proceed on the assumption that we're not going to do daily transcripts of the voir dire, that that's going to wait for trial.

**MS. BRAIN:** Very good, your Honor.

**THE COURT:** Okay. Okay.

And that's all I have.

Is that right? Yeah.

Anything?

**MR. KRULY:** No, Your Honor.

**MR. TRIPI:** Subject to --

**MR. WARBEL:** No, Your Honor.

**MR. TRIPI:** If Mr. Warbel is good, we're good at the table.

**THE COURT:** Defense?

**MS. ZOGHLIN:** We don't have anything further.

**THE COURT:** Okay. Should we -- I think we should schedule another date to come back and -- you know, we've been doing this every few weeks, and I think we should continue to do that.

Laura, I'll leave that up to you. When do you think?

**THE CLERK:** Well, Judge, we start June 15th. So maybe the week of June 8th.

**THE COURT:** Great.

**THE CLERK:** What do you think?

**THE COURT:** Let's do that.

**MS. HUGGINS:** The week of what? I'm sorry.

**THE COURT:** June 8th.

**THE CLERK:** I'm looking at a date in the week of June 8th.

**MS. BRAIN:** Would it make sense, Your Honor, to do it shortly after the -- Your Honor receives the CIPA material?

**THE COURT:** Oh, great idea.

When is that coming in?

**MR. KRULY:** The 12th --

**THE COURT:** The 12th.

**MR. KRULY:** -- which is a Friday.

**THE CLERK:** They're here the 15th.

**THE COURT:** And then they're here the 15th.

**THE CLERK:** So, I mean, we could do it --

**THE COURT:** And the 15th, the jury is going -- we're going to start doing the jurors on the 15th.

**THE CLERK:** Right.

**THE COURT:** So why don't we do it after. So we'll -- we'll do the initial instructions to the jurors on the -- on the 15th, and then we'll have our conference right after that.

How's that? Does that work?

**THE CLERK:** That works, Judge.

**THE COURT:** Let's do that.

**THE CLERK:** Mm-hmm. Yeah.

**THE COURT:** Yeah, I think that -- I think that makes sense, rather than have you come in beforehand, and then we'll have to have another session with the CIPA stuff.

Okay. Good. Anything else from either side?

**MR. TRIPI:** Just the last thing, Judge. We've been updating our exhibits and providing copies to the Court and to the Defense. We haven't updated our list. We'll be doing -- we've been providing more exhibits, but we haven't updated a

list in a while. We'll probably be doing that around June 1st when we have other filings due.

**THE COURT:** Great.

**MR. TRIPI:** Just wanted to let you know.

**THE COURT:** Good. Thank you very much.

**MR. TRIPI:** You're welcome.

**THE COURT:** Okay. Folks, thank you very much.

**THE CLERK:** All rise.

(Proceedings concluded at 2:58 p.m.)

* * * * * * * * *

**CERTIFICATE OF REPORTER**

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York on May 29, 2026.

s/ Laurel S. Tubbs____________________________
Laurel S. Tubbs, RPR, RMR, CRR
Official Court Reporter
U.S.D.C., W.D.N.Y.