IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v. 22-CR-109-LJV

PAYTON GENDRON,

Defendant.

**GOVERNMENT'S OMNIBUS PENALTY PHASE MOTION *IN LIMINE***

**THE UNITED STATES OF AMERICA**, by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, Joseph M. Tripi, Brett A. Harvey, Charles M. Kruly, Maeve E. Huggins, and Richard Antoine, Assistant United States Attorneys, Neville Hedley, Trial Attorney, Civil Rights Division, and Michael S. Warbel, Trial Attorney, Criminal Division, of counsel, and pursuant to this Court's May 28, 2026 order, Docket No. 585, respectfully submits this consolidated brief with respect to the potential penalty phase of the trial.[1]

## I. GOVERNMENT'S OMNIBUS PENALTY PHASE MOTION *IN LIMINE*

The government moves *in limine* to preclude certain defense evidence, information, or arguments from the potential penalty phase of trial. Because the issues are governed largely by the same legal principles, the government submits them in omnibus fashion.

## THE GOVERNING LAW

The Eighth Amendment and the Federal Death Penalty Act ("FDPA") both require that the finder of fact consider "*as a mitigating factor*, any aspect of a defendant's character or

[1] The government reserves its rights to file additional motions *in limine* or to respond to defense arguments regarding the potential penalty phase as necessary.

record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (affirming holding of *Lockett* in majority opinion concluding that character evidence is relevant mitigation); 18 U.S.C. § 3592(a)(8) (providing a catch-all mitigating factor of "[o]ther factors in the defendant's background, record, or character . . . that mitigate against imposition of the death sentence"). This requirement is rooted in the principle that punishment must relate directly to the defendant's personal culpability. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." (internal quotation marks omitted)), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

Despite this broad latitude to present *relevant* mitigating evidence, the defendant does not have unfettered discretion to present *any* evidence he claims may be mitigating. Rather, the Supreme Court recognized in *Lockett* that the trial court is not limited in its "traditional authority . . . to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *United States v. Fell*, 531 F.3d 197, 219 (2d Cir. 2008) (quoting *Lockett*, 438 U.S. at 604 n. 12). *See also Owens v. Guida*, 549 F.3d 399, 419 (6th Cir. 2008) (listing cases in which the Supreme Court has "confirmed that *Lockett* did not make all evidence automatically relevant" and holding courts may exclude certain evidence from capital sentencing hearings as irrelevant).

Applying *Lockett* to capital trials prosecuted under the FDPA, federal courts of appeals have routinely affirmed the exclusion of proffered mitigation unrelated to a defendant's background, his character, or the circumstances of the offense. *See*, *e.g.*, *Fell*, 531 F.3d at 219-20 (affirming exclusion of a failed plea agreement); *United States v. Roof*, 10 F.4th 314, 369-70 (4th Cir. 2021) (affirming exclusion of factors pertaining to defendant's purported vulnerability in prison); *United States v. Mikhel*, 889 F.3d 1003, 1062-63 (9th Cir. 2018) (affirming exclusion of conditions of confinement evidence); *id*. at 1066-67 (affirming exclusion of evidence that defendant's home country did not have a death penalty).

In addition to its authority to exclude proffered mitigation that does not relate to the defendant's background, his character, or the circumstances of the offense, this Court may also exclude information if its "probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The Supreme Court has expressly found that this provision of the FDPA does not violate the Eighth Amendment. *See United States v. Tsarnaev*, 595 U.S. 302, 317-320 (2022) (citing § 3593(c)'s balancing tests and observing that, "FDPA proceedings are not evidentiary free-for-alls" and concluding that § 3593(c) "does not offend the Eighth Amendment"); *see also Fell*, 531 F.3d at 219 ("[T]he FDPA's evidentiary standards do not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes." (quoting *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005)).

## ARGUMENT

The government anticipates the defendant will seek to offer penalty phase information and argument that either: 1) fails to relate to his background or character or the circumstances of the offense; or 2) holds little or no probative value, while posing a significant risk of creating

unfair prejudice, confusing the issues, and/or misleading jurors. Those arguments and that information should be precluded.

### A. The Court Should Preclude Any Defense Argument Concerning Application of the Beyond a Reasonable Doubt Standard to the Weighing Process

This Court should preclude any defense attempts to apply the "beyond a reasonable doubt" standard of proof to the death-penalty weighing process. Any such efforts would be illogical and confusing. As the government has previously briefed, each of the seven federal courts of appeals to reach the issue has agreed that the beyond a reasonable doubt standard is not amenable to the FDPA's weighing scheme. *See United States v. Gabrion*, 719 F.3d 511, 532 (7th Cir. 2013) (en banc); *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993-94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345-46 (5th Cir. 2007).[2]

Under the FDPA, once a jury finds unanimously and beyond a reasonable doubt that that the defendant is eligible for a sentence of death (that is, that his conduct satisfies at least one gateway intent factor set forth in 18 U.S.C. § 3591(a)(2)(A)-(D) and at least one statutory

[2] The government recognizes that Judge Sand's *Modern Federal Jury Instructions* suggest that district courts instruct a jury that it must apply the beyond-a-reasonable-doubt standard to the capital weighing process. Although Judge Sand's instructions are often a reliable and balanced statement of the law, the capital trial instructions do not meet that standard. Indeed, the commentary to Instruction 9A.04 recognizes that "several courts have recently held that [a beyond-a-reasonable-doubt instruction] is not required since the balancing is not a finding of fact to which the reasonable doubt standard applies." Yet, inexplicably—and without explanation—the instruction recommends that courts provide a beyond-a-reasonable-doubt instruction. The government is aware of no other instruction in Judge Sand's *Modern Federal Jury Instructions* that expressly ignore the uniform holdings of nearly three-quarters of the courts of appeals. What is more, the Introduction to Judge Sand's capital jury instructions state that they "include contributions from the Federal Death Penalty Resource Project," an organization which assists defense counsel in defending capital cases. Notably, no government attorney appears to have been consulted in drafting these instructions. The Court should therefore see Judge Sand's capital trial instructions for what they are: an effort to shape the law outside of the adversary process. Under these circumstances, there is no reason to defer to Judge Sand's instructions.

aggravating factor enumerated under 18 U.S.C. § 3592(c)), the FDPA provides that the jury must consider as follows:

> whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

18 U.S.C. § 3593(e)(3). Application of the beyond a reasonable doubt standard to this weighing process is not required and, in fact, makes no sense.

First, the Constitution does not require the beyond a reasonable doubt standard of proof, or any particular standard of proof for that matter, in the weighing process of a capital sentencing decision. In *Zant v. Stephens*, 462 U.S. 862, 875-76 n. 13 (1983), the Supreme Court made clear that the Eighth Amendment does not require "specific standards for balancing aggravating against mitigating circumstances." Federal appellate courts interpreting the FDPA following *Apprendi v. New Jersey*, 530 U.S. 466 (2000), have also uniformly concluded that the Fifth Amendment does not require proof beyond a reasonable doubt in the weighing stage because the weighing process is not a finding of fact. *See*, *e.g.*, *Gabrion*, 719 F.3d at 531-33.

In *Gabrion*, the court distinguished "binary" findings of fact, which under *Apprendi* and its progeny must be proved beyond a reasonable doubt, to the "moral judgment" a capital sentencing jury makes when it "consider[s] whether one type of factor sufficiently outweighs another so as to justify a particular sentence." *Id*. at 532 (internal quotation marks omitted). *See also Sampson*, 486 F.3d at 38 ("This argument founders, however, because it assumes, without the slightest support, that the weighing of aggravating and mitigating factors is a *fact*. This assumption is incorrect. As other courts have recognized, the requisite weighing

constitutes a process, not a fact to be found." (emphasis in original)); *Fields*, 483 F.3d at 345-46 (declining to extend *Apprendi/Ring* rule to the FDPA's weighing process).

Second, the FDPA also does not require the beyond a reasonable doubt standard of proof. In *Sampson*, the First Circuit reviewed the statute in detail:

> Sampson also alleges that the weighing instructions failed to require jurors to find beyond a reasonable doubt that aggravating factors outweighed mitigating factors, and thus violated the FDPA and the Fifth and Sixth Amendments. We can readily dismiss the statutory argument. The FDPA makes no mention of the reasonable doubt standard in the context of weighing aggravating and mitigating factors, *see* 18 U.S.C. § 3593(e), but it does reference the reasonable doubt standard in two proximate sections, *see id*. §§ 3591(a)(2), 3593(c). Because the inclusion of a term in one part of statute is persuasive evidence that its omission elsewhere is deliberate, *see Green*, 407 F.3d at 443, we hold that Congress did not intend the reasonable doubt standard to apply to the weighing process. That being so, Sampson cannot have been harmed by the instruction given.

486 F.3d at 31. *See also Runyon*, 707 F.3d at 516 (holding "the FDPA does not require the jury to find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt, and the jury therefore need not be so instructed").

