UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

22-CR-109 (LJV)

PAYTON GENDRON,

Defendant.

---

**PAYTON GENDRON'S RESPONSE IN OPPOSITION TO GOVERNMENT'S OMNIBUS PENALTY PHASE MOTION IN LIMINE**

Dated: July 20, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC

## I. The Governing Law

The government offers a limited view of permissible mitigating evidence the defense may present. ECF No. 597 at 1-3. But the Supreme Court has consistently expanded the umbrella of not only permissible but also constitutionally required mitigation. Indeed, the language used by the Supreme Court to describe mitigation underscores this point; through the years, the Court has written of jurors "tak[ing] a broad view of mitigating evidence," *Ayers v. Belmontes*, 549 U.S. 7, 21 (2006); referred to "potentially infinite mitigators," *id.*; given "the broadest latitude to the defendant," *Payne v. Tennessee*, 501 U.S. 808, 826-27 (1991); noted "the breadth of [mitigating] factors that a jury under our decisions must be allowed to consider," *Sawyer v. Whitley*, 505 U.S. 333, 346 (1992); described how "virtually no limits" are placed on mitigation, *Payne*, 501 U.S. at 822 (also quoted in *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)); and praised a state scheme's "unrestricted admissibility of mitigating evidence," *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (citing *Proffit v. Florida*, 428 U.S. 242 (1976), and *Jurek v. Texas*, 428 U.S. 262 (1976)). This broad view of mitigation is required by "the fundamental respect for humanity underlying the Eighth Amendment." *Sumner v. Shuman*, 483 U.S. 66, 85 (1987) (requiring "that the defendant be able to present any relevant mitigating evidence that could justify a lesser sentence").

Relying on *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion), the government argues that mitigating circumstances are limited to a defendant's background, record, or character and circumstances of the offense. ECF No. 597 at 1-3. However, later Supreme Court decisions both "endorsed *and broadened*" the rule *Lockett* announced. *See Abdul-Kabir*, 550 U.S. at 248 (citing *Eddings v. Oklahoma*, 455 U.S. 104 (1982) and *Skipper v. South Carolina*, 476 U.S. 1 (1986) (emphasis added)). "In those cases, [the Supreme Court] emphasized the

severity of imposing a death sentence and that 'the sentencer in capital cases must be permitted to consider *any* relevant mitigating factor." *Id.* (quoting *Eddings*, 455 U.S. at 112).

Courts define mitigation as "any relevant circumstance that could cause [the sentencer] to decline to impose the [death] penalty." *Sampson*, 335 F. Supp. 2d at 176 (quoting *McCleskey v. Kemp,* 481 U.S. 279, 305–06 (1987)); *see also Payne*, 501 U.S. at 822 (noting the Supreme Court has "held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death"). "In contrast to the carefully defined standards that must narrow a sentencer's discretion to impose the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey*, 481 U.S. at 304. "In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *Id*. at 306.[1]

The Court's decision in *Skipper* is a good example of its expanded view of mitigating circumstances, which in that case was the defendant's forward-looking evidence regarding his "probable future conduct if sentenced to life in prison." *Skipper*, 476 U.S. at 4-5. "Although it is true that any such inferences would not relate specifically to [a defendant's] culpability for the

[1] Of course, the defense does not claim that it has carte blanche to introduce evidence that does not meet the broad definition of mitigating circumstances. The relevancy/reasonableness requirement limits outlandish evidence that no reasonable factfinder could claim supports a sentence less than death. For example, the Supreme Court has indicated that just because evidence falls under a "feature of the defendant's character or the circumstances of the crime" does not necessarily make it mitigating if it is "trivial"—for example, a bare reference to a defendant's prison shower schedule, which would not tend to support a basis for a sentence less than death in most cases. *See Tennard*, 542 U.S. at 286. In so holding, the Court has signaled it determines whether evidence is mitigating from the ability of the evidence to support a sentence less than death, not from its mere categorization within a preset list of factors (character, record, circumstances of the crime).

crime he committed, . . . there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Id*. (quoting *Lockett*, 438 U.S. at 604). More recently, in *Ayers*, 549 U.S. at 15, the Court criticized the lower court's "narrow," "unrealistic," and "too confined" interpretation of a state statutory mitigating factor, and held that "forward-looking" mitigation, including a likelihood of some future good conduct, "count[s] as a circumstance tending to make a defendant less deserving of the death penalty" even though such information may not neatly fit into a box relating to the defendant's culpability, circumstances of the crime, characteristics, or background. *See also id.* (referring to such evidence as "analogous" to good character, thereby implying it is not exactly the same). Like the lower court in *Ayers*, the government's conception of mitigating evidence is narrow, unrealistic, and too confined.

The Supreme Court has rejected virtually all attempts by lower courts to redefine "constitutional relevance" beyond this broad definition. *See, e.g., Smith v. Texas,* 543 U.S. 37, 43-443 (2004) (noting the Court has rejected tests of "constitutional relevance"); *Tennard*, 542 U.S. at 286. In *Tennard*, the Court rejected a constitutional relevance test that the "individual must establish a nexus between [the mitigating evidence] and [his] crime before the Eighth Amendment prohibition on executing him is triggered. Equally, [the Court] cannot countenance the suggestion that [a mitigating factor] is not relevant mitigating evidence . . . unless the defendant also establishes nexus to the crime." *Id.* at 287. Furthermore, the Court should not judge the "persuasive[ness]" of the defendant's evidence in ruling on admissibility. *Cf. Abdul Kabir*, 550 U.S. at 259 (noting the lower court ruling "ignored the fact that even though [the defendant's] mitigating evidence may not have been as persuasive as Penry's, it was relevant . . . [and] intended to provide the jury with an entirely different reason for not imposing a death

sentence”). It is the sentencing body, here the jury, not the Court, that determines the weight to be given to relevant mitigating evidence.

As the Supreme Court has explained, sentencing schemes that “‘exclude[] from consideration . . . the possibility of compassionate or mitigating factors’” are “flawed” and the Constitution “require[s] that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses.” *Miller v. Alabama*, 567 U.S. 460, 475-76 (2012). This Court must follow the Supreme Court’s “entire line of cases establishing the importance of allowing juries to give meaningful effect to any mitigating evidence providing a basis for a sentence of life rather than death.” *Abdul-Kabir*, 550 U.S. at 260; *see also Payne*, 501 U.S. at 822 (“[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances”).

The Federal Death Penalty Act (“FDPA”) provides that, “[a]t the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592.” 18 U.S.C. § 3593(c). Section 3592 defines mitigating factors in § 3592(a)(1)–(8), and under the catch-all “[o]ther factors” prong, it includes “the defendant’s background, record, or character, or any other circumstance of the offense that mitigate against imposition of the death sentence.” 18 U.S.C. § 3592(a)(8). Under the FDPA, then, “the defendant’s background, record, or character, or any other circumstance of the offense” is a subset of the relevant material the sentencer must consider and not an outer limit to the information “relevant to the sentence.” *See United States v. Haynes*, 269 F. Supp. 2d 970, 977 n.8 (W.D. Tenn. 2003) (emphasizing that the use of the word

"including" in Section 3593(c) calls for an expansive interpretation of what is admissible under that section).

Finally, the Court must reject the government's suggestion that mitigating circumstances are limited to those that "relate directly to the defendant's personal culpability." ECF No. 597 at 2. The Supreme Court has expressly recognized that mitigating evidence is broader than that which goes to moral culpability. Indeed, the Court has referred to evidence "which tends to diminish . . . culpability" as a "particular[]" kind of mitigating evidence. *See Brewer v. Quarterman*, 550 U.S. 286, 289 (2007); *see also Abdul-Kabir*, 550 U.S. at 251 n.12 (similar); *Wong v. Belmontes*, 558 U.S. 15, 28 (2009) (Stevens, J., concurring) (noting the Court's prior conclusions that the jury must be allowed to give weight to mitigating evidence, "even if such evidence does not tend to reduce the defendant's culpability for his crime"). This makes sense because there is evidence that may not necessarily diminish a defendant's culpability but may provide a reasonable basis for a sentence less than death, such as evidence that a defendant's friends or family will suffer trauma, grief, or loss should he be executed. *See, e.g., Jones v. United States*, 527 U.S. 373, 378 n.4 (noting, without issue, mitigating factor found by at least one juror that defendant's daughter will suffer "emotional trauma" of defendant's execution).

## II. SPECIFIC MOTIONS IN LIMINE

### A. The Court Should Instruct the Jury and the Defense Should Be Permitted to Argue that the Reasonable Doubt Standard Applies to the Weighing Process.

Sentencing in a federal capital case occurs in two discrete phases. The first phase, "eligibility," requires the jury to determine whether a defendant qualifies for the death penalty, while the second phase, "selection," requires a decision as to whether he "should in fact receive that sentence." *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994). Both the eligibility and

selection phases are conducted in a special sentencing hearing mandated by the FDPA. *See* 18 U.S.C. § 3593(b).

For a defendant to be death-penalty eligible, the jury must first find the homicide was committed with the requisite "intent." *See* 18 U.S.C. § 3591(a)(2)(A)-(D). The death penalty may be imposed only if the jury unanimously concludes beyond a reasonable doubt that the defendant "intentionally killed the victim or intentionally engaged in other specifically defined conduct which resulted in the death of the victim." *United States v. Friend,* 92 F. Supp. 2d 534, 536 (E.D. Va. 2000) (citing 18 U.S.C. § 3591). If the jury makes this threshold determination, then it must also find beyond a reasonable doubt the presence of at least one statutory aggravating factor alleged in the government's notice of intent. 18 U.S.C. § 3593(e)(2); *see also* 18 U.S.C. § 3592(c) (listing the statutory aggravating factors pertinent to federal homicide offenses). Once the jury makes these findings, the defendant is deemed eligible for the death penalty, and the jury proceeds to the selection phase. During the selection phase, the jury may consider the presence of any other statutory or non-statutory aggravating factor that reliably guides the jury's discretion and for which the government has given notice. 18 U.S.C. § 3592(c). Each juror then weighs the aggravating factors—if found unanimously and beyond a reasonable doubt—against any mitigating circumstances the defendant has established by a preponderance of the evidence. 18 U.S.C. § 3593(d). The jury may recommend a death sentence only if it unanimously concludes that "the aggravating factor or factors found to exist sufficiently outweigh [] the mitigating factor or factors found to exist …, or, in the absence of a mitigating factor, … the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

Against this backdrop, it is clear that the elements of a federal capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the

aggravating circumstances actually outweigh the mitigating circumstances to such a degree that a sentence of death is justified. In truth, then, the jury does not make its "selection" decision until it reaches the final stage of determining "whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e). A simple "outweighing" is not enough. As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is insufficient to justify imposition of a sentence of death. It is not until the moment that critical and mandatory finding is made that the defendant's potential punishment increases to death.

