MANDATE

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of July, two thousand twenty-six.

Before: Richard J. Sullivan,
Joseph F. Bianco,
Alison J. Nathan,
*Circuit Judges*.

---

United States of America,

Appellant,

v.

Payton Gendron,

Defendant - Appellee.

**JUDGMENT**

Docket No. 25-2570

---

The appeal in the above captioned case from an order of the United States District Court for the Western District of New York was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's order is REVERSED and the case is REMANDED for further proceedings consistent with this Court's opinion.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

SECOND CIRCUIT

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 09/10/2026

25-2570
*United States v. Gendron*

# United States Court of Appeals
# For the Second Circuit

August Term 2025

Argued: May 20, 2026
Decided: July 27, 2026

No. 25-2570

UNITED STATES OF AMERICA,

*Appellant*,

*v.*

PAYTON GENDRON,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of New York
No. 22-cr-109, Lawrence J. Vilardo, *Judge*.

Before: SULLIVAN, BIANCO, and NATHAN, *Circuit Judges*.

Payton Gendron killed ten Black people in Buffalo, New York in an effort to spread racial hatred and incite violence. A grand jury subsequently indicted him on twenty-seven counts of (i) committing hate crimes resulting in death or

involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1)(B); (ii) discharging a firearm to commit murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(iii), and 924(j)(1); and (iii) using and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(iii). The government sought the death penalty on the "discharging a firearm to commit murder" charges, filing a notice of intent that listed various statutory aggravating factors justifying such a punishment. That notice also included, as relevant here, three non-statutory aggravating factors: (i) the effect of Gendron's crimes on the surviving victims; (ii) Gendron's racist motive for the shooting; and (iii) Gendron's hope of provoking further violence.

The district court struck all three of these factors. It concluded first that the government could not point to the surviving victims' injuries because only the shootings resulting in death constituted capital crimes. It then found that 18 U.S.C. § 3593(f), which bars juries from "consider[ing] the race" of capital defendants or their alleged victims, prohibited the government from arguing Gendron's racist motive as an aggravating factor. Finally, it held that the First Amendment protected Gendron's statements about his goal of inciting further violence and that the incitement aggravator unconstitutionally punished Gendron's speech. Because we disagree with the district court's determination as to each of these factors, we reverse its order and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

DANIEL HABIB, Federal Defenders of New York, Inc., New York, NY, *for Defendant-Appellee*.

TIFFANY H. LEE (Joseph M. Tripi, Brett A. Harvey, Charles M. Kruly, Maeve E. Huggins, Assistant United States Attorneys, *on the brief*), *for* Michael DiGiacomo, United States Attorney for the Western District of New York, Buffalo, NY; Michael S. Warbel; Jesus A. Osete, Principal Deputy Assistant Attorney General; Harmeet K. Dhillon, Assistant Attorney General, U.S.

Department of Justice, Washington, D.C., *for Appellant*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Payton Gendron killed ten Black people in Buffalo, New York in an effort to spread racial hatred and incite violence.[1] A grand jury subsequently indicted him on twenty-seven counts of (i) committing hate crimes resulting in death or involving an attempt to kill, in violation of 18 U.S.C. § 249(a)(1)(B); (ii) discharging a firearm to commit murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), 924(c)(1)(A)(iii), and 924(j)(1); and (iii) using and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(A)(iii). The government sought the death penalty on the "discharging a firearm to commit murder" charges, filing a notice of intent that listed various statutory aggravating factors justifying such a punishment. That notice also included, as relevant here, three non-statutory aggravating factors: (i) the effect of Gendron's crimes on the surviving victims; (ii) Gendron's racist motive for the shooting; and (iii) Gendron's hope of provoking further violence.

[1] Gendron pleaded guilty to ten counts of first-degree murder in New York State court and accepted a sentence of mandatory life imprisonment without the possibility of parole.