Though the Second Circuit has not yet decided this issue, *see United States v. Aquart*, 912 F.3d 1, 16 n. 5 (2d Cir. 2018), multiple district courts in this circuit have followed the precedents cited above from other circuits to conclude the beyond a reasonable doubt standard does not apply to the FDPA's weighing process. Most recently, in *United States v. Saipov*, No. 17-722, 2023 WL 4199415, *9 (S.D.N.Y. Jun. 27, 2023), the court granted a government motion *in limine* identical to that now raised by the government here. Judge Broderick noted that "[a]ll courts of appeals that have considered what is meant by justified have determined that the beyond-a-reasonable-doubt standard is inapplicable to the FDPA weighing process," and found "no reason to reach a contrary conclusion." *Id*. *See also United States v. Fell*, No. 01-12, 2017 WL 10809985, *4-5 (D. Vt. 2017) (concluding same).

Likewise, in the capital retrial of Ronnell Wilson for the 2003 double-homicide of two undercover New York City Police officers, the district court rejected the defendant's attempt to apply the beyond a reasonable doubt standard to jury instructions governing the weighing process. *United States v. Wilson*, No. 04-1016, 2013 WL 3187036 (E.D.N.Y. Jun. 20, 2013). Judge Garaufis first explained that the statutory text of the FDPA "does not force the Government to prove that the aggravators outweigh the mitigators beyond a reasonable doubt." *Id*. at *2. Next, he explained that Congress's failure to include a specific burden of proof for the weighing process, despite doing so for proof of aggravating and mitigating factors, "strongly indicate[d] that Congress knowingly omitted the phrase 'beyond a reasonable doubt' from the weighing process provision." *Id*. Finally, the court held the "purpose of the FDPA also cuts against" applying the beyond a reasonable doubt standard, elucidating:

> Burdens of proof are often employed to help a jury ascertain a verifiable fact, i.e., whether the defendant did or did not commit a crime. But the weighing process of the FDPA governs a unique role of any jury: determining whether a defendant should be sentenced to death. This is not a matter that is either true or not true. Rather, each juror must make a moral judgement about whether a defendant should be executed. To require the Government to prove that the defendant should be sentenced to death beyond a reasonable doubt is illogical and conflates truth-seeking with balancing moral values.

*Id.*

Here, there is no reason to upset the long line of cases declining to apply the beyond a reasonable doubt standard to the weighing process. Doing so goes beyond the dictates of the statute, defies logic, and risks confusing jurors. Indeed, too, the government notes that this Court recently removed references to the beyond a reasonable doubt standard when describing the weighing process in its instructions to be provided to potential jurors prior to filling out the jury questionnaire. To later permit the defendant to argue to the jury that the

beyond-a-reasonable-doubt standard does apply to the weighing process will only invite confusion. Accordingly, this Court should preclude the defense from arguing or suggesting that the beyond a reasonable doubt standard applies to the weighing process.

### B. The Court Should Preclude Any Reference to the Unavailability of a Death Sentence Under New York Law

The defense should also be precluded from making any assertions or arguments concerning the unavailability of the death penalty under New York state law. The state's position on the death penalty is not a proper mitigating factor under the Eighth Amendment or the FDPA, and evidence relating to the state of New York's position on the death penalty should also be excluded under 18 U.S.C. § 3593(c)'s evidentiary balancing test.

While Supreme Court jurisprudence and the FDPA take a liberal approach to what is admissible at the penalty phase, courts have consistently held that a state's position on the death penalty is not a proper mitigating factor. This includes the two most-recent capital cases tried in the Eastern and Southern Districts of New York. *See Wilson*, *supra*, 2013 WL 2948034, *3-4 (E.D.N.Y. Jun. 14, 2013) (denying defense motion to introduce evidence concerning the unavailability of the death penalty in New York state); *Saipov*, 2023 WL 4199415, at *9 (granting government motion *in limine* to preclude defense from making any argument concerning the status of the death penalty under New York state law).

The decision in *Wilson* was premised on *Gabrion*, 719 F.3d 511, an *en banc* decision from the Sixth Circuit Court of Appeals reversing a prior panel decision to permit admission of information relating to the unavailability of the death penalty in the state of Michigan where the defendant murdered his victim on federal property. *See Wilson*, 2013 WL 2948034, *3-4. In *Gabrion*, the *en banc* court held that evidence of Michigan's ban on the death penalty was "irrelevant to a reasoned moral response to [the defendant's] background, character, and

crime." 719 F.3d at 523. Thus, consideration of the defendant's proffered mitigation was not compelled under either the Eighth Amendment or the FDPA. *See id*. at 523-24. *See also United States v. Higgs*, 353 F.3d 281, 328 (4th Cir. 2003) (holding federal defendant's ineligibility for the death penalty under Maryland law was not mitigating); *Mikhel*, 889 F.3d at 1066-67 (holding in a case involving murder by a foreign national (a Lithuanian) that Lithuania's abolition of the death penalty was irrelevant, as it had "no bearing on [the defendant's] character, his prior record, or the circumstances of his offense").

Here, this Court should likewise reject any attempt by the defense to introduce the unavailability of capital punishment under New York state law. To paraphrase the *en banc Gabrion* court: that New York lacks a death penalty has nothing to do with Gendron's background or character. It has nothing to do with the reasons why he chose to commit his race-based attack, killing 10 innocent Black people. It has nothing to do with his odious motives or his culpability for his offenses or "with any other consideration the Supreme Court has ever flagged as mitigating." *Gabrion*, 719 F.3d at 522. In short, it says nothing about the "defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

Finally, even if this Court were to conclude that the unavailability of the death penalty in New York is somehow appropriate for the jury to consider in this case, this Court must, as did the *Wilson* court, find that "such value is outweighed by the danger of confusing the issues or misleading the jury." *Wilson*, 2013 WL 2948034, at *4 (internal quotation marks and brackets omitted). New York's ban on capital punishment is due to a specific, technical opinion by the New York Court of Appeals that would require substantial explanation. *Id*.

Additionally, jurors might confuse the unavailability of the death penalty in New York with the propriety of capital punishment in federal court. *Id*.

For the reasons set forth above, this Court should preclude any reference to the unavailability of capital punishment under New York State law.

**C. The Court Should Preclude Execution Impact Information**

The defendant may seek to introduce testimony at a potential penalty phase from his family, friends, and other loved ones or associates. Though testimony from these individuals relating to the defendant's background and character may be appropriate, this Court should preclude testimony that may include statements of the witness's love or feelings toward the defendant, pleas for mercy or any particular sentence, and statements about how the witness may be affected if the defendant is sentenced to death. Such testimony, commonly referred to as "execution impact" evidence, is irrelevant. *See*, *e.g.*, *United States v. Hager*, 721 F.3d 167, 194-96 (4th Cir. 2013) (affirming district court's exclusion of execution impact evidence from defendant's family); *Mikhel*, 889 F.3d at 1066-67 (same); *United States v. Taylor*, 814 F.3d 340, 369-70 (6th Cir. 2016) (same); *United States v. Snarr*, 704 F.3d 368, 401 (5th Cir. 2013) (same).

As detailed throughout this memorandum, subject to § 3593(c)'s evidentiary balancing test, "[a] capital jury cannot be precluded from considering as mitigating evidence 'any aspect of a defendant's character or record and any of the circumstance of the offense that the defendant proffers as a basis for a sentence less than death.'" *Mikhel*, 889 F.3d at 1066 (quoting *Lockett*, 438 U.S. at 604 & n. 12). But evidence that does not bear on the defendant's character, his prior record, or the circumstances of the offense may be excluded as irrelevant. *Id*.; *see also Hager*, 721 F.3d at 196. Applying these standards, statements of love and affection

for the defendant, appeals for mercy or sympathy, and opinions about the appropriate sentence are irrelevant and must be precluded.

As the Fifth Circuit has explained: "Because such evidence does not reflect on the defendant's background or character or the circumstances of his crime, the Supreme Court has never included friend/family impact testimony among other categories of mitigating evidence that must be admitted during a capital trial." *Snarr*, 704 F.3d at 401 (internal quotation marks and brackets omitted). Similarly, in *Hager*, the Fourth Circuit concluded:

> In sum, evidence regarding how Hager's execution might affect his daughters would have provided the jury with nothing about his character, prior record, or the circumstances of his offense. And the fact that they love him or that it is important to them "to talk with him, see him, and have him in their lives" provides no insight, either.

*Hager*, 721 F.3d at 196-97. Quite simply, execution impact testimony is grossly speculative and "not mitigating." *See Taylor*, 814 F.3d at 369 (quoting district court opinion).