Thus, because the jury's weighing determination is a necessary aspect of imposing a death sentence under the FDPA, it is "the functional equivalent of an element of a greater offense" that the Sixth Amendment demands must be found beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 585 (2002) (state capital sentencing scheme violated the Sixth Amendment's jury trial guarantee by entrusting to a judge the finding of a fact raising the defendant's maximum penalty to death). The Supreme Court has repeatedly held that the Due Process Clause and the Sixth Amendment require that a jury make any determination that increases a defendant's maximum, statutorily permissible sentence only on proof beyond a reasonable doubt. *See Southern Union Co. v. United States*, 567 U.S. 343 (2012); *Cunningham v. California*, 549 U.S. 270 (2007); *United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

The government insists that the FDPA's weighing process—a prerequisite to imposing a death sentence—is not a finding of fact subject to the Sixth Amendment rule set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000), and reiterated in *Ring*. ECF No. 597 at 5.

In doing so, the government concedes that this is still an open question in the Second Circuit. *Id.* at 6 (citing *United States v. Aquart*, 912 F.3d 1, 16 n.5 (2d Cir. 2018)). Nevertheless, the Supreme Court has never suggested that *Apprendi* and its progeny cover only determinations of historical fact, and it rejected such an argument before *Apprendi* was even decided in *United States v. Gaudin*, 515 U.S. 506 (1995). There, the government contended the Constitution permitted a judge to find an element when it involved applying a "legal standard" to certain "historical facts" found by the jury. The Court found two difficulties with this argument:

> First, the application-of-legal-standard-to-fact sort of question [] commonly called a 'mixed question of law and fact,' has typically been resolved by juries…. The second difficulty with the Government's position is that it has absolutely no historical support. If it were true, the lawbooks would be full of cases, regarding materiality and innumerable other 'mixed-law-and-fact' issues, in which the criminal jury was required to come forth with 'findings of fact' pertaining to each of the essential elements, leaving it to the judge to apply the law to those facts and render the ultimate verdict of 'guilty' or 'not guilty.' We know of no such case.

*Id*. at 513. This description applies fully to the weighing determination in a federal capital case, in which the jury needs to draw inferences from aggravating and mitigating factors and determine the significance of those inferences. Indeed, in denying the government's Motion, the Court should take as its lodestar Justice Antonin Scalia's concurrence in *Ring*: "[All] facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." 436 U.S. at 610 (Scalia, J., concurring).

Payton Gendron acknowledges that seven courts of appeals have held that the beyond a reasonable doubt standard does not apply to the jury's ultimate finding. *See* ECF No. 597 at 4 (collecting cases). It is worth noting, however, that in the most recent decision the government

cites, *United States v. Gabrion*, 719 F.3d 511 (7th Cir. 2013),[2] four judges dissented after concluding, *inter alia*, that the beyond-a-reasonable-doubt standard applies to jurors' weighing decisions.

> Although it is true that the FDPA forbids the imposition of the death penalty unless at least one aggravating factor listed in § 3592 is unanimously found to exist beyond a reasonable doubt, the death penalty is authorized only if the jury (under the statute) then decides that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e).7 Before this determination is made, a sentence of death is simply not an option. Even when there are no mitigating factors, the death penalty is still not authorized (again, under the statute) unless the jury finds that "the aggravating factor or factors alone are sufficient to justify a sentence of death." *Id*. Under the plain terms of the FDPA, the district court could not impose the death penalty solely on the grounds that the jury found an aggravating factor and the requisite intent. *Blakely*, 542 U.S. at 305, 124 S.Ct. 2531. The statutorily authorized sentence increases to death only after the jury determines that the aggravating factors sufficiently outweigh the mitigating factors to justify the sentence of death, and not a moment before.

*Gabrion*, 719 F.3d at 546 (Nelson, J., dissenting, joined by Martin, White, and Stranch, JJ.).

As the government acknowledges, Judge Sand's *Modern Federal Jury Instructions* "instruct a jury that it must apply the beyond-a-reasonable-doubt standard to the capital weighing process." ECF No. 597 at 4 n.2. The government argues that the Court should see Judge Sand's capital jury instruction not as "a reliable and balanced statement of the law" but as "an effort to shape the law outside of the adversary process." *Id*. In making this argument, the government claims that Judge Sands only consulted with the Federal Death Penalty Resource Project (FDPRP) in crafting the instructions and did not consult with any government attorneys or prosecutors. *Id*. This is not entirely accurate. First, Judge Sands made clear that, "[i]n large measure, these instructions are adapted from *United States v. Bin Laden*." Clearly Judge Sands consulted with government counsel in drafting those instructions, as the other courts consulted

[2] *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) was decided several months before *Gabrion*.

during the drafting of the *Modern Federal Jury Instructions* did in crafting jury instructions in other capital cases. Second, two paragraphs after the reference to the FDPRP, the introduction to the Federal Death Penalty instructions notes that the discussion of the applicable law relied on the work of law professor Rory Little, who, a few years before, had been Associate Attorney General under Janet Reno and quite involved with DOJ policies and oversight for capital prosecutions. *See* https://fedsoc.org/bio/rory-little (biography of Rory Little). Thus, Judge Sands consulted or relied upon diverse sources and not just the FDPRP as the government suggests.

If this Court decides that the beyond-a-reasonable-doubt standard does not apply to the weighing process, Payton Gendron asks that the following instruction be added to the penalty phase jury instructions to properly convey the solemnity of jurors' sentencing decisions and the certainty they should feel about their weighing decision:

> The law does not define "sufficiently outweigh;" rather, each juror must exercise their unique, individual moral judgment – taking into account your judgment determines the ultimate fate of another human being and is a duty of the utmost gravity and profound and solemn weight – in deciding whether the aggravating factor or factors sufficiently outweigh the mitigating circumstances to justify sentencing Payton Gendron to death rather than to life imprisonment without the possibility of release.

*See Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) ("In evaluating the various procedures developed by States to determine the appropriateness of death, this Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State."); *McGautha v. California*, 402 U.S. 183, 207-08 (1971) ("The States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision").

### B. Payton Gendron Does Not Intend to Offer the Unavailability of the Death Penalty Under New York Law as a Mitigating Circumstance.

The government asks the Court to prohibit the defense "from making any assertions or arguments concerning the unavailability of the death penalty under New York state law." ECF No. 597 at 8. Although potential jurors are aware of this fact from the Court's introductory remarks before they completed the questionnaire, the defense does not intend to introduce any evidence or argument related to this fact.

### C. The Court Should Not Preclude the Defense from Introducing Testimony Concerning All Aspects of Payton Gendron's Relationship with His Family, Including How His Execution Would Impact Them.

The government asks the Court to exclude three categories of testimony related to Payton Gendron's family and friends: (1) "statements of the witness's love or feelings toward [Payton]", (2) "pleas for mercy or any particular sentence," and (3) "statements about how the witness may be affected if [Payton] is sentenced to death." ECF No. 597 at 10-13. As a preliminary matter, Payton does not intend to ask any defense witness for their opinion of what his sentence should be. As discussed in his challenge to the government's proposed victim impact testimony and as reflected in the Court's proposed penalty phase instructions, witnesses' opinions on the appropriate sentence in this case are irrelevant and inadmissible. However, he may introduce testimony falling within the remaining categories the government challenges, and it is simply wrong to assert that such evidence is irrelevant to the jury's sentencing decision. Indeed, several of the cases the government cites in support of its request specifically *allowed* the defense to present the type of evidence the government now seeks to exclude.

Payton's prior, ongoing, and future relationship with his family and friends is clearly relevant to the jury's consideration of whether death is the appropriate punishment because it is a crucial aspect of his character and adaptability to prison life. This includes testimony from core

family members about how Payton's execution would affect them. Courts regularly permit juries to consider, as mitigation, the affection a capital defendant's family and friends feel for him. *See, e.g., United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007) (district court appropriately allowed "witnesses to testify regarding their affection for [the defendant] and their wish for his life to be spared"); *United States v. Williams*, 18 F. Supp. 3d 1065, 1069-71 (D. Haw. 2014) (permitting defendant to introduce "execution impact" evidence because "relatives' affection for' a defendant and 'their wish for his life to be spared' … has a tendency to show that imposition of the death penalty is not justified, and can concern his record and character") (citing *Mitchell*, 502 F.3d at 991); *United States v. Fell*, No. 2:01-CR-12-01, 2005 WL 1634067, at *1 (D. Vt. July 5, 2005); *see also* Exhibit A (providing examples of family love and execution impact-related mitigating factors from federal capital cases).

For example, in *Fell*, the government urged the court to strike from the defendant's list of mitigating circumstances that his "execution would detrimentally affect persons who care about him." 2005 WL 1634067 at *1. In refusing to do so, the court relied on *Payne*, *Skipper*, and the FDPA itself to determine that "evidence relating to the impact a defendant's execution will have on third parties" because of their affection for him appropriately implicates "a defendant's background, record or character." *Id*. Third-party impact testimony may shed light on a defendant's background and character by providing testimony about any "positive qualities, his capacity to be of emotional value to others, and the nature of his interpersonal relationships." *Id*. at *2-3 (internal quotations omitted). Ultimately, the *Fell* jury was instructed to consider the following mitigating circumstance: "Donald Fell's execution would detrimentally affect persons who care about him."

Evidence and testimony that Payton Gendron's family and friends love him and would suffer if he were sentenced to die "is directly relevant to the question of whether he can lead a 'useful life' if sentenced to life imprisonment because it tends to show that other people consider [him] valuable as a human being and would benefit from [his] survival." *Jackson v. Dretke*, 450 F.3d 614, 620 (5th Cir. 2006). Payton acknowledges that some district courts have excluded evidence of the impact an execution would have on the defendant's family and friends. *See, e.g., United States v. Hager*, 721 F.3d 167, 194-96 (4th Cir. 2013). However, many other courts have allowed it, including two the government miscites in support of its argument that such evidence should be excluded.

The government cites *United States v. Mikhel*, 889 F.3d 1003 (9th Cir. 2018), as support for its assertion that "execution impact evidence" is irrelevant. ECF No. 597 at 10. But the verdict form in that case included two mitigating circumstances related to execution impact:

- Iouri Mikhel's family and friends, including the young and elderly, will be adversely affected if he is executed.

- Iouri Mikhel is the father of a daughter, and step-father of a son, both of whom will suffer if he is executed.