The district court struck all three of these factors. It concluded first that the government could not point to the surviving victims' injuries because only the shootings resulting in death constituted capital crimes. It then found that 18 U.S.C. § 3593(f), which bars juries from "consider[ing] the race" of capital defendants or their alleged victims, prohibited the government from arguing Gendron's racist motive as an aggravating factor. Finally, it held that the First Amendment protected Gendron's statements about his goal of inciting further violence and that the incitement aggravator unconstitutionally punished Gendron's speech. Because we disagree with the district court's determination as to each of these factors, we reverse its order and remand for further proceedings consistent with this opinion.

## I. Background

On May 14, 2022, at approximately 2:30 p.m., Payton Gendron pulled into the parking lot of a crowded supermarket in Buffalo, New York with a deadly purpose.[2] Wearing a "tactical-style helmet, camouflage clothing, body armor, and

[2] Because Gendron has not yet been tried in federal court, we draw the following facts from the criminal complaint against Gendron and the sworn affidavit that accompanies it. As Gendron concedes, the law requires us to assume the truth of those allegations for purposes of this appeal. *See Boyce Motor Lines v. United States*, 342 U.S. 337, 343 (1952).

a GoPro video camera," and armed with a .223-caliber rifle and "multiple loaded magazines," Gov't App'x at 5, Gendron gunned down four people in the parking lot. He then entered the grocery store, stalked the aisles, and shot as many more victims as he could – all the while livestreaming his attack. By the time the Buffalo Police Department arrived at the scene and arrested Gendron, he had murdered ten people – all of whom were Black – and wounded three others.

This spree of murders did not result from a spur-of-the-moment decision. Instead, Gendron planned his assault for months, with the stated goals of "[k]ill[ing] as many blacks as possible" and inspiring others to commit similar crimes. *Id.* at 8. Gendron selected this particular supermarket because it was in a zip code where a high percentage of Black Buffalonians lived, and he even used a "diagram of the interior layout" of the grocery store to work out "a detailed plan to shoot and kill Black people." *Id.* at 7. Gendron described this scheme and its goals in a lengthy "manifesto" and online journal, which explained that he viewed Black people as "replacers" who needed to be exterminated. *Id.* at 7–8 (internal quotation marks omitted).

In July 2022, a grand jury indicted Gendron on twenty-seven counts of committing hate crimes and using a firearm in relation to violent crimes. The

government subsequently informed Gendron that it would be pursuing the death penalty on some of these charges.

When the government seeks capital punishment, it must inform the defendant of the "aggravating factor[s]" that it "proposes to prove as justifying a sentence of death." *See* 18 U.S.C. § 3593(a)(2). The government must select at least one such factor from a specifically enumerated statutory list. *See id.* § 3592(c); *Jones v. United States*, 527 U.S. 373, 377 (1999). It may also draft its own non-statutory factors, tailoring them to fit the particular set of circumstances that the case presents. *See* 18 U.S.C. § 3592(c); *see also Jones*, 527 U.S. at 378 n.2 (explaining that "the term 'nonstatutory aggravating factor' is used to refer to any aggravating factor that is not specifically described in 18 U.S.C. § 3592"). In Gendron's case, the government first proposed four statutory factors: that Gendron (i) "knowingly created a grave risk of death to one or more persons in addition to the victim[s] of the offense"; (ii) engaged in "substantial planning and premeditation"; (iii) "committed the offenses charged . . . against a victim who was particularly vulnerable due to old age and infirmity"; and (iv) "intentionally killed and attempted to kill more than one person in a single criminal episode." Gov't App'x

at 27 (citing 18 U.S.C. § 3592(c)(5), (9), (11), & (16)). The government then listed several non-statutory factors – including the three at issue here:

- **Injury To Surviving Victims**. PAYTON GENDRON caused serious physical and emotional injury, and severe psychological impact to individuals who survived the offense[;]

- **Attempt To Incite Violence**. PAYTON GENDRON, in preparation for and in committing the acts of violence charged in this case, attempted to incite violent action by others[;]

- **Racially[ ]Motivated Killings**. PAYTON GENDRON expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings of Roberta Drury, Pearl Young, Heyward Patterson, Ruth Whitfield, Celestine Chaney, Aaron W. Salter, Jr., Andre Mackniel, Margus Morrison, Katherine Massey, and Geraldine Talley.