Execution impact evidence is wholly distinguishable from victim impact evidence, which is expressly permitted under the Eighth Amendment and the FDPA. *See Payne v. Tennessee*, 501 U.S. 808 (1991); 18 U.S.C. § 3593(c). Because victim impact evidence concerns the harm caused, it informs the jury's assessment of "the defendant's moral culpability and blameworthiness." *Payne*, 501 U.S. at 825. In contrast, execution impact evidence in no way reflects on the defendant's culpability. *See Snarr*, 704 F.3d at 402; *Hager*, 721 F.3d at 194-95. What is more, the capital murder victim is obviously unavailable to testify as to his/her life and character; thus, the victim impact witness fills this role, allowing the jury to consider, in fairness, both the life of the defendant and the victim. *See Payne*, 501 U.S. at 827 ("Justice, though due to the accused, is due to the accuser also." (internal brackets omitted) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 122 (1934)). On the other hand, the "capital defendant

is available to offer the jury all the relevant information as to his life, background, character, and the impact any sentence will have on him. To allow testimony of the impact on third parties, however, does nothing to inform the jury on any of these matters and upsets the balance set forth in *Payne*." *Hager*, 721 F.3d at 195.

Admittedly, some courts have permitted execution impact testimony. *See*, *e.g.*, *United States v. Wilson*, 493 F. Supp. 2d 491, 506 (E.D.N.Y. 2007) (recognizing the "cases the Government cited in support of its argument," but finding that execution impact testimony from the defendant's family was relevant to defendant's "background"); *United States v. Fell*, No. 01-12, 2005 WL 1634067 (D. Vt. July 5, 2005). These decisions, however, lack persuasive authority, especially in light of repeated subsequent decisions from several courts of appeals finding that execution impact evidence is improper. Indeed, *Fell* noted that, *at the time*, "[f]ederal courts have not directly considered mitigating evidence relating to the impact a defendant's execution will have on third parties." 2005 WL 1634067, at *1. Nonetheless, even then, the court held that "testimony regarding the effect of Fell's execution should be limited to the extent it relates to his background, record, or character," and that "sympathy for the defendant's family should not be considered by the jury in mitigation." *Id*. at *2.

Importantly, the government is not suggesting that victim family members may not offer any relevant information during a potential sentencing phase. Indeed, multiple courts have found a permissible balance that may be accomplished by permitting the defendant's family and friends to testify regarding the defendant's background and character, but not straying into impermissible grounds of statements of love, pleas for mercy or sympathy, and the speculation of how their lives may be affected if the defendant is sentenced to death. For instance, in *Saipov*, the district court granted the government's pretrial motion *in limine* to

preclude execution impact testimony but permitted the defense to "present testimony that is relevant to the Defendant's background, record, or character in accordance with 18 U.S.C. § 3592(a)(8)." *See Saipov*, 2023 WL 4199415, at *9. Similarly, in *Taylor*, the Sixth Circuit noted that the district court was careful to allow testimony from relatives about the defendant's "character, background, and value as a human being," while precluding testimony about "the impact that his execution would have on them." *Taylor*, 814 F.3d at 369-70. *See also Mikhel*, 889 F.3d at 1062-63 (discussing approvingly the district court's decision to admit a number of videotaped interviews of the defendant's family and friends located overseas, and only exclude an interview of an ex-girlfriend on the grounds of creating a risk of unfair prejudice or confusing the issues, and portions of an interview of the defendant's cousin pleading for mercy on the grounds of relevance). *See also United States v. Umana*, No. 08-134, 2010 WL 3023498, *15 (W.D.N.C. July 27, 2010) ("[A] logical extension of *Payne* would allow family of the defendant to testify about his life and characteristics, but prohibit them from specifically advocating against the death penalty or its impact on their lives.").

In sum, execution impact testimony amounts to an impermissible plea for sympathy by referencing the witness's love for the defendant and, at least implicitly, the witness's preferred sentencing outcome. It is speculative and has to do with *the witness's* background or character, and not *the defendant's*. While the defendant may offer information relative to his own life, background, and character, he should not be permitted to offer testimony regarding the impact of his potential death on any third parties. This was the balance struck in multiple cases cited above, including *Saipov*, and it should be repeated here.

**D. The Court Should Preclude Comparative Proportionality Information or Arguments**

The government moves this Court to preclude any evidence, arguments, or mitigating factors concerning "comparative proportionality" – that is, a notion that the jury should not impose the death penalty in this case because it was not sought or imposed in any other particular cases. Such evidence and arguments have nothing to do with the defendant's background, character, prior record, or the circumstances of the offense. They are irrelevant and misleading – moving the jury's focus away from the defendant and the facts of the instant case and running the risk of creating confusion by creating a series of mini-trials. Accordingly, and consistent with established authority from other federal capital cases, such evidence and arguments must be precluded.

For instance, prior to a retrial in *Fell*, Judge Crawford precluded such evidence, explaining that the FDPA requires jurors to conduct a penalty phase "on the facts related to this offense, this defendant, and these victims only." *United States v. Fell*, No. 01-12-CWG, 2017 WL 10809985, *3-4 (D. Vt. Feb. 15, 2017). Likewise, in *Taylor*, the court precluded evidence of comparator cases reasoning that the outcomes of other cases had "nothing to do with the defendant in this case or the circumstances of his offense or any of the mitigating factors in § 3592(a)." *United States v. Taylor*, 583 F. Supp. 2d 923, 935-36 (E.D. Tenn. 2008). The court continued, the jury's "decision on life or death must turn on its understanding of this case, the offense involved, and this defendant, not on the specifics of other cases and other defendants." *Id*. at 936. *See also Saipov*, 2023 WL 4199415, at *9 (granting government's motion to preclude comparative proportionality evidence without objection from defense); *United States v. McCluskey*, No. 10-2734, Docket No. 1418 (D.N.M. Nov. 18, 2013) (applying same rationale to preclude comparative proportionality evidence); *United States v. Umana*, No.

08-134, 2010 WL 1740487, *4 (W.D.N.C. Apr. 28, 2010) (rejecting mitigators premised on proportionality review as "irrelevant to [defendant's] character or the circumstances of [the] offenses, and [ ] likely to confuse and mislead the jury"); *United States v. Caro*, 461 F. Supp. 2d 459, 464-65 (W.D. Va. 2006) ("Allowing the defendant during closing argument to reference totally unrelated cases in which the death penalty was not sought or the defendant was not sentenced to death would lead to a confusion of the issues and mislead the jury.").

Evidence regarding other capital cases is irrelevant and runs the risk that the penalty phase will instead turn into a series of mini-trials concerning comparator cases. The risk of juror confusion is underscored by briefing in this case relating to the defendant's motion to declare the FDPA unconstitutionally arbitrary. *See* Docket Nos. 181, 191, 204, 290, and 383. Among other things, it is nearly impossible to settle upon who is a similarly situated offender and what is a similarly situated offense, and it should be irrefutable that every case and every offender is unique. The jury should not be distracted from its obligation to consider relevant mitigation related to *this* defendant's background, his character, and circumstances of *these* offenses. Accordingly, this Court should preclude evidence and arguments relating to comparative proportionality.

**E. The Court Should Preclude Information or Arguments Relating to Potential Conditions of Confinement and/or Any Purported Lack of Future Dangerousness**

The government moves to preclude evidence or arguments relating to the defendant's potential future conditions of confinement and any purported lack of future dangerousness should he be sentenced to life imprisonment.

Although the defendant has not yet disclosed his mitigation case, the government suspects, based on experience, that the defendant may attempt to offer testimony regarding conditions of confinement at either the federal Bureau of Prisons' ("BOP") administrative

maximum facility at Florence, Colorado ("ADX"), high-security BOP prisons, or high-security prisons within the state of New York's Department of Corrections and Community Supervision to argue, among other things, that, if sentenced to life imprisonment, he can be safely housed and that a death sentence is, therefore, not necessary. He may also seek to introduce such evidence to suggest a life sentence is equally, if not more, severe than a death sentence. Finally, the defendant may seek to offer opinion testimony relating to his purported lack of future danger and/or capacity for rehabilitation in these facilities, which may be supported by data regarding these systems' conditions of confinement and rates of violence. This Court should preclude such information. It is irrelevant to mitigation and, in this case, has no potential to rebut any alleged aggravating factors.

**1. Conditions of Confinement**

Several courts have held that evidence of prison conditions is irrelevant for a jury considering a capital sentence. For instance, in *United States v. Johnson*, 223 F.3d 665, 674-75 (7th Cir. 2000), the Seventh Circuit held that the harshness of prison conditions is not an appropriate mitigating factor. Though the court approved the introduction of conditions-of-confinement information as rebuttal to the government's future dangerousness allegation, it held that the defendant "should not have been permitted to present to the jury, as he was, evidence of the existence of maximum-security federal prisons decked out with control units, *in order to establish a mitigating factor*." *Id*. (emphasis added). The court cogently explained:

> A mitigating factor is a factor arguing against sentencing *this* defendant to death; it is not an argument against the death penalty in general. The argument that life in prison without parole, especially if it is spent in the prison's control unit and thus in an approximation to solitary confinement, sufficiently achieves the objectives aimed at by the death penalty to make the latter otiose is an argument addressed to legislatures, not to a jury. This is apparent from the fact that the list of mitigating factors in the federal death-penalty statute does not

> include the harshness or ugliness or (some would say) the immorality of the death penalty, but only factors specific to the death penalty.
>
> The argument is also illogical, as it amounts to saying that because this defendant is *so* dangerous, he does not deserve to be sentenced to death, since his dangerousness will assure his secure confinement. And its illogic shows that it is really an argument against the death penalty, period, since if this defendant should be spared because he is unusually dangerous, surely less dangerous murderers should not be executed either, even though, because they are less dangerous, they are less likely to be confined securely.