Exhibit B at 14. Although no jurors found these mitigating circumstances to have been proven, the district court nonetheless found them relevant to the sentencing decision and included them on the verdict form. Moreover, the Ninth Circuit never held that these circumstances were irrelevant. The quotes the government includes in its Motion are related to the argument that the trial court erred in excluding as a mitigating factor the fact that the defendant's country of origin, Lithuania, did not have the death penalty. *Mikhel*, 889 F.3d at 1066-67; *see* ECF No. 597 at 10 (citing *Mikhel*). They did not, as the government suggests, relate to execution impact evidence. Indeed, the Ninth Circuit's decision does not address the relevance of execution impact evidence

*at all.* The government's summarization of the appellate court's discussion of the exclusion of portions of the defendant's family's testimony is incredibly misleading. *See* ECF No. 597 at 13. Citing *Mikhel* as support for the argument execution impact testimony is irrelevant, the government summarizes that decision as affirming the exclusion of "an interview of an ex-girlfriend on the grounds of creating a risk of unfair prejudice or confusing the issues, and portions of an interview of the defendant's cousin pleading for mercy on the grounds of relevance." *Id.* Here is what the court actually held:

> **Mikhel's excluded mitigation evidence**
>
> Mikhel sought to introduce a number of videotaped interviews of his friends and family. These were not depositions: the witnesses were not under oath, and the government was not represented. The district court admitted several of the interviews, but excluded all of an interview with Mikhel's ex-girlfriend, Marina Karagodina, and a small part of an interview with Mikhel's cousin, Edward Mikhel. Mikhel claims the exclusion of this evidence violated his rights under the Eighth Amendment and FDPA. We review the exclusion of mitigating evidence for abuse of discretion. *See* 18 U.S.C. § 3593(c); *Mitchell*, 502 F.3d at 991. …
>
> Among other things, Karagodina stated in her interview that she had a good relationship with Mikhel, that Mikhel had been good to her son from a previous marriage, and that Mikhel deserved mercy. The district court excluded the interview entirely, reasoning that Karagodina was being led by the investigator's questions, lacked first-hand knowledge on some issues, gave irrelevant testimony about Mikhel's arrest and her feelings toward the police, and could have traveled from England to the United States to testify in person. To this list of reasons to exclude the interview, the government adds that much of what Karagodina said in 2002 was no longer true by the time the penalty phase began in 2007. The government cites a 2005 interview in which Karagodina called Mikhel a "scary man" and said that he had threatened her, that she had switched phone numbers because of him, and that she had changed her daughter's last name from "Mikhel" to "Karagodina."
>
> Parts of the Karagodina interview spoke to Mikhel's character and background and thus were at least marginally relevant. *See* 18 U.S.C. § 3592(a)(8). Nevertheless, the district court was within its discretion in excluding the interview for its danger of creating unfair prejudice, confusing the issues, or misleading the jury. *See Mitchell*, 502 F.3d at 991. As the district court explained, many of Karagodina's statements "were, at best, gratuitous remarks or coached answers by defense investigators." Moreover, had the interview been admitted, the government would have had no opportunity to cross-examine Karagodina on her alleged involvement in Mikhel's crimes and bring to light her changed attitude toward Mikhel. Although it might not have been an abuse of discretion to admit the

> interview, we hold the district court did not abuse its discretion in excluding it. *Cf. United States v. Taylor*, 814 F.3d 340, 363 (6th Cir. 2016) (mitigation evidence may have been admissible, but it was not an abuse of discretion to exclude it).
>
> The district court admitted most of Edward's interview but excluded a small portion at the end in which he stated: "The only thing I ask for to be merciful, the court to be merciful. Maximum merciful as it is possible to my cousin, to my relative. What else can I say? To be merciful, to be merciful." It seems Edward did not know Mikhel well, and defense counsel conceded Edward had not seen Mikhel for years. The district court reasoned that Edward's plea for mercy was irrelevant because it was "not a mitigating factor" but "just a personal plea on behalf of the witness who has no knowledge of what transpired here."
>
> Mikhel argues on appeal that a bare plea for mercy is relevant mitigating evidence under our decision in *Mitchell*. But that case does not help him. In *Mitchell*, we held the district court "drew a fine, but appropriate, line" by admitting testimony regarding witnesses' "affection for [the defendant] and their wish for his life to be spared," while excluding testimony offering "an opinion about what they thought the jury's verdict should be." 502 F.3d at 991. Here, Edward's plea for mercy—particularly in light of his apparently limited relationship with Mikhel—was essentially an opinion about what the jury's verdict should be. The plea did not bear on Mikhel's character, prior record, or the circumstances of his offense. The district court did not abuse its discretion in excluding it.

*Mikhel*, 889 F.3d at 1062–63.

Similarly, the government cites to *United States v. Saipov*, proclaiming "the district court granted the government's pretrial motion in limine to preclude execution impact but permitted the defense 'to present testimony that is relevant to the Defendant's background, record, or character in accordance with 18 U.S.C. § 3592(a)(8).'" ECF No. 597 at 13 (quoting *United States v. Saipov*, No. 17-CR-722 (VSB), 2023 WL 4199415, at *9 (S.D.N.Y. June 27, 2023)). Here is what the *Saipov* court actually held:

> **Impact That the Defendant's Execution Would Have on the Defendant's Family**
>
> The Government initially requested that I "preclude any testimony or evidence about the impact that the Defendant's execution would have on the Defendant's family." (Doc. 285, at 75–78.) *However, in its reply in further support of its motions in limine, the Government stated that it "will not object to [the] admission of execution impact testimony to the limited extent such testimony bears on the defendant's background, record, or character,"* (Doc. 312, at 29.) The Government's motion is GRANTED; however, the Defense is still permitted to present testimony that is relevant to the Defendant's background, record, or character in accordance with 18 U.S.C. § 3592(a)(8).

(emphasis added). In its reply, the government had written:

> In its Motions in Limine, the Government moved to preclude the defendant from offering evidence regarding what impact his execution would have on third parties, such as his family. (Gov. MIL at 75-78). In response, the defendant concedes that the FDPA does not expressly require admission of execution impact testimony. Indeed, every federal court to have addressed this question has found as much. The defendant argues, however, that the Court should admit such testimony because it is relevant to the defendant's character and background. (Def. Br. at 22); *see also* 18 U.S.C. § 3592(a)(8). *In consideration of the defendant's arguments, the Government will not object to admission of execution impact testimony to the limited extent such testimony bears on the defendant's background, record, or character.*
>
> *The approach adopted by the Government here is consistent with United States v. Fell, No. 01 Cr. 12, 2005 WL 1634067, at *2 (D. Vt. July 5, 2005), on which the defendant relies.* In *Fell*, the district court permitted third party impact testimony that may "shed light on the defendant's background and character by providing testimony about any 'positive qualities,' 'his capacity to be of emotional value to others' and the nature of his interpersonal relationships." *Id*. The district court cautioned, however, that such testimony should be "limited to the extent it relates to [the defendant's] background, record or character." *Id.*; *see also Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) (describing the district court's authority, in capital cases, to "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"). The court further held that "[e]vidence introduced solely to elicit jury sympathy towards third parties impacted by [the defendant's] execution [would] be precluded." *Id.*
>
> In proposing an approach consistent with *Fell*, the Government does not concede, as the defendant argues, that the admissibility of execution impact testimony should be considered under the same framework as victim impact testimony.

*Saipov*, 1:17-cr-00722-VSB, ECF No. 312 at 32-34 (emphasis added). In other words, in *Saipov*, the defense and the government agreed the court should follow the approach in *Fell*, which allowed execution impact testimony that may "shed light on the defendant's background and character by providing testimony about any 'positive qualities,' 'his capacity to be of emotional value to others' and the nature of his interpersonal relationships." *Fell*, 2005 WL 1634067, at *2.[3] In this case, by contrast, the government argues both that *Fell* "lack[s]

[3] In *Saipov*, the jury found the following mitigating circumstances:

persuasive authority" and that this Court should strike the balance the district court did in *Saipov*, which is the same balance struck as *Fell*. ECF No. 597 at 12-13.

This Court should follow *Fell* and the myriad other decisions concluding that evidence relating to the impact a defendant's execution will have on friends and family because of their affection for him appropriately implicates "a defendant's background, record or character" and is admissible. *Fell*, 2005 WL 1634067, at *2; *see also Mikhel*, 889 F.3d at 1063 ("In *Mitchell*, we held the district court 'drew a fine, but appropriate, line' by admitting testimony regarding witnesses' 'affection for [the defendant] and their wish for his life to be spared,' while excluding testimony offering 'an opinion about what they thought the jury's verdict should be.' 502 F.3d at 991."); *United States v. Williams*, 610 F.3d 271, 279 (5th Cir. 2010) ("With respect to the mitigating factors, the jury found that: … (5) executing Williams would adversely impact his wife and family"); *Johnson v. United States*, 860 F. Supp. 2d 663, 906-07 (N.D. Iowa 2012) (on habeas review, concluding "that a reasonable attorney, who had available evidence of the severe effect of Johnson's execution on her family members, would have recognized its potentially powerful effect to humanize Johnson, or at least to give jurors a sense that the death penalty has human consequences, and, therefore, would have presented it directly to the jurors, not simply by inference, as Johnson's trial counsel did. I also think that there is a reasonable probability that, if confronted with such evidence, at least one juror would have reached a different result"); *United States v. Wilson*, 493 F. Supp. 2d 491, 506-07 (E.D.N.Y. 2007) (allowing execution impact

---

- Sayfullo Saipov's family members condemn his actions, but they still love him. (12 jurors)
- Even from prison, Saypullo Saipov's life is meaningful to his family. (12 jurors)
- Sayfullo Saipov's parents and sisters love him, and he will continue to be part of their lives even from prison. (12 jurors)
- Sayfullo Saipov's three children, Aisha, Hadicha, and Holid, love him. (12 jurors)

testimony); *see also* Exhibit A (collecting relevant mitigating factors from other federal capital cases).

The mitigation witnesses' testimony will be based on their existing relationships with Payton Gendron and the ways in which he has contributed to their lives over the years, including during his current period of incarceration. Because such testimony is relevant to Payton's character and background, and is otherwise relevant mitigating evidence under *Tennard* and the FDPA, it should be admitted.

### D. Both Parties Should Be Precluded from Introducing Evidence or Arguments Related to Other Crimes and Cases.

The government argues that Payton Gendron should be precluded from offering evidence of "comparator cases;" that is, cases of other capitally charged defendants. ECF No. 597 at 14-15. The government notes that introducing such evidence would "mov[e] the jury's focus away from the defendant and the facts of the instant case and run[] the risk of creating confusion by creating a series of mini-trials." *Id*. at 14. It also argues that "the jury's 'decision on life or death must turn on the understanding of this case, the offense involved, and this defendant, not on the specifics of other cases and other defendants.'" *Id*. (quoting *United States v. Taylor*, 583 F. Supp. 2d 923, 936 (E.D. Tenn. 2008)). The defense agrees. For these reasons and those set forth in Payton Gendron's Motion in Limine to Preclude Inadmissible Evidence, ECF No. 601 at 54-59, 74-77, 129-134, 193, the Court should preclude both parties from introducing evidence related to other cases and other defendants.