Gov't App'x at 28.

The district court struck these three factors. *See generally United States v. Gendron*, 800 F. Supp. 3d 503 (W.D.N.Y. 2025). It concluded first that "victim[-]impact evidence related to the non-capital crimes" – that is, the non-fatal shootings – was "not relevant to the capital sentencing" and therefore not a permissible basis for seeking the death penalty. *Id.* at 514. It next explained that the racist-motive factor impermissibly "ask[ed] the jury to focus on the victims' race," despite the statutory "proscription against" considering that fact found in

18 U.S.C. § 3593(f). *Id.* at 515. Finally, it concluded that the First Amendment shielded Gendron's manifesto and journal, and that the government could not "punish[] Gendron for his protected speech." *Id.* at 519. The government timely appealed.

## II. DISCUSSION

"We review conclusions of law and questions of statutory interpretation *de novo*." *United States v. Lett*, 944 F.3d 467, 470 (2d Cir. 2019) (internal quotation marks omitted). Here, because all three of the district court's rulings either interpret provisions of the Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591–99, or address purely legal issues, we review *de novo* across the board. "Before considering the merits of an appeal," however, "we are obliged to assure ourselves that appellate jurisdiction exists." *Maye v. City of New Haven*, 89 F.4th 403, 406 (2d Cir. 2023) (internal quotation marks omitted).

### A. We Have Jurisdiction.

Section 3731 of Title 18 permits us to hear the government's interlocutory appeal "from a decision or order of a district court suppressing or excluding evidence." "[D]espite [this] rather detailed wording," we have construed section 3731 as "a broad authorization to appeal unless prohibited by the Double Jeopardy

Clause." *United States v. Aslam*, 936 F.2d 751, 754 (2d Cir. 1991). In doing so, we have followed the lead of the Supreme Court, which has explained that section 3731 aimed "to remove all statutory barriers to [g]overnment appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337 (1975). This approach also honors the statute itself, which directs us to "liberally construe[]" its provisions so as "to effectuate its purposes." 18 U.S.C. § 3731.

Gendron nonetheless urges us to read section 3731 narrowly. He contends that the district court's order striking the non-statutory aggravating factors did not "exclud[e] evidence," because "evidence associated with each of the stricken non-statutory aggravating factors" would still "come in at trial" to prove other, still-valid aggravating factors. Gendron Br. at 27–28 (internal quotation marks omitted). But we have never conditioned our jurisdiction under section 3731 on our best guesses about whether the government might be able to skirt an evidence-excluding order by presenting similar evidence for different reasons. By striking the non-statutory aggravating factors, the district court necessarily blocked the government from offering evidence for the purpose of proving those factors. The order thus "exclud[ed] evidence," which is all that the statute requires for us to

exercise jurisdiction. 18 U.S.C. § 3731; *see United States v. Johnson*, 764 F.3d 937, 941–42 (8th Cir. 2014) ("Section 3731 . . . does not require that the order suppress or exclude evidence for all purposes"); *United States v. Delatorre*, 157 F.3d 1205, 1208–09 (10th Cir. 1998) (similar).

### B. The District Court Erred in Striking the Surviving-Victims Factor.

"In determining whether a sentence of death is justified" for a homicide offense, "the jury . . . shall consider" whether any "aggravating factors" support such a drastic penalty. 18 U.S.C. §§ 3592(c), 3593(e). Such factors include both those specifically enumerated in the FDPA's sixteen-item list and "*any other aggravating factor* for which notice has been given." *Id.* § 3592(c) (emphasis added). To give such notice, the government must "set[] forth" the factors that it "proposes to prove," which "may include" the "effect of the offense on the victim," *id.* § 3593(a)(2), as well as "any matter relevant to the sentence," *id.* § 3593(c).

Putting this all together, the FDPA allows juries deciding whether to impose a death sentence to weigh any relevant aggravating factor of which the government has provided notice. And an aggravator is "surely relevant" if it helps the jury "consider all of the circumstances of the crime in deciding whether to impose the death penalty" and "direct[s] the jury to the individual circumstances of the case." *Jones*, 527 U.S. at 401–02; *cf. Wisconsin v. Mitchell*, 508 U.S. 476, 485

(1993) ("Traditionally, sentencing judges have considered a wide variety of factors . . . in determining what sentence to impose on a convicted defendant.").