*Id*. at 675 (emphasis in original) (internal citations omitted). *See also Higgs*, 353 F.3d at 328 (relying on *Johnson's* reasoning to affirm the exclusion of proffered mitigation because it addressed a legislative policy matter).

Similarly, in *Taylor*, the Sixth Circuit affirmed district court decisions to exclude testimony from a former BOP official, James Aiken, and Dr. Mark Cunningham, a clinical and forensic psychologist who specializes in risk assessment and violence in prisons. *See Taylor*, 814 F.3d at 352-353. While the trial court allowed Aiken to opine that the defendant would likely be assigned to a high security facility and to contrast the security available at such institutions to that of a county jail from which Taylor attempted to escape while in pretrial detention, the court cut off questions about BOP policies and Taylor's potential daily life in a BOP facility. *Id*. at 353. The court also precluded Aiken from opining on BOP's ability to "safely control" the defendant. *Id*. at 354-55 (recounting Aiken's proffer outside the presence of the jury).

As to Dr. Cunningham, the court permitted testimony opining on the defendant's exposure to certain developmental "risk factors" and his brain maturation, but excluded testimony relating to BOP conditions of confinement, rates of violence in BOP facilities, and predictions relating to Taylor's likelihood of future violence in prison. The Fourth Circuit held that "because the excluded testimony did not pertain to Taylor's character, behavior, or

the circumstances of his crime, it did not constitute relevant mitigating evidence." *Id*. at 352;[3] *see also id*. at 361 (holding "testimony about the general prison conditions and the anticipated effectiveness of security protocols is insufficiently individualized" to meet Supreme Court standards for relevant mitigation information). *See also Roof*, 10 F.4th at 369-70 (affirming exclusion of proposed mitigating factors that "sought to prove that a sentence of life imprisonment would be particularly onerous for Roof," and preclusion of "evidence in support of speculation about [Roof's] future conditions of confinement"); *United States v. Coonce*, 932 F.3d 623, 639 (8th Cir. 2019) ("The district court need not – and should not — instruct juries that sufficient control in prison is a mitigating factor. We are not certain this evidence is individualized enough to qualify as a mitigating factor because some BOP evidence is common to many BOP defendants.").

Though the above precedents are not binding upon this court, they are nonetheless persuasive, given that they are from courts of appeals and reach consistent conclusions. Applying these precedents here, any proposed testimony from prison or risk assessment experts (or any other witness) regarding the defendant's potential conditions of confinement in any prison system, should the defendant be sentenced to life imprisonment, is irrelevant. It is not related to the defendant's background, his character, or the circumstances of his offenses and is "insufficiently individualized" to this defendant. *Taylor*, 814 F.3d at 361.

[3] In *Taylor*, the Sixth Circuit reproduced a lengthy excerpt from the district court's decision explaining the reasons to exclude the testimony from Warden Aiken and Dr. Cunningham. *See Taylor*, 814 F.3d at 356-60 (quoting *Taylor*, 583 F. Supp. 2d 923, 936-43). While not repeated here due to the length of the excerpt, the government encourages this Court to adopt the district court's reasoning from *Taylor*, which emphasized, among other things, that testimony regarding general prison security is not proper mitigation related to the individual defendant's background, record, or character, or the circumstances of the offense and that the proffered testimony was not proper rebuttal.

Rather, it is essentially offered as a public policy argument against the need for the death penalty writ large. Thus, it may not be offered to support stand-alone mitigating factors.

Such information is also not relevant as rebuttal in this case. Conditions-of-confinement evidence can be relevant rebuttal when the government has asserted the defendant's future dangerousness as an aggravator. *See Simmons v. South Carolina*, 512 U.S. 154, 169 (1994) ("Because truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires the he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court."); *see also Johnson*, 223 F.3d at 674-75 (explaining that while general conditions of confinement evidence is not proper mitigation, it may be appropriate as rebuttal evidence to counter future dangerousness allegations); *accord Coonce*, 932 F.3d at 638-39 (explaining the defendant was entitled to rebut allegation of future dangerousness in prison with conditions-of-confinement evidence, but not entitled to an instruction that BOP was "capable of imposing conditions of confinement that will control" the defendant).

Here, however, the government has not alleged future dangerousness as an aggravating factor. And, though it has alleged that the defendant was motivated to commit the capital murders in an attempt to incite violence by others (a factor this Court struck and which is currently before the Second Circuit), it has also not alleged that he continues in such attempts. Thus, the failure of this evidence to "respond to" any of the government's allegations serves as further basis for this Court to preclude it. *See Taylor*, 814 F.3d at 360-61 (distinguishing *Simmons* and finding the proffered conditions-of-confinement evidence was not proper rebuttal); *id.* at 352 (holding conditions-of-confinement evidence "was not responsive to the government's [narrow] arguments about Taylor's future dangerousness, so

that the district court did not abuse its discretion in refusing to admit the testimony as rebuttal evidence").

In addition to being irrelevant, testimony regarding potential conditions of confinement would also run afoul of the FDPA evidentiary balancing test set forth in 18 U.S.C. § 3593(c). Should he be sentenced to life imprisonment, the location and conditions of the defendant's future confinement are entirely speculative. The testimony would not be individualized to this defendant, but rather, would center on conditions at multiple potential institutions and the conduct of multiple other inmates. The penalty phase would devolve into a series of mini-trials or sideshows about BOP policies for classifying and placing inmates, how violence still occurs in the most-secure federal prisons (including ADX), and how *other* federal inmates convicted of *other* crimes have been housed and how they have reacted to various conditions of confinement. This testimony is irrelevant and has limited, at best, probative value, but on the other hand creates great risk of confusing the issues and misleading the jury. *See Taylor*, 583 F. Supp. 2d at 941 (finding excluded testimony would "simply confuse and mislead the jury and invite a decision on an impermissible basis."); *see also Wilson*, 493 F. Supp. 2d at 508 (allowing general conditions of confinement evidence to rebut future dangerousness but prohibiting testimony about specific institutions as being unduly speculative).

For these reasons, this Court should preclude any information or specific mitigating factors relating to the defendant's possible conditions of confinement.

**2. Opinions on Lack of Future Danger or Amenability to Rehabilitation**

In a similar vein, this Court should exclude opinion testimony relating to the defendant's ability to be safely housed, purported prospects for positively influencing others

while incarcerated, or purported lack of future dangerousness. Such testimony is irrelevant—not related to *the defendant's* background or character—and speculative at best.

In *United States v. Lighty*, the Fourth Circuit considered the admissibility of an opinion about the defendant's prospects for positively influencing others if he received a life sentence. *United States v. Lighty*, 616 F.3d 321, 364 (4th Cir. 2010). The district court had sustained a government objection to this evidence, stating that defense counsel could elicit from the witness, the defendant's uncle, "his own experience, his own relationship, his own evaluation of this man's character, but to ask him to extrapolate, saying how he will get along in prison if he gets life imprisonment is not a proper question." *Id*. In upholding the ruling, the Fourth Circuit distinguished the evidence at issue from *Skipper*, in which the Supreme Court held that a state court erroneously excluded the observations of two jailors and a visitor concerning the defendant's adjustment to pre-trial detention:

> Randy Lighty's testimony bore no resemblance to the kind of testimony that was excluded in *Skipper*. Unlike the jailors and visitor in *Skipper*, Randy Lighty was not asked about his *observations* of Lighty's adjustment to prison life prior to his trial. Instead, the question posed of Randy Lighty, whether he believed Lighty would have a positive impact on those in jail, called for no more than rank speculation about how Lighty would adjust to life in prison.

*Id*. (emphasis added). *See also Taylor*, 814 F.3d at 354-55 (recounting Warden Aiken's and Dr. Cunningham's proffers of evidence that was properly excluded, including Aiken's opinions on BOP's ability to "safely control" the defendant and Cunningham's predictions relating to Taylor's likelihood to commit violent acts in high-security or maximum-security BOP facilities).

This Court should adhere to the approach of the Fourth and Sixth Circuits and preclude opinions about how the defendant may adjust to life in prison. Such remarks hold little, if any, probative value and present an obvious risk of confusing the issues and

misleading the jury with conjecture and emotionally based remarks. Again, too, such opinion testimony would be inappropriate rebuttal in this case because the government has not put the defendant's future dangerousness at issue.