### E. Future Dangerousness and Conditions of Confinement

The government suggests—contrary to law and the practice in numerous federal death penalty trials—that the following types of mitigating circumstances,[4] and evidence to establish them, should be disallowed in this case:

- Payton Gendron "can be safely housed and that a death sentence is, therefore, not necessary";
- Evidence that "a life sentence is equally, if not more, severe than a death sentence"; and
- Payton Gendron poses a "lack of future danger" and has "capacity for rehabilitation in [prison] facilities" based on "data regarding these [prisons'] conditions of confinement and rates of violence." ECF No. 597 at 16.

Each of these mitigators is proper and has regularly been put before many other federal capital juries that, in turn, have found the mitigating circumstance to be established.

The conditions of a capital defendant's potential life sentence are of the utmost relevance to a jury's determination of life or death. If a jury is to consider a life sentence for Payton Gendron, it must be given relevant information about what that life sentence would entail. Moreover, Payton must respond to the government's arguments that killing him, rather than incarcerating him for life, is the just outcome. The presentation of such evidence, and preparation therefor, is required under the Fifth, Sixth, and Eighth Amendments and 18 U.S.C. § 3593(c).

"Accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant should live or die." *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion); *see also Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate"). The Due Process Clause does not allow the execution of a person "on the

[4] The government does not object to any specific mitigators, because Payton Gendron has not yet proposed any specific mitigators. Instead, the government seeks to preemptively prohibit entire topics of a potential defense case for life. These efforts should be rejected in full.

basis of information which he had no opportunity to deny or explain." *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994) (quoting *Gardner v. Florida,* 430 U.S. 349, 362 (1977)). In *Simmons*, a death sentence was reversed because the jury was not informed that the defendant was ineligible for parole if given a life sentence. The Supreme Court wrote: "The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative." *Id.* at 162.

To fully inform the jury of the true nature of "its noncapital sentencing alternative," the specifics of Payton Gendron's potential sentence of life imprisonment without the possibility of release must be addressed in front of the jury (and, for the reasons discussed below, the jury must be provided with accurate information). The government's Motion to preempt such relevant evidence and argument would violate Payton's due process rights.

The defense must be permitted to present relevant mitigation to the jury regarding Payton Gendron's future if the jurors select a life sentence. *See* 18 U.S.C. § 3592(a)(8); *Tennard*, 542 U.S. at 284-85 ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."). "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the [death] penalty...[and] must allow it to consider any relevant information offered by the defendant." *McCleskey*, 481 U.S. at 306; *see also Buchanan v. Angelone*, 522 U.S. 269, 276 (1999) ("In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering . . . any constitutionally relevant mitigating evidence"); *Boyde v. California*, 494 U.S. 370, 377-78 (1990) ("The Eighth

Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner.").

Specifically, Payton Gendron is permitted to present evidence regarding, *inter alia*, his ability to be safely confined, the conditions of his confinement, as well as the harsh punishment he will endure in custody, if the jury chooses a life sentence over a death sentence. *See Skipper*, 476 U.S. at 7 (mitigation includes a capital defendant's "disposition to make a well-behaved and peaceful adjustment to life in prison" and "convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment").

Indeed, such mitigation is a standard part of federal capital cases. And, in turn, jurors have regularly and repeatedly found such mitigating factors to be established in said cases:

- *United States v. Saipov*, 17 Cr. 722 (VSB), ECF No. 775 (S.D.N.Y. Mar. 15, 2023)
    - "If not sentenced to death, Sayfullo Saipov will be incarcerated for the rest of his life without any possibility of release." (12 jurors);
    - "If sentenced to life imprisonment without the possibility of release, Sayfullo Saipov will be sent to the H Unit at the Federal Bureau of Prisons ADX facility in Florence, Colorado." (12 jurors);
    - "On H Unit, Sayfullo Saipov will spend at least 22 hours a day alone in his cell." (12 jurors);
    - "A sentence of life imprisonment without the possibility of release is a harsh punishment." (12 jurors);
    - "Sayfullo Saipov will die in prison." (12 jurors).

- *United States v. Bowers*, 18 Cr. 292 (RJC), ECF No. 1537 (W.D. Pa., Aug. 2, 2023)
    - "Lifetime imprisonment without the possibility of release is a severe punishment." (10 jurors);
    - "There is no parole in the federal system."(12 jurors);
    - "The Department of Justice has the power to restrict and monitor any or all of Robert Bowers' communications with the outside world." (12 jurors);
    - "If sentenced to imprisonment without the possibility of release, Robert Bowers will be designated to a highly secure federal prison." (12 jurors).

- *United States v. Con-Ui*, 13 Cr. 123 (ARC), ECF No. 1242 (M.D. Pa., July 11, 2017)
    - "The alternative to a sentence of death is lifetime incarceration with no possibility of release." (12 jurors);

  - "Because of his federal conviction for the murder of Officer Williams, Jessie Con-Ui will never be eligible for release." (12 jurors);
  - "The federal conviction for the murder of Officer Williams means that Jessie Con-Ui will be subject to increased punishment, including more severe restrictions on his liberty and the loss of many privileges extended to maximum security prisoners in general population." (10 jurors).

- *United States v. Williams*, 06 Cr. 79 (JMS-KSC), ECF No. 2860 (D. Haw., June 27, 2014)
  - "Naeem Williams is likely to succeed in a prison environment because that is a highly structured situation that involves supervision." (10 jurors).

- *United States v. Basciano*, 05 Cr. 60 (NGG), ECF No. 1268 (E.D.N.Y., June 1, 2011)
  - "If not sentenced to death, Mr. Basciano will be imprisoned for the remainder of his life with no possibility of release." (12 jurors);
  - "The Federal Bureau of Prisons is capable of fashioning conditions of confinement that will control Mr. Basciano's activities while he is in prison." (12 jurors).

- *United States v. Aquart*, 06 Cr. 160 (JBA), ECF No. 936 (D. Conn., June 15, 2011)
  - "If not sentenced to death, Azibo Aquart will be imprisoned for the rest of his life without possibility of release." (12 jurors);
  - "Lifetime imprisonment is a severe punishment." (12 jurors);
  - "If Azibo Aquart is sentenced to life imprisonment, the Bureau of Prisons has the capability of safely and securely confining him." (12 jurors).

The government's arguments to the contrary are unavailing. The government ignores this slew of federal capital cases (which include the most recent federal capital trial in this country and in this circuit). Instead, the government primarily relies on dicta from a Seventh Circuit case that is more than 25 years old. ECF No. 597 at 16 (citing *United States v. Johnson*, 223 F.3d 665, 674 (7th Cir. 2000) (where the mitigating factors were not challenged on appeal, but commentary regarding them was "add[ed] as a detail" in the opinion)). Even if this Court were to follow the logic of the government's cited dicta, it would not lead to the conclusion urged by the government's Motion. In *Johnson*, the Seventh Circuit criticized certain far-too-generalized mitigators, i.e. "the existence of maximum-security federal prisons decked out with control units," which the Court found were "argument[s] against the death penalty in general," rather

than specific arguments regarding the defendant. *See id.* at 674-75;[5] *see also Lawlor v. Zook*, 909 F.3d 614, 628-31 (4th Cir. 2018) (reversing death sentence because the state court erroneously excluded, as mitigation, defense's proposed "predictive evidence of Lawlor's risk of violence in prison society," because it was not "generalized evidence of 'conditions of prison life."). Here, Payton Gendron will make no such generalized proposals.

The government's other citations in this section also fail to support its arguments. *See, e.g., United States v. Higgs*, 353 F.3d 281, 328 (4th Cir. 2003) (containing no prohibition of (and no discussion whatsoever) regarding conditions of confinement mitigators). In the other case heavily relied upon by the government, *United States v. Taylor*, 814 F.3d 340, 352 (6th Cir. 2016), the Sixth Circuit found no abuse of discretion in the district court's case- and fact-specific rulings regarding the scope of two defense experts' testimony. Those rulings included allowing one expert to "testify that after the trial Defendant will be transferred from the county jail where he is currently detained, and from which he allegedly tried to escape, to a Bureau of Prisons facility, where security would be different and greater," but prohibited another from offering "generalized [BOP policies, statistics, and] facts that could be said to apply to every death-eligible offender." *Id.* If or when Payton Gendron offers specific witnesses or evidence (on the topic of Payton's future confinement or any other mitigating circumstance), the government is free to raise any arguments about the appropriate scope thereof. But at this stage, these cases illustrate nothing more than the Court's ongoing role as gatekeeper regarding evidentiary issues if or when they become ripe. *See id.* at 362 (acknowledging that the same statistics it deemed inadmissible in the case at bar could equally be admissible in another case: "This is not to say

[5] And *Johnson* still did not prohibit these topics entirely; in fact, both sides properly called wardens and experts to discuss the likelihood of the defendant's future dangerousness in prison. *Id.* at 671-74.

that statistical evidence like Dr. Cunningham's can never be admissible. Quite the contrary, it can be relevant and admissible in many scenarios.");[6] *see also United States v. Roof*, 10 F.4th 314, 370 (4th Cir. 2021) (striking two proposed mitigators that, in light of the lack of evidence presented, were too "hypothetical," but the Court allowed substitutions therefor,[7] and also explicitly "invited Roof to rebut the prosecutor's argument regarding his future dangerousness"). Thus, the cases cited by the government do not remotely establish the broad proposition that "*any* proposed testimony from prison or risk assessment experts (or any other witness) regarding the defendant's potential conditions of confinement in any prison system, should the defendant be sentenced to life imprisonment, is irrelevant." ECF No. 597 at 18 (emphasis added). To the contrary, such evidence must be evaluated in the specific context of the arguments made by the government in favor of a death sentence, and the individualized evidence and facts about Payton Gendron. The government's Motion must be denied.

In addition, the fact that the government has not alleged an aggravating factor of future dangerousness in this case is not determinative. Even without that specific allegation, Payton's

---

[6] *See, e.g.*, *United States v. Umana*, No. 08 CR 134 (RJC), 2010 WL 1688441, at *3 (W.D.N.C. Apr. 26, 2010) ("Recognizing [that] several district courts have allowed Dr. Cunningham to offer similar testimony in capital cases where the government has alleged the defendant's future dangerousness" and permitting him to "testify as to the rates of prisoner violence at various security levels within the Bureau of Prisons" because "it appears that he intends to use these statistics to make an individualized prediction of whether the defendant will commit future acts of violence").