The surviving-victims factor is clearly relevant. By alleging that Gendron "caused serious physical and emotional injury, and severe psychological impact to individuals who survived" the attack, Gov't App'x at 28, the factor "direct[s] the jury" to an important "individual circumstance[]," *Jones*, 527 U.S. at 402, of Gendron's conduct: Gendron went on a mass shooting spree, killing some victims and maiming others. Indeed, death-penalty cases often involve such acts of widespread violence, and the fact that this conduct *injures* large numbers of survivors may often be one of the most important "circumstances of the crime." *Id.*; *see also United States v. McVeigh*, 153 F.3d 1166, 1216 (10th Cir. 1998) (noting that "three injured survivors" testified during the penalty phase of the Oklahoma City Bombing trial); *United States v. Saipov*, No. S1 17-CR-722, 2023 WL 371531, at *13 (S.D.N.Y. Jan. 24, 2023) ("[T]he Congress that passed the FDPA well knew through experience that there were mass acts of violence that killed few but devast[at]ed many, many survivors.").

Gendron resists this logic by arguing that section 3593(a)(2) *implicitly* restricts the use of potential aggravating factors related to a crime's impact on

victims. That section explains that the government "may include factors concerning the effect of the offense on *the victim* and the victim's family." 18 U.S.C. § 3593(a)(2) (emphasis added). Seizing on this language, Gendron argues that (i) the phrase "the victim" refers only to the deceased victim of a capital-homicide "offense"; (ii) the statute thus "limits non-statutory aggravating factors concerning 'victim impact' to factors addressing the impact of death-eligible offenses on victims who have died and their families"; and (iii) we should disregard section 3592(c)'s broad language regarding "any other aggravating factor" because "the specific governs the general." Gendron Br. at 31, 40 (internal quotation marks omitted).

But even if the term "victim" describes only *deceased* victims, Gendron's argument overlooks the rest of the statutory text and our own precedents. Section 3593(a)(2)'s plain text does not *limit* the use of aggravating factors; on the contrary, it simply lists factors that the notice "may include." *Cf. Env't Encapsulating Corp. v. City of New York*, 855 F.2d 48, 54 (2d Cir. 1988) ("We are reluctant to read the term 'includes' as meaning 'is limited to.'"); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (explaining that statutory use of word "include[]" "makes clear that the examples enumerated in the text are . . .

illustrative, not exhaustive" (internal quotation marks omitted)). Indeed, we have characterized this text as "language of inclusion, not exclusion." *See United States v. Whitten*, 610 F.3d 168, 188 (2d Cir. 2010). And again, section 3592(c) allows the government to put forth "any other aggravating factor" so long as (i) notice is given for it and (ii) it is relevant. *See* 18 U.S.C. § 3592(c). So even if "victim" means what Gendron says it does, section 3593(a) does not cabin permissible non-statutory aggravating factors to those described in its text. The district court thus erred in striking the surviving-victims factor.

### C. The District Court Erred in Striking the Attempted-Incitement Factor.

As discussed above, the FDPA generally authorizes the government to present any relevant non-statutory aggravating factor. And "[t]he defendant's motive for committing the offense is" obviously "relevant" to determining his level of culpability. *Mitchell*, 508 U.S. at 485 (internal quotation marks omitted); *see Tison v. Arizona*, 481 U.S. 137, 156 (1987) ("Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished.").