**3. Conclusion**

For the reasons set forth above, this Court should preclude any mitigating factors and the introduction of any penalty phase information relating to the defendant's potential future conditions of confinement if sentenced to life imprisonment, as well as any opinions on the defendant's ability to be safely housed, to positively influence others, or to be a low risk of future dangerousness. Such information does not relate to the defendant's background, character, record, or the circumstances of his offenses; therefore, the evidence is irrelevant. It also involves rank speculation. Further, neither the conditions of confinement evidence nor any evidence opining on the defendant's likelihood of future dangerousness would be proper rebuttal to any aggravating factor alleged by the government, particularly where, as here, the government has not alleged future dangerousness as an aggravating factor.

**F. This Court Should Preclude Evidence of Defendant's Conditional Offers to Plead Guilty**

As recognized in the government's response to the defendant's motion to change venue in this case, defense counsel has repeatedly—and publicly—referenced the defendant's state court guilty pleas, as well as his intention to plead guilty to the federal indictment should the government not seek the death penalty. *See, e.g.*, Docket No. 54 at 3 ("[O]ur client took responsibility in Erie County Court for the crimes he committed by pleading guilty to the indictment pending against him"); Docket No. 61 at 1 n. 1 ("As we have noted on several occasions, if the government decides not to seek Payton Gendron's execution, the criminal case will conclude with a guilty plea and sentence of life without the possibility of parole.");

Docket No. 80 at 2 ("On November 28, 2022, Payton Gendron accepted responsibility in state court for the crimes he committed by pleading guilty to the indictment pending against him in Erie County Court. . . As he has consistently stated, if the government decides not to seek a sentence of death against him in this case, he will plead guilty to the federal indictment, also, and proceed to a federal sentencing hearing, at the conclusion of which additional sentences of life without possibility of release will be imposed as mandated by law."), 16 n. 3; Docket No. 84 at 4 ("If the government decides against seeking a death sentence, there will be no motion practice; the case will end with a prompt guilty plea and the mandatory imposition of multiple additional life sentences."), 6 ("Our client has demonstrated his acceptance of responsibility for this crime by pleading guilty in state court. . ."); Docket No. 94 at 3 (". . . Gendron took responsibility for the crimes he committed by pleading guilty to the state court indictment"), 16; Docket No. 203 at 9-12. Accordingly, the government anticipates an attempt by the defendant to present evidence of those offers as mitigation at a potential penalty phase. This Court should preclude any such attempts. The plea offers, which have been consistently and expressly conditioned upon the government not pursuing a death sentence, do not constitute a mitigating factor relating to the defendant's background, his character, or circumstances of the offense. Further, their admission into evidence as purported mitigation at the penalty phase would contravene the § 3593(c) evidentiary balancing test, to wit: their probative value is minimal while the risks of undue prejudice to the government and confusion to the jury are high.

First, conditional offers to plead guilty do not amount to a genuine acceptance of responsibility, and therefore, are irrelevant as mitigation—that is, they do not reliably reflect upon the defendant's background, his character, or the circumstances of the offense. *See*

*United States v. Caro*, 597 F.3d 608, 635 (4th Cir. 2010) (finding district court did not abuse discretion or violate due process by excluding capital defendant's conditional offer to plead guilty to support a mitigating factor of acceptance of responsibility); *Owens*, 549 F.3d at 420 (holding state courts did not unreasonably apply clearly established federal law in denying capital defendant's attempts to introduce failed plea negotiations to demonstrate mitigating factor of acceptance of responsibility); *United States v. Lujan*, No. 05-924, Docket No. 870-1 at 14 (D.N.M. Apr. 15, 2011) (granting government motion *in limine* to preclude conditional plea offers); *see also United States v. McCluskey*, No. 10-2734, Docket No. 1060 at 26-29 (same). *But see United States v. Fell*, 372 F. Supp. 2d 773, 783 (D. Vt. 2005) (finding with minimal explanation that Fell's offer to plead guilty was relevant to the mitigating factor of acceptance of responsibility).

Here, neither the defendant's state court guilty plea nor his federal plea offers reflect an acceptance of responsibility for the federal hate-crime murders charged in this case. He made his guilty plea in state court months after he had been indicted on capital-eligible charges in federal court, and he likely did so in an effort to convince the Attorney General not to seek the death penalty. Likewise, the assertions in this Court that the defendant would plead guilty to federal charges have always been expressly conditioned on the federal government not seeking the death penalty and were made either after the federal government had filed its notice of intent to seek the death penalty or when it was obvious that the government was considering pursuing the death penalty. Given the timing of these offers, and the fact that the defendant is currently serving a life sentence in the state of New York, it is apparent that the defendant's offers are motivated by self-preservation and are merely an attempt to avoid the death penalty. Accordingly, the plea offers should be precluded as irrelevant.

Second, admission of the defendant's conditional offers to plead guilty would fail the § 3593(c) evidentiary balancing test. Even if this evidence may be seen as relevant to an acceptance of responsibility (a point the government does not concede), its probative value is minimal. *See*, *e.g.*, *Owens*, 549 F.3d at 420 (stating the defendant's conditional offer to plead guilty showed "she was less interested in accepting responsibility and more interested in avoiding the electric chair, a motivation that is much less persuasive as a mitigating factor"). On the flip side, admitting such evidence would substantially and unfairly prejudice the government and create the danger of significant juror confusion. If the Court permits such evidence, jurors "would undoubtedly question why they were spending [weeks or months] in trial," which "would lead them to question the motives of the United States, hamper their ability to focus, and confuse the issue," and could even "unfairly prejudice the jurors against the United States." *Lujan*, *supra*, Docket No. 870-1 at 14; *see also McCluskey*, *supra*, Docket No. 1060 at 26-29 (following *Lujan*).

Admission of the plea offers would further prejudice the government by potentially discouraging plea bargaining in future capital cases. Plea bargaining has been recognized as an essential component of the administration of justice. *See Santobello v. New York*, 404 U.S. 257, 260 (1971) ("Properly administered, it is to be encouraged."). *See also* Fed. R. Evid. 410, 1972 Advisory Committee note (stating the "[e]xclusion of offers to plead guilty or nolo has as its purpose the promotion of disposition of criminal cases by compromise"); Clifford S. Fishman and Anne T. McKenna, *Jones on Evidence* § 23:10 (7th ed. 2012) ("Although Fed. R. Evid. 410 only explicitly precludes statements offered by the prosecuting attorneys, fairness dictates that the restriction should apply to both parties in negotiations. If only the prosecutor is restricted, it would undermine the policy of promoting plea discussions."). "If such a policy

is to be fostered, it is essential that plea negotiations remain confidential to the parties if they are unsuccessful. Meaningful dialogue between the parties would, as a practical matter, be impossible if either party had to assume the risk that plea offers would be admissible." *United States v. Verdorn*, 528 F.2d 103, 107 (8th Cir. 1976). If a capital defendant is permitted to use as a mitigating factor his conditional offers to plead guilty when they may be nothing more than, as here, self-serving attempts to elude the death penalty, this could have the adverse effect of discouraging plea negotiations in capital cases. This, again, demonstrates why admission of the defendant's conditional offers to plead guilty in this case would unfairly prejudice the government.

The government acknowledges that at least some federal courts have permitted other capital defendants to introduce in mitigation their conditional offers to plead guilty. For instance, in *United States v. Williams*, the court denied a government motion *in limine* to exclude such evidence, stating "a conditional guilty plea may show some degree of acceptance of responsibility, and it is up to the jury – not this court – to determine how such fact should be weighed in determining Defendant's sentence." *United States v. Williams*, No. 06-79, 2014 WL 2436215, *2 (D. Haw. May 30, 2014); *see also Fell*, 372 F. Supp. 2d at 783. The *Williams* decision sets a precedent that should not be followed. First, the court acknowledged that the conditional plea offers demonstrate only "some degree" of acceptance of responsibility. 2014 WL 2436215, at *2. This is consistent with the government's assertion that such evidence has minimal, if any, probative value—a probative value that is substantially outweighed by negative risks. Second, *Williams* found it appropriate to leave it to the jury to determine the weight to give such evidence, but this abrogates the court's role under § 3593(c) to be the gatekeeper of evidence. *Fell* is equally unavailing because the court did not explain why it did

not address the issue of "unfair prejudice" to the government and only summarily found the evidence was not likely to be confusing to the jury. *See McCluskey*, *supra*, Docket No. 1060 at 28 (finding *Fell* unpersuasive because there was "no reasoning or analysis in the district court's opinion").

In *United States v. Roof*, the district court denied a government motion *in limine* to preclude a proffered mitigating factor that Roof had "offered to plead guilty as charged and to be sentenced [to] life in prison without the possibility of release." *United States v. Roof*, No. 15-472, 2016 WL 8678863, *1, *2 (D.S.C. Oct. 14, 2016). However, *Roof* demonstrates that the decision largely depended upon the particular facts of that case. *See id*. (noting the Fourth Circuit's opinion in *Caro* did not categorically preclude consideration of conditional plea offers, but rather, provided that the court "must exercise its discretion to make a decision appropriate to the facts of *this* case"). The court noted that Roof had offered to plead guilty "repeatedly and publicly," and those offers "were widely reported in national and regional media;" thus, the government was seeking to exclude information that was "both commonly known and undisputed." *Id*. The court also recounted that Roof had "unambiguously claimed responsibility" for his crimes in a custodial interview. *Id.; see also id*. ("To suggest that mention of Defendant's offer to plead guilty would confuse or mislead a jury shown a video of the Defendant stating, 'I am guilty. We all know I'm guilty,' strains credulity.").