[7] The Court permitted the following substitute mitigators for Dylann Roof, which the government did not oppose:

> "8. [T]he Defendant poses no significant risk of violence to other inmates or prison staff if imprisoned for life.
> 9. [G]iven his personal characteristics and record, the Defendant can be safely confined if sentenced to life imprisonment." *Id.* at 365-66, 370-71.

future is at the heart of the penalty phase in this case. Indeed, the circumstances of a defendant's future are relevant in every capital case. *See, e.g. United States v. Troya,* 733 F.3d 1125, 1136 (11th Cir. 2013) ("a defendant's future dangerousness" – and lack thereof – "bears on all sentencing determinations made in our criminal justice system") (citing *Simmons*, 512 U.S. at 162). In *Troya*, the Eleventh Circuit found the trial court abused its discretion and committed error when it precluded expert testimony to rebut future danger "as non-statutory mitigating evidence," even after the future danger aggravating factor was withdrawn, because it was implied in the government's presentation. *Id.* at 1135. Here, too, though the government has not proffered future danger as an aggravating factor, this topic is endemic in all criminal sentencings, and the jurors will necessarily consider the consequences to Payton Gendron and/or his custodians and fellow inmates of choosing between death and life imprisonment. *See* John H. Blume et al., *Future Dangerousness in Capital Cases: Always 'At Issue*,' 86 Cornell L. Rev. 397, 398-99 (2001) (based on interviews with capital jurors, concluding "that future dangerousness is on the minds of most capital jurors, and is thus 'at issue' in virtually all capital trials, no matter what the prosecution says or does not say").

The government also argues that "the location and conditions of the defendant's future confinement are entirely speculative" and therefore, "[t]he penalty phase would devolve into a series of mini-trials or sideshows about BOP policies for classifying and placing inmates, how violence still occurs in the most-secure federal prisons (including ADX), and how other federal inmates convicted of other crimes have been housed and how they have reacted to various conditions of confinement." ECF No. 597 at 20. But the defense believes the facts regarding Payton's future confinement are knowable – and has actively tried to reach a joint understanding

with the government on this precise topic. If the government would engage with the defense as requested, the concerns raised by this section of the government's Motion would be dispelled.

The defense has an obligation to determine the appropriate scope of relevant evidence regarding Payton Gendron's future if he is sentenced to life in prison without the possibility of release. To that end, in February, 2026, the defense contacted the government to reach a collective understanding about his future incarceration. We explained that because Payton is in primary New York State custody, we expect that, if sentenced to life, he will be incarcerated within a facility run by the New York State Department of Corrections and Community Supervision ("DOCCS").[8] We asked the government to confirm the same, but it declined to do so.[9] The government has provided no further information, discussion, or discovery on this topic in the ensuing four months. The government cannot refuse to "engage in this inquiry" and then weaponize the lack of clarity to preclude evidence about Payton Gendron's future confinement.

For the defense to complete its investigation and presentation of mitigating evidence about Payton's future, there must be an understanding between the parties regarding Payton Gendron's future placement, including whether he will be held in state or federal custody, each of which has its own unique set of practices and regulations regarding how he will be confined.

---

[8] By letter dated February 18, 2026, we asked the government to "please advise us of your position regarding the jurisdiction where Payton Gendron would serve a life sentence. And, if in DOCCS custody, please provide any further information the government possesses regarding the facility (or facilities) within DOCCS where Payton will be incarcerated." *See* Exhibit C.

[9] In a letter dated February 27, 2026, the government wrote: "At this time, we decline to engage in this inquiry because, among other things, your request is premature and seeks information that is currently unavailable, outside the scope of Rule 16, and irrelevant and inadmissible under *Skipper v. South Carolina*, 476 U.S. 1 (1986) (holding that admission of evidence relating to the defendant's good conduct is probative of the defendant's character), or *Simmons v. South Carolina*, 512 U.S. 154 (1994) (setting the minimum standards for cases in which the prosecution alleges the defendant is a future danger)." *See* Exhibit D.

Defense counsel is seeking witnesses and documentary evidence to support the types of mitigating circumstances presented to the juries in the cases cited above. (In many of these cases it was known, and former prison officials testified that it was known, not only in which facility but in which unit the defendant would be confined. Here, we are seeking – initially and at the most general level – confirmation that the parties share an understanding about the jurisdiction in which Payton Gendron will be imprisoned if he receives a life sentence.)

As described above, in this case, we expect that Payton's future confinement will be governed by the established rules of primary jurisdiction: he is in primary state custody and therefore will serve a life sentence in state prison. We hereby request that the Court direct the government to either confirm that it shares this expectation or explain on what basis it does not Then both parties can prepare their cases with non-speculative information.

The government's Motion lays bare the significant risk of prejudice to Payton Gendron if the government is not required to take a position about his future incarceration. The government cannot be allowed to argue that the death penalty is appropriate because the alternative is an unknowable mystery, or to undermine the defense's evidence regarding Payton Gendron's future confinement as speculative and unreliable. Allowing the government to present that uncertainty to the jury would invite the jury to speculate wildly – and inaccurately – about a life sentence in this case, which would directly run afoul of *Simmons*, 512 U.S. at 161, and risk the jury choosing a sentence of death unlawfully. There is a simple way to prevent this risk: require the government to take a position regarding jurisdiction now. Once there is a collective understanding by the parties, both sides may make appropriate arguments to the jury stemming therefrom.

The government also moves to broadly preclude "opinion testimony relating to the defendant's ability to be safely housed, purported prospects for positively influencing others

while incarcerated, or purported lack of future dangerousness." ECF No. 597 at 20-21. This Motion should also be denied at this juncture. No such opinion testimony has been proffered to date, nor could any such testimony be evaluated (or eliminated) in a vacuum. To the contrary, the cases cited by the government each involve a highly case- and fact-specific analysis of each opinion offered by a particular witness. *See, e.g., United States v. Lighty,* 616 F.3d 321, 364 (4th Cir. 2010) (allowing the defendant's uncle, i.e. a lay witness, to testify about "his own experience, his own relationship, his own evaluation of this man's character," but sustaining an objection to a particular question eliciting his "opinion about whether Lighty could have a positive influence on others in prison"). The government is free to make fact-specific objections when the time is right, but its efforts for broad preclusion at this stage are contrary to the law it cites and would deprive Payton Gendron of his rights to a fair trial and to present mitigation to save his life.

**F. Evidence of Payton Gendron's Offers to Plead Guilty Are Admissible.**

As the government notes in its Motion, in addition to pleading guilty to all charges in the state court proceeding, Payton Gendron has, from the outset of this case, offered to plead guilty in this one should the government forego seeking his execution. ECF. No. 597 at 22-23. The government will itself admit evidence of Payton's guilty plea in state court. *See* ECF No. 598 at 4-13 (arguing it should be allowed to introduce the transcript of the state plea colloquy). However, it seeks to exclude any evidence of Payton's repeated offers to plead guilty in this federal proceeding, offers he made through his counsel both before and after the government made the decision to seek the death penalty. *See* ECF No. 597 at 22-29; *see also id.* at 22 (collecting defense statements regarding Payton's willingness to plead guilty in this case). This evidence is relevant to

show Payton's acceptance of responsibility and should be admitted if offered at the penalty phase.

In arguing such evidence is inadmissible, the government relies principally on *United States v. Caro*, 597 F.3d 608, 634–35 (4th Cir. 2010), and two New Mexico district court cases, *United States v. Lujan*, No. 05-cr-924, ECF No. 782 (D.N.M. Apr. 15, 2011) ("*Lujan* Order"), and *United States v. McCluskey*, No. 10-cr-2734 (D.N.M. June 23, 2013) ("*McCluskey* Order"). ECF No. 597 at 24. In *Caro*, the Fourth Circuit affirmed the district court's exclusion of evidence of the defendant's conditional offer to plead guilty in exchange for a life sentence. 597 F.3d at 634-35. "That affirmance merely confirms the district court's broad discretion when ruling on the relevance of evidence—the Fourth Circuit did not hold district courts must exclude evidence of offers to plead guilty conditioned on an agreement not to seek the death penalty. To the contrary, this Court must exercise its discretion to make a decision appropriate to the facts of *this* case." *United States v. Roof*, No. CR 2:15-472-RMG, 2016 WL 8678863, at *2 (D.S.C. Oct. 14, 2016), *aff'd on other grounds*, 10 F.4th 314 (4th Cir. 2021).

The *Roof* court's understanding of the law—that a trial court retains broad discretion in ruling on the admission of evidence of conditional plea offers based on the unique circumstances of each case—is supported by the district court's analysis in *Lujan* and *McCluskey*. In *Lujan*, the defendant did not offer to plead guilty under *after* the government filed its notice of intent to seek the death penalty and three years after the alleged crimes. *Lujan* Order at 13, 18. In his first offer, the defendant offered to accept a 40-year sentence. *Id.* Four months later, the defendant offered to accept a sentence of life imprisonment, an offer he repeated several times before trial. *Id*. In excluding evidence of the offers, the *Lujan* court found it "material that the first offer was extended ten months after the first Notice of Intent to Seek a Sentence of Death was filed." *Id*. at

15. In *McCluskey*, at the time of the federal death penalty prosecution and trial, the defendant was "currently serving state sentences representing 'the actuarial equivalent of a term of life imprisonment'" for offenses unrelated to the murders. *McCluskey* Order at 25. The district court noted that under those circumstances the defendant's offer to plead guilty in return for another life sentence was not a markedly significant concession. Thus, it made sense that the court found the probative value of the evidence was outweighed by the danger of unfair prejudice under 18 U.S.C. § 3593(c). *McCluskey* Order at 29.

The facts of this case are nothing like the facts in *Lujan* and *McCluskey* and very similar to the circumstances in *Roof*. In denying the government's motion to exclude the defendant's conditional offers to plead, the *Roof* court explained:

> Defendant has offered—repeatedly and publicly—to plead guilty, before the jury panel was sworn and even before the Government decided to seek the death penalty, and those offers were widely reported in national and regional media. *See, e.g.,* Alan Blinder, Man Charged in Charleston Massacre Will Face Two Death Penalty Trials, N.Y Times, May 25, 2016, at All. The Government asks the Court to exclude information that is both commonly known and undisputed. The Court considers that an attempt to do so would be far more likely to confuse the jury than simply allowing the jury to weigh Defendant's argument and the Government's rebuttal.