The attempted-incitement factor here highlights a particularly heinous motive. It explains that Gendron, "in preparation for and in committing the acts

of violence charged in this case, attempted to incite violent action by others." Gov't App'x at 28. That aim – to inspire copycat killers to gun down crowds of people – made Gendron's behavior even more culpable, and the government may permissibly point to that goal as a reason to impose a death sentence. *See Mitchell*, 508 U.S. at 489 ("[I]t is but reasonable that among crimes of different natures those should be most severely punished [that] are the most destructive of the public safety and happiness." (quoting 4 William Blackstone, Commentaries *16)). Furthermore, the fact that the government plans to rely on Gendron's constitutionally protected manifesto and journal to prove that motive makes no difference, because "it is beyond cavil that '[t]he First Amendment . . . does not prohibit the evidentiary use of speech to . . . prove motive or intent.'" *United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998) (quoting *Mitchell*, 508 U.S. at 489).[3]

Gendron resists this chain of logic by arguing that the government is seeking to punish him for his speech, not his motive. Gendron insists that his "words [are not] being proffered to prove another valid aggravator – they [are] the aggravator." Gendron Br. at 67. The district court agreed, concluding that "a

[3] The district court's reliance on *Brandenburg v. Ohio*, 395 U.S. 444 (1969), to conclude that the government could never use Gendron's protected speech as an aggravating factor was thus misplaced. *See Gendron*, 800 F. Supp. 3d at 516–18.

defendant's beliefs and protected speech cannot be used *as* an aggravating factor," even though "they can be used to *prove* another aggravating factor." *Gendron*, 800 F. Supp. 3d at 519.

But the government is not seeking to punish Gendron because he expressed odious views. Rather, the aggravating factor here explicitly focuses on Gendron's *motive* in committing the crime; the factor seeks to punish Gendron more severely because he "attempted to incite violence" in "*preparation for and in committing the acts of violence charged in this case*." Gov't App'x at 28 (emphasis added). In other words, the government is seeking the death penalty not because Gendron said terrible things or is an avowed white supremacist, but because he murdered people allegedly so as to inspire other shootings. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence."). If Gendron had committed wire fraud, the government could not seek a stiffer penalty simply because he separately happened to be a racist whose writings displayed an unrelated "abstract belief[]" in the need for violence. *Dawson v. Delaware*, 503 U.S. 159, 166–67 (1992). But Gendron is alleged to have carried out a mass shooting in part to inspire others to commit similar acts of violence, and that alleged motive was "tied" to – and indeed lay at the heart of – his crime. *Id.*

at 166. The district court therefore erred in striking the attempted-incitement factor.

**D. The District Court Erred in Striking the Racist-Motive Factor.**

While the government may present a wide range of aggravating factors, not everything is fair game: section 3593(f) prohibits the jury from "consider[ing] the race . . . of the defendant or of any victim" when determining "whether a sentence of death is justified." 18 U.S.C. § 3593(f); *see* Webster's Third New International Dictionary 483 (3d ed. 1993) (defining "consider" as "reflect on" or "think about"). That bar means that the government may not present an aggravating factor that requires the jury to take account of a victim's or defendant's race. *Cf. Zant v. Stephens*, 462 U.S. 862, 885 (1983) (noting that death-penalty regimes may not "attach[] the 'aggravating' label to factors that are constitutionally impermissible," "such as . . . race").

A jury may, however, weigh a defendant's racist *motive*. As discussed above, the defendant's motive plays a starring role at sentencing. *See Mitchell*, 508 U.S. at 486 ("[I]t [is] permissible for the sentencing court to consider the defendant's racial animus in determining whether he should be sentenced to death."). And a jury evaluating a racist motive is simply analyzing a defendant's

particularly culpable, hate-driven rationale – without any need to assess his race or that of his victims.[4] For this reason, similar hate-crimes cases have involved aggravators virtually identical to the one that the district court struck here.[5]

Gendron advances two main arguments against this line of reasoning. *First*, he contends that section 3593(f) broadly outlaws *all* "race consideration" and that a jury evaluating a defendant's race-connected motive would necessarily have to take account of the defendant's or his victim's race. Gendron Br. at 52. But a jury is perfectly capable of punishing a defendant for his racist motivation without considering the race of his victim, which in fact has no bearing on the defendant's culpability. If Gendron had inadvertently killed a group of non-Black victims while intending to target Black victims, his racist motive would *still* make him

---

[4] As the government ultimately conceded at oral argument, section 3593(f) would clearly prohibit a jury from finding that animus against one racial group was more culpable than animus against another. *See* Oral Argument at 43:40–44:59, *United States v. Gendron* (No. 25-2570), ww3.ca2.uscourts.gov/audio/25-2570.mp3. But the aggravating factor at issue here does not encourage a jury to do that.