The facts of this case, however, are distinguishable from *Roof*. The defendant has not made a full-throated post-arrest custodial confession akin to Roof's, and the government has indicated it does not intend to introduce any of the brief statements the defendant made during a post-arrest custodial interview. *See* Docket No. 471 at 15. Moreover, the timing of the defendant's state guilty plea—while he was actively trying to convince the federal government

not to seek the death penalty—makes it obvious that his state guilty plea was part of his broader litigation strategy, as opposed to a genuine acceptance of responsibility. Based on the circumstances, the defendant's conditional offers to plead guilty in federal court have minimal value as potential evidence of acceptance of responsibility.

Further, unlike Roof, the defendant has not made repeated offers in public view; instead his offers have generally been made by his attorneys when he was not physically present and in connection with attempts to obtain other relief, *e.g.*, scheduling delays, protective orders, etc. Similarly, his offers are now dated in time, and he has generally not attended court proceedings since the government filed notice that it would seek the death penalty, *see* Docket No. 536 at 6-7. Moreover, *Roof* went to trial within approximately 16 months of Roof's mass killing, whereas trial in this case is scheduled to commence more than four years after the defendant's attack. Though much of the media coverage since the attacks has involved developments in the state and federal court proceedings, the coverage has proportionally diminished over time in both frequency and detail. *Id*. at 7. Finally, Roof, unlike the defendant, was not already subject to a state sentence of life imprisonment when he made his repeated offers to plead guilty; thus, Roof's offers to plead guilty had a much greater tendency to demonstrate credibly some acceptance of responsibility.

In sum, plea negotiations are not a relevant mitigating factor. They do not reliably reflect upon the defendant's background, his character, or the circumstances of the crime. Nor do such offers reflect an acceptance of responsibility for the hate-crime murders charged in this case. Given the timing of the defendant's offers, and the fact that the defendant is currently serving a life sentence in the state of New York, it is apparent that the defendant's offers are motivated by self-preservation and are merely an attempt to avoid the death penalty.

Moreover, any probative value the plea offers might have is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* 18 U.S.C. § 3593(c). Finally, the admission of plea offers as mitigating information at trial would particularly prejudice the government by way of its chilling effect upon plea negotiations in future capital cases. For these reasons, the government requests that this Court preclude the defendant from introducing during the penalty phase any evidence of his offers to plead guilty.

**G. The Court Should Preclude Defendant from Providing Unsworn Allocution Before the Jury**

The defendant may seek to offer at the penalty phase an unsworn allocution before the jury or to introduce into evidence his state court sentencing statement. This Court should not permit him to do so. Alternatively, if the Court allows the defendant to allocute before the jury, it should impose certain restrictions and employ a limiting instruction to the jury.

A statement of allocution is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." *United States v. Jackson*, 549 F.3d 963, 980 n. 22 (5th Cir. 2008) (internal quotation marks, brackets, and citation omitted). Here, the defendant does not have a constitutional, statutory, or rule-based right to provide such an unsworn statement to the jury. Nor does he have a constitutional, statutory, or rule-based right to introduce his unsworn statement made during his state sentencing, which consisted of the defendant reading from a written statement that was not subject to cross-examination. Further, the risk of unduly prejudicing the government and confusing the jury with these statements substantially outweighs the probative value of any such statement.

At the outset, neither the Supreme Court nor any circuit court of appeals has recognized a constitutional right to allocution before the jury during the sentencing phase of a federal capital trial. *See United States v. Lawrence*, 735 F.3d 385, 406-07 (6th Cir. 2013); *United States v. Honken*, 541 F.3d 1146, 1172 (8th Cir. 2008); *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000); *United States v. Hall*, 152 F.3d 381, 392 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000). Nor does such a right exist under the Federal Rules of Criminal Procedure. Though Rule 32 provides criminal defendants with a right to speak, this rule applies to sentencing hearings before a court, and it does not extend to allocution before the jury in a capital sentencing hearing, even if the jury is the sentencer in this context. *See Purkey*, 428 F.3d at 761 (holding the plain language of Rule 32 does not create a right to allocute in a capital sentencing hearing); *Barnette*, 211 F.3d at 820 ("Neither are we of the opinion that Rule 32 has such a requirement" to make an unsworn statement of remorse before the sentencing jury). In a federal capital case, the defendant's Rule 32 rights may be satisfied by providing him/her the opportunity to allocute before the court pronounces sentence. *See Lawrence*, 735 F.3d at 407 (noting the defendant's right to allocute before the court was not denied); *Hall*, 152 F.3d at 392 (finding district court complies with the plain language of Rule 32 by inquiring whether the defendant wished to make a statement before it announced his sentence). What is more, the FDPA, which was enacted after Rule 32, also provides no express right to allocution.

At best, the FDPA allows that the "defendant may present any information relevant to a mitigating factor," though the probative value of such information may not be outweighed by the risk of "creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Even assuming an allocution statement may be pertinent to the

defendant's character, an unsworn and unconfronted statement by the defendant would be, for want of any indicia of reliability, substantially more prejudicial than probative. *See United States v. George*, 2020 WL 4432276, *2-4 (E.D. La. July 31, 2020) (granting government motion to preclude the defendants' unsworn allocution).

Further, permitting the defendant to make an unsworn and unexamined statement would deny the jury the essential information necessary for the determination of credibility of such statement. *See id*. Of course, the best cure for these concerns, should the defendant wish to present a statement to the jury, would be for him to take the stand and make such statement under oath, subject to cross-examination—a right the government does not dispute. *See Hall*, 152 F.3d at 397-98 ("The district court could properly conclude that the danger that [the defendant's] unsworn, uncross-examined testimony would mislead the jury outweighed the probative value of the information conveyed in the testimony, particularly given the fact that such information was readily available in a superior form: [the defendant's] sworn testimony, which would have been subject to testing for truthfulness and accuracy through cross-examination."). Consistent with these cases, this Court ought to preclude any attempt by the defendant to introduce an unsworn allocution statement in this case. *See also United States v. McCluskey*, No. 10-2734, Docket No. 1418 at 1-3 (D.N.M. June 26, 2013) (granting government motion *in limine*); *United States v. Johnson*, 136 F. Supp. 2d 553, 566-68 (W.D. Va. 2001) (denying defense motion to present unsworn allocution statement).

For all the same reasons, the defendant's state court sentencing statement should be precluded. Admitting this statement would amount to nothing more than providing the defendant with a backdoor to present an unsworn allocution. This statement utterly lacks reliability as a genuine acceptance of responsibility or expression of remorse. The statement

was made after the defendant entered his guilty plea, including to at least one offense that carried a mandatory life sentence (Domestic Act of Terrorism Motivated by Hate in the First Degree, N.Y. Penal Law § 490.28). He read a prepared statement, and the prosecution had no opportunity to test the authenticity or veracity of his statement through cross-examination. The defendant made this statement fully aware that he faced the specter of federal capital prosecution, and it can be seen as little more than a self-serving attempt to avoid the death penalty.

Also, even more than a live allocution before the jury (which should not be permitted for the reasons stated above), admission of the defendant's state court sentencing statement would raise the risk of confusion for the jury and unduly prejudice the government. As to confusion, jurors may question why the state court permitted the statement, the circumstances under which it was offered, or why the defendant is not addressing them directly. As to prejudice, the federal government had no opportunity to challenge the statement made in state court, to cross-examine it, or to contemporaneously comment upon it, and the government has significant concerns with its self-serving and performative nature.

Though the defendant has no *right* to provide an unsworn allocution to the jury, some courts have nonetheless recognized discretion to permit such statements subject to the FDPA's evidentiary balancing test. *See*, *e.g., Lawrence*, 735 F3.d at 408 (recognizing potential value of hearing statements of remorse in a defendant's "own words"); *Wilson*, 493 F. Supp. 2d at 509-11 (finding defendant did not have a "constitutional right to allocute to his remorse," but exercising discretion to allow him to do so subject to certain limitations); *United States v. Con-Ui*, No. 3:13-CR-123, 2017 WL 1386202, *1-2 (M.D. Pa. Apr. 18, 2017) ("That does not mean, however, that allocution is impermissible."); *United States v. Lujan*, No. 05-

924, Docket No. 782 at 19-23 (D.N.M. Apr. 15, 2011) (allowing allocution statement subject to limitations). The government maintains, however, that the better discretion is to exclude such evidence as unduly prejudicial and confusing to the jury, particularly where, as here, the government has not alleged future dangerousness or lack of remorse in aggravation.