*Roof*, 2016 WL 8678863, at *2. Here, Payton Gendron publicly plead guilty to all state charges and has offered—repeatedly and publicly—to plead guilty in this case, before the jury panel had been sworn and before the Government decided to seek the death penalty, and those offers were widely reported in national and regional media. *See* Dave McKinley, *Next Phase of Jury Selection Begins in Payton Gendron Federal Death Penalty Trial*, wgrz.com (June 15, 2026) (reporting on the beginning of jury selection for this case and noting "[e]arly in his federal prosecution, Gendron, through his attorneys, offered to plead guilty if the death penalty were taken off the table, which is something the government has declined") (available at https://www.wgrz.com/article/news/crime/jury-selection-payton-gendron-federal-death-penalty-

trial/71-1f2680e5-4f41-4461-b065-e7b5bb017031); Maki Becker, *DOJ Committee Makes Recommendation on Seeking Death Penalty Against Tops Killer*, Buffalo News (Nov. 29, 2023) (discussing defense counsel's statements in court that Payton was willing to plead guilty and accept a life sentence without the possibility of release) (available at https://buffalonews.com/news/local/crime-courts/article_dcd4007e-8e24-11ee-994d-f71a8459e7c6.html); *The Editorial Board: A Federal Trial for the Racist Killer Could Offer Benefits*, Buffalo News (Dec. 14, 2022) (caption: "Zeneta Everhart, whose son, Zaire Goodman, was injured in the May 14 mass shooting, reacts to Friday's news that the accused shooter is willing to plead guilty to federal charges if the death penalty is taken off the table.") (available at https://buffalonews.com/opinion/editorial/article_50f9b34a-7bcf-11ed-bb05-4fca4931a6c3.html).

The government tries to distinguish *Roof* from the present case, but all its arguments fall flat. First, the government argues that, unlike Dylan Roof, Payton "has not made a full-throated post-arrest custodial confession akin to Roof's, and the government has indicated it does not intend to introduce any of the brief statements the defendant made during a post-arrest custodial interview." ECF No. 597 at 27. Payton plead guilty to all state charges, which included one count of domestic act of terrorism motivated by hate (N.Y. Penal Code 490.28), ten counts of first-degree murder (N.Y. Penal Code 25.27(1)(a)), and three counts of attempted first-degree murder (N.Y. Penal Code 10-125.25(1)). *See* Gov. Ex. 5000 (plea transcript). There is no greater a "full-throated post-arrest custodial confession" than an in-court admission to every single charge in an indictment. And the government has marked that confession as an exhibit so it absolutely "intend[s] to introduce" those statements at trial.

The government then argues that the plea colloquy doesn't count because it happened while it was deciding whether to seek the death penalty against Payton. *Id*. at 27. This is absurd.

Payton Gendron entered his guilty six months after he was charged in state court. That the federal government decided to initiate a parallel federal case while the state case was pending does not change the fact Payton accepted full responsibility and a life sentence in state court.

Next, it argues that, "unlike Roof, the defendant has not made repeated offers in public view; instead his offers have generally been made by his attorneys when he was not physically present and in connection with attempts to obtain other relief." ECF No. 597 at 28. Dylan Roof also made his plea offers in the public view through his attorneys. *See Roof*, 2016 WL 8678863, at *2 (noting that Dylan Roof's conditional offer to plead was public and citing to a New York Times article, which reported, "Mr. Bruck [Dylan Roof's attorney] said last summer that Mr. Roof was willing to enter a guilty plea in exchange for a sentence of life in prison") (citing Alan Blinder, *Man Charged in Charleston Massacre Will Face Two Death Penalty Trials*, N.Y Times, May 25, 2016)); *compare with* Mark Morales et al., *Buffalo Grocery Store Mass Shooter Willing to Plead Guilty to Federal Charges if Death Penalty Off the Table, Attorneys Say*, CNN.com (Dec. 9, 2022).

The government also claims Payton's plea offers "are now dated in time." ECF No. 597 at 28. Through his counsel, Payton has offered to plead guilty to the Indictment and accept a sentence of life without the possibility of release at virtually every meeting they have had with government counsel, including in the last few months. They make that offer on Payton's behalf again now.

An offer to plead guilty, conditional or not, is relevant to Payton Gendron's state of mind, which in turn is relevant to acceptance of responsibility. The jury can assess and evaluate the weight of his offer. *See United States v. Williams,* No. CRIM. 06-00079 JMS, 2014 WL 2436215, at *2 (D. Haw. May 30, 2014) (denying government's motion to preclude mitigating factors

based on defendant's plea offer because "[t]hat [the] Defendant offered a conditional guilty plea may show some degree of acceptance of responsibility, and it is ultimately up to the jury—not this court—to determine how such fact should be weighed in determining Defendant's sentence"); *see also United States v. Rodriguez*, No. 2:04 CR 55, 2007 WL 466752, at *44 (D.N.D. Feb. 12, 2007), *aff'd on other grounds*, 581 F.3d 775 (8th Cir. 2009) ("A defendant's offer to plead guilty is therefore relevant to the issue of acceptance of responsibility, and it may be admitted during the selection phase").

Finally, the government argues that the admission of evidence of Payton's willingness to plead guilty and accept a life sentence would prejudice it in two ways. First, the government asserts this evidence would cause the jury to question its motives in proceeding to trial in this case. However, given the state court plea, even if the Court were to exclude evidence that Payton offered to plead guilty to the federal indictment, the jury and everyone with an inkling of common sense knows the government is pursuing this case because it wants to secure a death sentence. Evidence of Payton's conditional offer to plead adds nothing to that point. But it could add a great deal to the defense case in mitigation.

Second, the government argues that allowing Payton Gendron to introduce evidence that he offered to plead guilty will somehow discourage plea bargaining in future capital cases. ECF No. 597 at 25. The government does not explain why this is so but instead asserts plea bargaining is important and disparages Payton Gendron's offer as it does throughout its pleading. The government's argument might make sense if Payton were seeking to introduce evidence of an offer it made, as was the case in *Owens v. Guida*, 549 F.3d 399, 420 (6th Cir. 2008). *See id.* ("The failed negotiations are not related to Owens's 'record.' Likewise, they are not related to the 'circumstances of the offense' because the plea offer says nothing about how the murder was

committed. Owens posits that the offer is relevant to the circumstances of the offense because it suggests that the prosecution did not think that her crime deserved a death sentence. This is speculation on her part because the record does not explain whether the prosecution made the offer because it saw her as unworthy of death or for some other reason such as the efficient use of prosecutorial resources."); *see also United States v. Fell*, 372 F. Supp. 2d 773, 784 (D. Vt. 2005), *aff'd on other grounds*, 531 F.3d 197 (2d Cir. 2008) (allowing evidence that the defendant offered to plead guilty and accept a life sentence, but excluding evidence of a proposed plea agreement with the government). But that is not the case here as the government has never offered to resolve this case.

As the government acknowledges, "some federal courts have permitted other capital defendants to introduce in mitigation their conditional offers to plead guilty." ECF No. 597 at 26 (citing *Williams*, 2014 WL 2436215, at *2 and *Fell,* 372 F. Supp. 2d at 783). Indeed, many courts have permitted it. *See Rodriguez*, 2007 WL 466752, at *44; *United States v. Christensen*, No. 17-CR-20037-JES-JEH, 2019 WL 11867003, at *2 (C.D. Ill. June 27, 2019); *United States v. Council*, No. 4:17-CR-00866-RBH, 2019 WL 3940759, at *4 (D.S.C. Aug. 21, 2019); *see also* cases listed in Exhibit E; *cf. Johnson v. United States*, 860 F.Supp.2d 663, 903 (N.D. Iowa 2012) ("Where the offer to plead guilty comes from the defendant, it may or may not be illuminating of the circumstances of the offense or the defendant's prior record, but it does have some bearing on the defendant's character and, more specifically, on the defendant's acceptance of responsibility for the charged offense."). Not surprisingly, but without much analysis, the government asserts these cases should not be followed. In seeking to discredit the court's decision in *Williams*, the government makes the peculiar argument that the court "found it appropriate to leave it to the jury to determine the weight to give such evidence, but this abrogates the court's role under §

3593(c) to be the gatekeeper of evidence." ECF 597 at 26. In finding that evidence of a conditional plea offer is relevant to show a defendant's acceptance of responsibility, the *Williams* court did exactly what 18 U.S.C. § 3593(c) required of it. The law is clear that, a court having found evidence to be relevant and otherwise admissible, it is exclusively up to the jury to decide the weight to be given to it.

As in *Fell*, *Williams*, *Roof* and the other cases discussed herein, the Court should deny the government's motion to exclude evidence that Payton Gendron has consistently offered to plead guilty to all charges in the Indictment and accept a life sentence without the possibility of release.

### G. Payton Gendron Has the Right to Speak to the Jurors Before They Decide His Punishment.

The government moves the Court to prohibit Payton Gendron from making an unsworn allocution before the jury that will decide whether he should live or die. ECF No. 597 at 29-35. The Court should deny this Motion in its entirety.

Fed. R. Crim. P 32(i)(4) requires that a defendant be provided an opportunity to address the court prior to sentencing. Specifically, a defendant must be allowed the opportunity "to speak or present any information *to mitigate the sentence*." Fed. R. Crim. P. 32(i)(4)(A)(ii) (emphasis added). The right of allocution is "considered an 'absolute right' in the federal courts." *United States v. Li*, 115 F.3d 125, 133 (2d Cir. 1997) (quoting *United States v. Sparrow*, 673 F.2d 862, 865 (5th Cir. 1982)). The purpose of the rule is clear:

> The right of allocution allows a defendant to personally address the court before sentencing *in an attempt to mitigate punishment*. With historical roots in the common law, the opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion possible, to help ensure that sentencing is particularized and reflects individual circumstances.

*United States v. Barnes*, 948 F.2d 325, 328 (7th Cir. 1991) (emphasis added) (quoted in *Li*, 115 F. 3d at 133).

In a capital case, the purpose of the rule—to give a defendant an opportunity to plead for mercy in mitigation of punishment—can only be satisfied by allowing a defendant to personally address jurors before they reach their sentencing decision.

> In a capital case, in which a defendant's fate is determined by a jury, permitting a defendant to speak to the court before the court imposes his sentence, but not to the jury before it determines that sentence, would afford capital defendants an "empty formality" rather than the substantive right afforded noncapital defendants. *United States v. Chong*, 104 F. Supp. 2d 1232, 1234 (D. Haw. 1999). Such a disparity would be unjust.

*United States v. Wilson*, 493 F. Supp. 2d 509, 511 (E.D.N.Y. 2007); *see also United States v. Lawrence*, 735 F.3d 385, 408 (6th Cir. 2013) ("[A]llowing allocution 'to mitigate the sentence' only before the court, which has no discretion and is obliged to impose sentence in accordance with the jury's recommendation, would seem to be an 'empty formality'") (quoting *Wilson*, 493 F. Supp. 2d at 511; *United States v. Henderson*, 485 F. Supp. 2d 831, 846 (S.D. Ohio 2007) (Allowing a capital defendant "to speak only after the sentence has been decided by the jury, but before this Court merely imposes the sentence, does not allow Defendant to present information to mitigate the sentence. A right to allocute only before the judge reads the jury's sentence would be an empty formality").