[5] *Compare* Notice of Intent to Seek the Death Penalty at 4, *United States v. Bowers*, No. 18-cr-00292 (W.D. Pa. Aug. 26, 2019), Doc. No. 86 (explaining that defendant "expressed hatred and contempt toward members of the Jewish faith and his animus toward members of the Jewish faith played a role in the killings"), *and* Notice of Intent to Seek the Death Penalty at 6, *United States v. Roof*, No. 15-cr-00472 (D.S.C. May 24, 2016), Doc. No. 164 (explaining that defendant had "expressed hatred and contempt towards African Americans . . . and his animosity towards African Americans played a role in the murders"), *with* Gov't App'x at 28 (explaining that Gendron "expressed bias, hatred, and contempt toward Black persons and his animus toward Black persons played a role in the killings").

more blameworthy than a garden-variety killer. The aggravator here thus permissibly points to Gendron's "bias," "hatred," "animus," and "contempt" – all neutral terms describing internal states of mind that do not depend on Gendron's race or that of his victims. Gov't App'x at 28.

This analysis also fits neatly with the history of section 3593(f). Congress included that section in a statute that *also* made certain hate crimes eligible for capital punishment. *See* Violent Crime Control & Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60006, 108 Stat. 1796, 1970 (1994); 18 U.S.C. § 245(b) ("Whoever [kills] . . . any person because of his race . . . may be sentenced to death"). It is hard to imagine that Congress would have authorized juries to punish racially motivated crimes with death sentences if that objective could not be reconciled with section 3593(f).[6]

*Second*, Gendron contends that even if a jury may consider a defendant's *generalized* racial animus, the factor here uses targeted, "facially race-based terms." Gendron Br. at 55. To be sure, Gendron is correct that the proposed factor refers

[6] To be clear, Gendron was charged with violating a different hate-crimes statute (18 U.S.C. § 249(a), not section 245(b)); he is therefore eligible for the death penalty on account of his other murder charges. *See* Gov't App'x at 25. Nevertheless, the legislative history of section 3593(f) is relevant insofar as it reveals that Congress contemplated that some racially motivated hate crimes could result in death sentences.

to a particular race by noting that Gendron's "bias, hatred, and contempt *toward Black persons* and his animus *toward Black persons* played a role in the killings of [the ten named victims]." Gov't App'x at 28 (emphases added). But the factor here focuses expressly on Gendron's "bias," "hatred," "contempt," and "animus," with the phrase "toward Black persons" simply giving context to those race-neutral terms. Gov't App'x at 28. And to the extent that Gendron is concerned that the reference to a specific race might risk confusing the jury, the way for the district court to cure that problem is by issuing a limiting instruction – not striking the entire aggravator. *See, e.g.*, Tr. of Jury Trial at 98, *United States v. Bowers*, No. 18-cr-00292 (W.D. Pa. Sept. 20, 2024), Doc. No. 1573 (clarifying similar aggravating factor with limiting instruction); *see also* Gov't App'x at 382 (proposing a limiting instruction for this aggravator in the alternative to striking it). The district court should give such an instruction to dispel any potential ambiguity by explaining to the jury that (i) neither Gendron's race nor that of his victims could play any role in its decision whether to impose the death penalty; (ii) the racist-motive factor described only Gendron's *generic* racist motive; and (iii) it should thus sentence Gendron because of his generalized racial hatred and the role that hatred played

in the killings – not because of the particular group or individuals whom he targeted.

The government alleges that Gendron's racist motive made his shooting "especially heinous, atrocious and cruel," *Barclay v. Florida*, 463 U.S. 939, 949 (1983) (plurality opinion) (internal quotation marks omitted), and that factor is permissible under the FDPA. The district court therefore erred in fully discarding the racist-motive factor, instead of simply providing a limiting instruction.

## III. CONCLUSION

For these reasons, we reverse the district court's order and remand the case for further proceedings consistent with this opinion.