Circumstances from *Wilson* underscore this concern with possible juror confusion. As noted, the defendant in *Wilson* was prosecuted for capital charges in the Eastern District of New York stemming from his killing two undercover New York Police Department detectives. *See United States v. Whitten*, 610 F.3d 168, 172 (2d Cir. 2010). He was convicted and sentenced to death in 2007. *Id*. at 173. During his initial trial, the district court permitted Wilson to provide an unsworn allocution statement subject to the following limitations: 1) the defendant was limited to addressing any arguments raised by the government other than the defendant's lack of remorse; 2) the defendant was not permitted to make any reference to the testimony of any witness, including victim impact witnesses; and 3) the court provided a cautionary instruction allowing the jury to consider that the statement was neither sworn nor subject to cross-examination. *See id*. at 196-97 & n. 21.

On appeal, the Second Circuit overturned the death sentence in part because it found the prosecution impermissibly commented during closing argument on the defendant's right not to testify. *See id*. at 199-200. Although the court found Wilson's allocution effected a limited waiver of his Fifth Amendment rights, and the district court expressly permitted the jury to consider that his allocution statement was unsworn and not subject to cross-examination, the Second Circuit found the government statements in summation—particularly, that the "path to the witness stand ha[d] never been blocked for Mr. Wilson,"—went too far. *Id*. at 200 The Second Circuit held that the district court should have issued a

"variant of the [no-adverse-inference] instruction that allowed jurors to consider Wilson's failure to testify *as to the subject of his allocution*, but that forbid them from considering his failure to testify for any other purpose or as to any other part of the defense's case." *Id*. (emphasis in original). These circumstances underscore the risks of creating juror confusion and undue prejudice to the government by permitting a defendant to provide an unsworn allocution before the jury. The better course of action would have been to preclude the unsworn allocution.

Should this Court, nonetheless, exercise discretion to permit the defendant to provide an unsworn allocution statement in this case, it ought to, at a minimum, apply limitations that were employed in *Wilson* and other cases. Particularly, the Court should limit any statement to a brief, prepared statement of remorse for killing the defendant's 10 victims, which must be provided to the Court and government in advance to allow for possible objections. The defendant should give any such statement from counsel table, not the podium or the witness stand. The defendant should be prohibited from commenting on any of the government's aggravating factors, any evidence in the case, or any arguments made by the government during trial. He should also be prohibited from commenting on the testimony of any witnesses, including victim impact witnesses, and should be precluded from directly addressing any witness or any victim family member. Finally, this Court should provide an instruction to the jury indicating that in deciding what weight to give the defendant's statement, if any, it may consider that the statement was not sworn or subject to cross-examination by the government. *See Wilson*, 493 F. Supp. 2d at 511; *Con-Ui*, 2017 WL 1386202, at *2.

For these reasons, the government moves to preclude the defendant from offering an unsworn allocution statement at trial, or in the alternative, to impose the proposed limitations or conditions upon any such statement. The government also moves to preclude introduction of the defendant's state court sentencing statement.

## II. GOVERNMENT'S MOTION TO COMPEL DISCOVERY OF MITIGATING FACTORS

The government requests an order compelling pretrial disclosure of the defendant's proposed mitigating factors no later than August 14, 2026—prior to the start of individual *voir dire*.[4] Requiring timely disclosure of the defendant's proposed mitigating factors will assure the fair and meaningful exercise of the government's statutory right of rebuttal, aid in the selection of an impartial jury, and contribute to the truth-seeking process of trial. *See United States v. Tsarnaev*, No. 13-10200, 2014 WL 4823882, *5 (D. Mass. Sept. 24, 2014).

To achieve individualized capital sentencing, the Eighth Amendment permits broad consideration of, among other things, evidence of the defendant's background and character. *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Consistent with this principle, the FDPA requires the government to give notice of aggravating factors a reasonable time before trial. 18 U.S.C. § 3593(a). Though it does not impose an express temporal, reciprocal notice duty on the defense, the FDPA expressly provides the government with the opportunity to rebut mitigating factors. *See* 18 U.S.C. § 3593(c) ("The government and the defendant shall be permitted to rebut any information received at the [penalty phase] hearing, and shall be given fair opportunity to present argument as to the adequacy of information to establish the

---

[4] In response to the government's request for pretrial disclosure of a list of the defendant's proposed mitigating factors, the defense, via an email dated June 9, 2026, advised that it could not agree to pretrial disclosure, but would agree to disclosure within 48 hours of a potential guilty verdict on any of the capital charges. For the reasons stated herein, the government finds post-guilty-verdict disclosure is insufficient.

existence of any aggravating or mitigating factor, and as to the appropriateness in this case of imposing a sentence of death.").

The Federal Rules of Criminal Procedure provide this Court with the inherent authority and discretion to require timely pretrial disclosure of the defendant's proposed mitigating factors. Specifically, Rule 57(b) provides that in the absence of controlling law: "A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." Recognizing procedural gaps in the FDPA because of its silence regarding defense disclosures and inherent authority under Rule 57(b), several federal courts have required capital defendants to provide pretrial notice of their proposed mitigating factors. *See*, *e.g.*, *Tsarnaev*, 2014 WL 4823882, at *5; *United States v. Roof*, No. 15-472, Docket No. 281 (D.S.C. July 26, 2016); *United States v. Sampson*, No. 01-10384, Docket No. 1319 at 2 (D. Mass. Mar. 19, 2014); *United States v. Wilson*, 493 F. Supp. 2d 464, 465-67 (E.D.N.Y. 2006); *United States v. Taveras*, No. 04-156, 2006 WL 1875339, *8-9 (E.D.N.Y. July 5, 2006). *See also United States v. Catalan Roman*, 376 F. Supp. 2d 108, 115-17 (D.P.R. 2005) (holding that the court, exercising inherent authority, may compel a capital defendant to notice and disclose non-mental expert mitigation in advance of the sentencing phase).[5] Other courts have found inherent authority to require disclosures, but have only required such disclosures after a guilty verdict and before the start of a penalty phase. *See*, *e.g.*, *United States v. Smith*, No. 16-86, 2019 WL 11863733, *1-2 (D. Alaska Dec. 9, 2019) (requiring pretrial disclosure of defendant's

[5] *See also United States v. Sampson*, 335 F. Supp. 2d 166, 200-01 (D. Mass. 2004) (holding that while Fed. R. Crim. P. 29 is not directly applicable to the penalty phase, it could apply similar procedures and standards pursuant to inherent authority). After all, "[i]f the federal courts have supervisory authority to formulate procedural rules not specifically required by the Constitution or the Congress to preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury, that authority must extend to the sentencing phase of a trial as well." *Id*. (internal quotation and citation omitted).

penalty phase witness list, but ordering disclosure of mitigating factors no later than 12 hours after a guilty verdict is returned); *United States v. Christensen*, No. 17-20037, 2019 WL 1976442, *6-7 (C.D. Ill. May 3, 2019) (granting motion for disclosure before the penalty phase, but not setting deadline at that time); *United States v. McCluskey*, No. 10-2734, 2013 WL 12329717, *2 (D.N.M. July 2, 2013) (finding inherent authority to require disclosure of mitigating factors, but finding government had not justified pretrial disclosure and that disclosure after a guilty verdict was sufficient); *United States v. Lujan*, No. 05-924, 2011 WL 13210665, *2-3 (D.N.M. Aug. 24, 2011) (requiring disclosure between the eligibility and section stages of the penalty phase).

The government recognizes that authority is not uniform on this issue and that several courts have rejected government requests for any disclosure of a defendant's mitigating factors. *See*, *e.g.*, *United States v. Bowers*, No. 18-2992, Docket No. 762 at 1 (W.D. Pa. July 15, 2022); *United States v. Council*, No. 17-866, 2018 WL 2090643, *1-5 (D.S.C. May 20, 2018); *United States v. Con-Ui*, No. 13-123, Docket No. 1157 (M.D. Pa. June 2, 2017). The government urges, this Court, however, to follow those courts that have required pretrial disclosures, as only pretrial disclosures can truly effectuate the government's right to challenge and rebut inappropriate or irrelevant mitigating factors, and pretrial disclosure would best promote judicial efficiency by minimizing the risk of delay between potential phases of this trial.

To have the "fair opportunity" of rebuttal required by statute, it is necessary that the government have notice of the mitigating factors the defendant intends to prove. *See Wilson*, 493 F. Supp. 2d at 466. Without sufficient time to investigate and prepare to rebut the defendant's proposed mitigating factors, the government's statutorily-granted opportunity for

rebuttal would be "meaningless," undermining the fairness and truth-seeking function of sentencing. *See Tsarnaev*, 2014 WL 4823882, at *5. What is more, "the facts affecting a sentencing determination [must] be as trustworthy as those informing a guilty verdict, and it is beyond dispute that the adequate preparation eased by early disclosure will contribute to the truth-seeking process, resulting in a more reliable sentencing determination." *Catalan Roman*, 376 F. Supp. 2d at 114.