In *Henderson*, the court grounded the defendant's right to allocution not only in Rule 32, but in the FDPA itself:

> [U]nder 18 U.S.C. § 3593, the defendant may present "any information relevant to a mitigating factor." In addition, such information is admissible "regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* Therefore, Defendant may offer an unsworn, un-cross-examined statement to the jury before it deliberates on his sentence. Of course, the Government may argue that the probative value of such statement is outweighed by the danger of unfair prejudice, and this Court

> may exclude Defendant's statement on that basis, if necessary. This Court may, however, also cure such danger with a limiting instruction, reminding the jurors that they should carefully consider the credibility of such statements, given that they are not sworn or cross-examined.

485 F. Supp. 2d at 846.

Rule 32 distinguishes between the making of such a statement and the presentation of other "information in mitigation of the sentence." The Court must inquire of the defendant as to each. Meaningful allocution requires that "a district court 'actually must take steps to communicate effectively to the defendant that, through his statement, he has a meaningful opportunity to influence the sentence.'" *United States v. Landeros-Lopez*, 615 F.3d 1260, 1266 (10th Cir. 2010). Thus, the fact that the defendant presents evidence in mitigation does not affect the requirement that he also be afforded the opportunity to make a *statement* before his sentence is determined.

That statement, the Fourth Circuit noted in *Murphy*, is likewise not satisfied by the argument of counsel, for "'[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.'" *Id*. at 2 n.2 (quoting *Green v. United States*, 365 U.S. 301, 304 (1961)).

"[A] defendant's right to allocution is even more pronounced when facing the possibility of a death sentence." *People v. Borrego*, 774 P.2d 854, 856 (Colo. 1989); *see also State v. Zola*, 548 A.2d 1022, 1045 (N.J. 1988) ("Whatever the Constitution permits, it bespeaks our common humanity that a defendant not be sentenced to death by a jury 'which never heard the sound of his voice'") (internal citation omitted); *People v. Davis*, 794 P.2d 159, 192 (Colo. 1990) ("The right to allocute is no more than the defendant's 'right to stand before the jury and ask in his own voice that he be spared.'") (internal citation omitted).

In *Li*, the Second Circuit recognized that Rule 32 "demands that each defendant be allowed a meaningful right to express relevant mitigating information before an attentive and receptive district judge." 115 F.3d at 133. Ensuring the fairness of the sentencing proceeding is even more important in a capital case where a defendant's life is at stake.

In addition to Rule 32 and the FDPA, the Due Process Clause requires that a federal capital defendant be allowed to allocute before his sentencing jury. *Boardman v. Estelle*, 957 F.2d 1523, 1525 (9th Cir. 1992); *but see Li*, 115 F.3d at 132 ("Although a [non-capital] defendant's right to a sentencing allocution is a matter of criminal procedure and not a constitutional right, it is nonetheless considered an 'absolute right' in the federal courts.") (internal citations omitted). The statutory sentencing scheme provides that, "[u]pon a recommendation ... that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly." 18 U.S.C. § 3594. Thus, following the jury's recommendation, the Court has no alternative but to impose that sentence.

Procedural due process does not countenance schemes which allow parties to avail themselves of their rights only at a time when it is meaningless to do so. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542-43 (1985) (due process requires a meaningful opportunity to protect the life, liberty or property interest at stake). *See also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (due process requires "meaningful opportunity" to present a complete defense). Obviously, affording a capital defendant his opportunity to allocute, as guaranteed by Rule 32(i)(A)(4), only before a judge who is performing the ministerial act of imposing a sentence previously predetermined by a jury which exercised sentencing discretion, can hardly be said to satisfy due process because it can have no mitigating effect. As the Supreme Court noted in

*Loudermill*, "the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be *before* the [decision] takes effect." *Id.* at 543 (emphasis added) (citing *Goss v. Lopez*, 419 U.S. 565, 583-84 (1975); *Gagnon v. Scarpelli*, 411 U.S. 778, 784-86 (1973)).

At the very least, and as the government acknowledges, see ECF No. 597 at 32, it has been recognized that, in a federal capital case, "the decision of whether to allow the allocution [falls] within the district court's discretion." *United States v. Caro*, 597 F.3d 608, 635 n. 24 (4th Cir. 2010). *See also Wilson*, 493 F. Supp. 2d at 511 ("What is clear … is that this court has the discretion to permit Wilson to allocute.") (granting the request for allocution before the jury in a capital case); *Henderson*, 485 F.Supp.2d at 847 ("Without reaching the question of whether Defendant has a constitutional right to allocution, this Court recognizes that it has discretion to permit Defendant to allocute pursuant to Rule 32. Defendant's motion is GRANTED."); *United States v. Con-ui*, No. 3:13-CR-123, 2017 WL 1386202, at *1–2 (M.D. Pa. Apr. 18, 2017) ("Thus, although the 'right' to give such a statement may not be statutorily or constitutionally mandated, there is nevertheless room for such evidence within the permissive confines of the FDPA."). Because this is a capital case and the right of allocution is guaranteed in a non-capital case, this Court should not hesitate to exercise its discretion in favor of allowing Payton Gendron the right of allocution. Otherwise, as stated in *Wilson*, "[s]uch a disparity would be unjust." 493 F. Supp. 2d at 511.

In urging this Court to prohibit Payton Gendron from allocuting before the jury in this case, the government argues that allowing him to do so would cause "possible juror confusion." ECF No. 597 at 33. It cites to *United States v. Whitten*, 610 F3d 168 (2d Cir. 2010), in which the defendant did not testify at the trial, but gave an unsworn statement at the penalty phase. *Id.* at 172. In that case, it was not the jury who was "confused" but rather the government, which

violated the defendant's constitutional rights by commenting in closing argument on his decision not to testify. *Id*. at 199-200. That the government violated a defendant's constitutional rights in a case in which the defendant was allowed to allocute is not grounds to deny Payton Gendron the same opportunity here.

For the foregoing reasons, the Court should deny the government's request to deprive Payton Gendron of the opportunity for a meaningful allocution. And, because Payton has not yet decided if and how he would allocute, the government's request to impose limitations on any allocution is premature and should be denied without prejudice. ECF No. 597 at 34.

**H. The Government Is Not Entitled to Early Disclosure of Mitigating Circumstances.**

The government asks the Court to order the defense to disclose its proposed mitigating circumstances no later than August 14, 2026, which is before the beginning of in person voir dire, before Payton Gendron has been found guilty of any capital count, and at least three months before any penalty phase evidence might be presented to a jury. ECF No. 597 at 35-42. The government cites no statute or rule supporting its request but rather attempts to get the Court to use its inherent authority to order premature discovery. The motion should be denied for at least three reasons: (1) neither the Federal Death Penalty Act nor the Federal Rules of Criminal Procedure allow for the early disclosure the government seeks; (2) such early disclosure would undermine Payton Gendron's Fifth and Sixth Amendment rights; and (3) the justifications the government gives for its request do not support it. As have most of the courts asked to consider this boilerplate request, the Court should deny the request for pretrial disclosure.

As the government tacitly concedes, neither the FDPA nor the Federal Rules of Criminal Procedure require pretrial disclosure of mitigating circumstances. *See* ECF No. 597 at 35-36. Nonetheless, the government suggests there are "procedural gaps" in the FDPA, which it argues

this Court should fill using its inherent authority under Fed. R. Crim. P. 57(b).[10] *Id*. at 36. But no such gaps exist. In effect, the government is attempting to circumvent the rules established by Congress to gain an undue advantage.

Under the FDPA, if a jury finds a defendant guilty of an offense for which a death sentence is an option, then the trial proceeds to a penalty phase, where the jury considers both mitigating and aggravating factors to determine the punishment. *See generally* 18 U.S.C. § 3592. Sections 3592 and 3593 establish the government's obligation to provide notice of any aggravating factors upon which it intends to rely. Section 3592 contains four distinct subsections; subsection (a) addresses mitigating circumstances, and subsections (b) through (d) address aggravating factors. 18 U.S.C. § 3592 (a)-(d). Subsections (b) through (d) each include two references to the government's obligation to provide notice of aggravating factors. *See* 18 U.S.C. §3592 (b), (c), (d) (limiting aggravating factors to those "for which notice has been given"). Section 3593(a) further explains the government's obligation to provide notice of aggravating factors.

In contrast, there is no notice requirement with regard to mitigating circumstances in either § 3592 or § 3593. The statutory silence is telling. If Congress had wanted to require pre-trial disclosure of mitigating circumstances, it would have been included such an obligation in the statute, as it did with the government's obligation to provide notice of aggravating factors. *See, e.g., Kimbrough v. United States*, 552 U.S. 85, 103 (2007) ("Drawing meaning from silence is particularly inappropriate . . . [when] Congress has shown that it knows how to [address an issue] in express terms"); *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335,

[10] Rule 57(b) provides, in relevant part: "Procedure When There Is No Controlling Law. A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district court."

341(2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

As the Supreme Court stated in another context, "'[w]hat the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.'" *Nichols v. United States,* 578 U.S. 104, 110 (2016) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926)).

Significantly, the government's request that the Court require Payton Gendron to prematurely disclose his mitigating circumstances follows on the heels of failed efforts to amend the statute to impose such an obligation. In the 110th Congress (that is, the United States Congress presiding between January 3, 2007, and January 3, 2009), three separate bills were introduced proposing an amendment to 18 U.S.C. § 3593 to add a new section, proposed 18 U.S.C. § 3593(b)(1), as follows:

> (b) Notice by the defendant. --
>
> (1) If, as required under subsection (a), the government has filed notice seeking a sentence of death, the defendant shall, a reasonable time before the trial, sign and file with the court and serve on the attorney for the government, notice setting forth the mitigating factor or factors that the defendant proposes to prove mitigate against imposition of a sentence of death.

Congressional Research Service, CRS Report for Congress, The Death Penalty: Capital Punishment Legislation in the 110th Congress (2007), at 10-12.

The proposed legislation did not pass. This Court should not impose a duty of disclosure on the defense that Congress considered and rejected. *See United States v. Fell*, No. 5:01-cr-

00012-gwc, ECF No. 1144 (Order on Motion for Disclosure of Mitigating Factors) (D. Vt. Jan. 27, 2017) (noting that Congress declined to enact an amendment to the FDPA requiring such disclosure and ruling that "[t]he court will not impose discovery obligations on the defendant which exceed the specific requirements of the FDPA and the federal rules"); *United States v. Council*, No. 4:17-CR-00866-RBH, 2018 WL 2090643, at *3 (D.S.C. May 2, 2018) ("While the Court recognizes the arguments made by the Government encouraging pretrial disclosure, the Court cannot rewrite the statute. These arguments could serve as a basis for amendment of the FDPA; however, for whatever reason, Congress has chosen not to do so.").