Pretrial disclosure of proposed mitigating factors will permit efficient litigation of their legality and propriety. Over two years ago, the government provided notice to the defendant of the aggravating factors it intends to prove during the penalty phase, through a Notice of Intent to Seek the Death Penalty, an informational outline, and discovery. *See* Docket Nos. 125, 210. In response, the defendant moved this Court (successfully on several fronts subject to pending interlocutory appeal) to strike multiple aggravating factors. *See* Docket Nos. 181 and 319. The government now moves *in limine* to preclude certain categories of purported mitigation, *supra*, and the government further anticipates challenging specific mitigating factors proposed by the defendant. This Court's ability to thoroughly review any such challenges as to the propriety of the defendant's mitigating factors will be substantially enhanced by pretrial disclosure of such factors. Deferring notice until after the guilt phase, or requiring no notice at all, is far more likely to result in hasty briefing and deliberation, would be inimical to judicial economy, and risks unfairly skewing the penalty phase evidence and arguments. Pretrial disclosure of mitigating factors will also eliminate any unwarranted surprise. *See Wiliams v. Florida*, 399 U.S. 78, 82 (1970) (a criminal trial is not a "poker game in which the players enjoy an absolute right always to conceal their cards until played").

Circumstances from *United States v. McCluskey* and *United States v. Sampson* underscore the need for early disclosure and justify disclosure earlier than proposed by defense counsel here. As noted above, in *McCluskey*, the district court denied a government motion for pretrial disclosure of the defendant's mitigating factors but ordered disclosure the next business day after a guilty verdict. *See McCluskey*, 2013 WL 12329717, *2. McCluskey was found guilty of capital charges on October 7, 2013, and one day later, he tendered under seal a list of 137 mitigating factors. *See McCluskey*, 2013 WL 12328844, *1 (D.N.M. Nov. 12, 2013). On November 3, 2013, near the conclusion of the eligibility phase of the capital sentencing hearing, the government moved to strike or consolidate some of those factors. *See id*. The court characterized this motion as a "twenty-one page Motion present[ing] a number of detailed and in-depth arguments on 58 of McCluskey's 137 proposed mitigating factors." *Id*. at *2. Though the district court had not set a deadline for any government challenge to McCluskey's mitigating factors, the court denied most of the government's challenges on the sole grounds that the government's motion was untimely. *See id*. (stating the government "appears to have failed to take advantage of the opportunity to prepare which the Court provided"). The court found that "full consideration" of the motion at that time would "unduly burden the defense and this Court." *Id*.

In *Sampson*, the district court required pretrial disclosure of mitigating factors, ordering the defendant to provide a list of proposed mitigating factors approximately 10 months prior to trial. *See Sampson*, *supra*, Docket No. 1319 at 2, 6 (establishing a comprehensive scheduling order). The defendant submitted a list of 308 potential mitigating factors. *See id.*, Docket No. 2259 at 2 (D. Mass. May 13, 2016) (describing case procedural history). "The government moved to strike more than one hundred of the proposed factors as 'non-mitigating,' and to

consolidate those remaining into twenty-four 'reasonable and comprehensible mitigating factors.'" *Id*. In its pretrial order, the district court then struck 26 of Sampson's proposed mitigators. *Id*. at 11. As to the government's motion to consolidate factors, the court agreed that the remaining list of 282 factors was "unwieldy" and that the list contained "duplicative factors, overlapping factors, and factors which appear amenable to reasonable consolidation." *Id*. at 14. The court, therefore, ordered Sampson "to revise his list into a reasonable and orderly presentation." *Id*. at 15. Sampson next submitted a revised list of proposed mitigating factors that still consisted of 203 factors. *See id*., Docket No. 2288 (D. Mass. June 3, 2016). Additional litigation ensued, both before and during trial, and the defendant's list of mitigating factors ultimately submitted to the jury consisted of 115 factors. *See id*., Verdict Form, Docket No. 2834 at 7-25 (D. Mass. Jan. 9, 2017).

These cases illustrate that not every potential mitigating factor proffered by capital defendants is appropriate for jury consideration, and meaningful litigation may be required to assess the propriety of the defendant's list of mitigating factors. The government needs time to evaluate the defendant's proposed mitigation and raise appropriate challenges—time it did not have enough of in the *McCluskey* proceedings described above. Indeed, challenges to the defendant's mitigating factors in *Sampson* took several months. Pretrial disclosure of the defendant's proposed mitigating factors best permits the parties and the Court to give this meaningful litigation the time and consideration it requires and deserves.

Ordering pretrial disclosure of the defendant's mitigating factors does not infringe upon his constitutional rights. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the government's case before announcing the nature of his defense. *Cf. Williams v. Florida*, 399 U.S. 78, 85 (1970) (application of the

Florida notice-of-alibi rule did not deprive a defendant of due process, a fair trial, or compel him to be a witness against himself). *See also Catalan Roman*, 376 F. Supp. 2d at 117 (citing *Williams* to observe that "accelerating disclosure of a particular defense does not violate a defendant's constitutional rights, because a criminal trial is not a poker game in which players enjoy an absolute right always to conceal their cards until played." (internal quotation marks and citation omitted)). Here, there is minimal-to-no risk that anything the defendant may include in a list of mitigating factors would infringe upon rights to remain silent or to proceed to trial, particularly in light of the overwhelming video and digital evidence of guilt he, himself, created, and his admission of guilt in state court. Moreover, the government acknowledges that it may not in any way use the defendant's list of mitigating factors against him in the guilt phase of trial. *See Tsarnaev*, 2014 WL 4823882, at *9.

Nor does pretrial disclosure of mitigating factors impose an undue or onerous burden on the defense, who has been investigating the defendant's background and preparing for trial for more than four years, and has been on specific notice that the government would seek the death penalty for more than two years. As recognized in *Wilson*, they have had an "extensive opportunity" to develop a defense, "including identification and preparation of mitigating factors." *Wilson*, 493 F. Supp. 2d at 466. It should come as no surprise to the defendant, then, that the government seeks notice sufficient to permit it to rebut information he will offer in the penalty phase. *See id*. Indeed, the defendant has already been ordered to provide his notice of intent to introduce expert mental health evidence during sentencing no later than June 19, 2026 – a date that has been extended multiple times. *See* Docket No. 581. During the April 22, 2026, status conference, this Court ordered defendant to provide a list of guilt phase witnesses within 30 days and a list of penalty phase witnesses within 60 days.

(Transcript, 4/22/2026, at 43-44). His counsel is also likely building strategies for jury selection that are informed by his planned mitigation case—something about which the government remains entirely in the dark.

Of course, too, while litigating a potential penalty phase, the defendant will have to disclose his proposed mitigating factors to the jury. There is no constitutional violation in requiring the defendant to disclose mitigating information he intends to offer the jury anyway. *Catalan Roman*, 376 F. Supp. 2d at 117.

Finally, the disclosure of mitigating factors may be necessary to select a fair and impartial jury. *Tsarnaev*, 2014 WL 4823882, at *9. The Court and the parties have and will continue to invest substantial time and resources to develop strategies for a searching *voir dire* of potential jurors. The pretrial disclosure of defense mitigating factors will better enable the selection of unbiased jurors who are neither positively nor negatively predisposed in relation to the defendant's proposed mitigating factors. Likewise, requiring pretrial disclosure of mitigating factors will ensure that litigation-related delays do not require jurors to be available beyond the estimate the Court has already provided.

For the reasons set forth above, the government requests this Court issue an order compelling the defendant to provide a list of his proposed penalty phase mitigating factors prior to the commencement of individual *voir dire* and no later than August 14, 2026.

## III. CONCLUSION

For the reasons set forth above, the government requests that this Court grant each of its motions *in limine* to preclude potential mitigation information and/or arguments that would be irrelevant or run afoul of the FDPA's evidentiary balancing test and issue an order

compelling the defendant to provide a list of his proposed penalty phase mitigating factors prior to the commencement of individual *voir dire* and not later than August 14, 2026.

DATED: Buffalo, New York, June 17, 2026.

MICHAEL DIGIACOMO
United States Attorney
Western District of New York

BY: *s/JOSEPH M. TRIPI*
*s/BRETT A. HARVEY*
*s/MAEVE E. HUGGINS*
*s/CHARLES M. KRULY*
*s/PIERRE RICHARD ANTOINE*
Assistant United States Attorneys
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202

BY: *s/MICHAEL S. WARBEL*
Trial Attorney
Criminal Division
U.S. Department of Justice
1301 New York Avenue NW,
Ste. 505
Washington, DC 20530
(202) 514-5605
Michael.Warbel@usdoj.gov

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

BY: *s/NEVILLE S. HEDLEY*
Trial Attorney
Civil Rights Division
U.S. Department of Justice
150 M Street NE, Suite 700
Washington, DC 20002
(202) 297-3424
Neville.Hedley@usdoj.gov