Congress knows how to require the defense to provide reciprocal disclosure and has done so with respect to the guilt phase. *See, e.g.*, Fed. R. Crim. P. 16(b)(1). The Federal Rules of Criminal Procedure require reciprocal disclosure under three circumstances, none of which would cover the government's request here even if the Rule applied to a capital sentencing proceeding. The three categories are: (1) books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items that (a) are within the defendant's possession, custody, or control; and (b) the defense intends to use in its case-in-chief at trial (Rule 16(b)(1)(A)); (2) results or reports of any physical or mental examination of any scientific test or experiment (Rule 16(b)(1)(B)); and, (3) a written summary of any expert testimony that the defendant intends to use (Rule 16(b)(1)(C)). Additionally, Rule 26.2 provides for production of statements of defense witnesses at trial, in essentially the same manner as required for statements by government witnesses. *See* Fed. R. Crim. P. 26.2. Neither Rule covers the disclosures the government requests concerning mitigating circumstances. *See United States v. Lujan*, No. CR 05-0924 RB, 2011 WL 13210666, at *2 (D.N.M. May 18, 2011) ("Neither Rule 16(b), nor Rule 26.2, cover the disclosures requested by the Government concerning mitigating

factors and a witness list.”). Where Congress has written clear provisions providing for government disclosure obligations and has declined to impose a similar obligation on the defense, the Court should reject the invitation to create a different rule.

Moreover, premature disclosure of mitigating circumstances would interfere with Payton Gendron’s Fifth and Sixth Amendment rights. Disclosure of mitigating circumstances even before a defendant is found guilty necessarily reveals defense strategies for sentencing, which is privileged work product. The Tenth Circuit has stated that “the work product privilege fosters ‘the general policy against invading the privacy of an attorney’s course of preparation [which] is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order.” *United States v. Colorado Supreme Court*, 189 F.3d 1281, 1287 (10th Cir. 1999) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

Should the defense be required to disclose its sentencing strategies before the start of the trial phase, Payton would be placed in a worse position than a non-capitally charged criminal defendant. For instance, non-capitally charged defendants do not submit a list of mitigating circumstances before trial or change of plea hearings. Indeed, they do not do so before the submission of their sentencing memorandum or at the hearing.

Considering these concerns, it is not surprising that over the course of the 32-year history of the FDPA (enacted in 1994) and its narcotics-related predecessor at 21 U.S.C. § 848(e) (enacted in 1988), and over 200 trials involving even more defendants, the government cites to the same handful of cases in which courts have ordered pretrial disclosure of mitigating factors that it has cited unsuccessfully many times before. *Compare* ECF No. 597 at 36 (citing *Roof*, *Tsarnaev*, *Sampson*, *Wilson*, *Taveras*, and *Catalan Roman*) with *Council*, 2018 WL 2090643, at

*4 ("The Government cites the following cases in support of its position: *United States v. Roof*, No. 2:15-cr-00472-RMG, at ECF No. 281 (D.S.C. July 26, 2016); *United States v. Tsarnaev*, 2014 WL 4823882, at *5 (D. Mass. Sept. 24, 2014); *United States v. Sampson*, No. 1:01-cr-10384-LTS, at ECF No. 1319 (D. Mass. Mar. 19, 2014); *United States v. Wilson*, 493 F. Supp. 2d 464, 465–66 (E.D.N.Y. 2006); *United States v. Taveras*, 2006 WL 1875339, at *8–9 (E.D.N.Y. July 5, 2006); *United States v. Catalan Roman*, 376 F. Supp. 2d 108, 111–18 (D.P.R. 2005). *See* ECF No. 104 at pp. 1–5. All these cases are distinguishable."). The Second Circuit has not addressed the issue, and the courts in the cases cited by the government did not give serious treatment to the Fifth and Sixth Amendment concerns raised here.

The cases cited by the government in support of pretrial disclosure either contain little analysis, or the disclosure timing was substantially different than what is requested here. In *United States. v. Wilson*, 493 F. Supp. 2d 464 (E.D.N.Y. 2006), the court ordered notice three days after the start of trial and did not engage in any meaningful analysis of the issues. *See United States. v. McCluskey*, CR 10-2734, 2013 WL 1239717, at *3 (D.N.M. July 2, 2013) ("[T]he [] opinion contains little analysis on the issue of timing, merely making a conclusory statement the defendant would not be prejudiced"); *Council*, 2018 WL 2090643 at *4 (same). As the court explained in *Council*:

> The *Taveras* order cited by the Government contains little helpful analysis and actually was issued after an "earlier order" that had required disclosure of mitigating factors. The *Sampson* order was merely a scheduling order with no analysis, and it is critical to recognize the context in which it was issued—after the district court granted habeas relief pursuant to 28 U.S.C. § 2255, "vacated the death sentence[,] and ordered a new penalty-phase hearing," and the disclosure required in *Sampson* was obviously after the guilt phase. *Tsarnaev* cites *Wilson*, *Catalan Roman*, and *Taveras* (which the Court has distinguished), and concludes in cursory fashion that pretrial disclosure is necessary to give the Government "a fair right of rebuttal" and to foster "'a more reliable sentencing determination.'" While the *Tsarnaev* court emphasized its statutory discretion to require disclosure and both parties' statutory right of rebuttal at the sentencing hearing as set forth in § 3593(c), notably absent from *Tsarnaev* is a discussion of the relevant statutory

> language analyzed in the instant Order. Finally, disclosure in *Roof* was ordered pursuant to a "joint motion" that was "[s]ubject to [d]efendant's reservation of his objection to any requirement that he provide notice of mitigating factors," and the court in *Roof* acknowledged in a subsequent order that the "[d]efendant's disclosure of mitigating factors is not binding, in that [d]efendant may choose not to argue some disclosed factors and that [d]efendant may choose to argue some factors not disclosed."

*Council*, 2018 WL 2090643 at *4 (citations omitted); *see also United States v. Bowers*, No. 18-cr-00292-RJC, ECF No. 762 (Memorandum Order) (W.D. Pa. July 15, 2022) (denying motion for early disclosure of mitigating circumstances; "As noted in Defendant's opposition brief, such disclosure is not mandated by the applicable statutes and rules, risks infringing on Defendant's constitutional rights, and is not supported by the vast majority of cases addressing the issue.").

In support of its request, the government claims that pretrial disclosure is necessary to give it "sufficient time to investigate and prepare to rebut the defendant's proposed mitigating factors[.]" ECF No. 597 at 37. The government's complaint rings hollow, particularly in light of (1) the government's use of the grand jury to compel the testimony of members of Payton Gendron's immediate family (his mother, father, aunt and uncle) as well as his closest friends; (2) the multiple interviews the FBI conducted with the same people who testified before the grand jury as well as other family members, friends, teachers and associates familiar with Payton and his life; and (3) the use of warrants and grand jury subpoenas to compel disclosure of voluminous documents and other evidence pertaining to Payton's life. In other words, the government has already conducted a substantial and thorough anti-mitigation investigation, and it does not need early disclosure of mitigating factors to prepare its case for Payton's execution. These same facts undermine the government's speculation about "any unwarranted surprise" at sentencing. *Id*. at 38.

The government also wrongly argues that ordering pretrial disclosure of mitigating circumstance will not impose an undue or onerous burden on the defense. *Id*. at 41. The defense is still investigating its case in mitigation and is nowhere near ready to disclose a list mitigating circumstances. The government knows this. In making its argument that the defense is ready, it acknowledges that the 12.2 notice due date "has been extended multiple times," as have deadlines for the defense to provide lists of witnesses and exhibits. *Id*. This is because the defense is still developing its case.[11]

Finally, citing to *Tsarnaev*, the government argues that it needs early disclosure of the defense mitigating circumstances to aid it in jury selection. ECF No. 597 at 42. It does not explain why this is so, and although the *Tsarnaev* court wrote that "the disclosure of that information may be necessary to select a fair and impartial jury," it offered no analysis or context to support its statement. *Tsarnaev*, 2014 WL 4823882, at *9.

As the government acknowledges, several courts have rejected outright similar government requests for disclosure of mitigating circumstances. ECF No. 597 at 37; *see also Bowers*, No. 18-cr-00292-RJC, ECF No. 762; *Council*, 2018 WL 2090643, at *5. Most have denied the government's requests for pretrial disclosure but have exercised their discretion to order disclosure after a guilty verdict. *See, e.g., United States v. Con-Ui*, No. 13-cr-00123-ARC-1, ECF No. 1157 (M.D. Pa. June 2, 2017) (text order denying government motion but ordering the defense to disclose its penalty phase experts and mitigating circumstances within 24 hours of a guilty verdict); *United States v. Smith*, No. 16-CR-00086-SLG-1, 2019 WL 11863733, at *2 (D.

[11] The government also suggests that because Payton will ultimately disclose his mitigating circumstances to the jury, there is no constitutional violation in ordering him to do so now. ECF 597 at 42. The government cites *Catalan Roman* in support. But in that case, the court ordered the defense to disclose its penalty phase non-mental health expert *after* the defendants had been convicted and while the sentencing phase of the trial was underway. 376 F. Supp. 2d at 111.

Alaska Dec. 9, 2019) (denying motion for pretrial disclosure and adopting defense suggestion of disclosure within 12 hours of guilty verdict); *Council*, 2018 WL 2090643, at *5 (denying motion but noting the "[d]efendant agreed to provide this list within twelve hours in the event of a guilty verdict," and issuing order reflecting agreement); *McCluskey*, 2013 WL 12329717, at * 2 (same but ordering disclosure one business day after guilty verdict).

As noted in the government's motion, ECF No. 597 at 35 n.4, the defense offered to agree to disclose a list of mitigating circumstances after the jury returns a guilty verdict on an eligible count. The defense initially proposed to disclose the list of mitigating circumstances within 72 hours of any such verdict, due to the substantial Rule 12.2 work the verdict would also trigger. However, we offered to reduce that to 48 hours as a compromise in the hopes that the government would agree to a post-verdict disclosure, which it declined to do. Under the circumstances, Payton Gendron respectfully asks that, if the Court is inclined to require him to disclose the list of mitigating factors before the close of the penalty phase evidence, it order him to make that disclosure within 72 hours of any guilty verdict.

Dated: July 20, 2026
Buffalo, New York

*s/Sonya A. Zoghlin*
Sonya A. Zoghlin
Assistant Federal Public Defender

*s/MaryBeth Covert*
MaryBeth Covert
Senior Litigator

*s/Julie Brain*
Julie Brain
Attorney at Law

*s/Theresa M. Duncan*
Theresa M. Duncan
Law Office of Theresa M. Duncan LLC